1  ARMAND J. KORNFELD (WSBA #17214)    HONORABLE WHITMAN L. HOLT
   AIMEE S. WILLIG (WSBA #22859)
2  SHANE E. CREASON (WSBA #63865)
   BUSH KORNFELD LLP
3  601 UNION STREET, SUITE 5000
   SEATTLE, WA 98101
4  (206) 292-2110
   ajkornfeld@bskd.com
5  awillig@bskd.com
   screason@bskd.com
6

7

8
                    UNITED STATES BANKRUPTCY COURT
9                    EASTERN DISTRICT OF WASHINGTON

10 In re                              Chapter 11

11 SUMMIT COLLECTIVE, INC. et al.,    Lead Case No. 25-02182-WLH11
                                      Jointly Administered
12                        Debtors.[1]
                                      DECLARATION OF ANGELINA
13                                    M. SMITH IN SUPPORT OF THE
                                      DEBTORS' EMERGENCY
14                                    MOTIONS

15

16     Angelina M. Smith Declares as follows:

17     1.     I am the Chief Executive Officer of the above-captioned debtors

18 ("Debtors"). I joined RAD as its Chief Financial Officer in April, 2025 and was

19 appointed its Chief Executive Officer as of the December 15, 2025 petition date herein.

20 I have personal knowledge of the facts stated herein.

21     2.     I make this declaration in support of the following Emergency Motions:

22 _____

23 [1] The Debtors, along with their case numbers, are as follows: Summit Collective Incorporated (25-02182)
   ("Summit") and Rad Power Bikes Inc. (25-02183) ("RAD").

DECLARATION OF ANGELINA M. SMITH – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

a. Emergency Motion for Interim Order (1) Authorizing Use of Cash Collateral and Granting Adequate Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code; and (2) Setting Final Hearing

b. Debtors' Emergency Motion For Authority To Pay Prepetition Payroll, Employee Benefits, and Related Expenses

c. Emergency Motion for Order Authorizing Debtor to Continue Use of Existing Cash Management System and Prepetition Business Banking Accounts and Checks

d. Emergency Motion for an Order Approving Adequate Assurance to Utilities

e. Debtors' Emergency Motion To Reject Non-Residential Real Property Lease and Sublease

f. Emergency Motion for Order Approving Key Employee Retention Plan; and

g. Debtors' Motion For an Order (I) Approving Bid Procedures For The Sale Of Assets; (II) Approving Procedures For The Assumption And Assignment Of Executory Contracts Unexpired Leases; (III) Scheduling The Sale Hearing.

Capitalized terms not defined herein have their meanings as ascribed in the applicable motion.

## I. Rad's Business – History, Operations, Events Leading to Chapter 11 Case

### A. Early Years Leading to Pandemic

3. Mike Radenbaugh developed the first "Rad" Power Bike and in 2007 founded sole proprietorship Rad Power Bikes. Eventually, Rad Power Bikes, Inc., was formed in 2015 and it experienced immediate market enthusiasm and significant private investment that drove rapid its growth and expansion. From its humble beginnings, RAD was a leading innovator in the ebike industry, pioneering the direct-to-consumer

DECLARATION OF ANGELINA M. SMITH – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

ebike movement. Today, there are almost 700,000 RAD bikes ridden around the globe with RAD as a Seattle-based icon.

4.     RAD sells its bikes through a variety of channels: direct to consumers online, through its own retail stores, and through an extensive network of hundreds of retail dealers who purchase RAD bikes wholesale for resale in their stores.

5.     As with many cutting-edge businesses, RAD soon encountered demand that exceeded its size and scope -- a welcome and complex problem. By 2019, RAD's revenue hit $100 million, attracting deep-pocketed investors. Then, the pandemic ensued, radically rearranging RAD's business.

### (i)     The Pandemic: Tremendous Growth Followed by Disruption and Inventory Challenges

6.     Like many exercise-related businesses, such as Peloton, the pandemic drove an increase in demand for RAD's bikes at a dizzying rate. By May 2020, RAD experienced an almost 300% increase in demand and it proceeded to work feverishly to meet that demand. RAD raised millions from investors, expanded its employee base, and, in order to address supply chain disruptions, purchased 64 containers and chartered vessels to deliver inventory (finished bikes and parts) from multiple sources in Asia. RAD expanded its leased warehouse footprint and 3PL relationships in order to store and move inventory. While the cost of this approach was substantial, so was the demand RAD sought to meet. A once-in-a-lifetime opportunity, especially for a relatively-young business.

7.     After the pandemic was resolved, demand for certain products diminished. By mid-2022, demand had slowed significantly, leaving the company overstocked with

DECLARATION OF ANGELINA M. SMITH – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

inventory that took several years to sell through, with commensurate significant related holding costs.

**B.** **Events Leading to Bankruptcy**

8.      The difficult-to-plan-for growth created by the pandemic and RAD's necessary maneuverings in response, created liquidity challenges for RAD and brought it to the place many first generation businesses reach – that is, a sale to a new owner who can take a maturing business with remarkable brand recognition, product development, and customer loyalty, and bridge that business to its next generation.

9.      In addition to liquidity challenges RAD has been dedicated to responding to the U.S. Consumer Product Safety Commission's focus on two older batteries previously sold on RAD bikes, which RAD no longer sells. CPSC recently took the somewhat unusual step of issuing a unilateral statement containing a warning about the safety of the batteries on RAD bikes. The CPSC statement did not include any warning regarding the safety of RAD's current battery system, known as Safe Shield batteries. As to the two older batteries at issue, despite no requirement to do so, RAD had engaged in extensive safety testing measures. Specifically, RAD had these two older batteries tested by reputable third-party labs to ensure the batteries met safety standards, even though CPSC has not yet even adopted the safety standards. Specifically, the batteries met two specific safety standards: UL 2271 (specific to e-mobility lithium-ion batteries) and UL 2849 (safety standard for the entire electrical system).

DECLARATION OF ANGELINA M. SMITH – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

10. From a market standpoint, sales during the Black Friday and Cyber Monday periods were strong, exceeding projections and even sales levels for the same period last year. Consumers trust RAD and the safety of its bikes.

11. In order to complete its sale process in the face of these challenges, RAD started a marketing process in earnest prepetition. RAD then filed this case with the support of and in consultation with its Senior Secured Lender, JPMORGAN Chase. During this past summer, RAD reached an agreement with a third party to sell the company without need for a bankruptcy proceeding. Unfortunately, the interested party backed away from the deal on the eve of closing in early fall. RAD pivoted and engaged Hilco Corporate Finance to expose the company to the market as broadly and quickly as possible.

C. **Current Efforts and Objectives**

12. As I understand from my communications with Hilco, Hilco has contacted over 100 parties, a mix of potential strategic and financial buyers. As of the filing of this case, 17 parties were actively completing diligence in the virtual data room established to support the marketing and sale process.

13. RAD's focus is to complete the sale of its business in the next 45 – 60 days. RAD will be seeking approval of bid procedures in order to provide interested buyers with clear guidance for the timing of the sales process and the rules that will govern that process.

14. Since the initially negotiated sale failed to materialize in the fall, RAD has worked closely with its Senior Secured Lender, JPMorgan Chase, to craft the approach

DECLARATION OF ANGELINA M. SMITH – Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

to this process and to reach agreement on the terms of RAD's use of Cash Collateral and the process now before this court.

15.    RAD's objective is simple: to preserve its well-established brand and the value of its unique and innovative business for all of its constituents.

## II.    CASH COLLATERAL MOTION

### A.    JPMORGAN Chase

16.    RAD is indebted to JPMorgan Chase pursuant to that certain Amended and Restated Credit Agreement, as amended dated as of December 17, 2021, under which the Senior Secured Lender extended a revolving term credit facility to RAD under which RAD was indebted as of the Petition Date in the amount of $10.9 Million.  A true copy of the Amended and Restated Credit Agreement is attached hereto as Ex. A. To secure the Senior Credit Facility, RAD executed a Security Agreement dated as of December 17, 2021, granting Chase a lien on all assets including accounts and inventory. A true copy of the Security Agreement is attached hereto as Ex. B.   Chase filed an initial UCC1 as to all assets on January 22, 2021, with an amendment as to the Debtor name filed in October 29, 2024, and a continuation filed on August 25, 2025. Copies of UCC filings are attached hereto as Exhibit C.

17.    As of November 30, 2025,  RAD held inventory with a book value of $14,226,874.73 (which excludes $1,273,851.19 in excess and obsolete inventory). Smith Decl.

### B.    Subordinated Secured Convertible Notes

18.    The Debtor is indebted under Subordinated Secured Convertible Promissory Notes dated October, November and December 2023 to thirty-seven

DECLARATION OF ANGELINA M. SMITH – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

noteholders in the principal amount of $26,285,715.98. The Subordinated Notes are secured pursuant to an October 6, 2023, Security Agreement granting the Subordinated Note Holders liens on assets including accounts and inventory. A true copy of the Security Agreement is attached hereto as Exhibit D. The Agent for the Subordinated Note Holders filed a UCC1 as to all assets on October 6, 2023, a copy of which is attached hereto as Exhibit E.

19. The Debtors require the immediate use of the Cash Collateral to continue uninterrupted operations for the benefit of their creditors, thereby avoiding immediate and irreparable harm to their business. The Debtors are unable to obtain unsecured credit to fund their continued operations. The Debtors seek to use Cash Collateral in accordance with the Budget attached hereto as Exhibit F. Without use of Cash Collateral, the Debtors will be unable to pay their ongoing operating expenses, including payroll, and will thus be unable to continue ongoing business operations.

20. The Debtors propose to grant the Secured Lenders adequate protection liens in assets of the same kind, type, and nature in which the Secured Lenders held liens as of the Petition Date and which are acquired after the Petition Date, and all proceeds of the Postpetition Collateral, to secure the amount of any diminution in the Secured Lenders' interests in the subject Prepetition Collateral as a result of the Debtors' use of Cash Collateral.

21. The Debtors and the Senior Secured Lender agree, as part of consensual use of Cash Collateral, to the following adequate protection payments: the Debtors will pay the Senior Secured Lender (a) postpetition interest as set forth in the Budget; and (b) the Senior Secured Lender's reasonable legal fees and expenses incurred in its

DECLARATION OF ANGELINA M. SMITH – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

enforcement of the Senior Credit Facility, provided that if the court determines that the Senior Credit Facility is not fully secured, then any legal fees paid to the Senior Secured Lender shall either be applied to the principal amount owed under the Senior Credit Facility or be repaid to the estate, as determined by the court. The Debtors agree, that regardless of whether the Senior Secured Lender is fully secured, Adequate Protection Payments comprised of interest payments shall not be subject to any adjustment.

22. The Debtors will provide the Secured Lenders with financial and other reporting in compliance with the requirements of the Bankruptcy Code and Rules.

23. The Debtors will continue to maintain insurance on their assets as the same existed as of the Petition Date.

24. The Budget provides for a Professional Fund to pay the postpetition, allowed fees/costs of all professionals retained in this chapter 11 case, whether by the Debtors or an unsecured creditors committee, assuming one will be formed. The purpose of the Professional Fund is to ensure that all estate professionals are treated identically. All amounts provided for in the Budget for the Professional Fund will be in addition to any prepetition retainers paid by the Debtors to their professionals, and shall be deposited into an interest bearing trust account maintained by Bush Kornfeld LLP, the Debtors' general bankruptcy counsel, for pro rata payment of allowed fees and costs to the Debtors' and the Committee's professionals, including any amounts payable pursuant to any other order entered by this court authorizing interim periodic payment of professional fees, subject to final allowance of such fees and costs.

DECLARATION OF ANGELINA M. SMITH – Page 8

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

### III.    Employee Wage Motion

25.    The Debtors employ approximately 130 individuals in the United States and Canada. The Debtors have incurred costs and obligations with respect to the Employees that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date. The Debtors seek to pay their pre-petition obligations to the Employees with respect to such costs and obligations.

26.    The Debtors pay wages and salaries of the Employees on a bi-weekly basis. The Debtors' aggregate gross bi-weekly payroll for all Employees is approximately $420,000. It is critical to the continuation of the Debtors' operations, and to the Debtors' smooth transition into Chapter 11, that payments to its Employees be made in a timely manner. The Debtors seek authority to pay their Employees for work performed prior to the Petition Date in accordance with their ordinary pre-petition practices, with no employee being owed more than $17,150 for prepetition wages.

27.    The Debtors sponsor several benefit plans for the Employees, including medical, dental, vision care, disability, and life insurance plans. Generally, the Debtors pay approximately $132,000 per month, of which approximately $72,000 is paid by the employee through payroll deductions pursuant to various contracts with third-party insurance administrators to cover the health and welfare benefits of its Employees.

28.    The Debtors withhold from the wages of the participating Employees contributions towards a 401(k) plan. Prior to the Petition Date, the Employees participating in the 401(k)-plan paid approximately $17,000 in Withholding Contributions to the Debtors on a bi-weekly basis.

DECLARATION OF ANGELINA M. SMITH – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

29. Prior to the Petition Date and in the ordinary course of its business, the Debtors reimbursed Employees for expenses incurred in the scope of their employment. The Debtors also directly reimbursed third-party credit card providers for expenses incurred by Employees. The Debtors pay on average approximately $15,000 per month to their Employees and $13,000 per month to credit card providers in connection with expenses incurred by the Employees relating to business-related travel expenses, business meals, car rentals, and a variety of other miscellaneous business expenses. All such expenses are incurred by Employees on the Debtors' behalf in connection with employment by the Debtors and in reliance upon the Debtors' reimbursement policy.

30. The Debtors are required by law to withhold from the Employees' wages amounts related to federal income taxes, and social security and Medicare taxes and to remit the same to the appropriate taxing authorities. The Debtors are required to match from their own funds the social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts of unemployment insurance and to remit the Payroll Taxes to the Taxing Authorities. The Debtors estimate that, on a bi-weekly basis, they remit $28,000 in Employer Payroll Taxes and $85,000 in Trust Fund Taxes to the Taxing Authorities. In addition to the Payroll Taxes, the Debtors may withhold from the Employees' wages amounts withheld pursuant to court order, under applicable law, or otherwise. The Wage Deductions are remitted to third parties in the ordinary course of the Debtors' business.

31. To ensure that employees receive the payments to which they are entitled pursuant to an order approving this motion, the Debtors also seek authorization to allow

DECLARATION OF ANGELINA M. SMITH – Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

their Financial Institutions to process, honor, and pay checks or electronic transfers issued in connection with the Prepetition Employee Obligations.

32.     The postpetition stability of the Debtors' workforce is integrally tied to the Debtors' ability to continue to honor the Prepetition Employee Obligations. The support and efforts of the Debtors' workforce are critical to the Debtors' successful reorganization. Any delay or interruption in payments to employees may irreparably harm employee morale, dedication, and cooperation, and poses a legitimate risk of losing a critical mass of the Debtors' personnel.

33.     In addition, many of the Debtors' employees rely on their wages to meet their own financial obligations. None of the Employee's prepetition wages exceed $17,150 for and the Debtors' inability to pay wages would likely result in personal hardship for the employees and their families, and in many instances, serious financial difficulties.

**IV.  Cash Management System, Bank Account, And Checks**

34.     The Debtors maintain a central cash management system with bank accounts as follows:

| JPMorgan Chase Accounts | |
|---|---|
| **Acct. #** | **Purpose of Account** |
| 1650 | Operating Account - Sweep Account |
| 6128 | Operating Account - Sweep Account |
| 0292 | Depository/Cash Collateral Account |
| 1651 | Depository/Receivables Account |
| 8869 | Money Market/ Cash Collateralization of Letter Of Credit |

35.     The Debtors maintain depository accounts at Chase Bank (account numbers ending in "0292" and "1651"). Deposits from various sales channels, including Shopify,

DECLARATION OF ANGELINA M. SMITH – Page 11

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Affirm, and B2B customers, are received into these accounts via ACH, wire, or other electronic payment methods. Funds collected in the Depository Accounts are automatically swept into the Operating Accounts to support operating disbursements, including vendor payments, payroll, and other general business expenses.

36. The Debtors maintain operating accounts at Chase. Although a limited number of deposits are received directly into the Operating Accounts, they are primarily funded by transfers from the Depository Accounts through automatic sweeps. Disbursements to vendors and payroll are processed through these accounts.

37. The Debtors previously maintained a money market account held at Chase, that was used for short-term cash management purposes. The money market account is currently being utilized to maintain cash collateralization of a letter of credit.

38. The Debtors request authorization to use their prepetition accounts, prepetition checks, and checking accounts without placing the label "debtor-in-possession" on each check. The use of existing accounts and checks will ensure a smooth transition into Chapter 11 and minimal disruption to the Debtor's operations.

39. The Debtors' Cash Management System is a vital part of their business operations. Requiring the Debtors to establish a new cash management system would cause delays and produce disruption, and irreparable harm, particularly when combined with the usual operational adjustments attendant to a Chapter 11 filing.

**V. Adequate Assurance to Utilities**

40. Before the Petition Date, the Utility Providers provided utility services to the Debtors. The services provided by the Utility Providers are crucial to the continued operations of the Debtors, and the Debtors may suffer irreparable harm if the court does

DECLARATION OF ANGELINA M. SMITH – Page 12

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

not grant the relief requested by the Utilities Motion. The Debtors fully intend to pay all postpetition obligations owed to the utility providers promptly.

41.     As adequate assurance of future payment, the Debtors propose to establish an account in the amount of $128,240.87 which is equal to approximately two weeks of service from all its Utility Providers as set forth on Exhibit A to the Utilities Motion. The Utility Account will serve as a cash security deposit to provide the Utility Providers with adequate assurance of payment for Utility Services provided to the Debtors after the Petition Date.

42.     To the extent the Debtors fail to pay a Utility Provider for postpetition services promptly, the Utility Provider may submit a payment request to the Debtors, certifying that the Debtors failed to pay for postpetition services and that such amounts are still outstanding. The Debtors will pay the outstanding amount within seven business days following receipt of the payment request, subject to their right to contest the payment request in this court or any other court with jurisdiction. Payments from the Utility Account will be made in the order the Debtors receive requests, and the Debtors will ensure that the Utility Account is replenished such that it remains at the Proposed Adequate Assurance amount or such greater amount to which the Debtors may agree, or the court may require.

**VI.     Rejection of the Brooklyn Lease and Sublease**

43.     In 2023, RAD determined that its lease of retail space at 25 Kent Avenue, Brooklyn, New York was not resulting in expected performance and exited the location as of the end of 2023. As of the Petition Date, RAD is party to a lease and a sublease at the Brooklyn location.

DECLARATION OF ANGELINA M. SMITH – Page 13

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

44.     With RAD having exited the location two years ago and the sublease being of only a portion of the premises, the Leases do not hold value for the estate. Therefore, it is the Debtors' business judgment that the Leases have no market value and that immediate rejection of the Leases is in the best interests of the estate and its creditors.

45.     The Debtors seek the court's approval of the rejection *nunc pro tunc* to the Petition Date. RAD vacated the premises two years ago and brought this motion as soon as practicable upon the filing of its Chapter 11 case.

**VII.  KERP Motion**

46.     From a pandemic-level high of 800 employees, the Debtors currently employ approximately 130 individuals in the United States and Canada. Due to post-pandemic market changes, the Debtors have implemented 10 reductions in force (RIFs) in the last three years, the most recent of which was in March 2025.  It is in this context that the Debtors transition their operations into this Chapter 11 case with their focus on completing a going-concern sale of their business.

47.     At this initial stage of the process, it is critical to ensure that specific of the Debtors' employees seminal to driving the Debtors' economic success are appropriately compensated and incentivized to deliver optimal results. After deliberation focused on optimizing the Chapter 11 sale process, the Debtors implemented a non-insider key employee retention plan. Because the loss of employees would seriously jeopardize the Debtors' ability to maximize the going concern value of their assets, it was determined that the KERP was both necessary and appropriate to ensure the Debtors' retention of key employees.

48.     The KERP applies to 15 employees and has the following terms:

DECLARATION OF ANGELINA M. SMITH – Page 14

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

a. KERP Employees shall be eligible if they remain under the employment of Rad through January 9, 2026.

b. KERP Employees who voluntarily resign or who are terminated for cause prior to January 9, 2026, are not eligible for payment under the KERP.

c. KERP Employees who qualify for the KERP payment shall, upon execution of a release agreement, be paid a retention payment equal to 4 weeks of the KERP Employee's hourly wages.

49. The total cost of the KERP is $165,363. No KERP Employee is an officer of the Debtors, and no KERP Employee may, without prior approval, take any significant actions with respect to the Debtors' corporate policies or the disposition of significant assets. These limitations are true as to all KERP Employees, including four KERP Employees whose job titles include the word "director": (i) Director Customer Service & Retail; (ii) Director Brand Marketing and Communications; (iii) Director Financial Planning & Analysis; and (iv) Director, Technical Program Management.

50. In the context of the Chapter 11 filing, concerns over continued employment may cause some or all KERP Employees to pursue alternative employment. The Debtors cannot afford to lose the KERP Employees who have the experience and knowledge necessary for RAD's smooth operation. A failure to retain KERP Employees would be catastrophic, causing the estate to incur significant costs attempting to obtain and train replacements, and to obtain replacement employees would be extremely difficult, if not impossible. The Debtors respectfully submit that the KERP is justified by the facts and circumstances of this Chapter 11 case as a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and creditors.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

51. I declare under penalty of perjury under the laws of the state of Washington that the foregoing information is true and correct to the best of my knowledge.

DATED this 15th day of December, 2025.

/s/ Angelina M. Smith
Angelina M. Smith

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

im12by01n1

# EXHIBIT A

# J.P.Morgan

**AMENDED AND RESTATED
CREDIT AGREEMENT**

dated as of

December 17, 2021,

among

RAD POWER BIKES INC.,
as a Borrower,

The Other Loan Parties Party Hereto,
as Guarantors,

The Lenders Party Hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

_____

JPMORGAN CHASE BANK, N.A.,
as Sole Bookrunner and Sole Lead Arranger

***ASSET BASED LENDING***

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................1

    Section 1.01    Defined Terms ......................................................................1
    Section 1.02    Classification of Loans and Borrowings.............................44
    Section 1.03    Terms Generally .................................................................44
    Section 1.04    Accounting Terms; GAAP..................................................45
    Section 1.05    Interest Rates; Benchmark Notifications ...........................46
    Section 1.06    Status of Obligations..........................................................46
    Section 1.07    Letters of Credit .................................................................46
    Section 1.08    Divisions ............................................................................47

ARTICLE II THE CREDITS.............................................................................................47

    Section 2.01    Commitments ......................................................................47
    Section 2.02    Loans and Borrowings .......................................................47
    Section 2.03    Requests for Revolving Borrowings ..................................48
    Section 2.04    Protective Advances............................................................49
    Section 2.05    Swingline Loans and Overadvances...................................49
    Section 2.06    Letters of Credit .................................................................51
    Section 2.07    Funding of Borrowings ......................................................57
    Section 2.08    Interest Elections................................................................58
    Section 2.09    Termination and Reduction of Commitments; Increase in Revolving
    Commitments.......................................................................................................59
    Section 2.10    Repayment and Amortization of Loans; Evidence of Debt ..........................61
    Section 2.11    Prepayment of Loans ..........................................................62
    Section 2.12    Fees .....................................................................................64
    Section 2.13    Interest.................................................................................65
    Section 2.14    Alternate Rate of Interest; Illegality .................................66
    Section 2.15    Increased Costs ...................................................................69
    Section 2.16    Break Funding Payments....................................................70
    Section 2.17    Withholding of Taxes; Gross-Up........................................71
    Section 2.18    Payments Generally; Allocation of Proceeds; Sharing of Setoffs ................74
    Section 2.19    Mitigation Obligations; Replacement of Lenders.........................77
    Section 2.20    Defaulting Lenders.............................................................78
    Section 2.21    Returned Payments .............................................................81
    Section 2.22    Banking Services and Swap Agreements ...........................81

ARTICLE III REPRESENTATIONS AND WARRANTIES.............................................81

    Section 3.01    Organization; Powers .........................................................81
    Section 3.02    Authorization; Enforceability.............................................82
    Section 3.03    Governmental Approvals; No Conflicts..............................82
    Section 3.04    Financial Condition; No Material Adverse Change............82
    Section 3.05    Properties ............................................................................82
    Section 3.06    Litigation and Environmental Matters................................83
    Section 3.07    Compliance with Laws and Agreements; No Default .................83

Section 3.08    Investment Company Status ...................................................83
Section 3.09    Taxes ...........................................................................................84
Section 3.10    ERISA .........................................................................................84
Section 3.11    Disclosure ...................................................................................84
Section 3.12    [Reserved] ...................................................................................84
Section 3.13    Solvency .......................................................................................84
Section 3.14    Insurance ......................................................................................85
Section 3.15    Capitalization and Subsidiaries ..................................................85
Section 3.16    Security Interest in Collateral .....................................................85
Section 3.17    Employment Matters ...................................................................86
Section 3.18    Margin Regulations .....................................................................86
Section 3.19    Use of Proceeds...........................................................................86
Section 3.20    No Burdensome Restrictions .......................................................86
Section 3.21    Anti-Corruption Laws and Sanctions..........................................86
Section 3.22    Affiliate Transactions..................................................................86
Section 3.23    Common Enterprise .....................................................................87
Section 3.24    Affected Financial Institutions....................................................87
Section 3.25    Plan Assets; Prohibited Transactions ..........................................87

ARTICLE IV CONDITIONS ...................................................................................87

Section 4.01    Effective Date .............................................................................87
Section 4.02    Each Credit Event .......................................................................89

ARTICLE V AFFIRMATIVE COVENANTS............................................................89

Section 5.01    Financial Statements; Borrowing Base and Other Information ....................90
Section 5.02    Notices of Material Events...........................................................93
Section 5.03    Existence; Conduct of Business....................................................94
Section 5.04    Payment of Obligations................................................................94
Section 5.05    Maintenance of Properties ...........................................................95
Section 5.06    Books and Records; Inspection Rights .........................................95
Section 5.07    Compliance with Laws ................................................................95
Section 5.08    Use of Proceeds...........................................................................96
Section 5.09    Accuracy of Information...............................................................96
Section 5.10    Insurance ......................................................................................96
Section 5.11    Casualty and Condemnation ........................................................97
Section 5.12    Appraisals ....................................................................................97
Section 5.13    Depository Banks .........................................................................98
Section 5.14    Additional Collateral; Further Assurances...................................98
Section 5.15    Receivables. .................................................................................99
Section 5.16    Inventory and Equipment.............................................................99
Section 5.17    Post-closing Covenants................................................................100

ARTICLE VI NEGATIVE COVENANTS.................................................................100

Section 6.01    Indebtedness.................................................................................100
Section 6.02    Liens.............................................................................................102
Section 6.03    Fundamental Changes..................................................................103
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions....................104

ii

Section 6.05    Asset Sales ................................................................................................106
Section 6.06    Sale and Leaseback Transactions ..........................................................108
Section 6.07    Swap Agreements ..................................................................................108
Section 6.08    Restricted Payments; Certain Payments of Indebtedness ...................108
Section 6.09    Transactions with Affiliates ..................................................................109
Section 6.10    Restrictive Agreements .........................................................................109
Section 6.11    Amendment of Material Documents ......................................................110
Section 6.12    Financial Covenants ..............................................................................110

ARTICLE VII EVENTS OF DEFAULT ...............................................................................111

ARTICLE VIII THE ADMINISTRATIVE AGENT ...........................................................114

Section 8.01    Authorization and Action......................................................................114
Section 8.02    Administrative Agent's Reliance, Limitation of Liability, Etc...................117
Section 8.03    Posting of Communications ..................................................................118
Section 8.04    The Administrative Agent Individually ................................................120
Section 8.05    Successor Administrative Agent............................................................120
Section 8.06    Acknowledgements of Lenders and Issuing Bank.................................121
Section 8.07    Collateral Matters..................................................................................123
Section 8.08    Credit Bidding........................................................................................124
Section 8.09    Certain ERISA Matters..........................................................................125
Section 8.10    Flood Laws.............................................................................................127

ARTICLE IX MISCELLANEOUS ........................................................................................127

Section 9.01    Notices ...................................................................................................127
Section 9.02    Waivers; Amendments...........................................................................128
Section 9.03    Expenses; Limitation of Liability; Indemnity; Etc. (a) Expenses...............131
Section 9.04    Successors and Assigns..........................................................................134
Section 9.05    Survival...................................................................................................138
Section 9.06    Counterparts; Integration; Effectiveness; Electronic Execution...................138
Section 9.07    Severability ............................................................................................139
Section 9.08    Right of Setoff........................................................................................140
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process...................140
Section 9.10    WAIVER OF JURY TRIAL ...................................................................141
Section 9.11    Headings .................................................................................................141
Section 9.12    Confidentiality .......................................................................................141
Section 9.13    Several Obligations; Nonreliance; Violation of Law...............................142
Section 9.14    USA PATRIOT Act................................................................................142
Section 9.15    Disclosure ..............................................................................................142
Section 9.16    Appointment for Perfection ...................................................................143
Section 9.17    Interest Rate Limitation .........................................................................143
Section 9.18    Marketing Consent..................................................................................143
Section 9.19    Acknowledgement and Consent to Bail-In of Affected Financial
                Institutions .............................................................................................143
Section 9.20    No Fiduciary Duty, Etc ..........................................................................144
Section 9.21    Acknowledgement Regarding Any Supported QFCs..............................145
Section 9.22    Joint and Several ....................................................................................145

iii

Section 9.23    Amendment and Restatement; No Novation ................................146

ARTICLE X LOAN GUARANTY ................................................................147

Section 10.01    Guaranty................................................................147
Section 10.02    Guaranty of Payment ................................................147
Section 10.03    No Discharge or Diminishment of Loan Guaranty....................148
Section 10.04    Defenses Waived ....................................................148
Section 10.05    Rights of Subrogation ..............................................149
Section 10.06    Reinstatement; Stay of Acceleration................................149
Section 10.07    Information ..........................................................149
Section 10.08    Termination ..........................................................149
Section 10.09    Taxes ..................................................................150
Section 10.10    Maximum Liability ..................................................150
Section 10.11    Contribution ..........................................................150
Section 10.12    Liability Cumulative ................................................151
Section 10.13    Keepwell ..............................................................151

ARTICLE XI THE BORROWER REPRESENTATIVE ........................................151

Section 11.01    Appointment; Nature of Relationship................................151
Section 11.02    Powers..................................................................151
Section 11.03    Employment of Agents ..............................................152
Section 11.04    Notices ................................................................152
Section 11.05    Successor Borrower Representative..................................152
Section 11.06    Execution of Loan Documents; Borrowing Base Certificate ........152
Section 11.07    Reporting..............................................................152

#152952520_v10

<u>SCHEDULES</u>:

Commitment Schedule

<u>EXHIBITS</u>:

| | | |
|---|---|---|
| Exhibit A | -- | Form of Assignment and Assumption |
| Exhibit B | -- | Form of Borrowing Base Certificate |
| Exhibit C | -- | Form of Compliance Certificate |
| Exhibit D | -- | Joinder Agreement |
| Exhibit E-1 | -- | U.S. Tax Certificate (For Foreign Lenders that are not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit E-2 | -- | U.S. Tax Certificate (For Foreign Participants that are not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit E-3 | -- | U.S. Tax Certificate (For Foreign Participants that are Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit E-4 | -- | U.S. Tax Certificate (For Foreign that are Partnerships for U.S. Federal Income Tax Purposes) |

AMENDED AND RESTATED CREDIT AGREEMENT dated as of December 17, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), by and among RAD POWER BIKES INC. (the "<u>Company</u>"; the Company, together with any of its Subsidiaries that become party hereto as a Borrower, each a "<u>Borrower</u>", and collectively, the "<u>Borrowers</u>"), the other Loan Parties party hereto, the Lenders party hereto, and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

RECITALS

A.  The Borrower and JPMorgan Chase Bank, N.A., have previously entered into that certain Credit Agreement dated as of November 25, 2020 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "<u>Existing Credit Agreement</u>");

B.  Borrower has requested that the Existing Credit Agreement be amended and restated to effect certain amendments as set forth herein and that Administrative Agent and the Lenders make certain other credit accommodations, and Administrative Agent and the Lenders have agreed to such amendment and restatement and to make certain other credit accommodations, subject to the terms and conditions set forth herein;

C.  It is the intent of the parties hereto that this Agreement amend and restate in its entirety the Existing Credit Agreement, and this Agreement does not and shall not constitute a novation of the obligations and liabilities of the parties under the Existing Credit Agreement; and

D.  It is further the intent of the parties to confirm that all obligations under the Loan Documents (as defined in the Existing Credit Agreement) shall continue in full force and effect and that, from and after the Effective Date, all references to the "Credit Agreement" and "Loan Documents" contained therein shall be deemed to refer to this Agreement and the Loan Documents (as defined herein).

The parties hereto agree as follows:

ARTICLE I

Definitions

Section 1.01   <u>Defined Terms</u>. As used in this Agreement, the following terms have the meanings specified below:

"<u>ABR</u>", when used in reference to (a) a rate of interest, refers to the Alternate Base Rate, and (b) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"<u>Account</u>" has the meaning assigned to such term in the UCC.

"<u>Account Debtor</u>" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Effective Date, by which any Loan Party or Subsidiary (a) acquires any going business or all or substantially all of the assets of any Person (other than an existing Subsidiary), whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person (other than an existing Subsidiary) which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency).

"Adjusted Daily Simple SOFR" means an interest rate per annum equal to (a) the Daily Simple SOFR, plus (b) the Benchmark Replacement Adjustment; provided that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Adjusted Term SOFR Rate" means, for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, plus (b) 0.10%; provided that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Administrative Agent" means JPMorgan Chase Bank, N.A. (or any of its designated branch offices or affiliates), in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Agent-Related Person" has the meaning assigned to it in Section 9.03(d).

"Aggregate Credit Exposure" means, at any time, the aggregate Credit Exposure of all the Lenders at such time.

"Aggregate Revolving Commitment" means, at any time, the aggregate of the Revolving Commitments of all of the Lenders, as increased or reduced from time to time pursuant to the terms and conditions hereof.

"Aggregate Revolving Exposure" means, at any time, the aggregate Revolving Exposure of all the Lenders at such time.

"Agreement" has the meaning specified in introductory paragraph hereof.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two (2) U.S. Government Securities Business Days prior to such day plus 1%, provided that, for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.14 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.14(b)), then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"Ancillary Document" has the meaning assigned to it in Section 9.06(b).

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to any Loan Party or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Parties" has the meaning assigned to it in Section 8.03(c).

"Applicable Percentage" means, with respect to any Lender, (a) with respect to Revolving Loans, LC Exposure, Overadvances, or Swingline Loans, a percentage equal to a fraction the numerator of which is such Lender's Revolving Commitment and the denominator of which is the Aggregate Revolving Commitment (provided that, if the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon such Lender's share of the Aggregate Revolving Exposure at that time), and (b) with respect to Protective Advances or with respect to the Aggregate Credit Exposure, a percentage based upon its share of the Aggregate Credit Exposure and the unused Commitments; provided that, in accordance with Section 2.20, so long as any Lender shall be a Defaulting Lender, such Defaulting Lender's Commitment shall be disregarded in the calculations under clauses (a) and (b) above.

"Applicable Rate" means, for any day, with respect to any Loan (a) 1.25% per annum for Term Benchmark Loans and RFR Loans, and (b) 0.25% per annum for ABR Loans.

"Approved Electronic Platform" has the meaning assigned to it in Section 8.03(a).

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Arranger" means JPMorgan Chase Bank, N.A. in its capacity as sole bookrunner and sole lead arranger hereunder.

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 26 of 286

"Assignment and Assumption" means an assignment and assumption agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form (including electronic records generated by the use of an electronic platform) approved by the Administrative Agent.

"Availability" means, at any time, an amount equal to (a) the lesser of (i) the Aggregate Revolving Commitment and (ii) the Borrowing Base *minus* (b) the Aggregate Revolving Exposure (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Applicable Percentage of all outstanding Borrowings).

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of all Commitments.

"Available Revolving Commitment" means, at any time, the Aggregate Revolving Commitment minus the Aggregate Revolving Exposure (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Applicable Percentage of all outstanding Borrowings).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 2.14.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Banking Services" means each and any of the following bank services provided to any Loan Party or its Subsidiaries by JPMCB or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, any direct debit scheme or arrangement, overdrafts, cash pooling services, and interstate depository network services), and (e) Lease Financing.

"Banking Services Obligations" means any and all obligations of the Loan Parties and their Subsidiaries, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services; provided, however, Banking Services Obligations in respect of Lease Financing shall be limited to Lease Deficiency Obligations.

"Banking Services Reserves" means all Reserves which the Administrative Agent from time to time establishes in its Permitted Discretion for Banking Services then provided or outstanding.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Event" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark" means, initially, with respect to any Term Benchmark Loan, the Term SOFR Rate; provided that if a Benchmark Transition Event and the related Benchmark Replacement Date have occurred with respect to the Daily Simple SOFR or Term SOFR Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.14.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1) the Adjusted Daily Simple SOFR;

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower Representative as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated

syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" " means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower Representative for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

#152952520_v10

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Blocking Regulation" has the meaning assigned to it in Section 3.21.

"Borrower" or "Borrowers" means, individually or collectively, the Company and each other Subsidiary of the Company that becomes a party hereto as a Borrower.

"Borrower Representative" has the meaning assigned to such term in Section 11.01.

"Borrowing" means (a) Revolving Borrowing, (b) a Swingline Loan, (c) a Protective Advance, and (d) an Overadvance.

"Borrowing Base" means, at any time, the sum of (a) eighty-five percent (85%) of Eligible Accounts at such time, *plus* (b) the lesser of (i) the product of seventy percent (70%) *multiplied by* the Borrowers' Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time, and (ii) the product of ninety percent (90%) *multiplied by* the NOLV Percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time, *minus* (c) Reserves. The Administrative Agent may, in its Permitted Discretion, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

"Borrowing Base Certificate" means a certificate, signed and certified as accurate and complete by a Financial Officer of the Borrower Representative, in substantially the form of Exhibit B or another form which is acceptable to the Administrative Agent in its sole discretion.

"Borrowing Request" means a request by the Borrower Representative for a Revolving Borrowing in accordance with Section 2.03.

#152952520_v10

"Burdensome Restriction" means any consensual encumbrance or restriction of the type described in clause (a) or (b) of Section 6.10.

"Business Day" means any day (other than a Saturday or a Sunday) on which banks are open for business in New York City or Chicago; provided that, in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings of such RFR Loan, any such day that is only an U.S. Government Securities Business Day.

"Capital Expenditures" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Company and its Subsidiaries prepared in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be capitalized on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Dominion Period" means at any time, at the election of the Administrative Agent, when (a) an Event of Default has occurred and is continuing, or (b) Availability is less than the greater of (i) $15,000,000, and (ii) 15% of the Revolving Commitment, and ending on the date that for a period of 30 consecutive calendar days (A) no Event of Default has been continuing and (B) Availability has been greater than the greater of (1) $15,000,000 and (2) 15% of the Revolving Commitment.

"CFC" means a controlled foreign corporation within the meaning of Section 957 of the Code.

"Change in Control" means (a) the Permitted Holders shall cease to own, free and clear of all Liens or other encumbrances, at least 25% of the outstanding voting Equity Interests of the Borrower on a fully diluted basis; (b) the acquisition of ownership (other than by one of the Permitted Holders), directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the Effective Date), of Equity Interests representing more than 30% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower; (c) occupation at any time of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were not (i) directors of the Borrower on the date of this Agreement, (ii) nominated, appointed or approved for consideration by shareholders for election by the board of directors of the Borrower, (iii) nominated, appointed or approved by the board of directors of the Borrower as director candidates prior to their election or appointment, nor (iii) appointed by directors so nominated, appointed or approved in accordance with the foregoing clauses (ii) or (iii) or existing on the date of this Agreement; or (d) the Borrower shall cease to own, free and clear of all Liens or other encumbrances (other than Permitted Encumbrances), 100% of the outstanding voting Equity Interests (other than director's qualifying shares and other

ownership interests or other nominal number of shares or ownership interests issued to foreign nationals to the extent required by applicable law) of each other Loan Party on a fully diluted basis.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Charges" has the meaning assigned to such term in Section 9.17.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Swingline Loans or Protective Advances, or Overadvances.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term SOFR (or a successor administrator).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or Lien in favor of the Administrative Agent, on behalf of itself and the Lenders and other Secured Parties, to secure the Secured Obligations.

"Collateral Access Agreement" has the meaning assigned to such term in the Security Agreement.

"Collateral Deposit Account" has the meaning assigned to such term in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement, any Mortgage, and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other

#152952520_v10

written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Administrative Agent.

"Collection Account" has the meaning assigned to such term in Article VII of the Security Agreement.

 "Commitment" means, with respect to each Lender, the sum of such Lender's Revolving Commitment, together with the commitment of such Lender to acquire participations in Protective Advances hereunder. The initial amount of each Lender's Commitment is set forth on the Commitment Schedule, or in the Assignment and Assumption or other documentation or record (as such term is defined in Section 9-102(a)(70) of the New York Uniform Commercial Code) as provided in Section 9.04(b)(ii)(C), pursuant to which such Lender shall have assumed its Commitment, as applicable.

"Commitment Schedule" means the Schedule attached hereto identified as such.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications" has the meaning assigned to such term in Section 8.03(c).

"Company" has the meaning given such term in the preamble.

"Compliance Certificate" means a certificate of a Financial Officer of the Borrower Representative in substantially the form of Exhibit C.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Disbursement Account" means any accounts of the Borrowers maintained with the Administrative Agent as a cash management account with a unique ABA routing number which effectively limits the number and frequency of daily check presentments pursuant to and under any agreement between a Borrower and the Administrative Agent, as modified and amended from time to time, and through which all or substantially all check disbursements of a Borrower, any other Loan Party and any designated Subsidiary of a Borrower are made and settled on a daily basis with no uninvested balance remaining overnight.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covered Entity" means any of the following:

           (i)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

           (ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

           (iii)   a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in Section 9.21.

"Credit Party" means the Administrative Agent, the Issuing Bank, the Swingline Lender or any other Lender.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day (such day "SOFR Determination Date") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrowers.

"DDA Access Product" means the bank service provided to any Loan Party by JPMCB in its sole discretion consisting of direct access to schedule payments from the Funding Account by electronic, internet or other access mechanisms that may be agreed upon from time to time by JPMCB and the funding of such payments under the Loan Borrowing Option in the DDA Access Product Agreement.

"DDA Access Product Agreement" means JPMCB's Treasury Services End of Day Investment & Loan Sweep Service Terms, as in effect on the date of this Agreement, as the same may be amended from time to time.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit or Swingline Loans or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular Default, if any) has not been satisfied; (b) has notified any Borrower or any Credit Party in writing, or has made a public statement, to the effect that it does not intend or

expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular Default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Loans and participations in then outstanding Letters of Credit and Swingline Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"Deficiency Funding Date" has the meaning assigned to such term in Section 2.05(a).

"Disclosure Letter" means that certain Disclosure Letter, dated as of the Effective Date, delivered by the Loan Parties to the Administrative Agent and the Lenders.

"Disclosed Matters" means the actions, suits, proceedings and environmental matters disclosed in Schedule 3.06 to the Disclosure Letter.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property (including any Equity Interest of a Subsidiary of such Person) by any Person (including any sale and leaseback transaction), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any other Equity Interest into which it is convertible or exchangeable) or upon the happening of any event or condition (a) matures (excluding maturity as a result of an option redemption by the issuer thereof) or is subject to mandatory redemption or repurchase (other than solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares) pursuant to a sinking fund obligation or otherwise, in whole or in part, on or prior to the date that is ninety one (91) days following the latest maturity date of the Loans (excluding any provisions requiring redemption upon the occurrence of a change of control or asset sale event; provided that such change of control or asset sale event results in the Payment in Full of the Obligations and the termination of the Commitments and any and all of Lender's obligations to extent credit or make final accommodations to Borrower hereunder or the terms thereof provide that any such Equity Interest need not be repurchased or redeemed unless such repurchase or redemption complies with Section 6.08); (b) is convertible into or exchangeable or exercisable for Indebtedness or any Disqualified Equity Interest, at the option of the holder thereof; (c) may be required to be redeemed or repurchased at the option of the holder thereof (other than solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares), in whole or in part, in each case on or before the date that is ninety one (91) days after the latest maturity date of the Loans; or (d) provides for scheduled payments of dividends or interest to be made in cash, provided that if such

Equity Interests are issued pursuant to a plan for the benefit of future, current or former employees, directors or officers of the Borrower or any other Loan Party or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrower or any other Loan Party in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"Dividing Person" has the meaning assigned to it in the definition of "Division."

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"Document" has the meaning assigned to such term in the UCC.

"Dollars", "dollars" or "$" refers to lawful money of the U.S.

"Domestic Subsidiary" means a Subsidiary organized under the laws of a jurisdiction located in the U.S.

"EBITDA" means, for any period, Net Income for such period *plus* (a) without duplication and to the extent deducted in determining Net Income for such period, the sum of (i) Interest Expense for such period, (ii) tax expense with respect to income, capital, or profits, for such period (including, for the avoidance of doubt, the amount of any Restricted Payments made pursuant to Section 6.08(a)(vii)), (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary losses, charges or expenses for such period and (v) any other non-cash charges for such period (but excluding any non-cash charge in respect of an item that was included in Net Income in a prior period), *minus* (b) without duplication and to the extent included in Net Income, any extraordinary gains and any non-cash items of income for such period, all calculated for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

#152952520_v10

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"<u>Electronic Signature</u>" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"<u>Electronic System</u>" means any electronic system, including e-mail, e-fax, web portal access for such Borrower and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent or any Issuing Bank and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"<u>Eligible Accounts</u>" means, at any time, the Accounts of a Borrower which the Administrative Agent determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans, Swingline Loans, and the issuance of Letters of Credit hereunder. Without limiting the Administrative Agent's discretion provided herein, Eligible Accounts shall not include any Account:

> (a)     which is not subject to a first priority perfected security interest in favor of the Administrative Agent;

> (b)     which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

> (c)     (i) with respect to which the scheduled due date is more than sixty-one (61) days after the date of the original invoice therefor, (ii) which is unpaid more than ninety (90) days after the date of the original invoice therefor or more than sixty (60) days after the original due date therefor, or (iii) which has been written off the books of such Borrower or otherwise designated as uncollectible;

> (d)     which is owing by an Account Debtor for which more than fifty percent (50%) of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

> (e)     which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to such Borrower exceeds (provided that solely the amount of such excess shall be excluded) fifteen percent (15%)

#152952520_v10

(or such larger percentage as Administrative Agent shall approve in writing in its sole discretion) of the aggregate Eligible Accounts;

(f)     with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(g)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation reasonably satisfactory to the Administrative Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(h)     for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrower or if such Account was invoiced more than once;

(i)     with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)     which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)     which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)     which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. (including any territory thereof) or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S. or the District of Columbia, Canada, or any province of Canada unless, in any such case, such Account is backed by a Letter of Credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent;

(m)     which is owed in any currency other than dollars;

(n)     which is owed by (i) any government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent, or (ii) any

16

government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect or protect the Lien of the Administrative Agent in such Account, have been complied with to the Administrative Agent's satisfaction;

(o)     which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p)     [reserved];

(q)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which such Borrower is indebted, but only to the extent of such indebtedness, or is subject to any security deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)     which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent thereof;

(s)     which is evidenced by any promissory note, chattel paper, or instrument;

(t)     which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, and, following a written request of the Administrative Agent, such Borrower has refused to file such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)     with respect to which such Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(v)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Federal Reserve Board;

(w)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Borrower has or has had an ownership interest in such goods, or which indicates any party other than such Borrower as payee or remittance party;

(x)     which was created on cash on delivery terms; or

(y)     which the Administrative Agent determines may not be paid by reason of the Account Debtor's inability to pay.

In the event that any Borrower becomes aware that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, such Borrower or the Borrower Representative shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate.  In determining the amount of an Eligible Account of a Borrower, the face amount of an Account may, in the Administrative Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrower to reduce the amount of such Account.

"Eligible Inventory" means, at any time, the Inventory of a Borrower which the Administrative Agent determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loan and Swingline Loans, and the issuance of Letters of Credit.  Without limiting the Administrative Agent's discretion provided herein, Eligible Inventory shall not include any of the following Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Administrative Agent;

(b)     which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent or (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(c)     which is, in the Administrative Agent's opinion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business, or unacceptable due to age, type, category and/or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true, or which does not conform in all material respects to all standards imposed by any applicable Governmental Authority;

(e)     in which any Person other than such Borrower shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein; provided that this clause (e) shall not apply to purported retention of title by any manufacturer of such Inventory in such Inventory so long as such retention of title is treated as a security interest under Article 9 of the UCC and the manufacturer has not taken any action to perfect such Lien;

(f)    which is unfinished goods or which constitutes work-in-process, raw materials, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)    which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers unless:

(i)    the Administrative Agent shall have received (1) a true and correct copy of the bill of lading and other shipping documents for such Inventory, and (2) evidence of satisfactory casualty insurance naming the Administrative Agent as lenders loss payee and otherwise covering such risks as the Administrative Agent may reasonably request,

(ii)    with respect to Inventory in transit within the U.S., the bill of lading shall be non-negotiable and the Administrative Agent shall have received, if requested, a duly executed Collateral Access Agreement, in form and substance satisfactory to the Administrative Agent, from the applicable customs broker, freight forwarder or carrier for such Inventory;

(iii)    with respect to the Inventory in transit from outside the U.S. to the continental U.S., (A) such Inventory shall be subject to a negotiable bill of lading or non-negotiable bill of lading, (B) the Administrative Agent shall have received (1) if such Inventory is subject to a negotiable bill of lading, confirmation that such bill of lading is issued in the name of the applicable Borrower and consigned to the order of the Administrative Agent, (2) if such Inventory is subject to a non-negotiable bill of lading, confirmation that such bill of lading is issued in the name of the Administrative Agent (it being agreed that if after the Effective Date the Administrative Agent requires bills of lading to be issued in negotiable form only, then (i) existing goods in transit shall not be deemed ineligible solely as a result thereof for a period of 30 days after notice from the Administrative Agent (or such later date as the Administrative Agent may agree in its sole discretion) and (ii) all future in transit Inventory permitted under this clause (iii) shall be subject to negotiable bills of lading only), (3) an acceptable agreement has been executed with such Borrower's customs broker and/or freight forwarder, in which, among other things, such Person agrees that it holds the bills of lading and Inventory as agent for the Administrative Agent and has granted the Administrative Agent access to the Inventory, (3) if required by the Administrative Agent at any time, the applicable Borrower shall have paid for the goods and, as a result, has title to such goods, and (4) an estimate from the applicable Borrower of the customs duties, customs fees, and other related fees and charges associated with such Inventory in order to establish an appropriate Reserve,

(i)    the common carrier is not an Affiliate of the applicable vendor or supplier, and

(ii) the customs broker is not an Affiliate of such Borrower;

(h) which is located in any location leased by such Borrower unless (A) (i) the lessor has delivered to the Administrative Agent a Collateral Access Agreement or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the Administrative Agent in its Permitted Discretion and (B) other than the Seattle retail location on the Effective Date, at least $100,000 of Inventory of such Borrower is located at such location;

(i) which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document (other than bills of lading to the extent permitted pursuant to clause (g) above), unless (A) (i) such warehouseman or bailee has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may require or (ii) an appropriate Reserve has been established by the Administrative Agent in its Permitted Discretion and (B) other than the Seattle retail location on the Effective Date, at least $100,000 of Inventory is located at such third party warehouse or in possession of such bailee;

(j) which is being processed offsite at a third party location or outside processor, or is in transit to or from such third party location or outside processor;

(k) which is a discontinued product or component thereof;

(l) which is the subject of a consignment by such Borrower as consignor;

(m) which is perishable;

(n) which contains or bears any intellectual property rights licensed to such Borrower unless the Administrative Agent is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o) which is not reflected in a current perpetual inventory report of such Borrower (unless such Inventory is reflected in a report to the Administrative Agent as "in transit" Inventory);

(p) for which reclamation rights have been asserted by the seller; or

(q) which has been acquired from a Sanctioned Person.

In the event that any Borrower becomes aware that any Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, such Borrower or the Borrower Representative shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (a) the environment, (b) preservation or reclamation of natural resources, (c) the management, Release or threatened Release of any Hazardous Material or (d) health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower or Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning assigned to such term in the UCC.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.  Notwithstanding the foregoing, convertible debt securities which otherwise constitute Indebtedness shall not constitute Equity Interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with a Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of any Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, concerning the imposition upon any Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

#152952520_v10

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Accounts" means any (a) segregated withholding, tax, escrow, fiduciary and trust accounts, (b) deposit accounts exclusively used for payroll, payroll taxes, and other employee wage and benefit payments to or for the benefit of a Borrower's or its Subsidiaries' employees, (c) any zero balance accounts, (d) deposit account maintained with the Administrative Agent or its Affiliates outside of the United States but that are not subject to a Deposit Account Control Agreement; provided that the aggregate balance of such deposit accounts does not at any time exceed $1,000,000, (e) deposit account maintained with the Administrative Agent or its Affiliates outside of the United States so long as the Administrative Agent has a perfected first priority security interest in such deposit account as determined by the Administrative Agent in its Permitted Discretion; (f) deposit accounts maintained outside the United States with a financial institution other than the Administrative Agent or its affiliates; provided that the aggregate balance of such deposit accounts does not at any time exceed $500,000; and (g) petty cash accounts; provided that the aggregate balance of such petty cash accounts does not at any time exceed $500,000.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan, Letter of Credit or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan, Letter of Credit or Commitment (other than pursuant to an assignment request by the Borrowers under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan, Letter of Credit or Commitment or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(f); and (d) any withholding Taxes imposed under FATCA.

"Existing Credit Agreement" has the meaning assigned to such term in the Preamble.

"Extenuating Circumstance" means any period during which the Administrative Agent has determined in its sole discretion (a) that due to unforeseen and/or nonrecurring circumstances, it is impractical and/or not feasible to submit or receive a Borrowing Request or Interest Election Request by email or fax or through Electronic System, and (b) to accept a Borrowing Request or Interest Election Request telephonically.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCA" has the meaning assigned to such term in Section 1.05.

"FCCR Covenant Election Date" means the last day the fiscal month occurring after the Company has delivered a written notice (which, for the avoidance of doubt, shall be at the Company's discretion) to the Administrative Agent of the Company's election to comply with the Fixed Charge Coverage Ratio covenant set forth in Section 6.12(b), provided that the Company may only make such election if the Company has achieved, for each of the three most recently ended fiscal months, a Fixed Charge Coverage Ratio for the 12 month period ending on the last day of each such fiscal month of at least 1.10 to 1.00.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as shall be set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that, if the Federal Funds Effective Rate as so determined would be less than 0.00%, such rate shall be deemed to be 0.00% for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Financial Officer" means the chief financial officer, chief accounting officer, vice president of finance, treasurer, controller or vice president of finance of a Borrower.

"Fixed Charge Coverage Ratio" means the ratio, for any applicable period, of (a) EBITDA *minus* Unfinanced Capital Expenditures to (b) Fixed Charges, all calculated for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

"Fixed Charges" means, for any period, without duplication, cash Interest Expense, *plus* scheduled principal payments on Indebtedness (other than Indebtedness described under clauses (f), (i), and (j) of the definition thereof and Indebtedness permitted by Sections 6.01(c), (d), (g), (h), (k), (l) and (m)) made during such period, *plus* expense for taxes paid in cash, *plus* Restricted Payments (other than Restricted Payments made to the Borrower or its Subsidiaries) paid in cash,

#152952520_v10

*plus* Capital Lease Obligation payments, all calculated for the Borrowers and their Subsidiaries on a consolidated basis.

"Flood Laws" has the meaning assigned to such term in Section 8.10.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR, as applicable. For the avoidance of doubt, the initial Floor for each of the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR shall be 0.00%.

"Foreign Lender" means (a) if a Borrower is a U.S. Person, a Lender, with respect to such Borrower, that is not a U.S. Person, and (b) if a Borrower is not a U.S. Person, a Lender, with respect to such Borrower, that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary of a Borrower other than a Domestic Subsidiary.

"Funding Account" has the meaning assigned to such term in Section 4.01(h).

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary indemnification obligations entered into in connection with any Acquisition or disposition of assets or of other entities (other than to the extent that the primary obligations that are the subject of such indemnification obligation would be considered Indebtedness hereunder). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer.

#152952520_v10

"Guaranteed Obligations" has the meaning assigned to such term in Section 10.01.

"Guarantors" means all Loan Parties, and the term "Guarantor" means each or any one of them individually.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Increased BBC Reporting Period" means at any time, at the election of the Administrative Agent, when (a) an Event of Default has occurred or (b) Availability is less than the greater of (i) $25,000,000 and (ii) 25% of the Revolving Commitment and ending on the date that for a period of 30 consecutive calendar days (x) no Event of Default has been continuing and (y) Availability has been greater than the greater of (A) $25,000,000 and (B) 25% of the Revolving Commitment.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) [reserved], (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) trade payables incurred in the ordinary course of business not more than 120 days past due (other than trade payables that are either (x) less than $100,000 in the aggregate or (y) that are being contested or disputed in good faith) and (ii) any bona-fide earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any earn-out to the extent required to be reflected as a liability on the balance sheet of such Person in accordance with GAAP, (l) any other Off-Balance Sheet Liability of such Person, (m) net obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction, and (n) obligations in respect of Disqualified Equity Interests. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (f) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by, or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(c).

"Ineligible Institution" has the meaning assigned to such term in Section 9.04(b).

"Information" has the meaning assigned to such term in Section 9.12.

"Interest Election Request" means a request by the Borrower Representative to convert or continue a Revolving Borrowing in accordance with Section 2.08.

"Interest Expense" means, for any period, total interest expense (including that attributable to Capital Lease Obligations) of the Company and its Subsidiaries for such period with respect to all outstanding Indebtedness of the Company and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Company and its Subsidiaries for such period in accordance with GAAP.

"Interest Payment Date" means (a) with respect to any ABR Loan (other than a Swingline Loan), the first day of each calendar month and the Maturity Date, (b) with respect to any RFR Loan, (1) each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such Loan (or, if there is no such numerically corresponding day in such month, then the last day of such month) and (2) the Maturity Date, and (c) with respect to any Term Benchmark Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part (and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period) and the Maturity Date.

"Interest Period" means, with respect to any Term Benchmark Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter (in each case, subject to the availability for the Benchmark applicable to the relevant Loan or Commitment), as the Borrower Representative may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, and (c) no tenor that has been removed from this definition pursuant to Section 2.14(e) shall be available for specification in such Borrowing Request or Interest Election Request. For purposes hereof, the date of a Borrowing

initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"In-Transit Inventory" means Inventory that is in-transit from a location outside the U.S. to a location in the U.S.

"In-Transit Inventory Report" means a report (in form and substance reasonably satisfactory to Administrative Agent) respecting the Borrowers' In-Transit Inventory, which is prepared on a shipment-by-shipment basis and includes, with respect to each such shipment, (a) the vendor invoice number for such shipment; (b) the invoice amount of such shipment; (c) the invoice date of such shipment; (d) the estimated sail date of such shipment; (e) the date on which such shipment was first added to an In-Transit Inventory Report; (f) the vendor of the goods subject to such shipment; (g) the product descriptions and quantities included in such shipment; (h) the payment terms of such shipment; (i) the shipping terms of such shipment; (j) the port of origin for such shipment; (k) the bill of lading number, type of bill of lading (e.g., negotiable, non-negotiable, electronic, etc.), and party in possession of each original Document for such shipment; (l) the name of the vessel carrying (or to carry) such shipment; (m) the port of destination and discharge of such shipment; (n) the place of delivery of such shipment; (o) the estimated date of port entry of such shipment; (p) the estimated date on which such shipment is to be transferred into a location leased by Borrower which is subject to a Collateral Access Agreement; (q) the freight forwarder and customs broker for such shipment; (r) calculations of estimated freight charges and duties for such shipment (prepared in good faith); (s) the name of the consignee of such shipment; (t) the name of marine or cargo insurance underwriter and broker providing insurance for such shipment while it is in-transit; and (u) such other information concerning such shipment as the Administrative Agent may request from time to time in its Permitted Discretion.

"Inventory" has the meaning assigned to such term in the UCC.

"Investment Limit" means $1,000,000 in the aggregate in any twelve month period.

"IRS" means the United States Internal Revenue Service.

"Issuing Bank" means, individually and collectively, each of JPMCB, in its capacity as the issuer of Letters of Credit hereunder, and any other Revolving Lender from time to time designated by the Borrower Representative as an Issuing Bank (in each case, through itself or through one of its designated affiliates or branch offices), with the consent of such Revolving Lender and the Administrative Agent, and their respective successors in such capacity as provided in Section 2.06(i). Any Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by its Affiliates, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate (it being agreed that such Issuing Bank shall, or shall cause such Affiliate to, comply with the requirements of Section 2.06 with respect to such Letters of Credit). At any time there is more than one Issuing Bank, all singular references to the Issuing Bank shall mean any Issuing Bank, either Issuing Bank, each Issuing Bank, the Issuing Bank that has issued the applicable Letter of Credit, or both (or all) Issuing Banks, as the context may require.

"Issuing Bank Sublimit" means, as of the Effective Date, (a) $5,000,000, in the case of JPMCB and (b) such amount as shall be designated to the Administrative Agent and the Borrower Representative in writing by an Issuing Bank; provided that any Issuing Bank shall be permitted at any time to increase or reduce its Issuing Bank Sublimit upon providing five (5) days' prior written notice thereof to the Administrative Agent and the Borrower Representative.

"Joinder Agreement" means a Joinder Agreement in substantially the form of Exhibit D.

"JPMCB" means JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors.

"LC Collateral Account" has the meaning assigned to such term in Section 2.06(j).

"LC Disbursement" means any payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit plus (b) the aggregate amount of all LC Disbursements relating to Letters of Credit that have not yet been reimbursed by or on behalf of the Borrowers. The LC Exposure of any Revolving Lender at any time shall be its Applicable Percentage of the aggregate LC Exposure at such time.

"Lease Deficiency Obligation" means after default, repossession and disposition of the Equipment which is the subject of or which secures a Lease Financing, the amount, if any, by which (a) any and all obligations of the Loan Parties or their Subsidiaries to a Lessor, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with a specific Lease Financing, exceeds (b) the Net Proceeds realized by the Lessor upon the disposition of the Equipment which is the subject of or which secures the specific Lease Financing.

"Lease Financing" means (a) a lease of specific Equipment as defined in Article 2-A of the UCC, and (b) a secured financing transaction secured by specific Equipment, whether that transaction is called a lease or a loan, entered into by any Loan Party or its Subsidiaries with JPMCB or any of its Affiliates (in this context, the "Lessor").

"Lender Parent" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"Lender-Related Person" has the meaning assigned to such term in Section 9.03(b).

"Lenders" means the Persons listed on the Commitment Schedule and any other Person that shall have become a Lender hereunder pursuant to Section 2.09 or an Assignment and Assumption or otherwise, other than any such Person that ceases to be a Lender hereunder pursuant to an Assignment and Assumption or otherwise. Unless the context otherwise requires, the term "Lenders" includes the Swingline Lender and the Issuing Bank.

#152952520_v10

"Letters of Credit" means the letters of credit issued pursuant to this Agreement, and the term "Letter of Credit" means any one of them or each of them singularly, as the context may require.

"Letter of Credit Agreement" has the meaning assigned to it in Section 2.06(b).

"Liabilities" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidity" means, on any date, the sum of, without duplication, (a) unrestricted (other than any restrictions in favor of the Administrative Agent pursuant to the Loan Documents) cash and cash equivalents of the Loan Parties maintained in a deposit account or securities account with the Administrative Agent or an Affiliate of the Administrative Agent not subject to any Lien other than Liens in favor of the Administrative Agent, provided that such securities accounts are subject to a securities account control agreement if maintained by an Affiliate, plus (b) Availability.

"Loan Borrowing Option" has the meaning assigned to such term in the DDA Access Product Agreement.

"Loan Documents" means, collectively, this Agreement, any promissory notes issued pursuant to this Agreement, any Letter of Credit Agreement, the Collateral Documents, each Compliance Certificate, the Loan Guaranty, any Obligation Guaranty, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, the Administrative Agent or any Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements, letter of credit applications and any agreements between the Borrower Representative and the Issuing Bank regarding the Issuing Bank's Issuing Bank Sublimit or the respective rights and obligations between the applicable Borrower and the Issuing Bank in connection with the issuance by the Issuing Bank of Letters of Credit, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Administrative Agent or any Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guaranty" means Article X of this Agreement.

"Loan Parties" means each of the Borrowers and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may

#152952520_v10

require.  For the avoidance of doubt, Rad Power Bikes B.V., a Foreign Subsidiary of the Borrower, shall not be a Loan Party.

"Loans" means the loans and advances made by the Lenders pursuant to this Agreement, including Swingline Loans, Overadvances, and Protective Advances.

"Lock Box Agreement" has the meaning assigned to such term in the Security Agreement.

"Lock Boxes" has the meaning assigned to such term in the Security Agreement.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, or, financial condition, of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its Obligations, (c) the Collateral, or the Administrative Agent's Liens (on behalf of itself and other Secured Parties) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Administrative Agent, the Issuing Bank or the Lenders under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit or any other Obligations), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties or any Subsidiary in an aggregate principal amount exceeding $1,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Loan Parties or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party or Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means December 17, 2024, or any earlier date on which the Revolving Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof.

"Maximum Rate" has the meaning assigned to such term in Section 9.17.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, on real property of a Loan Party, including any amendment, restatement, modification or supplement thereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Income" means, for any period, the consolidated net income (or loss) of the Company and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Company or any of its Subsidiaries, (b) the

income (or deficit) of any Person (other than a Subsidiary) in which the Company or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Company or such Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all fees and out-of-pocket expenses or costs paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer of the Borrower Representative).

"NOLV Percentage" means, as of any date of determination, the percentage of the book value of a Borrower's Inventory that is estimated to be recoverable in an orderly liquidation thereof net of all associated costs of such liquidation, as such percentage is specified in the most recent appraisal received by Administrative Agent from an appraiser selected by Administrative Agent.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(d).

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than 0.00%, such rate shall be deemed to be 0.00% for purposes of this Agreement.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligated Party" has the meaning assigned to such term in Section 10.02.

"Obligation Guaranty" means any Guarantee of all or any portion of the Secured Obligations executed and delivered to the Administrative Agent for the benefit of the Secured Parties by a guarantor who is not a Loan Party.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all LC Exposure, all accrued and unpaid fees and all expenses, reimbursements, liabilities, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding)of any of the Loan Parties to any of the Lenders, the Administrative Agent, the Issuing Bank or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or any of the Letters of Credit or other instruments at any time evidencing any thereof.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating or financing leases not required to be capitalized on the balance sheet of such Person in accordance with GAAP).

"Original Effective Date" means November 25, 2021.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan, Letter of Credit or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19).

"Overadvance" has the meaning assigned to such term in Section 2.05(b).

#152952520_v10

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in Dollars by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" or "Payment in Full" means, (a) the indefeasible payment in full in cash of all outstanding Loans and LC Disbursements, together with accrued and unpaid interest thereon, (b) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Administrative Agent of a cash deposit, or at the discretion of the Administrative Agent a backup standby letter of credit satisfactory to the Administrative Agent and the Issuing Bank, in an amount equal to 105% of the LC Exposure as of the date of such payment), (c) the indefeasible payment in full in cash of the accrued and unpaid fees, (d) the indefeasible payment in full in cash of all reimbursable expenses and other Secured Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, (e) the termination of all Commitments, and (f) the termination of the Swap Agreement Obligations and the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"Participant" has the meaning assigned to such term in Section 9.04(c).

"Participant Register" has the meaning assigned to such term in Section 9.04(c).

"Pass-Through Foreign Holdco" means any Subsidiary that holds no material assets other than interests treated as equity for U.S. federal income tax purposes in one or more CFCs or Pass-Through Foreign Holdcos; provided, however, that interests treated as indebtedness for U.S. federal income tax purposes in any directly or indirectly owned CFC shall not be treated as a material asset for purposes of this definition.

"Payment" has the meaning assigned to such term in Section 8.06(d).

"Payment Notice" has the meaning assigned to such term in Section 8.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

(a) Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 56 of 286

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)     deposits to secure (a) the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business, and (b) letters of credit permitted pursuant to Section 6.01(l);

(e)     judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)     easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any Subsidiary;

(g)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(h)     purported Liens evidenced by the filing a precautionary UCC-1 financing statement relating solely to leases of equipment;

(i)     non-exclusive licenses of intellectual property permitted by Section 6.05(i);

(j)     Liens arising as a matter of law or created in the ordinary course of business in the nature of (i) normal and customary rights of setoff and banker's liens upon deposits of cash in favor of banks or other depository institutions and (ii) Liens securing reasonable and customary fees for services in favor of banks, securities intermediaries or other depository institutions, including, for the avoidance of doubt, any Liens created under customary general terms and conditions of banks;

(k)     any interest or title of a lessor or sublessor under any lease of real or personal property;

(l)     to the extent constituting a Lien, purported retention of title by any manufacturer of Inventory in such Inventory so long as such manufacturer has not taken any action to perfect such Lien; and

(m)     other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $250,000;

34

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 57 of 286

<u>provided</u> that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (d), (e) and (j) above.

"<u>Permitted Holders</u>" means Mike Radenbaugh.

"<u>Permitted Investments</u>" means:

(a)	direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)	investments in commercial paper maturing within 365 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)	investments in certificates of deposit, bankers' acceptances and time deposits maturing within 365 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)	fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clauses (a) and (b) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)	money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f)	investments made pursuant to and in accordance with the Company's board-approved investment policy as in effect on the Original Effective Date and as, with the consent of Lender (such consent not to be unreasonably withheld, conditioned, delayed or denied), may be amended, supplemented or otherwise modified from time to time.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Plan Asset Regulations</u>" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"<u>Prepayment Event</u>" means:

(a)        any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party with a fair value equal to or greater than $500,000, other than Dispositions described in Section 6.05(a), (b), (c), (d), (f), (g), (h), (i), (j), (k), (l), (m), and (n);

(b)        any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than $500,000; or

(c)        the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Projections" has the meaning assigned to such term in Section 5.01(f).

"Protective Advance" has the meaning assigned to such term in Section 2.04.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 9.21.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Receivables" has the meaning assigned to such term in the Security Agreement.

"Recipient" means, as applicable, (a) the Administrative Agent, (b) any Lender and (c) any Issuing Bank, or any combination thereof (as the context requires).

#152952520_v10

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the Term SOFR Rate, 5:00 a.m. (Chicago time) on the day that is two (2) Business Days preceding the date of such setting, (2) if the RFR for such Benchmark is Daily Simple SOFR, then four (4) Business Days prior to such setting or (3) if such Benchmark is none of the Term SOFR Rate or Daily Simple SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"Refinance Indebtedness" has the meaning assigned to such term in Section 6.01(f).

"Register" has the meaning assigned to such term in Section 9.04(b).

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"Relevant Governmental Body" means the Federal Reserve Board and/or the NYFRB, the CME Term SOFR Administrator, as applicable, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate" means (i) with respect to any Term Benchmark Borrowing, the Adjusted Term SOFR Rate or (ii) with respect to any RFR Borrowing, the Adjusted Daily Simple SOFR, as applicable.

"Report" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Borrowers from information furnished by or on behalf of the Borrowers, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"Required Lenders" means, subject to Section 2.20, (a) at any time prior to the earlier of the Loans becoming due and payable pursuant to Article VII or the Commitments terminating or expiring, Lenders having Revolving Exposures and Unfunded Commitments representing more

than 50% of the sum of the Aggregate Revolving Exposure and Unfunded Commitments at such time; provided that, (a) as long as there are only two Lenders, Required Lenders shall mean both Lenders and (b) for all purposes after the Loans become due and payable pursuant to Article VII or the Commitments expire or terminate, Lenders having Revolving Exposures representing more than 50% of the Aggregate Revolving Exposure at such time.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation, bylaws, or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, to maintain (including, without limitation, an availability reserve, reserves for accrued and unpaid interest on the Secured Obligations, Banking Services Reserves, volatility reserves, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Swap Agreement Obligations, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the president, Financial Officer or other executive officer of a Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Company or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests; provided, however, that the conversion of, or payment for (including, without limitation, payments of principal and payments upon redemption or repurchase), or paying any interest with respect to, any debt securities constituting Indebtedness that are convertible into or exchangeable for Equity Interests (but including cash in lieu of fractional shares) shall not constitute a Restricted Payment.

"Reuters" means, as applicable, Thomson Reuters Corp, Refinitiv, or any successor thereto.

"Revolving Borrowing" means Revolving Loans of the same Type, made, converted or continued on the same date and, in the case of Term Benchmark Loans, as to which a single Interest Period is in effect.

"Revolving Commitment" means, with respect to each Lender, the amount set forth on the Commitment Schedule opposite such Lender's name, or in the Assignment and Assumption or other documentation or record (as such term is defined in Section 9-102(a)(70) of the New York Uniform Commercial Code) as provided in Section 9.04(b)(ii)(C) pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable, as such Revolving Commitment may be reduced or increased from time to time pursuant to (a) Section 2.09 and (b) assignments by or to such Lender pursuant to Section 9.04; provided, that at no time shall the Revolving Exposure of any Lender exceed its Revolving Commitment. The initial aggregate amount of the Lenders' Revolving Commitment is $100,000,000.

"Revolving Exposure" means, with respect to any Lender at any time, the sum of (a) the outstanding principal amount of such Lender's Revolving Loans, its LC Exposure and its Swingline Exposure at such time, *plus* (b) an amount equal to its Applicable Percentage of the aggregate principal amount of Protective Advances outstanding at such time, *plus* (c) an amount equal to its Applicable Percentage of the aggregate principal amount of Overadvances outstanding at such time.

"Revolving Lender" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"Revolving Loan" means a Loan made pursuant to Section 2.01(a).

"RFR Borrowing" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"RFR Loan" means a Loan that bears interest at a rate based on the Adjusted Daily Simple SOFR.

"Refinance Indebtedness" has the meaning assigned to such term in Section 6.01.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sale and Leaseback Transaction" has the meaning assigned to such term in Section 6.06.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union or any European Union member state, Her Majesty's Treasury of the United Kingdom or

#152952520_v10

other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Secured Obligations" means all Obligations, together with all (a) Banking Services Obligations and (b) Swap Agreement Obligations owing to one or more Lenders or their respective Affiliates; provided, however, that the definition of "Secured Obligations" shall not create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor.

"Secured Parties" means (a) the Administrative Agent, (b) the Lenders, (c) each Issuing Bank, (d) each provider of Banking Services, to the extent the Banking Services Obligations in respect thereof constitute Secured Obligations, (e) each counterparty to any Swap Agreement, to the extent the obligations thereunder constitute Secured Obligations, (f) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (g) the successors and assigns of each of the foregoing.

"Security Agreement" means that certain Amended and Restated Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Loan Parties and the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Administrative Agent and the other Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"SOFR" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date" has the meaning specified in the definition of "Daily Simple SOFR".

#152952520_v10

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"Statements" has the meaning assigned to such term in Section 2.18(f).

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Administrative Agent.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent and/or one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Company or a Loan Party, as applicable.

"Supported QFC" has the meaning assigned to it in Section 9.21.

"Swap Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrowers or the Subsidiaries shall be a Swap Agreement.

"Swap Agreement Obligations" means any and all obligations of the Loan Parties and their Subsidiaries, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements permitted hereunder with a Lender or an Affiliate of a Lender, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction permitted hereunder with a Lender or an Affiliate of a Lender.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Revolving Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

41

#152952520_v10

"Swingline Lender" means JPMCB (or any of its designated branch offices or affiliates), in its capacity as lender of Swingline Loans hereunder. Any consent required of the Administrative Agent or the Issuing Bank shall be deemed to be required of the Swingline Lender and any consent given by JPMCB in its capacity as Administrative Agent or Issuing Bank shall be deemed given by JPMCB in its capacity as Swingline Lender.

"Swingline Loan" has the meaning assigned to such term in Section 2.05(a).

"Target Balance" has the meaning assigned to such term in the DDA Access Product Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Benchmark" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate.

"Term SOFR Determination Day" has the meaning assigned to it under the definition of Term SOFR Reference Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two (2) U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day"), and for any tenor comparable to the applicable Interest Period, the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding Business Day is not more than five (5) Business Days prior to such Term SOFR Determination Day.

"Transactions" means (a) the execution, delivery and performance by the Borrowers of this Agreement and the other Loan Documents, (b) the borrowing of Loans and other credit extensions, (c) the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and (d) the payment of fees and expenses incurred in connection with any of the foregoing.

#152952520_v10

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted Term SOFR Rate or the ABR.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or in any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"UK Financial Institutions" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures" means, for any period, Capital Expenditures made during such period which are not financed from the proceeds of any Indebtedness (other than the Revolving Loans; it being understood and agreed that, to the extent any Capital Expenditures are financed with Revolving Loans, such Capital Expenditures shall be deemed Unfinanced Capital Expenditures) or any issuance of Equity Securities that are issued within 60 days of such Capital Expenditures.

"Unfunded Commitment" means, with respect to each Lender, the Revolving Commitment of such Lender less its Revolving Exposure.

"Unliquidated Obligations" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (a) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (b) any other obligation (including any guarantee) that is contingent in nature at such time; or (c) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S." means the United States of America.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 9.21.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f)(ii)(B)(3).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Term Benchmark Loan" or an "RFR Loan") or by Class and Type (e.g., a "Term Benchmark Revolving Loan" or an "RFR Revolving Loan").  Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Term Benchmark Borrowing" or an "RFR Borrowing") or by Class and Type (e.g., a "Term Benchmark Revolving Borrowing" or an "RFR Revolving Borrowing").

Section 1.03    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be

#152952520_v10

construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP. (a) Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower Representative notifies the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Administrative Agent notifies the Borrower Representative that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Company or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness under Financial Accounting Standards Board Accounting Standards Codification 470-20 or 2105-03 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b)    Notwithstanding anything to the contrary contained in Section 1.04(a) or in the definition of "Capital Lease Obligations," any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2015, such lease shall not be considered a capital lease, and all calculations and deliverables under this Agreement or any other Loan Document (other than, in each case, any financial statements required to be delivered pursuant to Section 5.01) shall be made or delivered, as applicable, in accordance therewith.

#152952520_v10

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 68 of 286

Section 1.05    Interest Rates; Benchmark Notifications. The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.14(b) provides a mechanism for determining an alternative rate of interest.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrowers, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.06    Status of Obligations. In the event that any Borrower or any other Loan Party shall at any time issue or have outstanding any Subordinated Indebtedness, such Borrower shall take or cause such other Loan Party to take all such actions as shall be necessary to cause the Secured Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Indebtedness and to enable the Administrative Agent and the Lenders to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness. Without limiting the foregoing, the Secured Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of any indenture or other agreement or instrument under which such Subordinated Indebtedness is outstanding and are further given all such other designations as shall be required under the terms of any such Subordinated Indebtedness in order that the Lenders may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.

Section 1.07    Letters of Credit. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit available to be drawn at such time; provided that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Agreement related thereto, provides for one or more automatic increases in the available amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is available to be drawn at such time. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any

#152952520_v10

amount may still be drawn thereunder by reason of the operation of Article 29(a) of the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time) or Rule 3.13 or Rule 3.14 of the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time) or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the Borrowers and each Lender shall remain in full force and effect until the Issuing Bank and the Lenders shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

Section 1.08   Divisions. For all purposes under the Loan Documents, in connection with any Division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE II

The Credits

Section 2.01   Commitments. Subject to the terms and conditions set forth herein, each Lender severally (and not jointly) agrees to make Revolving Loans in dollars to the Borrowers from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment or (ii) the Aggregate Revolving Exposure exceeding the lesser of (x) the Aggregate Revolving Commitment and (y) the Borrowing Base, subject to the Administrative Agent's authority, in its sole discretion, to make Protective Advances and Overadvances pursuant to the terms of Sections 2.04 and 2.05. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.

Section 2.02   Loans and Borrowings. (a) Each Loan (other than a Swingline Loan) shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required. Any Protective Advance, any Overadvance, and any Swingline Loan shall be made in accordance with the procedures set forth in Sections 2.04 and 2.05.

(b)      Subject to Section 2.14, each Revolving Borrowing and Term Loan Borrowing shall be comprised entirely of ABR Loans or Term Benchmark Loans as the Borrower Representative may request in accordance herewith, provided that all Borrowings made on the Effective Date must be made as ABR Borrowings but may be converted into Term Benchmark Borrowings in accordance with Section 2.08. Each Swingline Loan shall be an ABR Loan.  Each

Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 2.14, 2.15, 2.16 and 2.17 shall apply to such Affiliate to the same extent as to such Lender); provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)     At the commencement of each Interest Period for any Term Benchmark Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $500,000.  ABR Borrowings may be in any amount. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of five Term Benchmark Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrower Representative shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03   <u>Requests for Revolving Borrowings</u>. To request a Revolving Borrowing, the Borrower Representative shall notify the Administrative Agent of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower Representative or through Electronic System if arrangements for doing so have been approved by the Administrative Agent (or if an Extenuating Circumstance shall exist, by telephone) not later than (a) in the case of a Term Benchmark Borrowing, 10:00 a.m., Chicago time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, noon, Chicago time, on the date of the proposed Borrowing; provided that any such notice of an ABR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.06(e) may be given not later than 9:00 a.m., Chicago time, on the date of such proposed Borrowing.  Each such Borrowing Request shall be irrevocable and each such telephonic Borrowing Request, if permitted, shall be confirmed immediately upon the cessation of the Extenuating Circumstance by hand delivery, facsimile or a communication through Electronic System to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by a Responsible Officer of the Borrower Representative.  Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)     the name of the applicable Borrower(s);

(ii)     the aggregate amount of the requested Revolving Borrowing and a breakdown of the separate wires comprising such Borrowing;

(iii)     the date of such Revolving Borrowing, which shall be a Business Day;

(iv)     whether such Revolving Borrowing is to be an ABR Borrowing or a Term Benchmark Borrowing; and

(v)     in the case of a Term Benchmark Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period."

48

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 71 of 286

If no election as to the Type of Revolving Borrowing is specified, then the requested Revolving Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Term Benchmark Revolving Borrowing, then the applicable Borrower(s) shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04   Protective Advances. (a) Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrowers and the Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrowers, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 9.03) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "Protective Advances"); provided that, the aggregate amount of Protective Advances outstanding at any time shall not at any time exceed $5,000,000; provided further that, the Aggregate Revolving Exposure after giving effect to the Protective Advances being made shall not exceed the Aggregate Revolving Commitment. Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be ABR Borrowings. The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders (other than any Defaulting Lender). Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. At any time that there is sufficient Availability and the conditions precedent set forth in Section 4.02 have been satisfied, the Administrative Agent may request the Revolving Lenders to make a Revolving Loan to repay a Protective Advance. At any other time the Administrative Agent may require the Lenders to fund their risk participations described in Section 2.04(b).

(b)     Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent, without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Applicable Percentage. From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Applicable Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

Section 2.05   Swingline Loans and Overadvances.

(a)    The Administrative Agent, the Swingline Lender and the Revolving Lenders agree that in order to facilitate the administration of this Agreement and the other Loan Documents, promptly after the Borrower Representative requests an ABR Borrowing, the Swingline Lender may elect to have the terms of this Section 2.05(a) apply to such Borrowing Request by advancing, on behalf of the Revolving Lenders and in the amount requested, same day funds to the Borrowers, on the date of the applicable Borrowing to the Funding Account (each such Loan made solely by the Swingline Lender pursuant to this Section 2.05(a) is referred to in this Agreement as a "Swingline Loan"), with settlement among them as to the Swingline Loans to take place on a periodic basis as set forth in Section 2.05(d). Each Swingline Loan shall be subject to all the terms and conditions applicable to other ABR Loans funded by the Revolving Lenders, except that all payments thereon shall be payable to the Swingline Lender solely for its own account. In addition, the Borrowers hereby authorize the Swingline Lender to, and the Swingline Lender may, subject to the terms and conditions set forth herein (but without any further written notice required), not later than 1:00 p.m., Chicago time, on each Business Day, make available to the Borrowers by means of a credit to the Funding Account or the Controlled Disbursement Account, the proceeds of a Swingline Loan to the extent necessary to pay items to be drawn on any Controlled Disbursement Account that Business Day subject to the Administrative Agent's standard procedures for calculating clearing totals each morning; provided that, if on any Business Day there is insufficient borrowing capacity to permit the Swingline Lender to make available to the Borrowers a Swingline Loan in the amount necessary to pay all items to be so drawn on any such Controlled Disbursement Account on such Business Day, then the Borrowers shall be deemed to have requested an ABR Borrowing pursuant to Section 2.03 in the amount of such deficiency to be made on such Business Day. In addition, the Borrowers hereby authorize the Swingline Lender to, and the Swingline Lender may, subject to the terms and conditions set forth herein (but without any further written notice required), to the extent that from time to time on any Business Day funds are required under the DDA Access Product to reach the Target Balance (a "Deficiency Funding Date"), make available to the applicable Borrower the proceeds of a Swingline Loan in the amount of such deficiency up to the Target Balance, by means of a credit to the applicable Funding Account on or before the start of business on the next succeeding Business Day, and such Swingline Loan shall be deemed made on such Deficiency Funding Date. The aggregate amount of Swingline Loans outstanding at any time shall not exceed $0. The Swingline Lender shall not make any Swingline Loan if the requested Swingline Loan exceeds Availability (before or after giving effect to such Swingline Loan). All Swingline Loans shall be ABR Borrowings.

(b)    Any provision of this Agreement to the contrary notwithstanding, at the request of the Borrower Representative, the Administrative Agent may in its sole discretion (but with absolutely no obligation), on behalf of the Revolving Lenders, (x) make Revolving Loans to the Borrowers in amounts that exceed Availability (any such excess Revolving Loans are herein referred to collectively as "Overadvances") or (y) deem the amount of Revolving Loans outstanding to the Borrowers that are in excess of Availability to be Overadvances; provided that, no Overadvance shall result in a Default due to Borrowers' failure to comply with Section 2.01 for so long as such Overadvance remains outstanding in accordance with the terms of this paragraph, but solely with respect to the amount of such Overadvance. In addition, Overadvances may be made even if the condition precedent set forth in Section 4.02(c) has not been satisfied. All Overadvances shall constitute ABR Borrowings. The making of an Overadvance on any one occasion shall not obligate the Administrative Agent to make any Overadvance on any other occasion. The authority of the Administrative Agent to make Overadvances is limited to an

#152952520_v10

aggregate amount not to exceed $5,000,000 at any time, no Overadvance may remain outstanding for more than thirty days and no Overadvance shall cause any Revolving Lender's Revolving Exposure to exceed its Revolving Commitment; provided that, the Required Lenders may at any time revoke the Administrative Agent's authorization to make Overadvances. Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.

(c)      Upon the making of a Swingline Loan or an Overadvance (whether before or after the occurrence of a Default and regardless of whether a Settlement has been requested with respect to such Swingline Loan or Overadvance), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Swingline Lender or the Administrative Agent, as the case may be, without recourse or warranty, an undivided interest and participation in such Swingline Loan or Overadvance in proportion to its Applicable Percentage of the Revolving Commitment. The Swingline Lender or the Administrative Agent may, at any time, require the Revolving Lenders to fund their participations. From and after the date, if any, on which any Revolving Lender is required to fund its participation in any Swingline Loan or Overadvance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Applicable Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Swingline Loan or Overadvance.

(d)      The Administrative Agent, on behalf of the Swingline Lender, shall request settlement (a "Settlement") with the Revolving Lenders on at least a weekly basis or on any date that the Administrative Agent elects, by notifying the Revolving Lenders of such requested Settlement by facsimile, telephone, or e-mail no later than 12:00 noon Chicago time on the date of such requested Settlement (the "Settlement Date"). Each Revolving Lender (other than the Swingline Lender, in the case of the Swingline Loans) shall transfer the amount of such Revolving Lender's Applicable Percentage of the outstanding principal amount of the applicable Loan with respect to which Settlement is requested to the Administrative Agent, to such account of the Administrative Agent as the Administrative Agent may designate, not later than 2:00 p.m., Chicago time, on such Settlement Date. Settlements may occur during the existence of a Default and whether or not the applicable conditions precedent set forth in Section 4.02 have then been satisfied. Such amounts transferred to the Administrative Agent shall be applied against the amounts of the Swingline Lender's Swingline Loans and, together with Swingline Lender's Applicable Percentage of such Swingline Loan, shall constitute Revolving Loans of such Revolving Lenders, respectively. If any such amount is not transferred to the Administrative Agent by any Revolving Lender on such Settlement Date, the Swingline Lender shall be entitled to recover from such Lender on demand such amount, together with interest thereon, as specified in Section 2.07.

Section 2.06   Letters of Credit. (a) General. Subject to the terms and conditions set forth herein, the Borrower Representative may request any Issuing Bank to issue Letters of Credit for its own account or for the account of another Borrower denominated in dollars as the applicant thereof for the support of its or its Subsidiaries' obligations, in a form reasonably acceptable to such Issuing Bank, at any time and from time to time during the Availability Period, and such Issuing Bank may, but shall have no obligation, to issue such requested Letters of Credit pursuant to this Agreement.

51

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 74 of 286

(b)　　Notice of Issuance, Amendment, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment or extension of an outstanding Letter of Credit), the Borrower Representative shall deliver by hand or facsimile (or transmit through Electronic System, if arrangements for doing so have been approved by the respective Issuing Bank) to an Issuing Bank selected by it and to the Administrative Agent (reasonably in advance of, but in any event no less than three (3) Business Days prior to the requested date of issuance, amendment or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended or extended, and specifying the date of issuance, amendment or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend or extend such Letter of Credit. In addition, as a condition to any such Letter of Credit issuance, the applicable Borrower shall have entered into a continuing agreement (or other letter of credit agreement) for the issuance of letters of credit and/or shall submit a letter of credit application in each case, as required by the respective Issuing Bank and using such Issuing Bank's standard form (each, a "Letter of Credit Agreement"). In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any Letter of Credit Agreement, the terms and conditions of this Agreement shall control. A Letter of Credit shall be issued, amended or extended only if (and upon issuance, amendment or extension of each Letter of Credit the Borrowers shall be deemed to represent and warrant that), after giving effect to such issuance, amendment or extension the aggregate LC Exposure shall not exceed $5,000,000, (iv) no Revolving Lender's Revolving Exposure shall exceed its Revolving Commitment and (v) the Aggregate Revolving Exposure shall not exceed the lesser of (x) the Aggregate Revolving Commitment and (y) the Borrowing Base. Notwithstanding the foregoing or anything to the contrary contained herein, no Issuing Bank shall be obligated to issue or modify any Letter of Credit if, immediately after giving effect thereto, the outstanding LC Exposure in respect of all Letters of Credit issued by such Person and its Affiliates would exceed such Issuing Bank's Issuing Bank Sublimit. Without limiting the foregoing and without affecting the limitations contained herein, it is understood and agreed that the Borrower Representative may from time to time request that an Issuing Bank issue Letters of Credit in excess of its individual Issuing Bank Sublimit in effect at the time of such request, and each Issuing Bank agrees to consider any such request in good faith. Any Letter of Credit so issued by an Issuing Bank in excess of its individual Issuing Bank Sublimit then in effect shall nonetheless constitute a Letter of Credit for all purposes of this Agreement, and shall not affect the Issuing Bank Sublimit of any other Issuing Bank, subject to the limitations on the aggregate LC Exposure set forth in clause (i) of this Section 2.06(b).

An Issuing Bank shall not be under any obligation to issue any Letter of Credit if:

(i)　　any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, or any Requirement of Law relating to such Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit, or request that such Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon

#152952520_v10

such Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which such Issuing Bank in good faith deems material to it, or

(ii)     the issuance of such Letter of Credit would violate one or more policies of such Issuing Bank applicable to letters of credit generally.

(c)     Expiration Date. Each Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the applicable Issuing Bank to the beneficiary thereof) at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any extension of the expiration thereof, including, without limitation, any automatic renewal provision, one year after such extension) and (ii) the date that is five Business Days prior to the Maturity Date.

(d)     Participations. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the Revolving Lenders, such Issuing Bank hereby grants to each Revolving Lender, and each Revolving Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the respective Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrowers on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment required to be refunded to the Borrowers for any reason, including after the Maturity Date. Each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments.

(e)     Reimbursement. If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrowers shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 11:00 a.m., Chicago time, on (i) the Business Day that the Borrower Representative receives notice of such LC Disbursement, if such notice is received prior to 9:00 a.m., Chicago time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower Representative receives such notice, if such notice is received after 9:00a.m. Chicago time on the day of receipt; provided that, if such LC Disbursement is greater than or equal to $100,000, the Borrowers may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 or 2.05 that such payment be financed with an ABR Revolving Borrowing or Swingline Loan in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting ABR Revolving Borrowing or Swingline Loan, as applicable. If the Borrowers fail to make such payment when due, the Administrative Agent shall notify each Revolving Lender of the applicable LC Disbursement, the payment then due from the Borrowers in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its

#152952520_v10

Applicable Percentage of the payment then due from the Borrowers, in the same manner as provided in Section 2.07 with respect to Loans made by such Lender (and Section 2.07 shall apply, mutatis mutandis, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the respective Issuing Bank the amounts so received by it from the Revolving Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrowers pursuant to this paragraph, the Administrative Agent shall distribute such payment to the respective Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank, as their interests may appear. Any payment made by a Revolving Lender pursuant to this paragraph to reimburse an Issuing Bank for any LC Disbursement (other than the funding of ABR Revolving Loans or a Swingline Loan as contemplated above) shall not constitute a Loan and shall not relieve the Borrowers of their obligation to reimburse such LC Disbursement.

(f)     Obligations Absolute. The Borrowers' joint and several obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein or herein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the respective Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder. Neither the Administrative Agent, the Revolving Lenders, nor any Issuing Bank or any of their respective Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from causes beyond the control of the respective Issuing Bank; provided that the foregoing shall not be construed to excuse an Issuing Bank from liability to the Borrowers to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by any Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of an Issuing Bank (as finally determined by a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, an Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make

54

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 77 of 286

payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    Disbursement Procedures. The Issuing Bank for any Letter of Credit shall, within the time allowed by applicable law or the specific terms of the Letter of Credit following its receipt thereof, examine all documents purporting to represent a demand for payment under such Letter of Credit. Such Issuing Bank shall promptly after such examination notify the Administrative Agent and the applicable Borrower by telephone (confirmed by fax or through Electronic Systems) of such demand for payment if such Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse such Issuing Bank and the Revolving Lenders with respect to any such LC Disbursement.

(h)    Interim Interest. If the Issuing Bank for any Letter of Credit shall make any LC Disbursement, then, unless the Borrowers shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrowers reimburse such LC Disbursement, at the rate per annum then applicable to ABR Revolving Loans and such interest shall be due and payable on the date when such reimbursement is payable; provided that, if the Borrowers fail to reimburse such LC Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.13(d) shall apply. Interest accrued pursuant to this paragraph shall be for the account of such Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (e) of this Section to reimburse such Issuing Bank for such LC Disbursement shall be for the account of such Lender to the extent of such payment.

(i)    Replacement and Resignation of an Issuing Bank.

(i)    An Issuing Bank may be replaced at any time by written agreement among the Borrower Representative, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Revolving Lenders of any such replacement of an Issuing Bank. At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12(b). From and after the effective date of any such replacement, (A) the successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (B) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit then outstanding and issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit or extend or otherwise amend any existing Letter of Credit.

(ii)    Subject to the appointment and acceptance of a successor Issuing Bank, any Issuing Bank may resign as an Issuing Bank at any time upon thirty days' prior

written notice to the Administrative Agent, the Borrower Representative and the Lenders, in which case, such resigning Issuing Bank shall be replaced in accordance with Section 2.06(i)(i) above.

(j)     Cash Collateralization. If any Event of Default shall occur and be continuing, on the Business Day that the Borrower Representative receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Revolving Lenders with LC Exposure representing greater than 50% of the aggregate LC Exposure) demanding the deposit of cash collateral pursuant to this paragraph, the Borrowers shall deposit in an account or accounts with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Revolving Lenders (the "LC Collateral Account"), an amount in cash equal to 105% of the amount of the LC Exposure as of such date plus accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in clause (h) or (i) of Article VII. Such Borrower also shall deposit cash collateral in accordance with this paragraph as and to the extent required by Sections 2.10(b), 2.11(b) or 2.20. Each such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the Secured Obligations. In addition, and without limiting the foregoing or paragraph (c) of this Section, if any LC Exposure remains outstanding after the expiration date specified in said paragraph (c), the Borrowers shall immediately deposit in the LC Collateral Account an amount in cash equal to 105% of such LC Exposure as of such date plus any accrued and unpaid interest thereon. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and the Borrowers hereby grant the Administrative Agent a security interest in the LC Collateral Account and all money or other assets on deposit therein or credited thereto. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrowers' risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account. Moneys in the LC Collateral Account shall be applied by the Administrative Agent to reimburse each Issuing Bank for LC Disbursements for which it has not been reimbursed, together with related fees, costs, and customary processing charges, and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the LC Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Lenders with LC Exposure representing greater than 50% of the aggregate LC Exposure), be applied to satisfy other Secured Obligations. If the Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrowers within three (3) Business Days after all such Events of Defaults have been cured or waived as confirmed in writing by the Administrative Agent.

(k)     Issuing Bank Reports to the Administrative Agent. Unless otherwise agreed by the Administrative Agent, each Issuing Bank shall, in addition to its notification obligations set forth elsewhere in this Section, report in writing to the Administrative Agent (i) periodic activity (for such period or recurrent periods as shall be requested by the Administrative Agent) in respect of Letters of Credit issued by such Issuing Bank, including all issuances, extensions, and amendments, all expirations and cancelations and all disbursements and reimbursements, (ii)

reasonably prior to the time that such Issuing Bank issues, amends or extends any Letter of Credit, the date of such issuance, amendment or extension, and the stated amount of the Letters of Credit issued, amended or extended by it and outstanding after giving effect to such issuance, amendment or extension (and whether the amounts thereof shall have changed), (iii) on each Business Day on which such Issuing Bank makes any LC Disbursement, the date and amount of such LC Disbursement, (iv) on any Business Day on which any Borrower fails to reimburse an LC Disbursement required to be reimbursed to such Issuing Bank on such day, the date of such failure and the amount of such LC Disbursement, and (v) on any other Business Day, such other information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by such Issuing Bank.

(l)      Letters of Credit Issued for Account of Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder supports any obligations of, or is for the account of, a Subsidiary, or states that a Subsidiary is the "account party," "applicant," "customer," "instructing party," or the like of or for such Letter of Credit, and without derogating from any rights of the Issuing Bank (whether arising by contract, at law, in equity or otherwise) against such Subsidiary in respect of such Letter of Credit, the Borrowers (i) shall reimburse, indemnify and compensate the Issuing Bank hereunder for such Letter of Credit (including to reimburse any and all drawings thereunder) as if such Letter of Credit had been issued solely for the account of a Borrower and (ii) irrevocably waives any and all defenses that might otherwise be available to it as a guarantor or surety of any or all of the obligations of such Subsidiary in respect of such Letter of Credit. Each Borrower hereby acknowledges that the issuance of such Letters of Credit for its Subsidiaries inures to the benefit of the Borrowers, and that each Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

Section 2.07      Funding of Borrowings. (a) Each Lender shall make each Loan to be made by such Lender hereunder on the proposed date thereof solely by wire transfer of immediately available funds by 2:00 p.m., Chicago time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's Applicable Percentage; provided that, Swingline Loans shall be made as provided in Section 2.05. The Administrative Agent will make such Loans available to the Borrower Representative by promptly crediting the funds so received in the aforesaid account of the Administrative Agent to the Funding Account; provided that ABR Revolving Loans made to finance the reimbursement of (i) an LC Disbursement as provided in Section 2.06(e) shall be remitted by the Administrative Agent to the Issuing Bank and (ii) a Protective Advance or an Overadvance shall be retained by the Administrative Agent.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers each severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the

Administrative Agent, at (i) in the case of such Lender, the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of the Borrowers, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing, provided, that any interest received from a Borrower by the Administrative Agent during the period beginning when Administrative Agent funded the Borrowing until such Lender pays such amount shall be solely for the account of the Administrative Agent.

Section 2.08 <u>Interest Elections</u>. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Term Benchmark Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower Representative may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term Benchmark Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower Representative may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section shall not apply to Swingline Borrowings, Overadvances, or Protective Advances, which may not be converted or continued.

(b)     To make an election pursuant to this Section, the Borrower Representative shall notify the Administrative Agent of such election either in writing (delivered by hand or fax) by delivering an Interest Election Request signed by a Responsible Officer of the Borrower Representative or through Electronic System if arrangements for doing so have been approved by the Administrative Agent (or if an Extenuating Circumstance shall exist, by telephone) by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such Interest Election Request shall be irrevocable and each such telephonic Interest Election Request, if permitted, shall be confirmed immediately upon the cessation of the Extenuating Circumstance by hand delivery, Electronic System or facsimile to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by a Responsible Officer of the Borrower Representative.

(c)     Each written (or if permitted, telephonic) Interest Election Request (including requests submitted through Electronic System) shall specify the following information in compliance with Section 2.02:

(i)     the name of the applicable Borrower and the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Term Benchmark Borrowing; and

(iv)    if the resulting Borrowing is a Term Benchmark Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Term Benchmark Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower Representative fails to deliver a timely Interest Election Request with respect to a Term Benchmark Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower Representative, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Term Benchmark Borrowing and (ii) unless repaid, each Term Benchmark Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.09    Termination and Reduction of Commitments; Increase in Revolving Commitments. (a) Unless previously terminated, the Revolving Commitments shall terminate on the Maturity Date.

(b)    The Borrowers may at any time terminate the Revolving Commitments upon Payment in Full of the Secured Obligations.

(c)    The Borrowers may from time to time reduce the Revolving Commitments; provided that (i) in no event shall the Revolving Commitments be reduced to an amount less than $25,000,000 and (ii) the Borrowers shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.11, (A) any Lender's Revolving Exposure would exceed such Lender's Revolving Commitment or (B) the Aggregate Revolving Exposure would exceed the lesser of the Aggregate Revolving Commitment and the Borrowing Base.

(d)    The Borrower Representative shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) or (c) of this Section at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower Representative pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitments delivered by the Borrower Representative may state

#152952520_v10

that such notice is conditioned upon the effectiveness of other credit facilities or the sale of assets of, or Equity Interests of, the Company and/or its Subsidiaries, in which case such notice may be revoked by the Borrower Representative (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Revolving Commitments shall be permanent. Each reduction of the Revolving Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments.

(e)     Subject to the prior written consent of the Administrative Agent, the Borrowers may increase the Revolving Commitments by obtaining additional Revolving Commitments, either from one or more of the Lenders or another lending institution provided that (i) any such request for an increase shall be in a minimum amount of $10,000,000, (ii) the Borrower Representative, on behalf of the Borrowers, may make a maximum of 5 such requests, (iii) after giving effect thereto, the sum of the total of the additional Commitments does not exceed $50,000,000, (iv) the Administrative Agent and the Issuing Bank have approved the identity of any such new Lender, such approvals not to be unreasonably withheld, (v) any such new Lender assumes all of the rights and obligations of a "Lender" hereunder, and (vi) the procedure described in Section 2.09(f) have been satisfied. Nothing contained in this Section 2.09 shall constitute, or otherwise be deemed to be, a commitment on the part of any Lender to increase its Commitment hereunder at any time.

(f)     Any amendment hereto for such an increase or addition shall be in form and substance satisfactory to the Administrative Agent and shall only require the written signatures of the Administrative Agent, the Borrowers and each Lender being added or increasing its Commitment.  As a condition precedent to such an increase or addition, the Borrowers shall deliver to the Administrative Agent (i) a certificate of each Loan Party signed by an authorized officer of such Loan Party (A) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such increase, and (B) in the case of the Borrowers, certifying that, before and after giving effect to such increase or addition, (1) the representations and warranties contained in Article III and the other Loan Documents are true and correct, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date, (2) no Default exists, and (3) the Borrowers are in compliance (on a pro forma basis) with the covenant contained in Section 6.12 and (ii) legal opinions and documents consistent with those delivered on the Effective Date, to the extent requested by the Administrative Agent.

(g)     On the effective date of any such increase or addition, (i) any Lender increasing (or, in the case of any newly added Lender, extending) its Revolving Commitment shall make available to the Administrative Agent such amounts in immediately available funds as the Administrative Agent shall determine, for the benefit of the other Lenders, as being required in order to cause, after giving effect to such increase or addition and the use of such amounts to make payments to such other Lenders, each Lender's portion of the outstanding Revolving Loans of all the Lenders to equal its revised Applicable Percentage of such outstanding Revolving Loans, and the Administrative Agent shall make such other adjustments among the Lenders with respect to the Revolving Loans then outstanding and amounts of principal, interest, commitment fees and other amounts paid or payable with respect thereto as shall be necessary, in the opinion of the Administrative Agent, in order to effect such reallocation and (ii) the Borrowers shall be deemed to have repaid and reborrowed all outstanding Revolving Loans as of the date of any increase (or

#152952520_v10

addition) in the Revolving Commitments (with such reborrowing to consist of the Types of Revolving Loans, with related Interest Periods if applicable, specified in a notice delivered by the Borrower Representative, in accordance with the requirements of Section 2.03). The deemed payments made pursuant to clause (ii) of the immediately preceding sentence shall be accompanied by payment of all accrued interest on the amount prepaid and, in respect of each Term Benchmark Loan, shall be subject to indemnification by the Borrowers pursuant to the provisions of Section 2.16 if the deemed payment occurs other than on the last day of the related Interest Periods. Within a reasonable time after the effective date of any increase or addition, the Administrative Agent shall, and is hereby authorized and directed to, revise the <u>Commitment Schedule</u> to reflect such increase or addition and shall distribute such revised <u>Commitment Schedule</u> to each of the Lenders and the Borrower Representative, whereupon such revised <u>Commitment Schedule</u> shall replace the old <u>Commitment Schedule</u> and become part of this Agreement.

Section 2.10  <u>Repayment and Amortization of Loans; Evidence of Debt</u>. (a) The Borrowers hereby unconditionally promise to pay (i) to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan on the Maturity Date, (ii) to the Administrative Agent the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the Administrative Agent, and (iii) to the Administrative Agent the then unpaid principal amount of each Overadvance on the earlier of the Maturity Date and demand by the Administrative Agent.

(b)     At all times during a Cash Dominion Period, on each Business Day, the Administrative Agent shall apply all funds credited to the Collection Account on such Business Day or the immediately preceding Business Day (at the discretion of the Administrative Agent, whether or not immediately available) <u>first</u> to prepay any Protective Advances and Overadvances that may be outstanding, pro rata, and <u>second</u> to prepay the Revolving Loans (including Swingline Loans) and to cash collateralize outstanding LC Exposure.  Notwithstanding the foregoing, to the extent any funds credited to the Collection Account constitute Net Proceeds, the application of such Net Proceeds shall be subject to Section 2.11(c). For the avoidance of doubt, absent the existence of a Cash Dominion Period, all funds credited to, or received in, the Collection Account shall, if the Borrowers do not have access to the Collection Account themselves to direct funding therefrom, be deposited daily in Borrowers' Funding Account or as otherwise directed by Borrowers and shall be available to Borrowers without restriction.

(c)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

#152952520_v10

(e)     The entries made in the accounts maintained pursuant to paragraph (c) or (d) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement.

(f)     Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form.

Section 2.11   Prepayment of Loans. (a) The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (e) of this Section and, if applicable, payment of any break funding expenses under Section 2.16.

(b)     Except for Overadvances permitted under Section 2.05, in the event and on such occasion that the Aggregate Revolving Exposure exceeds the lesser of (i) the Aggregate Revolving Commitment and (ii) the Borrowing Base, the Borrowers shall prepay, on demand, the Revolving Loans, LC Exposure and/or Swingline Loans or cash collateralize the LC Exposure in an account with the Administrative Agent pursuant to Section 2.06(j), as applicable, in an aggregate amount equal to such excess. In addition, except for Overadvances permitted under Section 2.05, in the event and on such occasion that the Revolving Exposure of a Borrower exceeds the lesser of (i) the Revolving Commitment and (ii) the Borrowing Base of such Borrower, such Borrower shall prepay the Revolving Loans, LC Exposure and/or Swingline Loans in an aggregate amount equal to such excess.

(c)     In the event and on each occasion that any Net Proceeds are received by or on behalf of the Company or any other Loan Party or any Subsidiary in respect of any Prepayment Event, the Borrowers shall, immediately after such Net Proceeds are received by the Company or any other Loan Party or any Subsidiary, prepay the Obligations and cash collateralize the LC Exposure as set forth in Section 2.11(d) below in an aggregate amount equal to 100% of such Net Proceeds, provided that, in the case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event", if the Borrower Representative shall deliver to the Administrative Agent a certificate of a Financial Officer to the effect that the Loan Parties intend to apply the Net Proceeds from such event (or a portion thereof specified in such certificate), within 365 days after receipt of such Net Proceeds, to acquire (or replace or rebuild) real property, equipment or other tangible assets (excluding inventory) to be used or useful in the business of the Loan Parties (provided, however, that if any Loan Party enters into a legally binding commitment to invest such Net Proceeds within such 365-day period, it may invest such Net Proceeds on or prior to the later of (i) the end of the initial 365-day period and (ii) 180 days following the date on which such commitment becomes legally binding), and certifying that no Default has occurred and is continuing, then either (i) so long as a Cash Dominion Period is not in effect, no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds specified in such certificate or (ii) if a Cash Dominion Period is in effect, then, if the Net Proceeds specified in such certificate

#152952520_v10

are to be applied to acquire, replace or rebuild such assets by (A) the Borrowers, such Net Proceeds shall be applied by the Administrative Agent to reduce the outstanding principal balance of the Revolving Loans (without a permanent reduction of the Revolving Commitment) and upon such application, the Administrative Agent shall establish a Reserve against the Borrowing Base in an amount equal to the amount of such proceeds so applied and (B) any Loan Party that is not a Borrower, such Net Proceeds shall be deposited in a cash collateral account, and in the case of either (A) or (B), thereafter, such funds shall be made available to the applicable Loan Party as follows:

> (1)     the Borrower Representative shall request a Revolving Borrowing (specifying that the request is to use Net Proceeds pursuant to this Section) or the applicable Loan Party shall request a release from the cash collateral account be made in the amount needed;

> (2)     so long as the conditions set forth in Section 4.02 have been met, the Revolving Lenders shall make such Revolving Borrowing or the Administrative Agent shall release funds from the cash collateral account; and

> (3)     in the case of Net Proceeds applied against the Revolving Borrowing, the Reserve established with respect to such insurance proceeds shall be reduced by the amount of such Revolving Borrowing;

provided that to the extent of any such Net Proceeds therefrom that have not been so applied by the end of such 365 day period (or, if later, within 180 days following a binding commitment to invest the Net Proceeds if a binding commitment has been entered into within the initial 365-day period), a prepayment shall be required at such time in an amount equal to such Net Proceeds that have not been so applied.

(d)     (i) All prepayments made pursuant to Section 2.11(a) shall be applied, if made with respect to the Revolving Loans or the Swingline Loans, to prepay such Loans in accordance with the Lenders' respective Applicable Percentages without a corresponding reduction in the Revolving Commitments or the Swingline Commitment, as applicable, and to cash collateralize outstanding LC Exposure.

(ii)     All such amounts pursuant to Section 2.11(c) and (d) shall be applied, first to prepay any Protective Advances and Overadvances that may be outstanding, pro rata, second to prepay the Revolving Loans (including Swingline Loans) without a corresponding reduction in the Revolving Commitments or the Swingline Commitment, as applicable, and to cash collateralize outstanding LC Exposure. Notwithstanding the foregoing, all prepayments required to be made pursuant to Section 2.11(c) with respect to the Net Proceeds of any insurance or condemnation proceeds, arising from casualties or losses to cash or Inventory shall be applied, first to prepay any Protective Advances and Overadvances that may be outstanding, pro rata, and second to prepay the Revolving Loans (including Swingline Loans) without a corresponding reduction in the Revolving Commitments or the Swingline Commitment, as applicable,

and to cash collateralize outstanding LC Exposure. If the precise amount of insurance or condemnation proceeds allocable to Inventory as compared to Equipment, Fixtures and real property is not otherwise determined, the allocation and application of those proceeds shall be determined by the Administrative Agent, in its Permitted Discretion.

(e)     The Borrower Representative shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Administrative Agent, of any prepayment hereunder not later than (i) 10:00 a.m., Chicago time, (A) in the case of prepayment of a Term Benchmark Revolving Borrowing, three (3) Business Days before the date of prepayment, or (B) in the case of prepayment of an ABR Revolving Borrowing, one (1) Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by Section 2.09, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.09. Promptly following receipt of any such notice relating to a Revolving Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Revolving Borrowing shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Revolving Borrowing shall be applied ratably to the Revolving Loans included in the prepaid Borrowing. Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.13 and (ii) break funding payments pursuant to Section 2.16.

Section 2.12    Fees. (a) The Borrowers agree to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at a rate per annum equal to (i) at any time Availability is greater than 50% of the Revolving Commitment, 0.10%, and (ii) at any time Availability is less than or equal to 50% of the Revolving Commitment, 0.15%, on the average daily amount of the Available Revolving Commitment of such Lender during the period from and including the Effective Date to but excluding the date on which the Revolving Commitments terminate. Commitment fees accrued through and including the first day of each calendar month shall be payable in arrears on such day and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the date hereof; provided that any commitment fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day and the last day of each period but excluding the date on which the Revolving Commitments terminate).

(b)     The Borrowers agree to pay (i) to the Administrative Agent for the account of each Revolving Lender a participation fee with respect to its participations in each outstanding Letter of Credit, which shall accrue on the daily maximum stated amount then available to be drawn under such Letter of Credit at the same Applicable Rate used to determine the interest rate applicable to Term Benchmark Revolving Loans during the period from and including the Effective Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to each Issuing Bank for its own account a fronting fee with respect to each Letter of Credit

#152952520_v10

issued by such Issuing Bank, which shall accrue at the rate of 0.125% per annum, on the daily maximum stated amount then available to be drawn under such Letter of Credit, during the period from and including the Effective Date to but excluding the later of the date of termination of the Revolving Commitments and the date on which there ceases to be any LC Exposure with respect to Letters of Credit issued by such Issuing Bank, as well as such Issuing Bank's standard fees and commissions with respect to the issuance, amendment or extension of any Letter of Credit and other processing fees and other standard costs and charges, of such Issuing Bank relating to Letters of Credit as from time to time in effect. Participation fees and fronting fees accrued through and including the last day of each calendar month shall be payable on the first day of each calendar month, commencing on the first such date to occur after the Effective Date; provided that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand. Any other fees payable to an Issuing Bank pursuant to this paragraph shall be payable within ten (10) days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     The Borrowers agree to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent.

(d)     All fees payable hereunder shall be paid on the dates due, in dollars in immediately available funds, to the Administrative Agent (or to an Issuing Bank, in the case of fees payable to it) for distribution, in the case of commitment fees and participation fees, to the Lenders. Fees paid shall not be refundable under any circumstances.

Section 2.13     Interest.

(a)     The Loans comprising ABR Borrowings (including all Swingline Loans) shall bear interest at the ABR plus the Applicable Rate.

(b)     The Loans comprising each Term Benchmark Borrowing shall bear interest at the Adjusted Term SOFR Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     Each Protective Advance and each Overadvance shall bear interest at the ABR plus Applicable Rate for Revolving Loans.

(d)     Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Administrative Agent or the Required Lenders may, at their option, by notice to the Borrower Representative (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 9.02 requiring the consent of "each Lender affected thereby" for reductions in interest rates), declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(e)     Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Term Benchmark Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)     Interest computed by reference to the Term SOFR Rate shall be computed on the basis of a year of 360 days.  Interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).  In each case interest shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination.  The applicable Alternate Base Rate, Adjusted Daily Simple SOFR, Daily Simple SOFR, Adjusted Term SOFR Rate or Term SOFR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.14     Alternate Rate of Interest; Illegality.

(a)     Subject to clauses (b), (c), (d), (e), and (f) of this Section 2.14, if:

(i)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) (A) prior to commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate or the Term SOFR Rate  (including because the Term SOFR Reference Rate is not available or published on a current basis), for such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Adjusted Daily Simple SOFR or Daily Simple SOFR; or

(ii)     the Administrative Agent is advised by the Required Lenders that (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period or (B) at any time, the Adjusted Daily Simple SOFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or Loan) included in such Borrowing;

then the Administrative Agent shall give notice thereof to the Borrower Representative and the Lenders through Electronic System as provided in Section 9.01 as promptly as practicable thereafter and, until (x) the Administrative Agent notifies the Borrower Representative and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrowers deliver a new Interest Election Request in accordance with the terms of Section 2.08 or a new Borrowing Request in accordance with the terms of Section 2.03,

#152952520_v10

any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term Benchmark Borrowing and any Borrowing Request that requests a Term Benchmark Borrowing shall instead be deemed to be an Interest Election Request or a Borrowing Request, as applicable, for (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of Section 2.14(a)(i) or (ii) above or (y) an ABR Borrowing if the Adjusted Daily Simple SOFR also is the subject of Section 2.14(a)(i) or (ii) above; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted. Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower Representative's receipt of the notice from the Administrative Agent referred to in this Section 2.14(a) with respect to a Relevant Rate applicable to such Term Benchmark Loan, then until (x) the Administrative Agent notifies the Borrower Representative and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrowers deliver a new Interest Election Request in accordance with the terms of Section 2.08 or a new Borrowing Request in accordance with the terms of Section 2.03, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Administrative Agent to, and shall constitute, (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of Section 2.14(a)(i) or (ii) above or (y) an ABR Loan if the Adjusted Daily Simple SOFR also is the subject of Section 2.14(a)(i) or (ii) above, on such day.

(b)     Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(c)     Notwithstanding anything to the contrary herein or in any other Loan Document, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

#152952520_v10

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 90 of 286

(d)     The Administrative Agent will promptly notify the Borrower Representative and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period.   Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.14, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.14.

(e)     Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)     Upon the Borrower Representative's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrowers may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any such request for a Term Benchmark Borrowing into a request for a Borrowing of or conversion to (A) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event.   During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.   Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower Representative's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan, then until such time as a Benchmark Replacement is implemented pursuant to this Section 2.14, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Administrative Agent to, and shall constitute, (x) an RFR Loan so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition

#152952520_v10

Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event, on such day.

Section 2.15    Increased Costs. (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted Term SOFR Rate) or the Issuing Bank;

(ii)    impose on any Lender or the Issuing Bank or the applicable offshore interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein; or

(iii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender, the Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender, the Issuing Bank or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender, the Issuing Bank or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the Issuing Bank or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of, or the Loans made by, or participations in Letters of Credit or Swingline Loans held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

#152952520_v10

(c)     A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error. The Borrowers shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16    Break Funding Payments.  (a) With respect to Loans that are not RFR Loans, in the event of (i) the payment of any principal of any Term Benchmark Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.11), (ii) the conversion of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto, (iii) the failure to borrow, convert, continue or prepay any Term Benchmark Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(c) and is revoked in accordance therewith), or (iv) the assignment of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower Representative pursuant to Section 2.19 or 9.02(d), then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(b)     With respect to RFR Loans, in the event of (i) the payment of any principal of any RFR Loan other than on the Interest Payment Date applicable thereto (including as a result of an Event of Default or an optional or mandatory prepayment of Loans), (ii) the failure to borrow or prepay any RFR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11 and is revoked in accordance therewith) or (iii) the assignment of any RFR Loan other than on the Interest Payment Date applicable thereto as a result of a request by the Borrowers pursuant to Section 2.18, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

70

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 93 of 286

Section 2.17    Withholding of Taxes; Gross-Up.

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding for Indemnified Taxes has been made (including such deductions and withholdings for Indemnified Taxes applicable to additional sums payable under this Section 2.17) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)    Evidence of Payment. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.17, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such

#152952520_v10

payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to setoff and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)  Status of Lenders. (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)  Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A)  any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)  any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(1)  in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 95 of 286

Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     in the case of a Foreign Lender claiming that its extension of credit will generate U.S. effectively connected income, an executed copy of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)     to the extent a Foreign Lender is not the beneficial owner, an executed copy of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or

#152952520_v10

times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(g)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Survival. Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document (including Payment in Full of the Secured Obligations).

(i)     Defined Terms. For purposes of this Section 2.17, the term "Lender" includes any Issuing Bank and the term "applicable law" includes FATCA.

Section 2.18     Payments Generally; Allocation of Proceeds; Sharing of Setoffs.

#152952520_v10

(a)     The Borrowers shall make each payment or prepayment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to 2:00 p.m., Chicago time, on the date when due or the date fixed for any prepayment hereunder, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 10 South Dearborn Street, Floor L2, Chicago, Illinois, except payments to be made directly to the Issuing Bank or Swingline Lender as expressly provided herein and except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     All payments and any proceeds of Collateral received by the Administrative Agent (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrowers), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.11) or (C) amounts to be applied from the Collection Account during a Cash Dominion Period (which shall be applied in accordance with Section 2.10(b)) or (ii) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent and the Issuing Bank from the Borrowers (other than in connection with Banking Services Obligations or Swap Agreement Obligations), second, to pay any fees, indemnities, or expense reimbursements then due to the Lenders from the Borrowers (other than in connection with Banking Services Obligations or Swap Agreement Obligations), third, to pay interest due in respect of the Overadvances and Protective Advances, fourth, to pay the principal of the Overadvances and Protective Advances, fifth, to pay interest then due and payable on the Loans (other than the Overadvances and Protective Advances) ratably, sixth, to prepay principal on the Loans (other than the Overadvances and Protective Advances) and unreimbursed LC Disbursements, to pay an amount to the Administrative Agent equal to one hundred five percent (105%) of the aggregate LC Exposure, to be held as cash collateral for such Obligations, and to pay any amounts owing in respect of Swap Agreement Obligations up to and including the amount most recently provided to the Administrative Agent pursuant to Section 2.22, for which Reserves have been established, ratably, seventh, to payment of any amounts owing in respect of Banking Services Obligations and Swap Agreement Obligations up to and including the amount most recently provided to the Administrative Agent pursuant to Section 2.22 and to the extent not paid pursuant to clause sixth above, and eighth, to the payment of any other Secured Obligation due to the Administrative Agent or any Lender by the Borrowers. Notwithstanding the foregoing amounts received from any Loan Party shall not be applied to any Excluded Swap Obligation of such Loan Party. Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower Representative, or unless a Default is in existence, neither the Administrative Agent nor any Lender shall apply any payment which it receives to any Term Benchmark Loan of a Class, except

#152952520_v10

(a) on the expiration date of the Interest Period applicable thereto or (b) in the event, and only to the extent, that there are no outstanding ABR Loans of the same Class and, in any such event, the Borrowers shall pay the break funding payment required in accordance with Section 2.16. The Administrative Agent and the Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

(c)     At the election of the Administrative Agent, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 9.03), and other sums payable under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower Representative pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of any Borrower maintained with the Administrative Agent. The Borrowers hereby irrevocably authorize (i) the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (including Swingline Loans and Overadvances, but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses as described in Section 9.03) and that all such Borrowings shall be deemed to have been requested pursuant to Section 2.03, 2.04 or 2.05, as applicable, and (ii) the Administrative Agent to charge any deposit account of any Borrower maintained with the Administrative Agent for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

(d)     If, except as otherwise expressly provided herein, any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and Swingline Loans and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements and Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements and Swingline Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements or Swingline Loans to any assignee or participant, other than to the Borrowers or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

#152952520_v10

(e)     Unless the Administrative Agent shall have received, prior to any date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank pursuant to the terms hereof or any other Loan Document (including any date that is fixed for prepayment by notice from the Borrower Representative to the Administrative Agent pursuant to Section 2.11(e)), notice from the Borrower Representative that the Borrowers will not make such payment or prepayment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the NYFRB Rate.

(f)     The Administrative Agent may from time to time provide the Borrowers with account statements or invoices with respect to any of the Secured Obligations (the "Statements"). The Administrative Agent is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrowers' convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Secured Obligations. If the Borrowers pay the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrowers shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Administrative Agent, on behalf of the Lenders, of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Administrative Agent's or the Lenders' right to receive payment in full at another time.

Section 2.19     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or if any Lender becomes a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or 2.17) and

#152952520_v10

obligations under this Agreement and other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Administrative Agent (and in circumstances where its consent would be required under Section 9.04, the Issuing Bank and the Swingline Lender), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and funded participations in LC Disbursements and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply. Each party hereto agrees that (x) an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower Representative, the Administrative Agent and the assignee (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and such parties are participants), and (y) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, provided that any such documents shall be without recourse to or warranty by the parties thereto.

Section 2.20    Defaulting Lenders. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 2.12(a);

(b)    any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.18(b) or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to any Issuing Bank or Swingline Lender hereunder; third, to cash collateralize the LC Exposure with respect to such Defaulting Lender in accordance with this Section; fourth, as the Borrower Representative may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrower Representative, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under

this Agreement and (y) cash collateralize future LC Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with this Section; sixth, to the payment of any amounts owing to the Lenders, the Issuing Banks or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the Issuing Banks or Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by any Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement or under any other Loan Document; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or LC Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Disbursements owed to, all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or LC Disbursements owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in the Borrowers' obligations corresponding to such Defaulting Lender's LC Exposure and Swingline Loans are held by the Lenders pro rata in accordance with the Commitments without giving effect to clause (d) below. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto;

(c)     such Defaulting Lender shall not have the right to vote on any issue on which voting is required (other than to the extent expressly provided in Section 9.02(b)) and the Commitment and Revolving Exposure of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 9.02) or under any other Loan Document; provided, that, except as otherwise provided in Section 9.02, this clause (c) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender directly affected thereby;

(d)     if any Swingline Exposure or LC Exposure exists at the time such Lender becomes a Defaulting Lender then:

(i)     all or any part of the Swingline Exposure and LC Exposure of such Defaulting Lender (other than, in the case of a Defaulting Lender that is a Swingline Lender, the portion of such Swingline Exposure referred to in clause (b) of the definition of such term) shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent that such reallocation does not, as to any non-Defaulting Lender, cause such non-Defaulting Lender's Revolving Exposure to exceed its Revolving Commitment;

(ii)     if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrowers shall within one (1) Business Day following notice by

the Administrative Agent (x) first, prepay such Swingline Exposure and (y) second, cash collateralize, for the benefit of the Issuing Bank, the Borrowers' obligations corresponding to such Defaulting Lender's LC Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.06(j) for so long as such LC Exposure is outstanding;

(iii)    if the Borrowers cash collateralize any portion of such Defaulting Lender's LC Exposure pursuant to clause (ii) above, the Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.12(b) with respect to such Defaulting Lender's LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(iv)    if the LC Exposure of the non-Defaulting Lenders is reallocated pursuant to clause (i) above, then the fees payable to the Lenders pursuant to Sections 2.12(a) and 2.12(b) shall be adjusted in accordance with such non-Defaulting Lenders' Applicable Percentages; and

(v)    if all or any portion of such Defaulting Lender's LC Exposure is neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Issuing Bank or any other Lender hereunder, all letter of credit fees payable under Section 2.12(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until and to the extent that such LC Exposure is reallocated and/or cash collateralized; and

(e)    so long as such Lender is a Defaulting Lender, such Defaulting Lender's then outstanding LC Exposure will be 100% covered by the Commitments of the non-Defaulting Lenders and/or cash collateral will be provided by the Borrowers in accordance with Section 2.20(d), and Swingline Exposure related to any such newly made Swingline Loan or LC Exposure related to any newly issued or increased Letter of Credit shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.20(d)(i) (and such Defaulting Lender shall not participate therein).

If (i) a Bankruptcy Event or a Bail-In Action with respect to a Lender Parent shall occur following the date hereof and for so long as such event shall continue or (ii) the Issuing Bank has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless the Swingline Lender or the Issuing Bank, as the case may be, shall have entered into arrangements with the Borrowers or such Lender, satisfactory to the Swingline Lender or the Issuing Bank, as the case may be, to defease any risk to it in respect of such Lender hereunder.

In the event that each of the Administrative Agent, the Borrowers, the Swingline Lender and the Issuing Bank agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure and LC Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on the date of such readjustment such Lender shall purchase at par such of the Loans of the

other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

Section 2.21    Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Administrative Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Administrative Agent or such Lender. The provisions of this Section 2.21 shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent or any Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.21 shall survive the termination of this Agreement.

Section 2.22    Banking Services and Swap Agreements. Each Lender or Affiliate thereof providing Banking Services (excluding Lease Financing) for, or having Swap Agreements with, any Loan Party or any Subsidiary or Affiliate of a Loan Party shall deliver to the Administrative Agent, promptly after entering into such Banking Services or Swap Agreements, written notice setting forth the aggregate amount of all Banking Services Obligations and Swap Agreement Obligations of such Loan Party or Subsidiary or Affiliate thereof to such Lender or Affiliate (whether matured or unmatured, absolute or contingent). In addition, each such Lender or Affiliate thereof shall deliver to the Administrative Agent, from time to time after a significant change therein or upon a request therefor, a summary of the amounts due or to become due in respect of such Banking Services Obligations and Swap Agreement Obligations. The most recent information provided to the Administrative Agent shall be used in determining the amounts to be applied in respect of such Banking Services Obligations and/or Swap Agreement Obligations pursuant to Section 2.18(b) and which tier of the waterfall, contained in Section 2.18(b), such Banking Services Obligations and/or Swap Agreement Obligations will be placed. For the avoidance of doubt, so long as JPMCB or its Affiliate is the Administrative Agent, neither JPMCB nor any of its Affiliates providing Banking Services for, or having Swap Agreements with, any Loan Party or any Subsidiary or Affiliate of a Loan Party shall be required to provide any notice described in this Section 2.22 in respect of such Banking Services or Swap Agreements.

ARTICLE III

Representations and Warranties

Each Loan Party represents and warrants to the Lenders that:

Section 3.01    Organization; Powers. Each Loan Party and each Subsidiary is duly organized or formed, validly existing and (to the extent such concept is applicable in such jurisdiction) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in,

#152952520_v10

and is in good standing in, every jurisdiction where such qualification is required, in each case (other than with respect to any Loan Party's due organization, valid existence, and good standing under the laws of its jurisdiction of organization), except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02    Authorization; Enforceability. The Transactions are within each Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions on the part of such Loan Party and, if required, actions by such Loan Party by equity holders. Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Governmental Approvals; No Conflicts. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) for filings necessary to perfect Liens created pursuant to the Loan Documents, and (iii) to the extent that any failure to obtain such approvals, consents, registrations, filings or other actions has not had and would not reasonably be expected to have a Material Adverse Effect,  (b) except as has not had and would not reasonably be expected to have a Material Adverse Effect, will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary, (c) except as has not had and would not reasonably be expected to have a Material Adverse Effect, will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary, and (d) will not result in the creation or imposition of, or the requirement to create, any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

Section 3.04    Financial Condition; No Material Adverse Change.

(a)    The Company has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2020, reviewed but not audited KPMG, independent public accountants, and (ii) as of and for the fiscal month and the portion of the fiscal year ended December 31, 2021, certified by its Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Company and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since December 31, 2020.

Section 3.05    Properties. (a) As of the Effective Date, Schedule 3.05 to the Disclosure Letter sets forth the address of each parcel of real property that is owned or leased by any Loan

82

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 105 of 286

Party. As of the Effective Date, each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by Borrower or its Subsidiaries or, to Borrower's knowledge, any other party to any such lease or sublease, exists. Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in or rights to use, all of its real and personal property material to its business (except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes) free of all Liens other than those permitted by Section 6.02.

(b)     Each Loan Party and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to operate its business as currently conducted, and the use thereof by each Loan Party and each Subsidiary does not infringe in any material respect upon the rights of any other Person (except for any infringements that, individual or in the aggregate, have not resulted and would not reasonably be expected to result in a Material Adverse Effect). A correct and complete list of all applications for, and registrations of any trademarks, copyrights and patents with the United Stated Patent and Trademark Office and/or the United States Copyright Office of any Loan Party, as of the Effective Date, is set forth in Schedule 3.05 to the Disclosure Letter.

Section 3.06     Litigation and Environmental Matters. (a) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened in writing against any Loan Party or any Subsidiary (i) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any Loan Document or the Transactions.

(b)     Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)     Since the Effective Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in a Material Adverse Effect.

Section 3.07     Compliance with Laws and Agreements; No Default. Except where such non-compliance, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party and each Subsidiary is in compliance with (a) all Requirements of Law applicable to it or its property and (b) all indentures, agreements and other instruments binding upon it or its property. No Default has occurred and is continuing.

Section 3.08     Investment Company Status. No Loan Party or any Subsidiary is required to be registered as an "investment company" as defined in the Investment Company Act of 1940.

#152952520_v10

Section 3.09    Taxes. Each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 3.10    ERISA. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87 or subsequent recodification thereof, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $100,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $100,000 the fair market value of the assets of all such underfunded Plans.

Section 3.11    Disclosure. (a) As of the Effective Date, the Loan Parties have disclosed to the Administrative Agent all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Administrative Agent or any Lender in connection with this Agreement or any other Loan Document (as modified or supplemented by other information so furnished and when taken as a whole), when furnished, contained any material misstatement of fact or omitted to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered (it being understood that such projected financial information is subject to significant uncertainties and contingencies, any of which are beyond such Loan Parties' control, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projected financial information may differ significantly from the projected results and such differences may be material).

(b)    As of the Effective Date, to the best knowledge of any Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

Section 3.12    [Reserved].

Section 3.13    Solvency. (a) Immediately after the consummation of the Transactions to occur on the Effective Date, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of each Loan Party on a going concern basis will be greater than the

#152952520_v10

amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course, (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured in the ordinary course, and (iv) no Loan Party will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Effective Date.

(b)     No Loan Party intends to, nor will permit any Subsidiary to, and no Loan Party believes that it or any Subsidiary will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary in the ordinary course.

Section 3.14   Insurance. Schedule 3.14 to the Disclosure Letter sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date. As of the Effective Date, all premiums in respect of such insurance have been paid. Each Borrower maintains, and has caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 3.15   Capitalization and Subsidiaries. As of the Effective Date, Schedule 3.15 to the Disclosure Letter sets forth (a) a correct and complete list of the name and relationship to the Borrowers of each Subsidiary, (b) a true and complete listing of each class of each of the Borrower's authorized Equity Interests, all of which issued Equity Interests are validly issued, outstanding, fully paid and non-assessable (to the extent applicable), and owned beneficially and of record by the Persons identified in Schedule 3.15, and (c) the type of entity of the Borrowers and each Subsidiary.  All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.  Except as set forth on Schedule 3.15 of the Disclosure Letter, as of the Effective Date, there are no outstanding commitments or other obligations of any Loan Party other than Borrower to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party other than Borrower.

Section 3.16   Security Interest in Collateral. The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all of the Collateral in favor of the Administrative Agent, for the benefit of the Secured Parties, and such Liens constitute perfected (to the extent perfection can be achieved by taking the actions required by the Security Agreement) and continuing Liens on the Collateral, securing the Secured Obligations, enforceable against the applicable Loan Party, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Encumbrances and other Liens permitted by Section 6.02, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law or agreement, and (b) Liens perfected only by possession (including

possession of any certificate of title), to the extent the Administrative Agent has not obtained or does not maintain possession of such Collateral.

Section 3.17  Employment Matters. As of the Effective Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.

Section 3.18  Margin Regulations. No Loan Party is engaged principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing or Letter of Credit extension hereunder will be used to buy or carry any Margin Stock. Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than 25% of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock..

Section 3.19  Use of Proceeds. The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in Section 5.08.

Section 3.20  No Burdensome Restrictions. No Loan Party is subject to any Burdensome Restrictions except Burdensome Restrictions permitted under Section 6.10.

Section 3.21  Anti-Corruption Laws and Sanctions. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and directors and, to the knowledge of such Loan Party, its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) any Loan Party, any Subsidiary or any of their respective directors, officers or, to the knowledge of any such Loan Party or Subsidiary, employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing or Letter of Credit, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.22  Affiliate Transactions. Except as set forth on Schedule 3.22 to the Disclosure Letter or as permitted pursuant to Section 6.09, as of the Effective Date, there are no existing or proposed material agreements, arrangements, understandings, or transactions between any Loan Party and any Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families.

86

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 109 of 286

Section 3.23   Common Enterprise. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (a) successful operations of each of the other Loan Parties and (b) the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies. Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and/or indirect benefit to such Loan Party, and is in its best interest.

Section 3.24   Affected Financial Institutions. No Loan Party is an Affected Financial Institution.

Section 3.25   Plan Assets; Prohibited Transactions. No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery nor performance of the transactions contemplated under this Agreement, including the making of any Loan and the issuance of any Letter of Credit hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

ARTICLE IV

Conditions

Section 4.01   Effective Date. The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)   Credit Agreement and Other Loan Documents. The Administrative Agent (or its counsel) shall have received (i) from each party hereto a counterpart of this Agreement signed on behalf of such party (which, subject to Section 9.06(b), may include any Electronic Signatures transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), (ii) either (A) a counterpart of each other Loan Document signed on behalf of each party thereto or (B) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such Loan Document and (iii) such other certificates, documents, instruments and agreements as the Administrative Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including any promissory notes requested by a Lender pursuant to Section 2.10 payable to the order of each such requesting Lender and a written opinion of the Loan Parties' counsel, addressed to the Administrative Agent, the Issuing Bank and the Lenders and the other Secured Parties in form and substance satisfactory to the Administrative Agent and its counsel.

(b)     Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates. The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by an officer thereof, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the officers of such Loan Party authorized to sign the Loan Documents to which it is a party and, in the case of each Borrower, its Financial Officers, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, or other organizational or governing documents, and (ii) a good standing certificate for each Loan Party from its jurisdiction of organization or the substantive equivalent available in the jurisdiction of organization for each Loan Party from the appropriate governmental officer in such jurisdiction.

(c)     No Default Certificate. The Administrative Agent shall have received a certificate, signed by a Financial Officer of each Borrower and each other Loan Party, dated as of the Effective Date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in the Loan Documents are true and correct as of such date, and (iii) certifying as to any other factual matters as may be reasonably requested by the Administrative Agent.

(d)     Fees. The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented at least one (1) day prior to the Effective Date (including the reasonable fees and expenses of legal counsel), on or before the Effective Date. All such amounts will be paid with proceeds of Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrower Representative to the Administrative Agent on or before the Effective Date.

(e)     Lien Searches. The Administrative Agent shall have received the results of a recent lien search in each jurisdiction where the Loan Parties are organized and where the assets of the Loan Parties are located, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 6.02 or discharged on or prior to the Effective Date pursuant to a pay-off letter or other documentation satisfactory to the Administrative Agent.

(f)     Solvency. The Administrative Agent shall have received a solvency certificate signed by a Financial Officer of the Company dated the Effective Date.

(g)     Borrowing Base Certificate. The Administrative Agent shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of October 31, 2021.

(h)     Closing Availability. After giving effect to all Borrowings to be made on the Effective Date, the issuance of any Letters of Credit on the Effective Date and the payment of all fees and expenses due hereunder, and with all of the Loan Parties' indebtedness, liabilities, and obligations current, Liquidity shall not be less than $50,000,000.

#152952520_v10

(i)     Opinion of Counsel. Each of the Loan Parties shall have delivered a written opinion of such Loan Party's counsel, addressed to the Administrative Agent and the Lenders in form and substance satisfactory to the Administrative Agent and its counsel.

(j)     Other Documents. The Administrative Agent shall have received such other documents as the Administrative Agent, the Issuing Bank, any Lender or their respective counsel may have reasonably requested.

The Administrative Agent shall notify the Borrowers, the Lenders and the Issuing Bank of the Effective Date, and such notice shall be conclusive and binding.

Section 4.02   Each Credit Event. The obligation of each Lender to make a Loan on the occasion of any Borrowing, and of the Issuing Bank to issue, amend or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)     The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the date of such Borrowing or the date of issuance, amendment or extension of such Letter of Credit, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).

(b)     At the time of and immediately after giving effect to such Borrowing or the issuance, amendment or extension of such Letter of Credit, as applicable, (i) no Default shall have occurred and be continuing and (ii) no Protective Advance shall be outstanding.

(c)     After giving effect to any Borrowing or the issuance, amendment or extension of any Letter of Credit, Availability shall not be less than zero.

Each Borrowing and each issuance, amendment or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrowers on the date thereof as to the matters specified in paragraphs (a), (b), and (c) of this Section.

Notwithstanding the failure to satisfy the conditions precedent set forth in paragraphs (a) or (b) of this Section, unless otherwise directed by the Required Lenders, the Administrative Agent may, but shall have no obligation to, continue to make Loans and an Issuing Bank may, but shall have no obligation to, issue, amend or extend, or cause to be issued, amended or extended, any Letter of Credit for the ratable account and risk of Lenders from time to time if the Administrative Agent believes that making such Loans or issuing, amending or extending, or causing the issuance, amendment or extension of, any such Letter of Credit is in the best interests of the Lenders.

ARTICLE V

Affirmative Covenants.

#152952520_v10

Until all of the Secured Obligations have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 5.01    Financial Statements; Borrowing Base and Other Information. The Borrowers will furnish to the Administrative Agent, who shall furnish to each Lender:

(a)    within one hundred and twenty (120) days after the end of each fiscal year of the Company, its audited consolidated and, if applicable, consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants reasonably acceptable to the Administrative Agent (without a "going concern" or like qualification, commentary or exception and without any qualification or exception as to the scope of such audit (other than a "going concern" or like qualification, commentary or exception due to the impending maturity of any Obligations)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants;

(b)    during any fiscal quarter in which no Revolving Loans or Letters of Credit were outstanding, within forty-five (45) days after the end of such fiscal quarter of the Company, its consolidated and, if applicable, consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by its Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    during any fiscal month in which any Revolving Loans or Letters of Credit were outstanding, within thirty (30) days after the end of each fiscal month of the Company, its consolidated and, if applicable, consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by its Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(d)    concurrently with any delivery of financial statements under clause (a), (b) or (c) above, a Compliance Certificate (i) certifying, in the case of the financial statements delivered under clause (b) or (c), as presenting fairly in all material respects the financial condition and results of operations of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and

#152952520_v10

the absence of footnotes, (ii) certifying as to whether a Default or Event of Default has occurred since the later of the Effective Date and the date of the last Compliance Certificate and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, including a calculation of the Fixed Charge Coverage Ratio whether or not the Fixed Charge Coverage Ratio financial covenant is required to be tested pursuant to Section 6.12(b), and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(e)    no earlier than 30 days prior to the beginning of each fiscal year of the Company and no later than forty-five (45) days after the beginning of such fiscal year, a copy of the plan and forecast (including a projected consolidated and consolidating, if applicable, balance sheet, income statement and cash flow statement) of the Company and its Subsidiaries for each month of such fiscal year ("Projections") in form and detail reasonably satisfactory to the Administrative Agent;

(f)    (x) during any Increased BBC Reporting Period, by Friday of each calendar week, prepared as of the close of the last day of the preceding week, and (y) at all other times within twenty (20) days of the end of each calendar month, as of the period then ended, a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Administrative Agent may reasonably request;

(g)    (x) during any Increased BBC Reporting Period, by Friday of each calendar week, prepared as of the close of the last day of the preceding week, and (y) at all other times within twenty (20) days of the end of each calendar month, as of the period then ended, all delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent (not in an Adobe *.pdf file);

(i)    a detailed aging of the Borrowers' Accounts, including all invoices aged by invoice date and due date, prepared in a manner reasonably acceptable to the Administrative Agent, together with a summary specifying the name, address, and balance due for each Account Debtor;

(ii)    a schedule detailing the Borrowers' Inventory, in form reasonably acceptable to the Administrative Agent, (A) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Administrative Agent has previously indicated to the Borrower Representative are deemed by the Administrative Agent to be appropriate, and (B) including a report of any variances or other results of Inventory counts performed by the Borrowers since the last Inventory schedule (including information regarding sales or other reductions, additions, returns,

#152952520_v10

credits issued by Borrowers and complaints and claims made in writing against the Borrowers);

(iii)     a worksheet of calculations prepared by the Borrowers to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion and the Borrowers' sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(iv)     a reconciliation of the Borrowers' Accounts and Inventory between (A) the amounts shown in the Borrowers' general ledger and financial statements and (B) the amounts shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (e) above as of such date; and

(v)     a schedule and aging of the Borrowers' accounts payable, delivered electronically in a text formatted file acceptable to the Administrative Agent;

(h)     promptly upon the Administrative Agent's request in its Permitted Discretion:

(i)     copies of invoices issued by the Borrowers in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)     copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party;

(iii)     a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)     a reconciliation of the loan balance per the Borrowers' general ledger to the loan balance under this Agreement; and

(v)     copies of the income tax returns filed by any Loan Party with the U.S. Internal Revenue Service within the prior five (5) years.

(i)     promptly after any request therefor by the Administrative Agent or any Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that any Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l)(1) of ERISA that any Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if a Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the applicable Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

(j)     promptly following any request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit

committee of the board of directors) of the Company by independent accountants in connection with the accounts or books of the Borrowers or any Subsidiary, or any audit of any of them as the Administrative Agent may reasonably request;

(k)     promptly following any request therefor, (x) such other information regarding the operations, assets, liabilities, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may reasonably request, and (y) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation; and

(l)     at any time that In-Transit Inventory is included in the Borrowing Base, promptly following Administrative Agent's request therefor, an In-Transit Inventory Report. Borrower Representative shall promptly provide Administrative Agent a supplement to the most recently delivered In-Transit Inventory Report reflecting the actual sail dates of Inventory described therein as and when such information becomes known to Borrowers.

Section 5.02  <u>Notices of Material Events</u>. The Borrowers will furnish to the Administrative Agent (but in any event within any time period that may be specified below) written notice upon obtaining knowledge of any of the following:

(a)     the occurrence of any Default;

(b)     receipt of any written notice of any investigation by a Governmental Authority or any litigation or Proceeding commenced or threatened in writing against any Loan Party or any Subsidiary that (i) seeks damages in excess of $500,000, (ii) seeks injunctive relief that could reasonably be expected to result in costs or damages in excess of $500,000, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party or any Subsidiary and could reasonably be expected to result in criminal liability by such Loan Party of Subsidiary, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability and could reasonably be expected to result in costs or damages in excess of $500,000, (vi) asserts liability on the part of, and could reasonably be expected to result in costs or damages to, any Loan Party or any Subsidiary, in each case, in excess of $500,000, in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall and could reasonably be expected to result in costs or damages to any Loan Party or any Subsidiary in excess of $500,000;

(c)     any Lien (other than Permitted Encumbrances or other Liens permitted pursuant to Section 6.02) or claim made or asserted against any of the Collateral securing obligations in excess of $500,000;

(d)     any casualty event to the Collateral in the amount of $500,000 or more, whether or not covered by insurance;

#152952520_v10

(e)     within five (5) Business Days of receipt thereof, any and all default notices received under or with respect to any leased location or public warehouse where Collateral with a value in excess of $500,000 is located;

(f)     at least once per year, or more often as the Administrative Agent may request in its Permitted Discretion, the Borrower Representative will furnish to the Administrative Agent information in reasonable detail as to the insurance required to be maintained pursuant to Section 5.10;

(g)     any material change in accounting or financial reporting practices by the Borrowers or any Subsidiary;

(h)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding $500,000;

(i)     the occurrence of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect (as determined by Borrower in its good faith business judgment); and

(j)     any change in the information provided in the Beneficial Ownership Certification delivered to the Administrative Agent that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower Representative setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03     Existence; Conduct of Business. Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted, except, in each case, to the extent that any failure to do so could not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially in substantially the same fields of enterprise as it is presently conducted and any other fields of enterprise that are reasonably related, complementary or incidental thereto or which constitute a reasonable extension thereof.

Section 5.04     Payment of Taxes. Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Tax liabilities, before the same shall become delinquent or in default, and all lawful claims other than Tax liabilities which, if unpaid, would reasonably be expected to result in a Lien upon any Collateral not otherwise permitted under Section 6.02, except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in

#152952520_v10

accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

Section 5.05    Maintenance of Properties. Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear excepted, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.06    Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities, in each case, to the extent required to prepare financial statements in accordance with GAAP and (b) permit any representatives designated by the Administrative Agent or any Lender (including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Administrative Agent), upon reasonable prior notice, during normal business hours, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants all at such reasonable times and as often as reasonably requested; provided that the Loan Parties shall be responsible for the costs of expenses of one field examination during any calendar year and, if Availability in such calendar year falls below the greater of $20,000,000 and 20% of the Revolving Commitments during such calendar year, one additional field examination during such calendar year if the Lender elects to conduct such additional field examination; and the Loan Parties shall be responsible for the costs and expenses of all field examinations conducted while an Event of Default has occurred and is continuing.  So long as no Event of Default has occurred and is continuing, the Administrative Agent shall not unreasonably interfere with the operation of any Loan Party's business operations in any material respect in connection with such inspections. Each Loan Party acknowledges that the Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain Reports pertaining to each Loan Party's assets for internal use by the Administrative Agent and the Lenders. After the occurrence and during the continuance of any Event of Default, each Loan Party shall provide the Administrative Agent with access to its suppliers. Notwithstanding anything to the contrary in this Section, no Loan Party or its Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) in respect of which disclosure to the Administrative Agent (or its representatives) is prohibited by applicable law or any third party consent legally binding on any Loan Party or its Subsidiaries not entered into in contemplation hereof or (ii) that is subject to attorney, client or similar privilege or constitutes or includes attorney work-product.

Section 5.07    Compliance with Laws. Each Loan Party will, and will cause each Subsidiary to, comply with each Requirement of Law applicable to it or its property (including without limitation Environmental Laws), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

#152952520_v10

Section 5.08    Use of Proceeds.

(a)    The proceeds of the Loans and the Letters of Credit will be used only for working capital and general corporate purposes. No part of the proceeds of any Loan and no Letter of Credit will be used, whether directly or indirectly, for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X.

(b)    No Borrower will request any Borrowing or Letter of Credit, and no Borrower shall use, and each Borrower shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.09    Accuracy of Information. The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Administrative Agent or the Lenders by or on behalf of any Loan Party or any Subsidiary in connection with this Agreement or any other Loan Document (as modified or supplemented by other information so furnished and when taken as a whole), when furnished, contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading at the time delivered, and the furnishing of such information shall be deemed to be a representation and warranty by the Borrowers on the date thereof as to the matters specified in this Section; provided that, with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that such projected financial information is subject to significant uncertainties and contingencies, any of which are beyond such Loan Parties' control, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projected financial information may differ significantly from the projected results and such differences may be material).

Section 5.10    Insurance.

(a)    Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (i) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit (including, with respect to In-Transit Inventory, cargo insurance); theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (ii) all insurance required pursuant to the Collateral Documents.  The Borrower Representative will furnish to the Administrative Agent, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained in accordance with this Section 5.01 of this Agreement.

96

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 119 of 286

(b)     In the event any material Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", the applicable Loan Party shall purchase and maintain flood insurance on such real property (but also including any personal property which is located on any real property leased by such Loan Party within a "Special Flood Hazard Area").  The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Revolving Commitment or the total replacement cost value of the improvements.

(c)     All general liability and personal property insurance policies required hereunder or under this Section 5.10 shall name the Administrative Agent as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses or mortgagee clauses, through endorsements in form and substance reasonably satisfactory to the Administrative Agent, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to the Administrative Agent; (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and lender loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least 30 days (10 days for cancellation due to non-payment of premium) prior written notice given to the Administrative Agent.

(d)     All premiums on such insurance policies shall be paid when due, and copies of the policies delivered to the Administrative Agent.  If a Loan Party fails to obtain any insurance as required by this Section, the Administrative Agent may obtain such insurance at the Borrower's expense.   By purchasing such insurance, the Administrative Agent shall not be deemed to have waived any Default arising from the applicable Loan Party's failure to maintain such insurance or pay any premiums therefor.

Section 5.11   Casualty and Condemnation. The Borrowers will (a) furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

Section 5.12   Appraisals. Upon reasonable prior request, each Loan Party will provide the Administrative Agent with appraisals or updates thereof of its Inventory from an appraiser selected and engaged by the Administrative Agent, and prepared on a basis satisfactory to the Administrative Agent, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law; provided that the Loan Parties shall be responsible for the costs of expenses of one appraisal during any calendar year and, if Availability in such calendar year falls below the greater of $20,000,000 and 20% of the Revolving Commitments during such calendar year, one additional appraisal during such calendar year if the Lender elects to conduct such additional appraisal; and the Loan Parties shall be responsible for the costs and expenses of all appraisals conducted while an Event of Default has occurred and is continuing.

#152952520_v10

Section 5.13   Depository Banks. Each Borrower and each Domestic Subsidiary will maintain the Administrative Agent as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity and other deposit accounts for the conduct of its business (except, in each case, for any Excluded Accounts). Additionally, the Administrative Agent shall be the principal provider of other Banking Services to the Borrowers and their Domestic Subsidiaries.

Section 5.14   Additional Collateral; Further Assurances. (a) Subject to applicable Requirements of Law, each Loan Party will cause each Domestic Subsidiary (other than Pass-Through Foreign Holdcos) formed or acquired after the date of this Agreement to become a Loan Party by executing a Joinder Agreement. In connection therewith, the Administrative Agent shall have received all documentation and other information regarding such newly formed or acquired Subsidiaries as may be required to comply with the applicable "know your customer" rules and regulations, including the USA Patriot Act. Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b)   Each Loan Party will cause (i) 100% of the issued and outstanding Equity Interests of each of its Domestic Subsidiaries (other than any Pass-Through Foreign Holdco) and (ii) 65% of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary and Pass-Through Foreign Holdco directly owned by any Loan Party to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, pursuant to the terms and conditions of the Loan Documents or other security documents as the Administrative Agent shall reasonably request.

(c)   Without limiting the foregoing, each Loan Party will, and will cause each Domestic Subsidiary (other than Pass-Through Foreign Holdcos) to, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Administrative Agent and all at the expense of the Loan Parties.

(d)   If any material assets (including any real property or improvements thereto or any interest therein but excluding any Excluded Collateral) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower

#152952520_v10

Representative will (i) notify the Administrative Agent thereof and, if requested by the Administrative Agent or the Required Lenders, cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

Section 5.15    Receivables.

(a)    Certain Agreements on Receivables.  At any time that any Revolving Loans or Letters of Credit are outstanding, no Loan Party will make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable in the Borrowing Base or accept in satisfaction of a Receivable in the Borrowing Base less than the original amount thereof, except that, absent the existence of an Event of Default, the Loan Parties may discount, credit, rebate or otherwise reduce the amount of any Receivable  (i) if such discount, credit, rebate or other reduction is made in accordance with their present policies and in the ordinary course of business or (ii) if the amount of such discount, credit, rebate or other reduction is less than $10,000.

(b)    Collection of Receivables.  Except as otherwise provided in this Agreement, each Loan Party will collect and enforce, at the Loan Party's sole expense, all amounts due or hereafter due to such Loan Party under the Receivable in the Borrowing Base except that, absent the existence of an Event of Default, the Loan Parties may discount, credit, rebate or otherwise reduce the amount of any such Receivable  (i) if such discount, credit, rebate or other reduction is made in accordance with their present policies and in the ordinary course of business or (ii) if the amount of such discount, credit, rebate or other reduction is less than $10,000.

(c)    Delivery of Invoices.  The Borrowers will deliver to the Administrative Agent immediately upon its request after the occurrence and during the continuation of an Event of Default duplicate invoices with respect to each Account of the Loan Parties bearing such language of assignment as the Administrative Agent shall specify.

(d)    Disclosure of Counterclaims on Receivables.  If, at any time that any Revolving Loans or Letters of Credit are outstanding, (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable in the Borrowing Base, in each case, in excess of $50,000 exists or (ii) to the knowledge of any Loan Party, any material dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened in writing with respect to a Receivable in the Borrowing Base with a value in excess of $50,000, the Borrowers will promptly disclose such fact to the Administrative Agent in writing. With respect to Receivables in the Borrower Base, the Borrowers shall send the Administrative Agent a copy of each credit memorandum in excess of $50,000 as soon as issued by any Loan Party, and the Borrowers shall promptly report each credit memorandum and each of the facts required to be disclosed to the Administrative Agent in accordance with this Section 5.15(d) on the Borrowing Base Certificates submitted by it.

Section 5.16    Inventory and Equipment.

#152952520_v10

(a)     <u>Maintenance of Goods</u>. Each Loan Party will do all things necessary to maintain, preserve, protect and keep any Equipment material to the operation of any Loan Party's business and its Inventory in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Loan Party's business and except for ordinary wear and tear in respect of its Equipment.

(b)     <u>Returned Inventory</u>. The Borrowers shall immediately report to the Administrative Agent any returned Inventory that was in the Borrowing Base involving an amount in excess of $100,000. Each such report shall indicate the reasons for the returns and the locations and condition of such returned Inventory. In the event any Account Debtor returns Inventory to a Loan Party when an Event of Default exists, such Loan Party, upon the request of the Administrative Agent, shall: (i) hold the returned Inventory in trust for the Administrative Agent; (ii) segregate all returned Inventory from all of its other property; (iii) dispose of the returned Inventory solely according to the Administrative Agent's written instructions; and (iv) not issue any credits or allowances with respect thereto without the Administrative Agent's prior written consent. All returned Inventory shall be subject to the Administrative Agent's Liens thereon. Whenever any Inventory is returned, the related Account shall be deemed ineligible to the extent of the amount owing by the Account Debtor with respect to such returned Inventory and such returned Inventory shall not be Eligible Inventory.

(c)     <u>Inventory Count; Perpetual Inventory System</u>. Each Loan Party will conduct a physical count of the Inventory at least once per fiscal year, and after and during the continuation of an Event of Default, at such other times as the Administrative Agent requests. Each Loan Party, at its own expense, shall deliver to the Administrative Agent, at Administrative Agent's request, the results of each physical verification, which such Loan Party has made, or has caused any other Person to make on its behalf, of all or any portion of its Inventory. Unless waived by the Administrative Agent, each Loan Party will maintain a perpetual inventory reporting system at all times.

Section 5.17   <u>Post-closing Covenants</u>. For a period of at least sixty (60) days following the Effective Date, the Loan Parties shall use commercially reasonable efforts to obtain Collateral Access Agreements with respect to all third party bailee locations having Inventory with a value in excess of $1 million.

ARTICLE VI

Negative Covenants

Until all of the Secured Obligations have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

Section 6.01   <u>Indebtedness</u>. No Loan Party will, nor will it permit any Subsidiary to, create, incur, or suffer to exist any Indebtedness, except:

(a)     the Secured Obligations;

100

(b)     Indebtedness existing on the date hereof and set forth in Schedule 6.01 to the Disclosure Letter and any extensions, renewals, refinancings and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)     Indebtedness of any Borrower to any Subsidiary and of any Subsidiary to any Borrower or any other Subsidiary, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to any Borrower or any other Loan Party shall be subject to Section 6.04 and (ii) Indebtedness of any Loan Party to any Subsidiary that is not a Loan Party shall be subordinated to the Secured Obligations on terms reasonably satisfactory to the Administrative Agent;

(d)     Guarantees by any Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of any Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by any Borrower or any other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)     Indebtedness of any Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) below; provided that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (e) together with any Refinance Indebtedness in respect thereof permitted by clause (f) below, shall not exceed $1,000,000 at any time outstanding;

(f)     Indebtedness which represents extensions, renewals, refinancing or replacements (such Indebtedness being so extended, renewed, refinanced or replaced being referred to herein as the "Refinance Indebtedness") of any of the Indebtedness described in clauses (b), (e), (n) and (o) hereof (such Indebtedness being referred to herein as the "Original Indebtedness"); provided that (i) such Refinance Indebtedness does not increase the principal amount of the Original Indebtedness, together with any accrued and unpaid interest thereon, any prepayment premium in connection with such refinancing or replacement and customary fees and expenses incurred by any Loan Party or any Subsidiary in connection with such extension, renewal, refinancing or replacement, (ii) any Liens securing such Refinance Indebtedness are not extended to any additional property of any Loan Party or any Subsidiary, other than to the extent permitted by clause (d) of Section 6.02, (iii) no Loan Party or any Subsidiary that is not originally obligated with respect to repayment of such Original Indebtedness is required to become obligated with respect to such Refinance Indebtedness, (iv) such Refinance Indebtedness does not result in a shortening of the average weighted life to maturity of such Original Indebtedness, (v) the terms of such Refinance Indebtedness other than fees and interest are not less favorable in any material respect when taken as a whole to the obligor thereunder than the original terms of such Original Indebtedness and (vi) if such Original Indebtedness was subordinated in right of payment to the Secured Obligations, then the terms and conditions of such Refinance Indebtedness must include

subordination terms and conditions that are at least as favorable to the Administrative Agent and the Lenders as those that were applicable to such Original Indebtedness;

(g)     Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(h)     Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

(i)     Subject to Section 5.13, Indebtedness arising from customary cash management and treasury services and the honoring of a check, draft or similar instrument against insufficient funds or from the endorsement of instruments for collection, in each case, in the ordinary course of business;

(j)     Indebtedness under Swap Agreements permitted under Section 6.07;

(k)     Indebtedness representing deferred compensation owing to employees, directors and officers of the Borrowers or any of their Subsidiaries in the ordinary course of business; provided that the cash component of any such deferred compensation obligations shall not exceed $500,000 in aggregate amount at any time outstanding;

(l)     Indebtedness in respect of letters of credit, bank guarantees and the like in an aggregate amount not to exceed $500,000 at any time outstanding;

(m)     Indebtedness incurred in connection with the financing of insurance premiums in the ordinary course of business;

(n)     Subordinated Indebtedness in an aggregate principal amount not exceeding $2,000,000 at any time outstanding;

(o)     Indebtedness incurred on credit cards in an aggregate principal amount of up to $1,000,000 outstanding at any time; and

(p)     other unsecured Indebtedness in an aggregate principal amount not exceeding $500,000 at any time outstanding.

Section 6.02     Liens. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a)     Liens created pursuant to any Loan Document;

(b)     Permitted Encumbrances;

102

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 125 of 286

(c)     any Lien on any property or asset of the Borrowers or any of their Subsidiaries existing on the date hereof and set forth in Schedule 6.02 to the Disclosure Letter; provided that (i) such Lien shall not apply to any other property or asset of such Borrower or Subsidiary, other than any accessions, attachments, replacements or improvements to such assets or property, and any proceeds of such assets or property (and any accessions, attachments, replacements or improvements thereto) and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof, except by the amount of any accrued and unpaid interest thereon, any prepayment premium in connection with such refinancing or replacement and customary fees and expenses incurred by any Loan Party or any Subsidiary in connection with such extension, renewal, refinancing or replacement;

(d)     Liens on fixed or capital assets acquired, constructed or improved by the Borrowers or any Subsidiary and any accessions, attachments, replacements or improvements to such assets, and any proceeds of such assets (and any accessions, attachments, replacements or improvements thereto); provided that (i) such Liens secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and any accessions, attachments, replacements or improvements thereto and (iv) such Liens shall not apply to any other property or assets of the Borrowers or Subsidiary;

(e)     Liens of a collecting bank arising in the ordinary course of business under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(f)     Liens arising out of Sale and Leaseback Transactions permitted by Section 6.06;

(g)     Liens granted by a Subsidiary that is not a Loan Party in favor of the Borrowers or another Loan Party in respect of Indebtedness owed by such Subsidiary;

(h)     Liens on insurance proceeds securing Indebtedness incurred in connection with the financing of insurance premiums in the ordinary course of business; and

(i)     Liens on real or personal property granted to a lessor under a real property lease so long as such lessor has not taken any action to perfect such Lien.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clauses (a) and (b) (solely with respect to clauses (a) and (e) of the definition of Permitted Encumbrances) above, or (2) Inventory, other than those permitted under clauses (a) and (b) (solely with respect to clauses (a), (b), (e) and (g) of the definition of Permitted Encumbrances) above.

Section 6.03    Fundamental Changes.

(a)     No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it,

or otherwise Dispose of all or substantially all of its assets, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing (i) any Subsidiary of any Borrower may merge into a Borrower in a transaction in which such Borrower is the surviving entity, (ii) any Subsidiary may merge with or into any Person (other than a Borrower) in a transaction in which the surviving entity is or becomes a Loan Party and (iii) any Subsidiary that is not a Loan Party may merge with or into any other Subsidiary that is not a Loan Party and (iv) any Subsidiary that is not a Loan Party may liquidate or dissolve if the Borrower which owns such Subsidiary determines in good faith that such liquidation or dissolution is in the best interests of such Borrower and is not materially disadvantageous to the Lenders; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)     No Loan Party will, nor will it permit any Subsidiary to, consummate a Division as the Dividing Person, without the prior written consent of the Administrative Agent; provided, however, that notwithstanding the foregoing any Subsidiary that is not a Loan Party may consummate a Division if Borrower determines in good faith that such Division is in the best interests of Borrower and is not materially disadvantageous to the Secured Parties. Without limiting the foregoing, if any Loan Party consummates a Division (with or without the prior consent of Lender as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.14 and the other further assurances obligations set forth in the Loan Documents and become a Loan Party under this Agreement and the other Loan Documents to the extent required by Section 5.14.

(c)     No Loan Party will, nor will it permit any Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrowers and their Subsidiaries on the date hereof and businesses reasonably related, complementary or incidental thereto or which constitute a reasonable extension thereof.

(d)     No Loan Party will, nor will it permit any Subsidiary to, change its fiscal year from the basis in effect on the Effective Date.

(e)     No Loan Party will change the accounting basis (i.e., from GAAP to a non-GAAP accounting basis or from an accrual basis to a cash basis) upon which its financial statements are prepared.

(f)     No Loan Party will change its name as it appears in official filings in the state of its incorporation or organization, state of incorporation or organization, its organizational type, or its organizational identification number, in each case, unless the Administrative Agent shall have received at least 30 days prior written notice of such change and Borrower shall have taken any reasonable action requested by the Administrative Agent in connection therewith to continue the perfection of any Liens in favor of the Administrative Agent in any Collateral, provided that, any new location of incorporation or organization of Borrower or any Domestic Subsidiary shall be in the continental U.S.

Section 6.04   <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>. No Loan Party will, nor will it permit any Subsidiary to, form any Subsidiary after the Effective Date, or

purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests of any Person, or other securities (including any option, warrant or other right to acquire any of the foregoing) of any Person, make or permit to exist any loans or advances to any Person, Guarantee any obligations of, or purchase or otherwise consummate any Acquisition (all of the foregoing being collectively called "Investments"), except:

(a) Permitted Investments, subject to control agreements in favor of the Administrative Agent or otherwise subject to a perfected security interest in favor of the Administrative Agent, in each case, to the extent required by any Collateral Documents;

(b) Investments in existence on the date hereof and described in Schedule 6.04 to the Disclosure Letter;

(c) Investments by any Loan Party and Subsidiaries in Equity Interests in their respective Subsidiaries, provided that (i) any such Equity Interests directly held by a Loan Party shall be pledged pursuant to the Security Agreement (subject to the limitations applicable to Equity Interests of Foreign Subsidiaries and Pass-Through Foreign Holdcos set forth in Section 5.14) and (ii) the aggregate amount of Investments by Loan Parties in Subsidiaries that are not Loan Parties (together with intercompany loans permitted under clause (ii) to the proviso to Section 6.04(d), Guarantees permitted under the proviso to Section 6.04(e) and Dispositions permitted under Section 6.05(g)) shall not exceed the Investment Limit in any twelve-month period (in each case determined without regard to any write-downs or write-offs);

(d) loans or advances made by any Loan Party to any Subsidiary and made by any Subsidiary to a Loan Party or any other Subsidiary, provided that (i) any such loans and advances in an aggregate principal amount for all such loans in excess of $500,000 at any time outstanding made by a Loan Party to any Subsidiary that is not a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement and (ii) the amount of such loans and advances made by Loan Parties to Subsidiaries that are not Loan Parties (together with investments permitted under clause (ii) to the proviso to Section 6.04(c), Guarantees permitted under the proviso to Section 6.04(e) and Dispositions permitted under Section 6.05(g)) shall not exceed the Investment Limit in any twelve-month period (in each case determined without regard to any write-downs or write-offs);

(e) Guarantees constituting Indebtedness permitted by Section 6.01, provided that the aggregate principal amount of Indebtedness of Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party (together with outstanding investments permitted under clause (ii) to the proviso to Section 6.04(c), outstanding intercompany loans permitted under clause (ii) to the proviso to Section 6.04(d) and Dispositions permitted under Section 6.05(g)) shall not exceed the Investment Limit in any twelve-month period (in each case determined without regard to any write-downs or write-offs);

(f) loans or advances made by a Loan Party or any Subsidiary to its employees, directors or consultants in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes up to a maximum of $100,000 at any one time outstanding;

#152952520_v10

(g)     notes payable, or stock or other securities, issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(h)     Investments in the form of Swap Agreements permitted by Section 6.07;

(i)     Investments of any Person existing at the time such Person becomes a Subsidiary of a Borrower or consolidates or merges with a Borrower or any of the Subsidiaries so long as such investments were not made in contemplation of such Person becoming a Subsidiary or of such merger;

(j)     Investments received in connection with Dispositions permitted by Section 6.05;

(k)     accounts receivable and extensions of trade credit in the ordinary course of business;

(l)     advances in the form of prepayments of expenses, so long as such expenses were incurred in the ordinary course of business and are paid in accordance with customary trade terms of Borrower or its Subsidiaries;

(m)     Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(n)     Guarantees of obligations not constituting Indebtedness in the ordinary course of business;

(o)     Investments consisting of Indebtedness, Liens, Dispositions and/or Restricted Payments permitted (other than by reference to this Section 6.04(o)) under Sections 6.01, 6.02, 6.05 and 6.08, respectively; and

(p)     Other Investments; provided that at the time any such Investment is made, the aggregate amount of Investments made in reliance on this clause (p) shall not exceed $500,000 at any time outstanding.

Section 6.05     Asset Sales. No Loan Party will, nor will it permit any Subsidiary to, Dispose of any asset, including any Equity Interest owned by it, nor will any Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to another Borrower or another Subsidiary in compliance with Section 6.04), except:

(a)     Dispositions of (i) Inventory in the ordinary course of business; (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business, and (iii) the abandonment or dedication to the public of intellectual property that is not material to the business of the Borrowers and their Subsidiaries or necessary or desirable for the disposition of Inventory;

(b)     Dispositions of assets among Loan Parties or from any Subsidiary that is not a Loan Party to any Loan Party (subject to compliance with Section 6.09);

#152952520_v10

(c)     Dispositions of Accounts in connection with the compromise, settlement or collection thereof;

(d)     Dispositions constituting Permitted Investments and other investments permitted by clauses (c), (d), (e), (f), (g), (i), (j), (k), (l), (n), and (p) of Section 6.04;

(e)     Sale and Leaseback Transactions permitted by Section 6.06;

(f)     Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrowers or any Subsidiary;

(g)     Dispositions made by any Loan Party to any Subsidiary that is not a Loan Party, provided that (i) the amount of such Dispositions (together with Investments permitted under Sections 6.04(c), outstanding loans or advances permitted under Section 6.04(d), and Guarantees permitted under Section 6.04(e)) shall not exceed the Investment Limit in any twelve-month period and (ii) Loan Parties may not Dispose of intellectual property material to the business of a Loan Party to a Subsidiary that is not a Loan Party;

(h)     Dispositions of assets among Subsidiaries that are not Loan Parties;

(i)     non-exclusive licenses of intellectual property granted by any Loan Party or Subsidiary in the ordinary course of business (including intercompany licenses of intellectual property) that does not interfere in any material respect with the business of the Loan Parties and their Subsidiaries or the rights and remedies of the Administrative Agent with respect to such intellectual property or Inventory of a Loan Party; for the avoidance of doubt, the existence of non-exclusive licenses to customers with respect to Inventory purchased by such customers shall not constitute a material interference with the rights and remedies of the Administrative Agent with respect to such intellectual property;

(j)     to the extent constituting a Disposition, (i) the creation, incurrence or assumption of any Lien permitted by Section 6.02, (ii) transactions permitted by Section 6.03, (iii) the making of Restricted Payments permitted by Section 6.08 and (iv) the unwinding of any Swap Agreement permitted under Section 6.07;

(k)     to the extent constituting a Disposition, the use, transfer or disposition of cash or Permitted Investments in a manner that is not otherwise prohibited by this Agreement;

(l)     directors' qualifying shares and/or other nominal amounts of Equity Interests required to be held by Persons other than the Borrowers or any of their Subsidiaries under applicable law;

(m)     the settlement, waiver, release or surrender of claims or litigation rights in good faith;

(n)     the transfer of improvements or alterations in connection with the termination of any lease of real or personal property; and

107

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 130 of 286

(o)    Dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other paragraph of this Section, underlined provided that the aggregate fair market value of all assets Disposed of in reliance upon this paragraph (o) shall not exceed $500,000 during any fiscal year of the Borrowers;

provided that all Dispositions permitted under clause (o) of this Section 6.05 shall be made for fair value and for at least 75% cash consideration.

Section 6.06    Sale and Leaseback Transactions. No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except for any such sale of any fixed or capital assets by any Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within 90 days after such Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset.

Section 6.07    Swap Agreements. No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which any Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of any Borrower or any of its Subsidiaries), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Borrower or any Subsidiary or to hedge against fluctuations in currency exchange rates.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.

(a)    No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) each of the Loan Parties and Subsidiaries may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and, with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, (iii) the Borrowers may make Restricted Payments, not exceeding $1,000,000 during any fiscal year, pursuant to and in accordance with stock option plans or other benefit plans or stock repurchase agreements for management, consultants or employees of the Borrowers and their Subsidiaries, (iv) the Borrowers may make cash payments in lieu of the issuance of fractional shares in connection with the conversion or exercise, as applicable of warrants, options, or other securities convertible into or exchangeable for shares of capital stock of the Borrower; (v) any Borrower may issue capital stock of such Borrower upon the conversion or exercise, as applicable, of convertible notes or securities, options or warrants pursuant to the terms of such convertible notes or securities, options or warrants, (vi) the Borrowers may make Restricted Payments with respect to equity compensation consisting solely of the withholding of shares to any employee (or other provider of services) in an amount equal to the employee's (or other provider of services') tax obligation on such compensation and the payment

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 131 of 286

in cash to the applicable Governmental Authority of an amount equal to such obligation and (vii) so long as no Event of Default exists or would result therefrom, other Restricted Payments in an amount not to exceed $250,000 in any fiscal year.

(b)    No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except (i) payment of Indebtedness created under the Loan Documents and other Secured Obligations, (ii) payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof, (iii) refinancings of Indebtedness to the extent permitted by Section 6.01, (iv) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of, or casualty event involving, the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05, (v) the conversion of Indebtedness of any Loan Party or Subsidiary into Equity Interests of the Company and the payment of cash in lieu of fractional shares in connection with such conversion, (vi) payments of Indebtedness permitted to be incurred under Sections 6.01(c), (d), (e), (f), (g), (i), (j), (k), (l) and (m), (vii) payments in respect of other Indebtedness in an aggregate amount not to exceed $500,000 in any fiscal year of Borrower, and (viii) payments on account of Subordinated Indebtedness to the extent expressly permitted by the applicable intercreditor or subordination agreement applicable thereto.

Section 6.09    <u>Transactions with Affiliates</u>. No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among Loan Parties not involving any other Affiliate, (c) any investment permitted by Sections 6.04(c), 6.04(d), 6.04(e), 6.04(f), and 6.04(p), (d) any Indebtedness permitted under Sections 6.01(c), 6.01(d), or 6.01(k), (e) any Restricted Payment permitted by Section 6.08, (f) transactions set forth on <u>Schedule 6.09</u> to the Disclosure Letter so long as such transactions are not amended or modified in a manner adverse to a Loan Party in any material respect after the Effective Date, (g) the payment of reasonable fees to directors of the Borrowers or any Subsidiary who are not employees of the Borrowers or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrowers or their Subsidiaries in the ordinary course of business and (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors.

Section 6.10    <u>Restrictive Agreements</u>. No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or

#152952520_v10

assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrowers or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 to the Disclosure Letter (but shall apply to any extension or renewal of, or any amendment or modification, in each case, expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of Borrower or any Subsidiary or any assets of Borrower or any Subsidiary, in each case, pending such sale, provided that such restrictions and conditions apply only to the Person or assets that is or are to be sold and such sale is not otherwise prohibited hereunder or all Obligations will be Paid in Full in connection with such sale, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment or encumbrance thereof, (vi) the foregoing shall not apply to restrictions and conditions in any agreement, document, instrument or other arrangement relating to the assets or business of any Subsidiary existing prior to the consummation of an acquisition in which such Subsidiary was acquired (and not created in contemplation of such acquisition), (vii) the foregoing shall not apply to customary provisions in joint venture agreements (and other similar agreements) (provided that such provisions apply only to such joint venture and to Equity Interests in such joint venture), (viii) clause (b) of the foregoing shall not apply to customary net worth provisions or similar financial maintenance provisions contained in real property leases entered into by any Subsidiary, (ix) clause (b) of the foregoing shall not apply to restrictions requiring minimum reserves of cash or other deposits, in each case, imposed by customers of Borrowers or any Subsidiary under contracts entered into in the ordinary course of business, and (x) the foregoing shall not apply to restrictions or conditions set forth in any agreement governing Indebtedness permitted by Section 6.01; provided that such restrictions and conditions are customary for such Indebtedness and no more burdensome, taken as a whole, than the restrictions contained herein (in each case as reasonably determined by the Borrowers).

Section 6.11    Amendment of Material Documents. No Loan Party will, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness, except to the extent permitted under the intercreditor agreement or subordination agreement applicable to such Subordinated Indebtedness, or (b) its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement, in each case, in a manner that would be adverse in any material respect to the Administrative Agent and the Lenders.

Section 6.12    Financial Covenants.

(a)    Minimum Liquidity.  Prior to the FCCR Covenant Election Date, the Borrowers shall have, as of last day of each fiscal month, Liquidity greater than or equal to $35,000,000.

(b)    Fixed Charge Coverage Ratio.  On and after the FCCR Covenant Election Date, the Borrowers will not permit the Fixed Charge Coverage Ratio, determined as of the end of the most

recent fiscal month for which a Compliance Certificate was delivered (or required to be delivered) pursuant to Section 5.01(c) for the 12 fiscal months then ending, to be less than 1.10 to 1.00.

## ARTICLE VII

### Events of Default

If any of the following events ("Events of Default") shall occur:

      (a)    the Borrowers shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

      (b)    the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for three (3) Business Days;

      (c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in this Agreement or any other Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document, shall prove to have been materially incorrect when made or deemed made;

      (d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence) or 5.08 or in Article VI;

      (e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of (i) 10 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Administrative Agent (which notice will be given at the request of any Lender) if such breach relates to terms or provisions of Section 5.01, 5.02 (other than Section 5.02(a)), 5.03 through 5.07, 5.10, 5.11, 5.13, 5.15, 5.16, or 5.17 of this Agreement or (ii) 15 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Administrative Agent (which notice will be given at the request of any Lender) if such breach relates to terms or provisions of any other Section of this Agreement;

      (f)    any Loan Party or Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable after giving effect to any applicable grace period in the applicable instrument or agreement evidencing such Material Indebtedness;

      (g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any

#152952520_v10

trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness to the extent such sale, transfer or other disposition is not otherwise prohibited by this Agreement, and (ii) any Indebtedness to the extent that the obligations thereunder are settled with Equity Interests (other than Disqualified Equity Interests) and any cash payment in respect thereof is limited solely to the payment of cash in lieu of fractional Equity Interests;

(h)  an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)  any Loan Party or Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)  any Loan Party or Subsidiary shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally to pay its debts as they become due;

(k)  (i) one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 (to the extent not fully covered by a creditworthy insurer that has not denied coverage) shall be rendered against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or Subsidiary to enforce any such judgment; or (ii) any Loan Party or Subsidiary shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

#152952520_v10

(l)     an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(m)     a Change in Control shall occur;

(n)     [Reserved];

(o)     the Loan Guaranty or any Obligation Guaranty shall fail to remain in full force or effect or any action shall be taken by any Loan Guarantor or any Loan Party or their respective Subsidiaries to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty or any Obligation Guaranty or a Loan Guarantor shall fail to comply with any of the material terms or provisions of the Loan Guaranty or any Obligation Guaranty to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty or any Obligation Guaranty to which it is a party, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 9.08 or any notice of termination delivered pursuant to the terms of any Obligation Guaranty, in each case, except where such Loan Party's dissolution, merger, consolidation or other disposition is expressly permitted under this Agreement;

(p)     except as permitted by the terms of any Loan Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any material Collateral purported to be covered thereby with a value in excess of $1,000,000 in the aggregate, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien (subject to any Liens permitted by Section 6.02), except (x) as a result of the Administrative Agent no longer having possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Documents, (y) except as a result of a Uniform Commercial Code filing having lapsed because a Uniform Commercial Code continuation statement was not filed in a timely manner, or (z) to the extent that a first priority security interest cannot be obtained by taking all of the actions required under the applicable Loan Documents;

(q)     except as permitted by the terms of this Agreement or any other Loan Document, any Collateral Document shall fail to remain in full force or effect or any action shall be taken by any Loan Party or its Subsidiaries to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r)     except as permitted by the terms of any Loan Document, any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms, or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms; or

(s)     any Loan Party is criminally indicted or convicted under any law that may reasonably be expected to lead to a forfeiture of any property of such Loan Party having a fair market value in excess of $250,000;

113

then, and in every such event (other than an event with respect to the Borrowers described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower Representative, take any or all of the following actions, at the same or different times: (i) terminate the Commitments (including the Swingline Commitment), whereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Classes of Loans and the Loans of each Class at the time outstanding, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued and unpaid interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrowers accrued hereunder and under any other Loan Document, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, and (iii) require cash collateral for the LC Exposure in accordance with Section 2.06(j) hereof; and in the case of any event with respect to the Borrowers described in clause (h) or (i) of this Article, the Commitments (including the Swingline Commitment) shall automatically terminate and the principal of the Loans then outstanding and the cash collateral for the LC Exposure, together with accrued and unpaid interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrowers accrued hereunder and under any other Loan Documents, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.

## ARTICLE VIII

### The Administrative Agent

Section 8.01    Authorization and Action.

(a)    Each Lender, on behalf of itself and any of its Affiliates that are Secured Parties and each Issuing Bank hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors and assigns to serve as the administrative agent and collateral agent under the Loan Documents and each Lender and each Issuing Bank authorizes the Administrative Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than within the United States, each Lender and each Issuing Bank hereby grants to the Administrative Agent any required powers of attorney to execute and enforce any Collateral Document governed by the laws of such jurisdiction on such Lender's or such Issuing Bank's behalf. Without limiting the foregoing, each Lender and each Issuing Bank hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative

Agent is a party, and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents.

(b)     As to any matters not expressly provided for herein and in the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, pursuant to the terms in the Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender and each Issuing Bank; provided, however, that the Administrative Agent shall not be required to take any action that (i) the Administrative Agent in good faith believes exposes it to liability unless the Administrative Agent receives an indemnification and is exculpated in a manner satisfactory to it from the Lenders and the Issuing Banks with respect to such action or (ii) is contrary to this Agreement or any other Loan Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Administrative Agent may seek clarification or direction from the Required Lenders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided. Except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower, any other Loan Party, any Subsidiary or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. Nothing in this Agreement shall require the Administrative Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(c)     In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders and the Issuing Banks (except in limited circumstances expressly provided for herein relating to the maintenance of the Register), and its duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing:

(i)     the Administrative Agent does not assume and shall not be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Lender, Issuing Bank, any other Secured Party or holder of any other obligation other than as expressly set forth herein and in the other Loan Documents, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Loan Document with reference to the Administrative Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Lender agrees that it will not assert any claim against the

115

#152952520_v10

Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and/or the transactions contemplated hereby;

(ii)     where the Administrative Agent is required or deemed to act as a trustee in respect of any Collateral over which a security interest has been created pursuant to a Loan Document expressed to be governed by the laws of the United States, or is required or deemed to hold any Collateral "on trust" pursuant to the foregoing, the obligations and liabilities of the Administrative Agent to the Secured Parties in its capacity as trustee shall be excluded to the fullest extent permitted by applicable law; and

(iii)    nothing in this Agreement or any Loan Document shall require the Administrative Agent to account to any Lender for any sum or the profit element of any sum received by the Administrative Agent for its own account.

(d)     The Administrative Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub agent except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(e)     No arranger shall have obligations or duties whatsoever in such capacity under this Agreement or any other Loan Document and shall incur no liability hereunder or thereunder in such capacity, but all such persons shall have the benefit of the indemnities provided for hereunder.

(f)     In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan or any reimbursement obligation in respect of any LC Disbursement shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Disbursements and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim under Sections 2.12, 2.13, 2.15, 2.17 and 9.03) allowed in such judicial proceeding; and

#152952520_v10

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender, each Issuing Bank and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, the Issuing Banks or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03). Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or Issuing Bank or to authorize the Administrative Agent to vote in respect of the claim of any Lender or Issuing Bank in any such proceeding.

(g)    The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Banks, and, except solely to the extent of the Borrowers' right to consent pursuant to and subject to the conditions set forth in this Article, no Borrower nor any Subsidiary, or any of their respective Affiliates, shall have any rights as a third party beneficiary under any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

Section 8.02    Administrative Agent's Reliance, Limitation of Liability, Etc.

(a)    Neither the Administrative Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Administrative Agent or any of its Related Parties under or in connection with this Agreement or the other Loan Documents (x) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document (including, for the avoidance of doubt, in connection with the Administrative Agent's reliance on any Electronic Signature transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page) or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)    The Administrative Agent shall be deemed not to have knowledge of any (i) notice of any of the events or circumstances set forth or described in Section 5.02 unless and until written notice thereof stating that it is a "notice under Section 5.02" in respect of this

117

Agreement and identifying the specific clause under said Section is given to the Administrative Agent by the Borrower Representative, or (ii) notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the Administrative Agent by the Borrower Representative, a Lender or the Issuing Bank. Further, the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items (which on their face purport to be such items) expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent, or (vi) the creation, perfection or priority of Liens on the Collateral.

(c)     Without limiting the foregoing, the Administrative Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with Section 9.04, (ii) may rely on the Register to the extent set forth in Section 9.04(b), (iii) may consult with legal counsel (including counsel to the Borrowers), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Lender or Issuing Bank and shall not be responsible to any Lender or Issuing Bank for any statements, warranties or representations made by or on behalf of any Loan Party in connection with this Agreement or any other Loan Document, (v) in determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an Issuing Bank, may presume that such condition is satisfactory to such Lender or Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or Issuing Bank sufficiently in advance of the making of such Loan or the issuance of such Letter of Credit and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

Section 8.03     Posting of Communications.

(a)     The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders and the Issuing Bank by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)     Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Effective Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders, the Issuing Bank and each Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders, the Issuing Bank and each Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)     THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY ARRANGER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER, ANY ISSUING BANK OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

"Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent, any Lender or Issuing Bank by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

(d)     Each Lender and Issuing Bank agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender and Issuing Bank agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such

#152952520_v10

Lender's or Issuing Bank's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)     Each of the Lenders, Issuing Bank and each Borrower agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies.

(f)     Nothing herein shall prejudice the right of the Administrative Agent, any Lender or Issuing Bank to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 8.04    The Administrative Agent Individually. With respect to its Commitment, Loans (including Swingline Loans) and Letters of Credit, the Person serving as the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or Issuing Bank, as the case may be. The terms "Issuing Bank", "Lenders", "Required Lenders" and any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity as a Lender, Issuing Bank or as one of the Required Lenders, as applicable. The Person serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust or other business with, any Loan Party, any Subsidiary or any Affiliate of any of the foregoing as if such Person was not acting as the Administrative Agent and without any duty to account therefor to the Lenders or the Issuing Bank.

Section 8.05    Successor Administrative Agent.

(a)     The Administrative Agent may resign at any time by giving 30 days' prior written notice thereof to the Lenders, the Issuing Bank and the Borrower Representative, whether or not a successor Administrative Agent has been appointed. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York or an Affiliate of any such bank. In either case, such appointment shall be subject to the prior written approval of the Borrower Representative (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Administrative Agent. Upon the acceptance of appointment as Administrative Agent by a successor Administrative Agent, the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.

#152952520_v10

(b)     Notwithstanding paragraph (a) of this Section, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders, the Issuing Bank and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and continue to be entitled to the rights set forth in such Collateral Document and Loan Document, and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that (A) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall directly be given or made to each Lender and Issuing Bank. Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article, Section 2.17(d) and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Section 8.06     Acknowledgements of Lenders and Issuing Bank.

(a)     Each Lender and each Issuing Bank represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such Lender or Issuing Bank, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender and each Issuing Bank agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the Administrative Agent, any Arranger, or any other Lender or Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender or such Issuing Bank, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities. Each Lender and

#152952520_v10

each Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger, or any other Lender or Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrowers and their Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)     Each Lender, by delivering its signature page to this Agreement on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date or the effective date of any such Assignment and Assumption or any other Loan Document pursuant to which it shall have become a Lender hereunder.

(c)     Each Lender hereby agrees that (i) it has requested a copy of each Report prepared by or on behalf of the Administrative Agent; (ii) the Administrative Agent (A) makes no representation or warranty, express or implied, as to the completeness or accuracy of any Report or any of the information contained therein or any inaccuracy or omission contained in or relating to a Report and (B) shall not be liable for any information contained in any Report; (iii) the Reports are not comprehensive audits or examinations, and that any Person performing any field examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel and that the Administrative Agent undertakes no obligation to update, correct or supplement the Reports; (iv) it will keep all Reports confidential and strictly for its internal use, not share the Report with any Loan Party or any other Person except as otherwise permitted pursuant to this Agreement; and (v) without limiting the generality of any other indemnification provision contained in this Agreement, (A) it will hold the Administrative Agent and any such other Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any extension of credit that the indemnifying Lender has made or may make to a Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (B) it will pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorneys' fees) incurred by the Administrative Agent or any such other Person as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

(d)     (i) Each Lender hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Lender shall

#152952520_v10

promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this Section 8.06(d) shall be conclusive, absent manifest error.

(ii)     Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment. Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)     Each Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party.

(iv)     Each party's obligations under this Section 8.06(d) shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

Section 8.07    Collateral Matters.

(a)     Except with respect to the exercise of setoff rights in accordance with Section 9.08 or with respect to a Secured Party's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral

#152952520_v10

or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof. In its capacity, the Administrative Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the UCC. In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the Administrative Agent is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Secured Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Secured Parties.

(b)     In furtherance of the foregoing and not in limitation thereof, no arrangements in respect of Banking Services the obligations under which constitute Secured Obligations and no Swap Agreement the obligations under which constitute Secured Obligations, will create (or be deemed to create) in favor of any Secured Party that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under any Loan Document. By accepting the benefits of the Collateral, each Secured Party that is a party to any such arrangement in respect of Banking Services or Swap Agreement, as applicable, shall be deemed to have appointed the Administrative Agent to serve as administrative agent and collateral agent under the Loan Documents and agreed to be bound by the Loan Documents as a Secured Party thereunder, subject to the limitations set forth in this paragraph.

(c)     The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(b). The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

Section 8.08   Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or

124

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 147 of 286

for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

Section 8.09    <u>Certain ERISA Matters</u>.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and each Arranger and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that none of the Administrative Agent, any Arranger, or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

(c)     The Administrative Agent and each Arranger hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments, this Agreement and any other Loan Documents, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees,

126

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 149 of 286

arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 8.10    Flood Laws. JPMCB has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and related legislation (the "Flood Laws"). JPMCB, as administrative agent or collateral agent on a syndicated facility, will post on the applicable electronic platform (or otherwise distribute to each Lender in the syndicate) documents that it receives in connection with the Flood Laws. However, JPMCB reminds each Lender and Participant in the facility that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or Participant in the facility) is responsible for assuring its own compliance with the flood insurance requirements.

ARTICLE IX

Miscellaneous

Section 9.01    Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

      (i)      if to any Loan Party, to the Borrower Representative at:

            Rad Power Bikes Inc.
            1128 NW 52ND ST, Suite 200
            Seattle, WA 98107
            Attention: General Counsel and Mark Klebanoff
            Email:  legal@radpowerbikes.com
            Email:  mark.klebanoff@radpowerbikes.com

      (ii)      if to the Administrative Agent, JPMCB in its capacity as an Issuing Bank or the Swingline Lender, to JPMorgan Chase Bank, N.A. at:

            JPMorgan Chase Bank, N.A.
            3424 Peachtree Road NE,
            21st Floor-Suite 2150
            Atlanta, GA 30326
            Attention: Eric Anderson

      (iii)      if to any other Lender or Issuing Bank, to it at its address or facsimile number set forth in its Administrative Questionnaire.

#152952520_v10

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (B) sent by facsimile shall be deemed to have been given when sent, underlined provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (C) delivered through Electronic Systems or Approved Electronic Platforms, as applicable, to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)      Notices and other communications to any Borrower, any Loan Party, the Lenders and the Issuing Banks hereunder may be delivered or furnished by using Electronic Systems or Approved Electronic Platforms, as applicable, or pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II or to Compliance Certificates delivered pursuant to Section 5.01(d) unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent and the Borrower Representative (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by Electronic Systems or Approved Electronic Platforms, as applicable, pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; underlined provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)      Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02   Waivers; Amendments. (a) No failure or delay by the Administrative Agent, the Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver

of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)     Except as provided in the first sentence of Section 2.09(f) (with respect to any commitment increase) and subject to Section 2.14(c), (d) and (e) and Section 9.02(e) below, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, with the consent of the Required Lenders; provided that no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender (including any such Lender that is a Defaulting Lender), (B) reduce or forgive the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of each Lender (including any such Lender that is a Defaulting Lender) directly affected thereby (provided that any amendment or modification of the financial covenants in this Agreement (or any defined term used therein) shall not constitute a reduction in the rate of interest or fees for purposes of this clause (B)), (C) postpone any scheduled date of payment of the principal amount of any Loan or LC Disbursement, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender (including any such Lender that is a Defaulting Lender) directly affected thereby, (D) change Section 2.09(d) or Section 2.18(b) or (d) in a manner that would alter the ratable reduction of Commitments or the manner in which payments are shared, without the written consent of each Lender (other than any Defaulting Lender), (E) increase the advance rates set forth in the definition of Borrowing Base or add new categories of eligible assets, without the written consent of each Revolving Lender (other than any Defaulting Lender), (F) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (other than any Defaulting Lender) directly affected thereby, (G) change Section 2.20 without the consent of each Lender (other than any Defaulting Lender), (H) release any Guarantor from its obligation under its Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents), without the written consent of each Lender (other than any Defaulting Lender), or (I) except as provided in clause (c) of this Section or in any Collateral Document, release all or substantially all of the Collateral, without the written consent of each Lender (other than any Defaulting Lender); provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Issuing Bank or the Swingline Lender hereunder without the prior written consent of the Administrative Agent, the Issuing Bank or the Swingline Lender, as the case may be (it being understood that any amendment to Section 2.20 shall require the consent of the Administrative Agent, the Issuing Bank and the Swingline Lender); provided further that no such agreement shall amend or modify the provisions of Section 2.06 without the prior written consent of the Administrative Agent and the Issuing Banks. The Administrative Agent may also amend the Commitment Schedule to reflect assignments entered into pursuant to Section 9.04. Any amendment, waiver or other modification of this Agreement or any other Loan Document that by its terms affects the rights or duties under this Agreement of the

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 152 of 286

Lenders of one or more Classes (but not the Lenders of any other Class), may be effected by an agreement or agreements in writing entered into by the Borrowers and the requisite number or percentage in interest of each affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time.

(c)     The Lenders and the Issuing Bank hereby irrevocably authorize the Administrative Agent, at its option and in its sole discretion, to release any Liens granted to the Administrative Agent by the Loan Parties on any Collateral (i) upon Payment in Full of all Secured Obligations, and the cash collateralization of all Unliquidated Obligations in a manner satisfactory to each affected Lender, (ii) constituting property being sold or disposed of if the Loan Party disposing of such property certifies to the Administrative Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold or disposed of constitutes 100% of the Equity Interests of a Subsidiary, the Administrative Agent is authorized to release any Loan Guaranty provided by such Subsidiary, (iii) constituting property leased to a Loan Party under a lease which has expired or been terminated in a transaction permitted under this Agreement, or (iv) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Administrative Agent and the Lenders pursuant to Article VII. Except as provided in the preceding sentence, the Administrative Agent will not release any Liens on Collateral without the prior written authorization of the Required Lenders; provided that, the Administrative Agent may in its discretion, release its Liens on Collateral valued in the aggregate not in excess of $1,000,000 during any calendar year without the prior written authorization of the Required Lenders (it being agreed that the Administrative Agent may rely conclusively on one or more certificates of the Borrowers as to the value of any Collateral to be so released, without further inquiry). Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral. Any execution and delivery by the Administrative Agent of documents in connection with any such release shall be without recourse to or warranty by the Administrative Agent.

(d)     If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender affected thereby," the consent of the Required Lenders is obtained, but the consent of other necessary Lenders is not obtained (any such Lender whose consent is necessary but has not been obtained being referred to herein as a "Non-Consenting Lender"), then the Borrowers may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, provided that, concurrently with such replacement, (i) another bank or other entity which is reasonably satisfactory to the Borrowers, the Administrative Agent and the Issuing Bank shall agree, as of such date, to purchase for cash the Loans and other Obligations due to the Non-Consenting Lender pursuant to an Assignment and Assumption and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lender to be terminated as of such date and to comply with the requirements of clause (b) of Section 9.04, and (ii) the Borrowers shall pay to such Non-Consenting Lender in same day funds on the day of such replacement (1) all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrowers hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under

#152952520_v10

Sections 2.15 and 2.17, and (2) an amount, if any, equal to the payment which would have been due to such Lender on the day of such replacement under Section 2.16 had the Loans of such Non-Consenting Lender been prepaid on such date rather than sold to the replacement Lender. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower Representative, the Administrative Agent and the assignee (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and such parties are participants), and the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, provided that any such documents shall be without recourse to or warranty by the parties thereto.

(e)    Notwithstanding anything to the contrary herein the Administrative Agent may, with the consent of the Borrower Representative only, amend, modify or supplement this Agreement or any of the other Loan Documents to cure any ambiguity, omission, mistake, defect or inconsistency.

Section 9.03    Expenses; Limitation of Liability; Indemnity; Etc. (a) Expenses. The Loan Parties shall, jointly and severally, pay all (i) reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of outside counsel for the Administrative Agent, in connection with the syndication and distribution (including, without limitation, via the internet or through any Electronic System or Approved Electronic Platform) of the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) out-of-pocket expenses incurred by the Administrative Agent, the Issuing Bank or any Lender, including the fees, charges and disbursements of any outside counsel for the Administrative Agent, the Issuing Bank or any Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with:

(A)    appraisals and insurance reviews;

(B)    field examinations and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees for each Person employed by the Administrative Agent with respect to each field examination;

131

#152952520_v10

(C)     background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Administrative Agent;

(D)     Taxes, fees and other charges for (1) lien and title searches and title insurance and (2) recording any Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Administrative Agent's Liens;

(E)     sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(F)     forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral;

provided that the Loan Parties shall not be obligated to reimburse the Administrative Agent for more than the number of appraisals and field examinations set forth in Sections 5.06 and 5.12 of this Agreement unless a Default has occurred and is continuing at the time of such appraisal or field examination.

All of the foregoing fees, costs and expenses may be charged to the Borrowers as Revolving Loans or to another deposit account, all as described in Section 2.18(c).

(b)     Limitation of Liability. To the extent permitted by applicable law (i) neither any Borrower nor any Loan Party shall assert, and each Borrower and each Loan Party hereby waives, any claim against the Administrative Agent, any Arranger, any Issuing Bank and any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any Liabilities arising from the use by others of information or other materials (including, without limitation, any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet) except to the extent determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee, and (ii) no party hereto shall assert, and each such party hereby waives, any Liabilities against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, nothing in this Section 9.03(b) shall relieve any Borrower or any Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in Section 9.03(c), against any special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(c)     Indemnity. The Loan Parties shall, jointly and severally, indemnify the Administrative Agent, each Arranger, the Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all Liabilities and related expenses, including the fees, charges and disbursements of one firm counsel for all such Indemnitees (plus one local counsel in

132

each reasonably necessary jurisdiction and one specialty counsel in each reasonably necessary specialty area) and in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs the Company of such conflict and thereafter retains its own counsel, another firm of counsel for each such affected Indemnitee, in each case, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, (ii) the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iv) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (v) the failure of a Loan Party to deliver to the Administrative Agent the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.17, or (vi) any actual or prospective Proceeding relating to any of the foregoing, whether or not such Proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such Liabilities or related expenses are (1) determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (2) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from a material breach in bad faith by such Indemnitee of its express obligations under any Loan Document pursuant to a claim made by any Loan Party, or (3) result from any dispute solely among Indemnitees (but not with respect to the Administrative Agent acting in such capacity) that do not involve any act or omission by Borrower or any of its Subsidiaries. This Section 9.03(c) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(d)     <u>Lender Reimbursement</u>. Each Lender severally agrees to pay any amount required to be paid by any Loan Party under paragraphs (a), (b) or (c) of this Section 9.03 to the Administrative Agent, each Issuing Bank and the Swingline Lender, and each Related Party of any of the foregoing Persons (each, an "<u>Agent-Related Person</u>") (to the extent not reimbursed by a Loan Party and without limiting the obligation of any Loan Party to do so), ratably according to their respective Applicable Percentage in effect on the date on which such payment is sought under this Section (or, if such payment is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Applicable Percentage immediately prior to such date), and agrees to indemnify and hold each Agent-Related Person harmless from and against any and all Liabilities and related expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent-Related Person in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent-Related Person under or in connection with any of the foregoing; provided that the unreimbursed expense or Liability or related expense, as the case may be, was incurred by or asserted against such Agent-

#152952520_v10

Related Person in its capacity as such; provided, further, that no Lender shall be liable for the payment of any portion of such Liabilities, costs, expenses or disbursements that are found by a final and non appealable decision of a court of competent jurisdiction to have resulted primarily from such Agent-Related Person's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and Payment in Full of the Secured Obligations.

(e)    Payments. All amounts due under this Section 9.03 shall be payable promptly after written demand therefor.

Section 9.04   Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, participations in Letters of Credit and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)    the Borrower Representative, provided that the Borrower Representative shall be deemed to have consented to any such assignment of all or a portion of the Revolving Loans and Commitments unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof, and provided further that no consent of the Borrower Representative shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee;

(B)    the Administrative Agent;

(C)    the Issuing Bank; and

(D)    the Swingline Lender.

(ii)    Assignments shall be subject to the following additional conditions:

134

#152952520_v10

(A) except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower Representative and the Administrative Agent otherwise consent, provided that no such consent of the Borrower Representative shall be required if an Event of Default has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent (x) an Assignment and Assumption or (y) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, together with a processing and recordation fee of $3,500; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Company, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 9.04(b), the terms "Approved Fund" and "Ineligible Institution" have the following meanings:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Ineligible Institution" means (a) a natural person, (b) a Defaulting Lender or its Lender Parent, (c) a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof; provided that, with respect to clause (c), such holding company, investment vehicle or trust shall not constitute an Ineligible Institution if it (x) has not been established for the primary purpose of acquiring any Loans or Commitments, (y) is managed by a professional advisor, who is not such natural person or a relative thereof, having significant experience in the business of making or purchasing commercial loans, and (z) has assets greater than $25,000,000 and a significant part of its activities consist of making or

135

purchasing commercial loans and similar extensions of credit in the ordinary course of its business; provided that upon the occurrence and during the continuance of an Event of Default, unless approved in writing by the Administrative Agent in its sole discretion, any Person (other than a Lender) shall be an Ineligible Institution if after giving effect to any proposed assignment to such Person, such Person would hold more than 25% of the then outstanding Revolving Exposure or Commitments, as the case may be or (d) a Loan Party or a Subsidiary or other Affiliate of a Loan Party.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent, the Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of (x) a duly completed Assignment and Assumption executed by an assigning Lender and an assignee or (y) to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Administrative Agent and the parties to the Assignment and Assumption are participants, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.05, 2.06(d) or (e), 2.07(b), 2.18(d) or 9.03(d), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information

#152952520_v10

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 159 of 286

therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may, without the consent of, or notice to, the Borrowers, the Administrative Agent, the Issuing Bank or the Swingline Lender, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrowers, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and/or obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) and (g) (it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender and the information and documentation required under Section 2.17(g) will be delivered to the Borrowers and the Administrative Agent)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 2.18 and 2.19 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.15 or 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.19(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(b) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 160 of 286

owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

Section 9.06    Counterparts; Integration; Effectiveness; Electronic Execution. (a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to (i) fees payable to the Administrative Agent and (ii) increases or reductions of the Issuing Bank Sublimit of the Issuing Bank constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 9.01), certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby

#152952520_v10

(each an "<u>Ancillary Document</u>") that is an Electronic Signature transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; <u>provided</u> that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; <u>provided</u>, <u>further</u>, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Borrower and each Loan Party hereby (A) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders, the Borrowers and the Loan Parties, Electronic Signatures transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (B) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (C) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (D) waives any claim against any Lender-Related Person for any Liabilities arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Borrower and/or any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

Section 9.07 <u>Severability</u>. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

#152952520_v10

Section 9.08   Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Lender, the Issuing Bank or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the Secured Obligations held by such Lender, the Issuing Bank or their respective Affiliates, irrespective of whether or not such Lender, the Issuing Bank or their respective Affiliates shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender or the Issuing Bank different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.20 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Bank, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender, the Issuing Bank or such Affiliate shall notify the Borrower Representative and the Administrative Agent of such setoff or application, provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff or application under this Section. The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have.

Section 9.09   Governing Law; Jurisdiction; Consent to Service of Process. (a) The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the State of New York, but giving effect to federal laws applicable to national banks.

(b)   Each of the Lenders and the Administrative Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent by any Secured Party relating to this Agreement, any other Loan Document, the Collateral or the consummation or administration of the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

(c)   Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court sitting in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other

jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent, the Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(d)     Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (c) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10   WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11   Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12   Confidentiality. Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process in which case Administrative Agent shall promptly notify the Borrower in advance, to the extent it is practicable to do so and to the extent permitted by law or the terms of

such subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower Representative, (h) to holders of Equity Interests in any Borrower, (i) to any Person providing a Guarantee of all or any portion of the Secured Obligations, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a non-confidential basis from a source other than the Borrowers.

For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Borrowers or their business, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a non-confidential basis prior to disclosure by the Borrowers and other than information pertaining to this Agreement provided by arrangers to data service providers, including league table providers, that serve the lending industry; provided that, in the case of information received from the Borrowers after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 9.13    Several Obligations; Nonreliance; Violation of Law. The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder. Each Lender hereby represents that it is not relying on or looking to any margin stock (as defined in Regulation U of the Board) for the repayment of the Borrowings provided for herein. Anything contained in this Agreement to the contrary notwithstanding, neither the Issuing Bank nor any Lender shall be obligated to extend credit to the Borrowers in violation of any Requirement of Law.

Section 9.14    USA PATRIOT Act. Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.15    Disclosure. Each Loan Party, each Lender and the Issuing Bank hereby acknowledges and agrees that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.16    Appointment for Perfection. Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Administrative Agent and the other Secured Parties, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession or control. Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.17    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by such Lender.

Section 9.18    Marketing Consent. The Borrowers hereby authorizes the Administrative Agent and its Affiliates, at their sole expense, but without any prior approval by the Borrowers, to publish such tombstones and give such other publicity to this Agreement as any of them may from time to time determine in their sole discretion (subject in all respects to the confidentiality provisions set forth herein).  The foregoing authorization shall remain in effect unless and until the Borrower Representative notifies the Administrative Agent in writing that such authorization is revoked.

Section 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 9.20     No Fiduciary Duty, Etc. (a)     Each Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that no Credit Party will have any obligations except those obligations expressly set forth herein and in the other Loan Documents and each Credit Party is acting solely in the capacity of an arm's length contractual counterparty to each Borrower with respect to the Loan Documents and the transactions contemplated herein and therein and not as a financial advisor or a fiduciary to, or an agent of, any Borrower or any other person. Each Borrower agrees that it will not assert any claim against any Credit Party based on an alleged breach of fiduciary duty by such Credit Party in connection with this Agreement and the transactions contemplated hereby. Additionally, each Borrower acknowledges and agrees that no Credit Party is advising any Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. Each Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated herein or in the other Loan Documents, and the Credit Parties shall have no responsibility or liability to any Borrower with respect thereto.

(b)     Each Borrower further acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that each Credit Party, together with its Affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, any Credit Party may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, any Borrower and other companies with which any Borrower may have commercial or other relationships. With respect to any securities and/or financial instruments so held by any Credit Party or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

(c)     In addition, each Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that each Credit Party and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which a Borrower may have conflicting interests regarding the transactions described herein and otherwise. No Credit Party will use confidential information obtained from any Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with such Borrower in connection with the performance by such Credit Party of services for other companies, and no Credit Party will furnish any such information to other companies. Each Borrower also acknowledges that no Credit Party has any obligation to use in

144

connection with the transactions contemplated by the Loan Documents, or to furnish to any Borrower, confidential information obtained from other companies.

Section 9.21 <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 9.22 <u>Joint and Several</u>. Each Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Administrative Agent, the Issuing Banks and the Lenders for the Secured Obligations. In furtherance thereof, each Borrower agrees that wherever in this Agreement it is provided that a Borrower is liable for a payment, such obligation is the joint and several obligation of each Borrower. Each Borrower acknowledges and agrees that its joint and several liability under this Agreement and the Loan Documents is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Administrative Agent, any Issuing Bank, any Lender or any other Person. Each Borrower's liability for the Secured Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the credit extended hereunder or for what purposes such proceeds are used, and each Borrower waives notice of borrowing requests issued by, and loans or other extensions of credit made to, other Borrowers. Each Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to such Borrower against any party liable for payment under this Agreement and the Loan

145

Documents unless and until the Administrative Agent, each Issuing Bank and each Lender have been paid in full and all of the Secured Obligations are satisfied and discharged following termination or expiration of all commitments of the Lenders to extend credit to the Borrowers. Each Borrower's joint and several liability hereunder with respect to the Secured Obligations shall, to the fullest extent permitted by applicable law, be the unconditional liability of such Borrower irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Secured Obligations or of any other document evidencing all or any part of the Secured Obligations, (ii) the absence of any attempt to collect any of the Secured Obligations from any other Loan Party or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the amendment, modification, waiver, consent, extension, forbearance or granting of any indulgence by the Administrative Agent or any Lender with respect to any provision of any instrument executed by any other Loan Party evidencing or securing the payment of any of the Secured Obligations, or any other agreement now or hereafter executed by any other Loan Party and delivered to the Administrative Agent, (iv) the failure by the Administrative Agent or any Lender to take any steps to perfect or maintain the perfected status of its Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Secured Obligations or the Administrative Agent's release of any Collateral or of its Liens upon any Collateral, (v) the release or compromise, in whole or in part, of the liability of any other Loan Party for the payment of any of the Secured Obligations, (vi) any increase in the amount of the Secured Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, in each case, if consented to by any other Borrower, or any decrease in the same, or (vii) any other circumstance that might constitute a legal or equitable discharge or defense of any Loan Party. After the occurrence and during the continuance of any Event of Default, the Administrative Agent may proceed directly and at once, without notice to any Borrower, against any or all of Loan Parties to collect and recover all or any part of the Secured Obligations, without first proceeding against any other Loan Party or against any Collateral or other security for the payment or performance of any of the Secured Obligations, and each Borrower waives any provision that might otherwise require the Administrative Agent or the Lenders under applicable law to pursue or exhaust remedies against any Collateral or other Loan Party before pursuing such Borrower or its property. Each Borrower consents and agrees that neither the Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or against or in payment of any or all of the Secured Obligations.

Section 9.23    Amendment and Restatement; No Novation.

(p)    Upon the Effective Date, the terms and conditions of the Existing Credit Agreement are amended as set forth in, and restated in their entirety and superseded by, this Agreement; provided, however, that (i) all "Loans," and "Letters of Credit," and other indebtedness, obligations and liabilities outstanding under the Existing Credit Agreement on such date shall continue to constitute Loans, Letters of Credit and other indebtedness, obligations and liabilities under this Agreement, as applicable, (ii) the execution and delivery of this Agreement or any of the Loan Documents hereunder shall not constitute a novation, refinancing or any other fundamental change in the relationship among the parties, and (iii) the Loans, Letters of Credit, and other indebtedness, obligations and liabilities outstanding under the Existing Credit Agreement immediately prior to the date hereof, shall constitute the same loans, letters of credit, and other indebtedness, obligations and liabilities as were outstanding under

#152952520_v10

the Existing Credit Agreement, except to the extent of any increases therein that become effective on the Effective Date.

(q)     Nothing in this Agreement shall be deemed to be a novation of any of the obligations under the Existing Credit Agreement.  Notwithstanding any provision of this Agreement or any other Loan Document or instrument executed in connection herewith, the execution and delivery of this Agreement and the incurrence of Secured Obligations hereunder shall be in substitution for, but not in payment of, the Secured Obligations owed by the Borrowers under the Existing Credit Agreement; provided, however, except as otherwise provided in the Loan Documents, in no event shall the Collateral (and Liens related thereto) or Guarantees securing the Existing Credit Agreement or the obligations thereunder be deemed affected hereby, it being the intent and agreement of the parties that the Guarantees and the Liens on the Collateral granted to secure the Secured Obligations of the parties in connection with the Existing Credit Agreement shall not be extinguished and shall remain valid, binding and enforceable securing the obligations under the Existing Credit Agreement, as amended and restated hereby.

ARTICLE X

Loan Guaranty

Section 10.01 Guaranty. Each Loan Guarantor (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all reasonable and documented costs and expenses including, without limitation, all court costs and reasonable and documented attorneys' and paralegals' fees and expenses paid or incurred by the Administrative Agent, the Issuing Bank and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, any Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "Guaranteed Obligations"; provided, however, that the definition of "Guaranteed Obligations" shall not create any guarantee by any Loan Guarantor of (or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 10.02 Guaranty of Payment. This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives to the fullest extent permitted by applicable law any right to require the Administrative Agent, the Issuing Bank or any Lender to sue any Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for, all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

147

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 170 of 286

Section 10.03  No Discharge or Diminishment of Loan Guaranty. (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, the Issuing Bank, any Lender or any other Person, whether in connection herewith or in any unrelated transactions.

(b)     The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent, the Issuing Bank or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent, the Issuing Bank or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than Payment in Full of the Guaranteed Obligations).

Section 10.04  Defenses Waived. To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower, any Loan Guarantor or any other Obligated Party, other than Payment in Full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of

#152952520_v10

foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been Paid in Full. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

Section 10.05 <u>Rights of Subrogation</u>. No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification, that it has against any Obligated Party or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Administrative Agent, the Issuing Bank and the Lenders.

Section 10.06 <u>Reinstatement; Stay of Acceleration</u>. If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded, or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of any Obligated Party or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent, the Issuing Bank and the Lenders are in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Obligated Party, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Administrative Agent.

Section 10.07 <u>Information</u>. Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrowers' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that none of the Administrative Agent, the Issuing Bank or any Lender shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

Section 10.08 <u>Termination</u>. Each of the Lenders and the Issuing Bank may continue to make loans or extend credit to the Borrowers based on this Loan Guaranty until five (5) days after it receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lenders for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations. Nothing in this Section 10.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Administrative Agent or any Lender may have in respect of, any Default or Event of Default that shall exist under Article VII hereof as a result of any such notice of termination.

149

Section 10.09  [Reserved].

Section 10.10  Maximum Liability. Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law. In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

Section 10.11  Contribution.

(a)     To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)     As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)     This Section 10.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 10.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification is owing.

150

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 173 of 286

(e)     The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 10.11 shall be exercisable upon Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

Section 10.12  <u>Liability Cumulative</u>. The liability of each Loan Party as a Loan Guarantor under this Article X is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent, the Issuing Bank and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

Section 10.13  <u>Keepwell</u>. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this Guarantee in respect of a Swap Obligation (<u>provided</u>, <u>however</u>, that each Qualified ECP Guarantor shall only be liable under this Section 10.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.13 or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 10.13 shall remain in full force and effect until the termination of all Swap Obligations. Each Qualified ECP Guarantor intends that this Section 10.13 constitute, and this Section 10.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

ARTICLE XI

The Borrower Representative

Section 11.01  <u>Appointment; Nature of Relationship</u>.  The Company is hereby appointed by each of the Borrowers as its contractual representative (herein referred to as the "<u>Borrower Representative</u>") hereunder and under each other Loan Document, and each of the Borrowers irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this Article XI. Additionally, the Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the Funding Account, at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower(s), <u>provided</u> that, in the case of a Revolving Loan, such amount shall not exceed Availability. The Administrative Agent and the Lenders, and their respective officers, directors, agents or employees, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or the Borrowers pursuant to this Section 11.01.

Section 11.02  <u>Powers</u>. The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto. The

#152952520_v10

Borrower Representative shall have no implied duties to the Borrowers, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

Section 11.03 <u>Employment of Agents</u>. The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

Section 11.04 <u>Notices</u>. Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default or Event of Default hereunder referring to this Agreement describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to the Administrative Agent and the Lenders. Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

Section 11.05 <u>Successor Borrower Representative</u>. Upon the prior written consent of the Administrative Agent, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative. The Administrative Agent shall give prompt written notice of such resignation to the Lenders.

Section 11.06 <u>Execution of Loan Documents; Borrowing Base Certificate</u>. The Borrowers hereby empower and authorize the Borrower Representative, on behalf of the Borrowers, to execute and deliver to the Administrative Agent and the Lenders the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including, without limitation, the Borrowing Base Certificates and the Compliance Certificates. Each Borrower agrees that any action taken by the Borrower Representative or the Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Borrower Representative of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

Section 11.07 <u>Reporting</u>. Each Borrower hereby agrees that such Borrower shall furnish promptly after each fiscal month to the Borrower Representative a copy of its Borrowing Base Certificate and any other certificate or report required hereunder or requested by the Borrower Representative on which the Borrower Representative shall rely to prepare the Borrowing Base Certificates and Compliance Certificate required pursuant to the provisions of this Agreement.

(Signature Pages Follow)

152

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the day and year first above written.

**RAD POWER BIKES INC.,**
a Delaware corporation

By: _____
Name: Mark Klebanoff
Title: Chief Financial Officer

**JPMORGAN CHASE BANK, N.A.**, individually
and as Administrative Agent, Issuing Bank and
Swingline Lender

By: _____

Name:  Eric A. Anderson
Title:    Authorized Officer

COMMITMENT SCHEDULE

| Lender | Revolving Commitment | Commitment |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $100,000,000 | $100,000,000 |
| **Total** | **$100,000,000** | **$100,000,000** |

Commitment Schedule

EXHIBIT A

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit, guarantees and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and other rights of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.     Assignor:     _____

2.     Assignee:     _____
                         [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.     Borrowers:     _____

4.     Administrative Agent:     JPMorgan Chase Bank, N.A., as the administrative agent under the Credit Agreement

5. Credit Agreement:     The $100,000,000 Amended and Restated Credit Agreement dated as of December 17, 2021, by and among Rad Power Bikes Inc., as a "Borrower", the other Loan Parties party thereto, the

_____

[1] Select as applicable.

Exhibit A
1

Lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent.

6. Assigned Interest:

| Facility Assigned[2] | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[3] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more Credit Contacts to whom all syndicate-level information (which may contain material non-public information about the Company, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By:_____
    Title:

ASSIGNEE

[NAME OF ASSIGNEE]

By:_____
    Title:

---

[2] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Revolving Commitment," etc.)

[3] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

#152952520_v10

Exhibit A
2

[Consented to and]⁴ Accepted:

JPMORGAN CHASE BANK, N.A., as
[Administrative Agent, Issuing Bank and Swingline Lender]


By_____
   Title:

[Consented to:]⁵

[NAME OF RELEVANT PARTY]


By_____
   Title:

---

⁴ To be added only if the consent of the Administrative Agent, Issuing Bank and/or Swingline Lender, as applicable, is required by the terms of the Credit Agreement.
⁵ To be added only if the consent of the Borrowers and/or other parties (e.g. Swingline Lender, Issuing Bank) is required by the terms of the Credit Agreement.

#152952520_v10

Exhibit A
3

ANNEX 1
ASSIGNMENT AND ASSUMPTION

[_____][1]
STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1. Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a lender under the Credit Agreement or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by any Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement and under applicable law that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender[2], (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of this type, (v) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section ___ thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent, any Arranger, the Assignor or any other Lender or any of their respective Related Parties, and (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement,

_____

[1] Describe Credit Agreement at option of Administrative Agent.

[2] To the extent a Borrower or another Lender insists on adding a specific representation from the Assignee that it is not a Disqualified Institution, please discuss with the internal JPMCB counsel that covers the transaction. Please keep in mind that the Borrowers would have already reviewed and approved the primary syndicate in executing a Master Consent to Assignments and therefore the "not a Disqualified Institution" representation provides no additional protection for the Borrowers.

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 182 of 286

duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, any Arranger, the Assignor or any other Lender or any of their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3. <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Acceptance and adoption of the terms of this Assignment and Assumption by the Assignee and the Assignor by Electronic Signature or delivery of an executed counterpart of a signature page of this Assignment and Assumption by any Approved Electronic Platform shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 183 of 286

EXHIBIT B
<u>BORROWING BASE CERTIFICATE</u>

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 184 of 286

# BORROWING BASE CERTIFICATE

(Actual in US Dollars)

Client Name: Rad Power Bikes Inc

Collateral Component Name:

Collateral Component:

Certificate # 11
Certificate Date: 11/15/21
Period Covered: 10/01/21 to 10/31/21

| | | Accessories Inventory US INV01 | Spare Parts Inventory US INV02 | Finished Bicycles INV03 | Other Inventory US INV04 | On The Water Inventory US INV05 | | |
|---|---|---|---|---|---|---|---|---|
| | COLLATERAL AVAILABILITY | | | | | | | |
| 1 | Beginning Collateral Balance (Previous Certificate Line 3) | 3,814,835.05 | 2,293,789.71 | 7,461,102.38 | 28,831.95 | 27,560,033.82 | | |
| 2 | Net Change to Collateral | 801,112.67 | 945,540.57 | 16,923,544.34 | 6,556.12 | 12,189,339.13 | | |
| 3 | Ending Collateral Balance | 4,615,947.72 | 3,239,330.28 | 24,384,646.72 | 35,388.07 | 39,749,372.95 | Total Revolver Gross Collateral | 72,024,685.74 |
| 4 | Less Collateral Ineligibles (see attached schedule) | -145,927.18 | -137,217.91 | -751,804.54 | -3,919.40 | -39,749,372.95 | | |
| 5 | Eligible Collateral | 4,470,020.54 | 3,102,112.37 | 23,632,842.18 | 31,468.67 | 0.00 | Total Revolver Eligible Collateral | 31,236,443.76 |
| 5.A | Advance Rate Percentage | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | | |
| 6 | Gross Available - Borrowing Base Value | 2,682,012.32 | 1,861,267.42 | 14,179,705.31 | 18,881.20 | 0.00 | | |
| 6.A | Collateral CAPS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 7 | Net Available - Borrowing Base Value | 2,682,012.32 | 1,861,267.42 | 14,179,705.31 | 18,881.20 | 0.00 | | |
| 7.A | *Suppressed Availability* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | | |
| 7.B | *Effective Advance Rate* | *58.1%* | *57.5%* | *58.2%* | *53.4%* | *0.0%* | | |
| 8 | Total Gross Availability - Borrowing Base Value | 18,741,866.26 | | | | | | |
| 8.A | SOFA | 0.00 | | | | | | |
| 8.B | Less Availability Reserves (see attached schedule) | 0.00 | | | | | | |
| 9 | Total Availability - Maximum Borrowing Base Value | 18,741,866.26 | | | | | Total Revolver Line Availability | 18,741,866.26 |
| 10 | Revolver Line of Credit | 30,000,000.00 | | | | | | |
| 10.A | Less Line Reserves (see attached schedule) | 0.00 | | | | | Total Revolver Available to Borrow | 18,741,866.26 |
| 11 | Maximum Borrowing Limit (Lesser of Lines 9 less 10.A or 10 less 10.A) | 18,741,866.26 | | | | | | |
| 11.A | *Suppressed Availability* | *0.00* | | | | | | |
| | LOAN STATUS | | | | | | | |
| 12 | Previous Revolver Loan Balance (Previous Certificate Line 17) | 0.00 | | | | | | |
| 13 | Less: Net Collections (Current Certificate Line ) | 0.00 | | | | | | |
| 14 | Less: Adjustments / Payoff | 0.00 | | | | | | |
| 15 | Add: Request for Funds | 0.00 | | | | | | |
| 16 | Add: Adjustments / Term Loan Proceeds | 0.00 | | | | | | |
| 17 | Current Revolver Loan Balance | 0.00 | | | | | Total Current Revolver Loan Balance | 0.00 |
| 18 | Letters of Credit/Bankers Acceptance Outstanding | 0.00 | | | | | Outstanding Letters of Credit | 0.00 |
| 19 | | 0.00 | | | | | | 0.00 |
| 20 | Availability Not Borrowed (Lines 11 less 17 less 18 plus 19) | 18,741,866.26 | | | | | Revolver Availability Not Borrowed | 18,741,866.26 |
| 21 | OVERALL EXPOSURE (lines 17, 18 & 19) | 0.00 | | | | | OVERALL EXPOSURE | 0.00 |

Pursuant to, and in accordance with, the terms and provisions of that certain Credit Agreement dated as of November ___, 2020 (as it may be amended or modified from time to time, the "Agreement") between JPMorgan Chase Bank, N.A. (the "Lender"), and Rad Power Bikes LLC, a Washington limited liability company (the "Borrower"), the Borrower is executing and delivering to the Lender this Borrowing Base Certificate accompanied by supporting data in connection herewith to the extent required by the Agreement (collectively referred to as the "Certificate"). The Borrower warrants and represents to the Lender that this Certificate is true, correct, and is based on information contained in Borrower's own financial accounting records. The Borrower, by the execution of this Certificate, hereby ratifies, confirms and affirms all of the terms, conditions and provisions of the Agreement, and further certifies that, as of the date this Certificate is delivered to the Lender, (i) the representations and warranties of the Loan Parties set forth in the Agreement and the other Loan Documents are true and correct in all material respects and (ii) no Default or Event of Default has occurred or is continuing or would result after giving effect to any Borrowing as of the date hereof. Unless otherwise defined herein, capitalized terms used herein without definition are used as defined in the Agreement.

BORROWER NAME:

Rad Power Bikes Inc

Authorized Signature:

Amy Baker

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 185 of 286

EXHIBIT C

COMPLIANCE CERTIFICATE

To:     The Lenders parties to the
        Credit Agreement Described Below

This Compliance Certificate is furnished pursuant to that certain Amended and Restated Credit Agreement dated as of December 17, 2021 (as amended, modified, renewed or extended from time to time, the "Agreement") among Rad Power Bikes Inc. (the "Borrower Representative" and together with the other entities party thereto as borrowers from time to time, the "Borrowers"), the other Loan Parties, the Lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent for the Lenders. Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES, ON ITS BEHALF AND ON BEHALF OF THE BORROWERS, THAT:

1.      I am the duly elected _____ of the Borrower Representative;

2.      I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Company and its Subsidiaries during the accounting period covered by the attached financial statements **[for monthly financial statements add**: and such financial statements present fairly in all material respects the financial condition and results of operations of the Borrowers and their consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes];

3.      The examinations described in paragraph 2 did not disclose, except as set forth below, and I have no knowledge of (i) the existence of any condition or event which constitutes a Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate or (ii) any change in GAAP or in the application thereof that has occurred since the date of the audited financial statements referred to in Section 3.04 of the Agreement;

4.      I hereby certify that no Loan Party has changed (i) its name, (ii) its chief executive office, (iii) principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization without having given the Administrative Agent the notice required by Section 8.03 of this Agreement or Section 4.12 of the Security Agreement;

5.      Schedule I attached hereto sets forth financial data and computations evidencing the Borrowers' compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct[1].

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the (i) nature of the condition or event, the period during which it has existed and the action which the Borrowers

---

[1] Schedule I must include detailed calculation tables for all components of the financial covenant calculations.

Exhibit C
1

have taken, are taking, or propose to take with respect to each such condition or event or (i) the change in GAAP or the application thereof and the effect of such change on the attached financial statements:

_____

_____

_____

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this ___ day of _____, ____.

RAD POWER BIKES INC., as
Borrower Representative

By:_____

Name:_____

Title:_____

SCHEDULE I

Compliance as of _____, ____ with
Provisions of __ and ____ of the Agreement

[Schedule I must include detailed calculation tables for all components of the financial covenant calculations.]

EXHIBIT D

JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of _____, ____, 20__, is entered into between _____, a _____ (the "New Subsidiary") and JPMORGAN CHASE BANK, N.A., in its capacity as administrative agent (the "Administrative Agent") under that certain Amended and Restated Credit Agreement dated as of December 17, 2021 (as amended, modified, renewed or extended from time to time, the "Agreement") among Rad Power Bikes Inc. (the "Borrower Representative" and together with the other entities party thereto as borrowers from time to time, the "Borrowers"), the other Loan Parties party thereto, the Lenders party thereto and the Administrative Agent for the Lenders. All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

The New Subsidiary and the Administrative Agent, for the benefit of the Lenders, hereby agree as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Credit Agreement and a "Loan Guarantor" for all purposes of the Credit Agreement and shall have all of the obligations of a Loan Party and a Loan Guarantor thereunder as if it had executed the Credit Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Credit Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article III of the Credit Agreement, *[and]* (b) all of the covenants set forth in Articles V and VI of the Credit Agreement *[and (c) all of the guaranty obligations set forth in Article X of the Credit Agreement. Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Sections 10.10 and 10.13 of the Credit Agreement, hereby guarantees, jointly and severally with the other Loan Guarantors, to the Administrative Agent and the Lenders, as provided in Article X of the Credit Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Loan Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.]* *[The New Subsidiary has delivered to the Administrative Agent an executed Loan Guaranty.]*

2.      If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as requested by the Administrative Agent in accordance with the Credit Agreement.

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 189 of 286

3.     The address of the New Subsidiary for purposes of Section 9.01 of the Credit Agreement is as follows:

_____

_____

_____

_____

4.     The New Subsidiary hereby waives acceptance by the Administrative Agent and the Lenders of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

5.     This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.

6.     THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF [ILLINOIS][NEW YORK].

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Administrative Agent, for the benefit of the Lenders, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By:_____
Name:_____
Title:_____

Acknowledged and accepted:

JPMORGAN CHASE BANK, N.A., as
Administrative  Agent

By:_____
Name:_____
Title:_____

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 190 of 286

EXHIBIT E-1

[FORM OF]

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Amended and Restated Credit Agreement dated as of December 17, 2021 (as amended, modified, renewed or extended from time to time, the "Agreement") among Rad Power Bikes Inc. (the "Borrower Representative" and together with the other entities party thereto as borrowers from time to time, the "Borrowers"), the other Loan Parties party thereto, the Lenders party thereto and JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent for the Lenders.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower Representative with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower Representative and the Administrative Agent with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____
   Name:
   Title:

Date: _____, __, 20[ ]

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 191 of 286

EXHIBIT E-2

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Amended and Restated Credit Agreement dated as of December 17, 2021 (as amended, modified, renewed or extended from time to time, the "Agreement") among Rad Power Bikes Inc. (the "Borrower Representative" and together with the other entities party thereto as borrowers from time to time, the "Borrowers"), the other Loan Parties party thereto, the Lenders party thereto and JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent for the Lenders.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
  Name:
  Title:

Date: _____, __, 20[ ]

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 192 of 286

EXHIBIT E-3

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Amended and Restated Credit Agreement dated as of December 17, 2021 (as amended, modified, renewed or extended from time to time, the "Agreement") among Rad Power Bikes Inc. (the "Borrower Representative" and together with the other entities party thereto as borrowers from time to time, the "Borrowers"), the other Loan Parties party thereto, the Lenders party thereto and JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent for the Lenders.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by a withholding statement together with an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
  Name:
  Title:

Date: _____, __, 20[ ]

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 193 of 286

EXHIBIT E-4

[FORM OF]

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Amended and Restated Credit Agreement dated as of December 17, 2021 (as amended, modified, renewed or extended from time to time, the "Agreement") among Rad Power Bikes Inc. (the "Borrower Representative" and together with the other entities party thereto as borrowers from time to time, the "Borrowers"), the other Loan Parties party thereto, the Lenders party thereto and JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent for the Lenders.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any promissory note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower Representative with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower Representative and the Administrative Agent with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____

  Name:

  Title:

Date: _____, __, 20[ ]

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 194 of 286

# EXHIBIT B

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (as it may be amended or modified from time to time, this "***Security Agreement***") is entered into as of December 17, 2021, by and between RAD POWER BIKES INC., a  Delaware corporation (the "***Grantor***"), and JPMORGAN CHASE BANK, N.A., in its capacity as administrative agent (the "***Administrative Agent***") for the lenders party to the Credit Agreement referred to below.

### PRELIMINARY STATEMENT

The Grantor, the other Loan Parties (if any), the Lenders party thereto, and the Administrative Agent are entering into that certain Amended and Restated Credit Agreement of even date herewith (as it may be amended, restated, supplemented or otherwise or modified from time to time, the "***Credit Agreement***").  The Grantor is entering into this Security Agreement in order to induce the Lenders to enter into and extend credit to the Grantor under the Credit Agreement.

The Grantor and JPMorgan Chase Bank, N.A., as lender (the "***Existing Lender***"), have previously entered into that certain Security Agreement dated as of November 25, 2020 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "***Existing Security Agreement***").

The Grantor, the Existing Lender, the Lender, and Administrative Agent desire to amend and restate the Existing Security Agreement and it is the intent of the parties hereto that this Security Agreement amend and restate in its entirety the Existing Security Agreement, and this Security Agreement does not and shall not constitute a novation of the obligations and liabilities of the parties under the Existing Security Agreement.

ACCORDINGLY, the Grantor and the Administrative Agent, on behalf of the Secured Parties, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1.    <u>Terms Defined in Credit Agreement</u>.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

1.2.    <u>Terms Defined in UCC</u>.  Terms defined in the UCC which are not otherwise defined in this Security Agreement are used herein as defined in the UCC.

1.3.    <u>Definitions of Certain Terms Used Herein</u>.  As used in this Security Agreement, in addition to the terms defined in the first paragraph hereof and in the Preliminary Statement, the following terms shall have the following meanings:

"***Collateral***" shall have the meaning set forth in Article II.

"**Collateral Access Agreement**" means any landlord waiver or other agreement, in form and substance satisfactory to the Administrative Agent in its Permitted Discretion, between the Administrative Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any Grantor for any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"**Collateral Deposit Account**" shall have the meaning set forth in Section 7.1(a).

"**Collateral Report**" means the Borrowing Base Certificate and each other report or other document delivered by the Grantor to the Administrative Agent with respect to the Collateral pursuant to any Loan Document.

"**Commercial Tort Claims**" means the following existing commercial tort claims of the Grantor: N/A.

"**Control Agreement**" means an agreement, in form and substance satisfactory to the Administrative Agent in its Permitted Discretion, among the Grantor, a bank, financial institution, securities intermediary or other Person holding the Grantor's funds or maintaining a Deposit Account or Securities Account for the Grantor, and the Administrative Agent, with respect to collection and control of all deposits, balances, securities and other assets held in a Deposit Account or Securities Account maintained by any Grantor with such bank, financial institution, securities intermediary or other Person.

"**Copyrights**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing throughout the world.

"**Event of Default**" means an event described in <u>Article VII</u> of the Credit Agreement.

"**Excluded Collateral**" means collectively (a) Equity Interests of any Foreign Subsidiary, solely to the extent that such Equity Interests represent more than 65% of the issued and outstanding Equity Interests in such Foreign Subsidiary entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)); (b) any (i) rights or interest in any contract, lease, permit, license or license agreement and (ii) real or personal property, in each case, of any Grantor, if the grant of a security interest or lien therein is prohibited by applicable law or under the terms of any contract, lease, permit, license, or other agreement (or would give rise to a right of termination under such contract, lease, permit, license or other agreement) that is valid and binding on such Grantor and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or other agreement has not been obtained (provided, that,

(A) the foregoing exclusions of this clause (b) shall in no way be construed (x) to apply to Accounts or Inventory, (y) to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law, or (z) to apply to the extent that any consent or waiver has been obtained that would permit the Administrative Agent's security interest or lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or other agreement or any real or personal property subject thereto and (B) the foregoing exclusions of clauses (a) and (b) shall in no way be construed to limit, impair, or otherwise affect the Administrative Agent's continuing security interests in and liens upon any rights or interests of Grantor in or to (A) monies due or to become due under or in connection with any described contract, lease, permit, license, other agreement, or Equity Interests (including any Accounts), or (B) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license, other agreement, or Equity Interests); (c) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications or a registration issuing from such intent-to-use trademark application under applicable federal law, provided that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered Collateral; and (d) Excluded Accounts.

"**_Lock Box Agreement_**" and "**_Lock Boxes_**" shall have the respective meanings set forth in Section 7.1(a).

"**_Patents_**" means, with respect to any Person, all of such Person's right, title, and interest in and to: (a) any and all patents and patent applications; (b) all inventions and improvements described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, and continuations-in-part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing throughout the world.

"**_Pledged Collateral_**" means all Instruments, Securities and other Investment Property of the Grantor, to the extent constituting Collateral, whether or not physically delivered to the Administrative Agent pursuant to this Security Agreement.

"**_Receivables_**" means the Accounts, Chattel Paper, Documents, Investment Property, Instruments and any other rights or claims to receive money which are General Intangibles and which constitute Collateral.

"**_Security Agreement Disclosure Letter_**" means that certain Disclosure Letter, dated as of the Effective Date, delivered by the Grantor to the Administrative Agent.

"**_Trademarks_**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof and the

#152955086_v4

goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (f) all rights corresponding to any of the foregoing throughout the world.

"*UCC*" means the Uniform Commercial Code, as in effect from time to time, in the Governing State or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, Administrative Agent's Lien on any Collateral.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE II
## GRANT OF SECURITY INTEREST

The Grantor hereby pledges, collaterally assigns and grants to the Administrative Agent, on behalf of and for the benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, the Grantor (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Grantor, and regardless of where located (all of which will be collectively referred to as the "*Collateral*"), including:

(i)     all Accounts;

(ii)     all Chattel Paper;

(iii)     all Copyrights, Patents and Trademarks;

(iv)     all Documents;

(v)     all Equipment;

(vi)     all Fixtures;

(vii)     all General Intangibles;

(viii)     all Goods;

(ix)     all Instruments;

(x)     all Inventory;

4

(xi)     all Investment Property;

(xii)    all cash or cash equivalents;

(xiii)   all letters of credit, Letter-of-Credit Rights and Supporting Obligations;

(xiv)    all Deposit Accounts and Securities Accounts with any bank, financial institution, securities intermediary or other Person;

(xv)     all Commercial Tort Claims; and

(xvi)    all accessions to, substitutions for and replacements, proceeds (including all dividends and distributions), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing;

to secure the prompt and complete payment and performance of the Secured Obligations. Notwithstanding anything contained in this Security Agreement to the contrary, the term "Collateral" and the foregoing grant shall not include, and no security interest shall attach to, any Excluded Collateral; provided, that if and when any property shall cease to be Excluded Collateral, such property shall be deemed at all times from and after such date to constitute Collateral and a security interest shall attach to such Collateral to the extent otherwise subject to the grant clause in this Article II.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

The Grantor represents and warrants to the Administrative Agent that:

3.1.     <u>Title, Authorization, Validity, Enforceability, Perfection and Priority</u>.  The Grantor has good and valid rights in or title to, or the power to transfer the Collateral, free and clear of all Liens, except for Liens permitted under Section 6.02 of the Credit Agreement, and has full power and authority to grant to the Administrative Agent the security interest in the Collateral pursuant hereto.  This Security Agreement creates a security interest which is enforceable against the Grantor in all Collateral it now owns or hereafter acquires, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  When financing statements have been filed in the appropriate offices against the Grantor in Grantor's jurisdiction of incorporation or formation listed in Section H of the Security Agreement Disclosure Letter or in such locations as are otherwise notified to Administrative Agent from time to time pursuant to this Security Agreement or Section 6.03 of the Credit Agreement, the Administrative Agent will have a fully perfected first priority security interest in that Collateral

in which a security interest may be perfected by such filings, subject only to Liens permitted under Section 6.02 of the Credit Agreement.

3.2. <u>Type and Jurisdiction of Organization, Organizational and Identification Numbers</u>. The type of entity of the Grantor, its state of organization, the organizational number issued to it by its state of organization and its federal employer identification number are either set forth in Section A of the Security Agreement Disclosure Letter or have been notified to Administrative Agent from time to time pursuant to Section 6.03 of the Credit Agreement.

3.3. <u>Principal Location</u>. As of the Effective Date, the Grantor's mailing address, and the location of its places of business and its chief executive office, are disclosed in Section A of the Security Agreement Disclosure Letter; as of the Effective Date, the Grantor has no other places of business except those set forth in Section A of the Security Agreement Disclosure Letter.

3.4. <u>Collateral Locations</u>. As of the Effective Date, all of Grantor's locations containing Collateral with a value in excess of $50,000 for each such location are listed in Section A of the Security Agreement Disclosure Letter. All of said locations are owned by the Grantor except for locations (a) which are leased by the Grantor as lessee and or (b) at which Inventory is held in a public warehouse or is otherwise held by a bailee or on consignment.

3.5. <u>Deposit and Securities Accounts</u>. As of the Effective Date, all of the Grantor's Deposit Accounts and Securities Accounts (other than Excluded Accounts) are listed on in Section B of the Security Agreement Disclosure Letter.

3.6. <u>Exact Names</u>. As of the Effective Date, the Grantor's name in which it has executed this Security Agreement is the exact name as it appears in the Grantor's organizational documents, as amended, as filed with the Grantor's jurisdiction of organization. As of the Effective Date, the Grantor has not, during the past five years, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition, except as disclosed in Section A of the Security Agreement Disclosure Letter.

3.7. <u>Letter-of-Credit Rights and Chattel Paper</u>. Section C of the Security Agreement Disclosure Letter lists all Letter-of-Credit Rights and Chattel Paper of the Grantor owned by the Grantor as of the Effective Date and having a value in excess of $100,000 individually. All action by the Grantor requested by the Administrative Agent in its Permitted Discretion to perfect the Administrative Agent's Lien on each item listed in Section C of the Security Agreement Disclosure Letter (including the delivery of all originals and the placement of a legend on all Chattel Paper as required hereunder) has been duly taken. Upon the taking of the actions expressly required by this Security Agreement, the Administrative Agent will have a fully perfected first priority security interest in the Collateral listed in Section C of the Security Agreement Disclosure Letter to the extent that such actions were required to be taken with respect to such Collateral and that the security interest in such Collateral can be perfected by the taking of such actions, subject only to Liens permitted under Section 6.02 of the Credit Agreement.

3.8. <u>Accounts and Chattel Paper</u>.

(a) The names of the obligors, amounts owing, due dates and other information with respect to its Accounts and Chattel Paper are correctly stated in all material respects

#152955086_v4

in all records of the Grantor relating thereto and in all invoices and Collateral Reports with respect thereto furnished to the Administrative Agent by the Grantor from time to time.

(b)     Except as specifically disclosed to Administrative Agent and solely with respect to Accounts scheduled or listed on the most recent Borrowing Base Report, (i) all Accounts are Eligible Accounts; (ii) all Accounts represent bona fide sales of Inventory or rendering of services to Account Debtors in the ordinary course of the Grantor's business and are not evidenced by a judgment, Instrument or Chattel Paper; (iii) there are no setoffs, claims or disputes existing or asserted with respect thereto and the Grantor has not made any agreement with any Account Debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except in, each case, to the extent expressly permitted by the Loan Documents (including, without limitation, Section 5.15 of the Credit Agreement); (iv) there are no facts, events or occurrences known to any Responsible Officer which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on the Grantor's books and records and any invoices, statements and Collateral Reports with respect thereto; (v) no Responsible Officer has received any notice of proceedings or actions which are threatened in writing or pending against any Account Debtor which would reasonably be expected to result in any material adverse change in such Account Debtor's financial condition; and (vi) no Responsible Officer has knowledge that any Account Debtor has become insolvent or is generally unable to pay its debts as they become due.

(c)     In addition, with respect to all Accounts included in the most recent Borrowing Base Certificate (i) the amounts shown on all invoices, statements and Collateral Reports with respect thereto are actually and absolutely owing to the Grantor as indicated thereon and are not in any way contingent; (ii) no payments have been made or shall be made thereon except payments promptly delivered to a Lock Box or a Collateral Deposit Account as required pursuant to this Agreement; and (iii) to the knowledge of any Responsible Officer, all Account Debtors have the capacity to contract.

3.9.    Inventory.  With respect to any Inventory scheduled or listed on the most recent Collateral Report, (a) such Inventory (other than Inventory in transit) is located at one of the Grantor's locations set forth in Section A of the Security Agreement Disclosure Letter or otherwise maintained by Grantor in accordance with the Loan Documents (including, without limitation, Section 4.1(g)), (b) prior to the sale or other disposition of such Inventory,  no such Inventory (other than Inventory in transit) is now, or shall at any time or times hereafter be stored at any other location except as permitted by Section 4.1(g), (c) the Grantor has good, indefeasible and merchantable title to such Inventory, except for any purported retention of title by any manufacturer of such Inventory in such Inventory so long as such retention of title is treated as a security interest under Article 9 of the UCC and the manufacturer has not taken any action to perfect such Lien, and such Inventory is not subject to any Lien or security interest or document whatsoever except for Liens permitted under Section 6.02 of the Credit Agreement, (d) except as specifically disclosed in the most recent Collateral Report, such Inventory is Eligible Inventory of good and merchantable quality, free from any defects, (e) such Inventory is not subject to any licensing, patent, royalty, Trademark, trade name or Copyright agreements with any third parties

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 202 of 286

which would require any consent of any third party upon sale or disposition of that Inventory (other than such consents as have already been obtained) or the payment of any monies to any third party upon such sale or other disposition, (f) such Inventory has been produced in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder, and (g) the completion of manufacture, sale or other disposition of such Inventory by the Administrative Agent following the occurrence and during the continuance of an Event of Default shall not require the consent of any Person (other than such consent as has already been obtained) and shall not constitute a breach or default under any contract or agreement to which the Grantor is a party or to which such property is subject.

3.10.  <u>Intellectual Property</u>.  As of the Effective Date, the Grantor does not own any registered Patent, Trademark or Copyright (or any application for such registration) except as set forth in Section D of the Security Agreement Disclosure Letter.  This Security Agreement is effective to create a valid and continuing Lien and, upon filing of appropriate financing statements in the offices listed on Section H of the Security Agreement Disclosure Letter and an intellectual property security agreement with the United States Copyright Office and/or the United States Patent and Trademark Office, as applicable, fully perfected first priority security interests in favor of the Administrative Agent on the Grantor's Patents, Trademarks and Copyrights constituting Collateral, in each case, to the extent a security interest therein may be perfected by the taking of such measures, which perfected security interests are enforceable as such as against any and all creditors of and purchasers from the Grantor.

3.11.  <u>Filing Requirements</u>.  As of the Effective Date, none of Grantor's Equipment is covered by any certificate of title, except for the vehicles described in Part I of Section E of the Security Agreement Disclosure Letter.  None of the Collateral is of a type for which security interests or liens may be perfected by filing under any federal statute except for (a) the vehicles described in Part II of Section E of the Security Agreement Disclosure Letter and (b) Patents, Trademarks and Copyrights held by the Grantor.

3.12.  <u>No Financing Statements, Security Agreements</u>.  No financing statement or security agreement describing all or any portion of the Collateral which has not lapsed or been terminated (by a filing authorized by the secured party in respect thereof) naming the Grantor as debtor has been filed or is of record in any jurisdiction except for financing statements or security agreements (a) naming the Administrative Agent as the secured party or (b) with respect to other Liens permitted under Section 6.02 of the Credit Agreement.

3.13.  <u>Pledged Collateral</u>.

(a)  Section G of the Security Agreement Disclosure Letter sets forth a complete and accurate list of all of the Pledged Collateral as of the Effective Date.  As of the Effective Date, the Grantor is the direct, sole beneficial owner and sole holder of record of the Pledged Collateral listed in Section G of the Security Agreement Disclosure Letter as being owned by it, free and clear of any Liens, except for the security interest granted to Administrative Agent hereunder and any Liens permitted by Section 6.02 of the Credit Agreement. The Grantor further represents and warrants that (i) all Pledged Collateral constituting an Equity Interest has been (to the extent such concepts are relevant with respect to such Pledged Collateral) duly authorized and validly issued, and are fully paid

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 203 of 286

and non-assessable, (ii) with respect to any certificates delivered to the Administrative Agent representing an Equity Interest, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise, or, if such certificates are not Securities, the Grantor has so informed the Administrative Agent so that the Administrative Agent may take steps to perfect its security interest therein as a General Intangible, (iii) to the extent required by this Security Agreement and the Credit Agreement, all Pledged Collateral (other than any Pledged Collateral with a value not in excess of $250,000 individually or $500,000 in the aggregate) held by a securities intermediary is covered by a Control Agreement among the Grantor, the securities intermediary and the Administrative Agent pursuant to which the Administrative Agent has Control and (iv) to Grantor's knowledge, all Pledged Collateral which represents Indebtedness owed to the Grantor has been duly authorized, authenticated or issued and delivered by the issuer of such Indebtedness, and is the legal, valid and binding obligation (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles or equity, regardless of whether considered in a proceeding in equity or at law) of such issuer and such issuer is not in default thereunder.

(b)     In addition, (i) none of the Pledged Collateral owned by it has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) no options, warrants, calls or commitments of any character whatsoever (A) exist relating to the Pledged Collateral or (B) obligate the issuer of any Equity Interest included in the Pledged Collateral to issue additional Equity Interests, and (iii) no consent, approval, authorization, or other action by, and no giving of notice or filing with, any Governmental Authority or any other Person is required for the pledge by the Grantor of the Pledged Collateral pursuant to this Security Agreement or for the execution, delivery and performance of this Security Agreement by the Grantor, or for the exercise by the Administrative Agent of the voting or other rights provided for in this Security Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Security Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally, as may from time to time be applicable under the laws of any jurisdiction outside of the United States to any Equity Interests of any Foreign Subsidiary, and except to the extent provided under the organizational documents of any Subsidiary that is a limited liability company.

(c)     Except as set forth in Section G of the Security Agreement Disclosure Letter, the Grantor owns 100% of the issued and outstanding Equity Interests which constitute Pledged Collateral and none of the Pledged Collateral which represents Indebtedness owed to the Grantor is subordinated in right of payment to other Indebtedness or subject to the terms of an indenture.

## ARTICLE IV
## COVENANTS

From the date of this Security Agreement, and thereafter until this Security Agreement is terminated, the Grantor agrees that:

#152955086_v4

4.1     <u>General</u>.

(a)     <u>Collateral Records</u>.  The Grantor will maintain complete and accurate books and records in all material respects with respect to the Collateral and furnish to the Administrative Agent such reports relating to such Collateral as the Administrative Agent shall from time to time request in its Permitted Discretion.

(b)     <u>Authorization to File Financing Statements; Ratification</u>.  The Grantor hereby authorizes the Administrative Agent to file, and if requested (subject to the exceptions and qualifications set forth herein and in the other Loan Documents) will deliver to the Administrative Agent, all financing statements and other documents and take such other actions as may from time to time be requested by the Administrative Agent in its Permitted Discretion in order to maintain a first perfected security interest (subject to liens permitted by Section 6.02 of the Credit Agreement) in and, if applicable, Control of, the Collateral.  Any financing statement filed by the Administrative Agent may be filed in such offices as Administrative Agent reasonably determines to be appropriate to perfect the security interest of the Administrative Agent under this Security Agreement and may (i) indicate the Collateral (A) as all assets of the Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (B) by any other description which reasonably approximates the description contained in this Security Agreement, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor, and (B) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  The Grantor also agrees to furnish any such information described in the foregoing sentence to the Administrative Agent promptly upon request.  The Grantor also ratifies its authorization for the Administrative Agent to have filed in any filing office as Administrative Agent reasonably determined to be appropriate to perfect the security interest of the Administrative Agent under this Security Agreement any initial financing statements or amendments thereto if filed prior to the date hereof.

(c)     <u>Further Assurances</u>.  The Grantor will, if so requested by the Administrative Agent, furnish to the Administrative Agent, as often as the Administrative Agent requests in its Permitted Discretion, statements and schedules further identifying and describing the Collateral and such other reports and information in connection with the Collateral as the Administrative Agent may reasonably request in its Permitted Discretion, all in such detail as the Administrative Agent may specify in its Permitted Discretion.  Subject to the limitations set forth herein, Grantor agrees to take any and all actions necessary to defend title to the Collateral against all Persons and to defend the security interest of the Administrative Agent in the Collateral and the priority thereof against any Lien not expressly permitted hereunder or under the Credit Agreement.

(d)     [Reserved].

(e)     [Reserved].

(f)     Other Financing Statements.  The Grantor will not authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral, except for financing statements (i) naming the Administrative Agent as the secured party and/or (ii) in respect to Liens permitted under Section 6.02 of the Credit Agreement. The Grantor acknowledges that it is not authorized to file any financing statement with respect to this Security Agreement or the Administrative Agent, or any amendment or termination thereof, without the prior written consent of the Administrative Agent, subject to the Grantor's rights under Section 9-509(d)(2) of the UCC.

(g)     Locations. The Grantor will not maintain any Collateral with a value in excess of $50,000 (other than *de minimis* Collateral held by employees and Collateral in-transit)   at any location other than those locations listed in Section A of the Security Agreement Disclosure Letter as of the Effective Date or as otherwise disclosed in writing to the Administrative Agent.

(h)     [Reserved].

(i)     Titled Vehicles.  The Grantor will give the Administrative Agent notice of its acquisition of any vehicle with a value in excess of $150,000 (other than any vehicle subject to a Lien that is permitted under Section 6.02(d) of the Credit Agreement) covered by a certificate of title and deliver to the Administrative Agent, upon request, the original of any such vehicle title certificate and provide and/or file all other documents or instruments necessary to have the Lien of the Administrative Agent noted on any such certificate or with the appropriate state office.

(j)     Control.  The Grantor shall take all steps requested by Administrative Agent in its Permitted Discretion to grant the Administrative Agent Control of all electronic chattel paper with a value in excess of $250,000 individually or $500,000 in the aggregate or all such electronic chattel paper in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

4.2     Delivery of Instruments, Securities, Chattel Paper and Documents. The Grantor will (a) deliver to the Administrative Agent immediately upon execution of this Security Agreement the originals of all Chattel Paper, Securities and Instruments constituting Collateral (if any then exist), in each case, solely to the extent such item of Chattel Paper, Security or Instrument exceeds $250,000 individually or $500,000 in the aggregate, (b) hold in trust for the Administrative Agent upon receipt and promptly thereafter deliver to the Administrative Agent any Chattel Paper, Securities and Instruments constituting Collateral owned by it, in each case, solely to the extent such item of Chattel Paper, Security or Instrument exceeds $250,000 individually or $500,000 in the aggregate, (c) upon the Administrative Agent's request, deliver to the Administrative Agent (and thereafter hold in trust for the Administrative Agent upon receipt and immediately deliver to the Administrative Agent) any Document evidencing or constituting Collateral owned by it and (d) promptly upon the Administrative Agent's request, deliver to the Administrative Agent a duly executed amendment to this Security Agreement, in the form satisfactory to the Administrative

#152955086_v4

Agent (the "***Amendment***"), pursuant to which the Grantor will pledge such additional Collateral. The Grantor hereby authorizes the Administrative Agent to attach each Amendment to this Security Agreement and agrees that all additional Collateral set forth in such Amendments shall be considered to be part of the Collateral.

4.3     Uncertificated Pledged Collateral. The Grantor will permit the Administrative Agent from time to time to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Pledged Collateral not represented by certificates and with a value in excess of $250,000 individually or $500,000 in the aggregate to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Pledged Collateral not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Administrative Agent granted pursuant to this Security Agreement.  With respect to Pledged Collateral, the Grantor will take any actions necessary and requested by Administrative Agent in its Permitted Discretion to cause (a) the issuers of uncertificated securities which are Pledged Collateral and (b) any securities intermediary which is the holder of any Pledged Collateral, to cause the Administrative Agent to have and retain Control over such Pledged Collateral.

4.4     Pledged Collateral.

(a)     [Reserved].

(b)     Issuance of Additional Securities.  The Grantor will not permit or suffer the issuer of an Equity Interest that is a Subsidiary constituting Pledged Collateral to issue additional Equity Interests, any right to receive the same or any right to receive earnings, except to the Grantor, other than directors' qualifying shares and/or other nominal amounts of Equity Interests required to be held by Persons other than the Grantor or any Subsidiary under applicable law.

(c)     Registration of Pledged Collateral.  Upon the occurrence and during the continuance of an Event of Default, the Grantor will permit any registerable Pledged Collateral to be registered in the name of the Administrative Agent or its nominee at any time at the option of the Administrative Agent.

(d)     Exercise of Rights in Pledged Collateral.

(i)     Without in any way limiting the foregoing and subject to clause (ii) below, the Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral for all purposes that do not violate this Security Agreement, the Credit Agreement or any other Loan Document; provided however, that no vote or other right shall be exercised or action taken which would have the effect of impairing the rights of the Administrative Agent in respect of the Pledged Collateral in any material respect.

(ii)     The Grantor will permit the Administrative Agent or its nominee at any time after the occurrence and during the continuance of an Event of Default, upon notice by Administrative Agent (to the extent such notice is not prohibited by

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 207 of 286

applicable law), to exercise all voting rights or other rights relating to the Pledged Collateral, including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any Equity Interest or Investment Property constituting such Pledged Collateral as if it were the absolute owner thereof.

(iii) The Grantor shall be entitled to collect and receive for its own use all cash dividends and interest paid in respect of the Pledged Collateral to the extent not in violation of the Credit Agreement other than any of the following distributions and payments (collectively referred to as the "***Excluded Payments***"): (A) dividends and interest paid or payable other than in cash in respect of any Pledged Collateral, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral; and (B) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in capital of an issuer; provided however, that until actually paid, all rights to such distributions shall remain subject to the Lien created by this Security Agreement.

(iv) All Excluded Payments and all other distributions in respect of any Pledged Collateral, whenever paid or made, shall be delivered to the Administrative Agent to hold as Pledged Collateral and shall, if received by the Grantor, be received in trust for the benefit of the Administrative Agent, be segregated from the other property or funds of the Grantor, and be forthwith delivered to the Administrative Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

(e) Interests in Limited Liability Companies and Limited Partnerships. The Grantor agrees that no ownership interests in a limited liability company or a limited partnership which are included within the Collateral shall at any time constitute a Security under Article 8 of the UCC of the applicable jurisdiction, unless at least ten (10) days prior written notice is provided to Administrative Agent and Administrative Agent is able to properly perfect is security interest in such ownership interests, including, without limitation, by obtaining control of any uncertificated ownership interests governed by Article 8 of the UCC.

4.5 Intellectual Property.

(a) Grantor will use its commercially reasonable efforts to secure all consents and approvals necessary or appropriate to permit the assignment to or benefit of the Administrative Agent of any license by the Grantor of any Patent, Trademark or Copyright (and all rights under or relating to such license) constituting Collateral (other than generally available commercial software) and which is material to the operation of Grantor's business and held by the Grantor to enforce the security interests granted hereunder.

(b) The Grantor shall promptly notify the Administrative Agent if any Responsible Officer has reason to know that any application or registration relating to any Patent, Trademark or Copyright (now or hereafter existing), which is material to Grantor's

#152955086_v4

business, will become abandoned or dedicated, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) regarding the Grantor's ownership of any Patent, Trademark or Copyright, which is material to the Grantor's business, its right to register the same, or to keep and maintain the same.

(c)     At the time of delivery of the financial statements required pursuant to Sections 5.01(a) or (b) of the Credit Agreement, the Grantor shall provide to Administrative Agent a list of all applications for the registration of any Patent or Trademark filed with the United States Patent and Trademark Office or any similar office or agency by or on behalf of the Grantor during the quarter to which such financial statements relate and all Patent or Trademark registrations and applications therefor acquired by Grantor during such month. Grantor shall provide Administrative Agent with at least ten (10) days' prior written notice of any applications for the registration of any Copyright with the United States Copyright Office. Upon request of Administrative Agent, Grantor shall execute and deliver any and all security agreements as Administrative Agent may request to evidence Administrative Agent's first priority security interest (subject to Liens permitted under Section 6.02 of the Credit Agreement) on any such Patent, Trademark or Copyright registrations and applications constituting Collateral.

(d)     The Grantor shall take all actions necessary or requested by the Administrative Agent in its Permitted Discretion, to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of its Patents, Trademarks and Copyrights (now or hereafter existing), which are, in each case, material to the conduct of the Grantor's business.

(e)     The Grantor shall take such actions as it shall reasonably determine are necessary and appropriate to enforce its rights against any infringement, misappropriation or dilution of its Patents, Trademarks or Copyrights that are material to its business. In the event that the Grantor institutes suit because any of its Patents, Trademarks or Copyrights constituting Collateral are infringed upon, or misappropriated or diluted by a third party, the Grantor shall comply with Section 4.6.

4.6     Commercial Tort Claims.  At the time of delivery of the financial statements pursuant to Sections 5.01(a) or (b) of the Credit Agreement, the Grantor shall notify Administrative Agent of any Commercial Tort Claim (other than any such Commercial Tort Claims not in excess of $250,000 individually or $500,000 in the aggregate) acquired by it during the quarter to which such financial statements relate and upon request of Administrative Agent, the Grantor shall enter into an Amendment to this Security Agreement, in the form and substance satisfactory to Administrative Agent in its reasonable discretion, granting to Administrative Agent a first priority security interest (subject to Liens permitted under Section 6.02 of the Credit Agreement) in such Commercial Tort Claim.

4.7     Letter-of-Credit Rights.  At the time of delivery of the financial statements pursuant to Sections 5.01(a) or (b) of the Credit Agreement,  the Grantor shall provide Administrative Agent with a list of letters of credit (other than any such letters not in excess of $250,000 individually or

$500,000 in the aggregate) with respect to which Grantor is a beneficiary and, upon request of Administrative Agent, use commercially reasonable efforts to cause the issuer and/or confirmation bank to (a) consent to the assignment of any Letter-of-Credit Rights to the Administrative Agent and (b) agree to direct all payments thereunder to a Deposit Account at the Administrative Agent or subject to a Control Agreement for application to the Secured Obligations, in accordance with Section 2.18 of the Credit Agreement, all in form and substance reasonably satisfactory to the Administrative Agent.

4.8    Federal, State or Municipal Claims.   The Grantor will promptly notify the Administrative Agent of any Collateral which constitutes a claim against the United States government or any state or local government or any instrumentality or agency thereof, the assignment of which claim is restricted by federal, state or municipal law.

4.9    [Reserved].

4.10    Collateral Access Agreements.   The Grantor shall use commercially reasonable efforts to obtain a Collateral Access Agreement from the lessor of each leased property, mortgagee of owned property or bailee or consignee with respect to any warehouse, processor or converter facility or other third-party location where Collateral with a value in excess of $100,000 for each such location is stored or located.   After the Effective Date, no new real property or warehouse space shall be leased by the Grantor and no Inventory shall be shipped to a processor or converter not utilized by the Grantor prior to the Effective Date, in each case if such location would contain Collateral with a value in excess of $1,000,000, unless and until a Collateral Access Agreement shall first have been obtained with respect to such location; provided that, the Administrative Agent may, in its discretion, defer delivery of any such Collateral Access Agreement and establish a Reserve with respect to any such location for which the Administrative Agent has not received such Collateral Access Agreement.   Notwithstanding anything in this Section 4.10, no Collateral Access Agreement shall be required for any locations maintained by Grantor outside of the U.S. so long as any Inventory included as Eligible Inventory in the most recent Borrowing Base Certificate delivered to Administrative Agent is not moved to locations maintained by Grantor outside of the U.S.

4.11    Control Agreements.   The Grantor will provide to the Administrative Agent promptly upon the Administrative Agent's request, a Control Agreement duly executed on behalf of each bank, financial institution, securities intermediary or other Person holding the Grantor's funds or maintaining a Deposit Account or Securities Account for the Grantor (in each case, other than any Excluded Account); provided that, the Administrative Agent may, in its discretion, defer delivery of any such Control Agreement, establish a Reserve with respect to any Deposit Account or Securities Account for which the Administrative Agent is required to have received a Control Agreement and has not received such Control Agreement, and require the Grantor to open and maintain a new Deposit Account or Securities Account with a bank, financial institution, securities intermediary or other Person subject to a Control Agreement.

4.12    Change of Name or Location.   The Grantor shall not change its chief executive office or principal place of business, unless Administrative Agent shall have received at least ten (10) days (or such shorter period as may be agreed by Administrative Agent in its sole discretion) prior written notice of such change.

#152955086_v4

# ARTICLE V
# REMEDIES

5.1     <u>Remedies</u>.

(a)     Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may exercise any or all of the following rights and remedies:

(i)     those rights and remedies provided in this Security Agreement, the Credit Agreement, or any other Loan Document; <u>provided</u> that, this Section 5.1(a) shall not be understood to limit any rights or remedies available to the Administrative Agent prior to an Event of Default;

(ii)     those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement;

(iii)     give notice of sole control or any other instruction under any Control Agreement and take any action therein with respect to the Collateral subject thereto;

(iv)     without notice (except as specifically provided in Section 8.1 or elsewhere herein), demand or advertisement of any kind to the Grantor or any other Person, enter the premises of the Grantor where any Collateral is located (through self-help and without judicial process) to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at the Grantor's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable; and

(v)     concurrently with written notice to the Grantor, transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof.

(b)     The Administrative Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

#152955086_v4

(c)     The Administrative Agent shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Administrative Agent the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption the Grantor hereby expressly releases.

(d)     Until the Administrative Agent is able to effect a sale, lease, or other disposition of Collateral, the Administrative Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent. The Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Administrative Agent's remedies, with respect to such appointment without prior notice or hearing as to such appointment.

(e)     If, after the Credit Agreement has terminated by its terms and all of the Obligations have been paid in full, there remain Swap Agreement Obligations outstanding, the Administrative Agent may exercise the remedies provided in this Section 5.1 upon the occurrence of any event which would allow or require the termination or acceleration of any Swap Agreement Obligations pursuant to the terms of the Swap Agreement.

(f)     Notwithstanding the foregoing, the Administrative Agent shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against, the Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of its rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(g)     The Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof in accordance with clause (a) above.  The Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Grantor or the issuer of the Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the Grantor and the issuer would agree to do so.

5.2     <u>Grantor's Obligations upon Default</u>.  Upon the request of the Administrative Agent after the occurrence and during the continuance of an Event of Default, the Grantor will:

#152955086_v4

(a)     assemble and make available to the Administrative Agent the Collateral and all books and records relating thereto at any place or places specified by the Administrative Agent, whether at the Grantor's premises or elsewhere;

(b)     permit the Administrative Agent, by the Administrative Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Grantor for such use and occupancy;

(c)     [Reserved];

(d)     take, or cause an issuer of Pledged Collateral that is a Subsidiary of Grantor to take, any and all actions necessary to register or qualify the Pledged Collateral to enable the Administrative Agent to consummate a public sale or other disposition of the Pledged Collateral; provided, that Grantor shall not be required to take any actions to register or qualify any Pledged Collateral under any federal or state securities laws or any other similar or equivalent rules or regulations; and

(e)     at its own expense, cause the independent certified public accountants then engaged by the Grantor to prepare and deliver to the Administrative Agent, at any time, and from time to time, promptly upon the Administrative Agent's request, the following reports with respect to the Grantor: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts.

5.3     <u>Grant of Intellectual Property License</u>.  Solely for the purpose of enabling the Administrative Agent to exercise the rights and remedies under this <u>Article V</u> during such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, the Grantor hereby (a) grants to the Administrative Agent, for the benefit of itself and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Grantor) to use, license or sublicense any intellectual property rights now owned or hereafter acquired by the Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof and (b) irrevocably agrees that the Administrative Agent may sell any of the Grantor's Inventory constituting Collateral directly to any person, including without limitation persons who have previously purchased the Grantor's Inventory from the Grantor and in connection with any such sale or other enforcement of the Administrative Agent's rights under this Security Agreement, may sell Inventory which bears any Trademark owned by or licensed to the Grantor and any Inventory that is covered by any Copyright owned by or licensed to the Grantor and the Administrative Agent may finish any work in process and affix any Trademark owned by or licensed to the Grantor and sell such Inventory as provided herein.

**ARTICLE VI**
**ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY**

25-02182-WLH11   Doc 16   Filed 12/15/25   Entered 12/15/25 15:40:58   Pg 213 of 286

6.1 <u>Account Verification</u>.  The Administrative Agent may, at any time, in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent, or in the name of the Grantor communicate (by mail, telephone, facsimile or otherwise) with (a) the Account Debtors of the Grantor and (b) without limiting clause (a), parties to contracts with the Grantor and obligors in respect of Instruments of the Grantor, in the case of this clause (b), after the occurrence and during the continuation of an Event of Default, to verify with such Persons, to the Administrative Agent's satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper, payment intangibles and/or other Receivables.

6.2 <u>Authorization for Administrative Agent to Take Certain Action</u>.

(a) Subject to paragraph (b) below, the Grantor irrevocably authorizes the Administrative Agent at any time and from time to time in the sole discretion of the Administrative Agent and appoints the Administrative Agent as its attorney-in-fact to (i) execute on behalf of the Grantor as debtor and file financing statements necessary or desirable in the Administrative Agent's sole discretion to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral, (ii) endorse and collect any cash proceeds of the Collateral, (iii) file a carbon, photographic or other reproduction of this Security Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as the Administrative Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral, (iv) contact and enter into one or more agreements with the issuers of uncertificated securities which are Pledged Collateral or with securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Administrative Agent Control over such Pledged Collateral, (v) apply the proceeds of any Collateral received by the Administrative Agent to the Secured Obligations as provided in Section 2.10 or 2.18 of the Credit Agreement, (vi) discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens that are permitted under Section 6.02 of the Credit Agreement), (vii) contact Account Debtors for any reason, (viii) demand payment or enforce payment of the Receivables in the name of the Administrative Agent or the Grantor and to endorse any and all checks, drafts, and other instruments for the payment of money relating to the Receivables, (ix) sign the Grantor's name on any invoice or bill of lading relating to the Receivables, drafts against any Account Debtor of the Grantor, assignments and verifications of Receivables, (x) exercise all of the Grantor's rights and remedies with respect to the collection of the Receivables and any other Collateral, (xi) settle, adjust, compromise, extend or renew the Receivables, (xii) settle, adjust or compromise any legal proceedings brought to collect Receivables, (xiii) prepare, file and sign the Grantor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of the Grantor, (xiv) prepare, file and sign the Grantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables, (xv) in the case of any intellectual property owned by Grantor, execute, deliver and have recorded any document that the Administrative Agent may reasonably request to evidence, effect, publicize or record the Administrative Agent's security interest in such intellectual property and the goodwill and

#152955086_v4

General Intangibles of Grantor relating thereto or represented thereby, and (xvi) do all other acts and things necessary to carry out this Security Agreement; and the Grantor agrees to reimburse the Administrative Agent on demand for any payment made or any expense incurred by the Administrative Agent in connection with any of the foregoing; provided that, this authorization shall not relieve the Grantor of any of its obligations under this Security Agreement or under the Credit Agreement.

(b) All acts of said attorney or designee are hereby ratified and approved. The powers conferred on the Administrative Agent under this Section 6.2 are solely to protect the Secured Parties' interests in the Collateral and shall not impose any duty upon the Administrative Agent to exercise any such powers. The Administrative Agent agrees that, except for the powers granted in Section 6.2(a)(i) through (vi), it shall not exercise any power or authority granted to it unless an Event of Default has occurred and is continuing.

6.3    Proxy. THE GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS THE PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.2 ABOVE) OF THE GRANTOR WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING THE RIGHT TO VOTE ANY OF THE PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO. IN ADDITION TO THE RIGHT TO VOTE ANY OF THE PLEDGED COLLATERAL, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF ANY OF THE PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY OF THE PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF THE PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT DEFAULT.

6.4    Nature of Appointment; Limitation of Duty. THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS ARTICLE VI IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS SECURITY AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 8.13. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES, NOR ANY OF ITS OR ITS AFFILIATES' RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

# ARTICLE VII
# COLLECTION AND APPLICATION OF COLLATERAL PROCEEDS; DEPOSIT ACCOUNTS

7.1     <u>Collection of Receivables and other Proceeds</u>.

(a)     On or before the Effective Date, the Grantor shall (i) execute and deliver to the Administrative Agent Control Agreements for each Deposit Account (other than Excluded Accounts) maintained by the Grantor into which all cash, checks or other similar payments relating to or constituting payments made in respect of Receivables or the proceeds of other Collateral will be deposited (each a "***Collateral Deposit Account***"), which Collateral Deposit Accounts are identified as such on Section B of the Security Agreement Disclosure Letter, and (ii) establish lock box service (the "***Lock Boxes***") with the bank(s) set forth in Section B of the Security Agreement Disclosure Letter, which Lock Boxes shall be subject to irrevocable lockbox agreements in the form provided by or otherwise acceptable to the Administrative Agent in its Permitted Discretion and shall be accompanied by an acknowledgment by the bank where the Lock Box is located of the Lien of the Administrative Agent granted hereunder and of irrevocable instructions to wire all amounts collected therein to the Collection Account (each, a "***Lock Box Agreement***").

(b)     The Grantor shall direct all of its Account Debtors to forward payments directly to Lock Boxes subject to Lock Box Agreements or to a Collateral Deposit Account. The Administrative Agent shall have sole access to the Lock Boxes and Collateral Deposit Accounts at all times and the Grantor shall take all actions necessary to grant the Administrative Agent such sole access.  At no time shall the Grantor remove any item from a Lock Box or a Collateral Deposit Account without the Administrative Agent's prior written consent.  If the Grantor should refuse or neglect to notify any Account Debtor to forward payments directly to a Lock Box subject to a Lock Box Agreement after notice from the Administrative Agent, the Administrative Agent shall, notwithstanding the language set forth in Section 6.2(b), be entitled to make such notification directly to such Account Debtor.  If notwithstanding the foregoing instructions, the Grantor receives any proceeds of any Receivables or other Collateral, the Grantor shall receive such payments as the Administrative Agent's trustee, and shall immediately deposit all cash, checks or other similar payments received by it to a Collateral Deposit Account.  All funds deposited into any Lock Box subject to a Lock Box Agreement or a Collateral Deposit Account will be swept on a daily basis into a collection account maintained by such Grantor with the Administrative Agent (the "<u>Collection Account</u>").  All amounts deposited in the Collection Account shall be deemed received by the Administrative Agent in accordance with Section 2.18 of the Credit Agreement and shall, after having been credited to the Collection Account, be applied (and allocated) by Administrative Agent in accordance with Section 2.10(b) of the Credit Agreement during the existence of a Cash Dominion Period; provided that unless a Cash Dominion Period is in effect, Grantor shall have the right to direct the disposition or transfer of any funds in the Collection Account in its sole discretion.

7.2     <u>Covenant Regarding New Deposit Accounts; Lock Boxes</u>.  Before opening or replacing any Collateral Deposit Account or other Deposit Account, or establishing a new Lock

#152955086_v4

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 216 of 286

Box, the Grantor shall, other than with respect to Excluded Accounts, cause each bank or financial institution in which it seeks to open (i) a Collateral Deposit Account or other Deposit Account, to enter into a Control Agreement with the Administrative Agent in order to give the Administrative Agent Control of such Collateral Deposit Account or other Deposit Account, or (ii) a Lock Box, to enter into a Lock Box Agreement with the Administrative Agent in order to give the Administrative Agent Control of the Lock Box and provide for a daily sweep into the Collection Account.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1　　Waivers.  To the maximum extent permitted by applicable law, the Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Grantor, addressed as set forth in Article IX, at least ten days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made.  To the maximum extent permitted by applicable law, the Grantor waives all claims, damages, and demands against the Administrative Agent or any other Secured Party arising out of the repossession, retention or sale of the Collateral, except such as arise solely out of the gross negligence or willful misconduct of the Administrative Agent or such Secured Party as finally determined by a court of competent jurisdiction. To the extent it may lawfully do so, the Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any other Secured Party, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.  Except as otherwise specifically provided herein, the Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

8.2　　Limitation on the Administrative Agent's Duty with Respect to the Collateral.  The Administrative Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Administrative Agent shall use reasonable care with respect to the Collateral in its possession or under its control.  Neither the Administrative Agent nor any other Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent or such other Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. To the extent that applicable law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, the Grantor acknowledges and agrees that it is commercially reasonable for the Administrative Agent to (a) fail to incur expenses deemed significant by the Administrative Agent to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (b) fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) fail to exercise

#152955086_v4

collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) contact other Persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of the Collateral, (g) hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) dispose of assets in wholesale rather than retail markets, (j) disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral, or (l) the extent deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. The Grantor acknowledges that the purpose of this Section 8.2 is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would be commercially reasonable in the Administrative Agent's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 8.2. Without limitation upon the foregoing, nothing contained in this Section 8.2 shall be construed to grant any rights to the Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section 8.2.

8.3 <u>Compromises and Collection of Collateral</u>. The Grantor and the Administrative Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to a Receivable. In view of the foregoing, the Grantor agrees that the Administrative Agent may at any time and from time to time, if an Event of Default has occurred and is continuing, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Administrative Agent in its sole discretion shall determine or abandon any Receivable, and any such action by the Administrative Agent shall be commercially reasonable so long as the Administrative Agent acts in good faith based on information known to it at the time it takes any such action.

8.4 <u>Secured Party Performance of Debtor Obligations</u>. Without having any obligation to do so, the Administrative Agent may perform or pay any obligation which the Grantor has agreed to perform or pay in this Security Agreement and the Grantor shall reimburse the Administrative Agent for any amounts paid by the Administrative Agent pursuant to this Section 8.4. The Grantor's obligation to reimburse the Administrative Agent pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

#152955086_v4

8.5     Specific Performance of Certain Covenants.  The Grantor acknowledges and agrees that a breach of any of the covenants contained in Sections 4.1(d), 4.1(e), 4.2, 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.11, 4.12, 4.13, 5.2, 5.3, or 8.7 or in Article VII will cause irreparable injury to the Administrative Agent and the other Secured Parties, that the Administrative Agent and the other Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Administrative Agent or the other Secured Parties to seek and obtain specific performance of other obligations of the Grantor contained in this Security Agreement, that the covenants of the Grantor contained in the Sections referred to in this Section 8.5 shall be specifically enforceable against the Grantor.

8.6     [Reserved].

8.7     No Waiver; Amendments; Cumulative Remedies. No failure or delay by the Administrative Agent or any other Secured Party in exercising any right or power under this Security Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the other Secured Parties hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have. No waiver of any provision of this Security Agreement or consent to any departure by the Grantor therefrom shall in any event be effective unless in writing signed by the Administrative Agent with the concurrence or at the direction of the Lenders required under Section 9.02 of the Credit Agreement and then only to the extent in such writing specifically set forth.

8.8     Limitation by Law; Severability of Provisions.  All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.   Any provision in this Security Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction, and to this end the provisions of this Security Agreement are declared to be severable.

8.9     Reinstatement.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Grantor for liquidation or reorganization, should the Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof (including a payment effected through exercise of a right of setoff), is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), all as though such

#152955086_v4

payment or performance had not been made. In the event that any payment, or any part thereof (including a payment effected through exercise of a right of setoff), is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

8.10 <u>Benefit of Agreement</u>. The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantor, the Administrative Agent, the other Secured Parties, and their respective successors and assigns (including all persons who become bound as a debtor to this Security Agreement), except that the Grantor shall not have the right to assign its rights or delegate its obligations under this Security Agreement or any interest herein, without the prior written consent of the Administrative Agent. No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Secured Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Administrative Agent hereunder.

8.11 <u>Survival of Representations</u>. All representations and warranties of the Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.

8.12 <u>Headings</u>. The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

8.13 <u>Termination</u>. This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until (a) the Credit Agreement has terminated pursuant to its express terms and (b) all of the Secured Obligations have been Paid in Full. Upon termination of this Security Agreement in accordance with the preceding sentence, this Security Agreement shall terminate and the Administrative Agent, at the written request of the Grantor, will promptly execute and deliver to the Grantor a proper instrument or instruments (including, without limitation, Uniform Commercial Code termination statements on Form UCC-3) acknowledging the satisfaction and termination of this Security Agreement, and will duly assign, transfer and deliver to the Grantor such of the Collateral as may be in the possession of Administrative Agent or any other Secured Party and as has not theretofore been sold or otherwise applied or released pursuant to this Security Agreement and will take such other actions as reasonably requested by Grantor to evidence the termination of the Liens granted hereunder in each case at the sole expense of Grantor.

8.14 <u>Entire Agreement</u>. This Security Agreement and the other Loan Documents embody the entire agreement and understanding between the Grantor and the Administrative Agent relating to the Collateral and supersedes all prior agreements and understandings between the Grantor and the Administrative Agent relating to the Collateral.

8.15 <u>Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial</u>. **THIS SECURITY AGREEMENT SHALL BE GOVERNED BY SECTION 9.09 OF THE CREDIT AGREEMENT. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY**

#152955086_v4

**ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

8.16    <u>Counterparts</u>.  This Security Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Subject to the terms of the Credit Agreement, delivery of an executed counterpart of a signature page of this Security Agreement that is an Electronic Signature (as defined in the Credit Agreement) transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Security Agreement.

**ARTICLE IX**
**NOTICES**

9.1    <u>Sending Notices</u>.  Any notice required or permitted to be given under this Security Agreement shall be sent in accordance with Section 8.01 of the Credit Agreement.

**ARTICLE X**
**THE ADMINISTRATIVE AGENT**

JPMorgan Chase Bank, N.A. has been appointed Administrative Agent for the other Secured Parties hereunder pursuant to Article VIII of the Credit Agreement.  It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Secured Parties to the Administrative Agent pursuant to Article VIII the Credit Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such Article VIII.  Any successor Administrative Agent appointed pursuant to Article VIII of the Credit Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder.

**ARTICLE XI**
**AMENDMENT AND RESTATEMENT**

Upon the Effective Date, the terms and conditions of the Existing Security Agreement are amended as set forth in, and restated in their entirety and superseded by, this Security Agreement. Nothing in this Security Agreement shall be deemed to be a novation of any of the obligations under the Existing Security Agreement.  In no event shall the Collateral (and Liens related thereto) or Guarantees securing the Secured Obligations be deemed adversely affected hereby, it being the

#152955086_v4

intent and agreement of the parties that the Guarantees and the Liens on the Collateral granted to secure the Secured Obligations of the parties in connection with the Existing Credit Agreement shall not be extinguished and shall remain valid, binding and enforceable securing the obligations under the Existing Credit Agreement.

[Signature Page Follows.]

#152955086_v4

IN WITNESS WHEREOF, the Grantor and the Administrative Agent have executed this Security Agreement as of the date first above written.

**GRANTOR**:

**RAD POWER BIKES INC.,**
a Delaware corporation

By: _____
Name:  Mark Klebanoff
Title:   Chief Financial Officer

**ADMINISTRATIVE AGENT**:

**JPMORGAN CHASE BANK, N.A.**,
as Administrative Agent

By: _____
Name:  Eric A. Anderson
Title:    Authorized Officer

# EXHIBIT C

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| LIEN SOLUTIONS 800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
| UCCFILINGRETURN@WOLTERSKLUWER.COM |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RAD POWER BIKES INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1128 NW 52ND STREET | SEATTLE | WA | 98107 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JPMORGAN CHASE BANK, N.A. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10 SOUTH DEARBORN, FLOOR L2, IL1-1145 | CHICAGO | IL | 60603 | US |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of the Debtor, whether now existing or hereafter acquired, including, without limitation, all products and proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE-0-78654153-60572861

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| WK LIEN SOLUTIONS 800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| UCCFILINGRETURN@WOLTERSKLUWER.COM |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 02:30 PM 10/29/2024**
**U.C.C. Initial Filing No: 2021 0577743**
**Amendment No: 2024 7517954**
**Service Request No:  20244072901**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|
| **20210577743** | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes: **AND** Check one of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record ☑ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c ☐ ADD name: Complete item 7a or 7b, and item 7c ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **RAD POWER BIKES INC.** | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **RAD POWER BIKES INC.** | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1121 NW 52ND STREET** | **SEATTLE** | **WA** | **98107** | **US** |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **JPMORGAN CHASE BANK, N.A.** | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
DE-0-101392813-70375627- DEBTOR: RAD POWER BIKES I

International Association of Commercial Administrator

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| WK LIEN SOLUTIONS 800-331-3282 |

**B. E-MAIL CONTACT AT FILER (optional)**
UCCFILINGRETURN@WOLTERSKLUWER.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

Delaware Department of State
U.C.C. Filing Section
Filed: 09:05 AM 08/25/2025
U.C.C. Initial Filing No: 2021 0577743
Amendment No: 2025 6222308
Service Request No:  20253768873

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|---|
| 20210577743 | | |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:  **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record  ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c  ☐ ADD name: Complete item 7a or 7b, and item 7c  ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| OR | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | JPMORGAN CHASE BANK, N.A. | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
DE-0-105495697-72368065- DEBTOR: RAD POWER BIKES I

International Association of Commercial Administrator

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# EXHIBIT D

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT, THE SECURITY INTERESTS GRANTED HEREUNDER, AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AND INTERCREDITOR AGREEMENT (AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME PURSUANT TO THE TERMS THEREOF, THE "SPECIFIED SUBORDINATION AGREEMENT") DATED AS OF OCTOBER 6 , 2023, AMONG THE COMPANY, THE OTHER "LOAN PARTIES" PARTY THERETO, EACH OF THE PERSONS LISTED ON THE SIGNATURE PAGES THERETO AS "SUBORDINATED CREDITOR" (INDIVIDUALLY AND COLLECTIVELY, "SUBORDINATED CREDITOR"), THE COLLATERAL AGENT (AS DEFINED BELOW), AND THE SENIOR AGENT (AS DEFINED BELOW), TO THE SENIOR DEBT (AS DEFINED IN THE SPECIFIED SUBORDINATION AGREEMENT) OWED BY THE COMPANY AND THE SECURITY INTERESTS SECURING SUCH SENIOR DEBT PURSUANT TO THE SENIOR CREDIT AGREEMENT (AS DEFINED IN THE SPECIFIED SUBORDINATION AGREEMENT), AND THE OTHER SENIOR DEBT DOCUMENTS (AS DEFINED IN THE SPECIFIED SUBORDINATION AGREEMENT), AS SUCH CREDIT AGREEMENT AND SUCH SENIOR DEBT DOCUMENTS HAVE BEEN AND HEREAFTER MAY BE AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME AND TO INDEBTEDNESS REFINANCING THE INDEBTEDNESS UNDER SUCH AGREEMENTS, AND THE SECURITY INTERESTS SECURING SUCH INDEBTEDNESS, AS CONTEMPLATED BY THE SPECIFIED SUBORDINATION AGREEMENT; AND THE COLLATERAL AGENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SPECIFIED SUBORDINATION AGREEMENT.

This Security Agreement (as amended, modified or otherwise supplemented from time to time, this "**Security Agreement**"), dated as of October 6 , 2023, is executed by Rad Power Bikes Inc., a Delaware corporation (together with its successors and assigns, "**Company**"), in favor of **Collateral Agent** (as herein defined) on behalf of the Investors listed on the signature pages hereof.

## <u>RECITALS</u>

A.      Company and the Investors have entered into a Note and Warrant Purchase Agreement, dated as of the date hereof (the "**Purchase Agreement**"), pursuant to which the Company has issued convertible promissory notes, dated as of the date hereof (as amended, modified or otherwise supplemented from time to time, (each a "**Note**" and collectively, the "**Notes**") in an aggregate principal amount of $ 25,754,556.98  in favor of the Investors.

B.     In order to induce each Investor to extend the credit evidenced by the Notes, Company has agreed to enter into this Security Agreement and to grant Collateral Agent, for the benefit of itself and the Investors, the security interest in the Collateral described below.

**AGREEMENT**

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Company hereby agrees with Collateral Agent and the Investors as follows:

1.     Definitions and Interpretation.  When used in this Security Agreement, the following terms have the respective meanings set forth below. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement or the Notes:

"**Collateral**" has the meaning given to that term in Section 2 hereof.

"**Excluded Accounts**" means any (a) segregated withholding, tax, escrow, fiduciary and trust accounts, (b) deposit accounts used exclusively for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Company, (c) any zero balance accounts, (d) deposit accounts maintained outside the United States and (e) petty cash accounts; provided that the aggregate balance of all such petty cash accounts does not at any time exceed $500,000.

"**Obligations**" means all loans, advances, debts, liabilities and obligations, howsoever arising, owed by Company to Collateral Agent and the Investors of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of the Notes and the other Transaction Documents, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"**Permitted Liens**" means (a) Liens for taxes not yet delinquent or Liens for taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established; (b) Liens in respect of property or assets imposed by law which were incurred in the ordinary course of business, such as carriers', warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings; (c) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, and other Liens to secure the performance of tenders, statutory obligations, contract bids, government contracts, performance and return of money bonds and other similar obligations, incurred in the ordinary course of business, whether pursuant to statutory requirements, common law or consensual arrangements; (d) Liens in favor of the Collateral Agent (e) Liens upon any equipment acquired or held by Company or any of

-2-

its subsidiaries to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition of such equipment, so long as such Lien extends only to the equipment financed, and any accessions, replacements, substitutions and proceeds (including insurance proceeds) thereof or thereto; (f) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 2 (g) of the Note; (g) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods, (h) Liens which constitute rights of setoff of a customary nature or banker's liens, whether arising by law or by contract; (i) Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums; (j) leases or subleases and licenses or sublicenses granted in the ordinary course of Company's business; (k) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business; (l) non-exclusive licenses of intellectual property; (m) any interest or title of a lessor or sublessor under any lease of real or personal property granted in the ordinary course of business; (n) to the extent constituting a Lien, purported retention of title by any manufacturer of Inventory in such Inventory as long as the manufacturer has not taken any action to perfect such Liens; (o) Liens (as defined in the Subordination Agreement) in favor of the Senior Agent (as defined in the Subordination Agreement) in connection with the Senior Debt Documents (as defined in the Subordination Agreement) and Liens in connection with any Permitted Refinancing Senior Debt Documents (as defined in the Subordination Agreement); and (p) other Liens which do not secure indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed Two Hundred Fifty Thousand Dollars ($250,000).

"**Transaction Documents**" means this Security Agreement, the Purchase Agreement and each Note and Warrant issued thereunder.

"**UCC**" means the Uniform Commercial Code as in effect in the State of Delaware from time to time.

Unless otherwise defined herein, all terms defined in the UCC have the respective meanings given to those terms in the UCC.

2.     Grant of Security Interest.  As security for the Obligations, Company hereby pledges to Collateral Agent and grants to Collateral Agent a security interest of first priority in all right, title and interests of Company in and to the property described in Attachment 1 hereto, whether now existing or hereafter from time to time acquired (collectively, the "**Collateral**").

Notwithstanding the foregoing, the security interest granted herein shall not extend to and the term "Collateral" shall not include (a) any equipment or other property financed by a third party, provided that such third party's Liens are Liens of the type described in subsection (e) of the definition of Permitted Liens; provided further that such equipment or other property shall be deemed "Collateral" hereunder if such third party's Lien is released or otherwise terminated; (b) any (i) rights or interest in any contract, lease, permit, license or license agreement and (ii) real or personal property, in each case, of the Company, if (for both (i) and (ii)) the grant of a security interest or lien therein is prohibited by applicable law or under the terms of such contract, lease, permit, license, or other agreement (or would give rise to a right of termination under such contract, lease, permit, license or

25-02182-WLH11    Doc 16    Filed 12/15/25    Entered 12/15/25 15:40:58    Pg 232 of 286

other agreement) that is valid and binding on the Company and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or other agreement has not been obtained (provided, that, (A) the foregoing exclusions of this clause (b) shall in no way be construed (x) to apply to Accounts or Inventory, (y) to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law, or (z) to apply to the extent that any consent or waiver has been obtained that would permit the Collateral Agent's security interest or lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or other agreement or any real or personal property subject thereto and (B) the foregoing exclusions of clause (b) shall in no way be construed to limit, impair, or otherwise affect the Collateral Agent's continuing security interests in and liens upon any rights or interests of the Company in or to (A) monies due or to become due under or in connection with any described contract, lease, permit, license or other agreement (including any Accounts), or (B) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license or other agreement; (c) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications or a registration issuing from such intent-to-use trademark application under applicable federal law, provided that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered Collateral; (d) any Excluded Accounts; and (e) any "Excluded Collateral" (as such term is defined and used in the Specified Subordination Agreement).

3. <u>General Representations and Warranties</u>. Company represents and warrants to Collateral Agent and the Investors that (a) Company is the owner of the Collateral (or, in the case of after-acquired Collateral, at the time Company acquires rights in the Collateral, will be the owner thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time Company acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than Permitted Liens; (b) upon the Company's filing of UCC-1 financing statements in the appropriate filing offices, Collateral Agent has (or in the case of after-acquired Collateral, at the time Company acquires rights therein, will have) a first priority perfected security interest in the Collateral to the extent that a security interest in the Collateral can be perfected by such filing, except for Permitted Liens; (c) all Inventory has been (or, in the case of hereafter produced Inventory, will be) produced in compliance with applicable laws, including the Fair Labor Standards Act; (d) all accounts receivable and payment intangibles are genuine and enforceable against the party obligated to pay the same; (e) the originals of all documents evidencing all accounts receivable and payment intangibles of Company and the only original books of account and records of Company relating thereto are, and will continue to be, kept at the address of the Company set forth in <u>Section 8(a)</u> of this Security Agreement.

4. <u>Covenants Relating to Collateral</u>.

(a) Company hereby agrees (i) to perform all acts that may be necessary to maintain, preserve, protect and perfect the Collateral, the Lien granted to Collateral Agent therein and the perfection and priority of such Lien, except for Permitted Liens, including, without limitation,

-4-

filing any financing or continuation statements under the UCC in effect in any jurisdiction with respect to the liens created hereby; (ii) not to sell, lease, transfer or otherwise dispose of the Collateral, other than in the ordinary course of business or in connection with Permitted Liens; (iii) not to use or permit any Collateral to be used (x) in violation in any material respect of any applicable law, rule or regulation, or (y) in violation of any policy of insurance covering the Collateral; (iv) to pay promptly when due all taxes and other governmental charges, all Liens and all other charges now or hereafter imposed upon or affecting any Collateral; (v) without 30 days' written notice to Collateral Agent, (x) not to change Company's name or place of business (or, if Company has more than one place of business, its chief executive office), or the office in which Company's records relating to accounts receivable and payment intangibles are kept and (y) not to change Company's state of incorporation, (vi) to notify the Collateral Agent of any material claim made or asserted against the Collateral by any Person or other event that could materially adversely affect the value of the Collateral, and (vii) to procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by Collateral Agent to perfect, maintain and protect its Lien hereunder and the priority thereof and to deliver promptly upon the request of Collateral Agent all originals of Collateral consisting of instruments.

(b)     When the Liens granted by the Company in connection with the Senior Credit Agreement (as defined in the Subordination Agreement) can be released in connection with the Senior Debt (as defined in the Subordination Agreement) being Paid in Full (as defined in the Subordination Agreement) and the Company does not in connection therewith incur any Permitted Refinancing (as defined in the Subordination Agreement) (the "**JPM Lien Release Event**"), the Company shall ensure that all such Liens in favor of JPMorgan Chase Bank, N.A. are promptly released and shall notify Collateral Agent and Investors of the occurrence of the JPM Lien Release Event. Furthermore, upon the occurrence of the JPM Lien Release Event, (i) Company will enter into an intellectual property security agreement (the "**IPSA**") with respect to the Company's Intellectual Property, in such form and substance as are reasonably satisfactory to Collateral Agent and authorize the Collateral Agent to file the same with the United States Patent and Trademark Office (the "**USPTO**") and with similar governmental authorities in such other jurisdictions that the Collateral Agent reasonably determines to file its security interest in the Company's Intellectual Property in, (ii) except to the extent that a holder of Senior Indebtedness has an account control agreement over a deposit account, securities account or any other bank account, promptly enter into, and cause the banks or other applicable financial institutions to enter into, account control agreements with Collateral Agent with respect to all deposit accounts, securities accounts and any other bank accounts of the Company with respect to which an account control agreement is required to perfect Collateral Agent's security interest therein under the UCC, other than Excluded Accounts, (iii) use commercially reasonable efforts to cause the applicable landlord or bailee to enter into, landlord consents or bailee waivers, as applicable, in favor Collateral Agent with respect to all leased locations or bailee storage locations where the Company maintains Collateral with a value in excess of Two Hundred Fifty Thousand Dollars ($250,000), (iv) promptly notify Collateral Agent with respect to any new locations that the Company leases or where the Company stores Collateral and comply with provisions of clause (iii) hereof with respect to such locations within 30 days of transferring Collateral to such location, (v) notify Collateral Agent quarterly with respect to any new Intellectual Property that the Company registers or files for a grant or registration for and enter into such amendments to the IPSA as Collateral Agent may require to register its security interest with respect to such Intellectual Property with the USPTO and with similar

-5-

governmental authorities in such other jurisdictions that the Collateral Agent reasonably determines to file its security interest in the Company's Intellectual Property in and (vi) notify Collateral Agent promptly after opening any new bank accounts and comply with its obligations set forth in clause (ii) hereof with respect to such new bank accounts promptly after the opening thereof.

5.  Authorized Action by Collateral Agent.  Company hereby irrevocably appoints Collateral Agent as its attorney-in-fact (which appointment is coupled with an interest) and agrees that Collateral Agent may perform (but Collateral Agent shall not be obligated to and shall incur no liability to Company or any third party for failure so to do) any act which Company is obligated by this Security Agreement to perform, and to exercise such rights and powers as Company might exercise with respect to the Collateral, including the right to (a) collect by legal proceedings or otherwise and endorse, receive and receipt for all dividends, interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral; (b) enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for the Collateral; (c) make any compromise or settlement, and take any action it deems advisable, with respect to the Collateral; (d) insure, process and preserve the Collateral; (e) pay any indebtedness of Company relating to the Collateral; and (f) file UCC financing statements and execute other documents, instruments and agreements required hereunder; provided, however, that Collateral Agent shall not exercise any such powers granted pursuant to subsections (a) through (e) prior to the occurrence of an Event of Default and shall only exercise such powers during the continuance of an Event of Default.  Company agrees to reimburse Collateral Agent upon demand for any reasonable costs and expenses, including attorneys' fees, Collateral Agent may incur while acting as Company's attorney-in-fact hereunder, all of which costs and expenses are included in the Obligations.  It is further agreed and understood between the parties hereto that such care as Collateral Agent gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Collateral when in Collateral Agent's possession; provided, however, that Collateral Agent shall not be required to make any presentment, demand or protest, or give any notice and need not take any action to preserve any rights against any prior party or any other person in connection with the Obligations or with respect to the Collateral.

6.  Default and Remedies.

(a)  Default.  Company shall be deemed in default under this Security Agreement upon the occurrence and during the continuance of an Event of Default (as defined in the Notes).

(b)  Remedies.  Upon the occurrence and during the continuance of any such Event of Default, Collateral Agent shall have the rights of a secured creditor under the UCC, all rights granted by this Security Agreement and by law, including the right to: (a) require Company to assemble the Collateral and make it available to Collateral Agent and the Investors at a place to be designated by Collateral Agent and the Investors; and (b) prior to the disposition of the Collateral, store, process, repair or recondition it or otherwise prepare it for disposition in any manner and to the extent Collateral Agent and the Investors deem appropriate.  Company hereby agrees that ten (10) days' notice of any intended sale or disposition of any Collateral is reasonable.  In furtherance of Collateral Agent's rights hereunder, Company hereby grants to Collateral Agent an irrevocable, non-exclusive license, exercisable without royalty or other payment by Collateral Agent, and only in connection with the

-6-

exercise of remedies hereunder, to use, license or sublicense any patent, trademark, trade name, copyright or other intellectual property in which Company now or hereafter has any right, title or interest together with the right of access to all media in which any of the foregoing may be recorded or stored.

      (c)    <u>Application of Collateral Proceeds</u>. The proceeds and/or avails of the Collateral, or any part thereof, and the proceeds and the avails of any remedy hereunder (as well as any other amounts of any kind held by Collateral Agent at the time of, or received by Collateral Agent after, the occurrence of an Event of Default) shall be paid to and applied as follows:

      (i)    <u>First</u>, to the payment of reasonable costs and expenses, including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made hereunder by Collateral Agent;

      (ii)    <u>Second</u>, to the payment to each Investor of the amount then owing or unpaid on such Investor's Note, and in case such proceeds shall be insufficient to pay in full the whole amount so due, owing or unpaid upon such Note, then its Pro Rata Share of the amount remaining to be distributed (to be applied first to accrued interest and second to outstanding principal);

      (iii)    <u>Third</u>, to the payment of other amounts then payable to each Investor under any of the Transaction Documents, and in case such proceeds shall be insufficient to pay in full the whole amount so due, owing or unpaid under such Transaction Documents, then its Pro Rata Share of the amount remaining to be distributed; and

      (iv)    <u>Fourth</u>, to the payment of the surplus, if any, to Company, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

For purposes of this Security Agreement, the term "Pro Rata Share" shall mean, when calculating an Investor's portion of any distribution or amount, that distribution or amount (expressed as a percentage) equal to a fraction (i) the numerator of which is the original outstanding principal amount of such Investor's Note and (ii) the denominator of which is the original aggregate outstanding principal amount of all Notes issued under the Purchase Agreement. In the event that an Investor receives payments or distributions in excess of its Pro Rata Share, then such Investor shall hold in trust all such excess payments or distributions for the benefit of the other Investors and shall pay such amounts held in trust to such other Investors upon demand by such Investors.

    7.    <u>Collateral Agent</u>.

      (a)    <u>Appointment</u>. The Investors hereby appoint Cercano Management LLC as collateral agent for the Investors under this Security Agreement (in such capacity, the "**Collateral Agent**") to serve from the date hereof until the termination of the Security Agreement.

(b)     Powers and Duties of Collateral Agent, Indemnity by Investors.

(i)     Each Investor hereby irrevocably authorizes the Collateral Agent to take such action and to exercise such powers hereunder as provided herein or as requested in writing by the Requisite Holders in accordance with the terms hereof, together with such powers as are reasonably incidental thereto.  Collateral Agent may execute any of its duties hereunder by or through agents or employees and shall be entitled to request and act in reliance upon the advice of counsel concerning all matters pertaining to its duties hereunder and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance therewith.

(ii)     Neither the Collateral Agent nor any of its directors, officers or employees shall be liable or responsible to any Investor or to Company for any action taken or omitted to be taken by Collateral Agent or any other such person hereunder or under any related agreement, instrument or document, except in the case of gross negligence or willful misconduct on the part of the Collateral Agent, nor shall the Collateral Agent or any of its directors, officers or employees be liable or responsible for (i) the validity, effectiveness, sufficiency, enforceability or enforcement of the Notes, this Security Agreement or any instrument or document delivered hereunder or relating hereto; (ii) the title of Company to any of the Collateral or the freedom of any of the Collateral from any prior or other liens or security interests; (iii) the determination, verification or enforcement of Company's compliance with any of the terms and conditions of this Security Agreement; (iv) the failure by Company to deliver any instrument  or document required to be delivered pursuant to the terms hereof; or (v) the receipt, disbursement, waiver, extension or other handling of payments or proceeds made or received with respect to the Collateral, the servicing of the Collateral or the enforcement or the collection of any amounts owing with respect to the Collateral.

(iii)     In the case of this Security Agreement and the transactions contemplated hereby and any related document relating to any of the Collateral, each of the Investors agrees to pay to the Collateral Agent, on demand, its Pro Rata Share of all fees and all expenses incurred in connection with the operation and enforcement of this Security Agreement, the Notes or any related agreement to the extent that such fees or expenses have not been paid by Company.  In the case of this Security Agreement and each instrument and document relating to any of the Collateral, each of the Investors and the Company hereby agrees to hold the Collateral Agent harmless, and to indemnify the Collateral Agent from and against any and all loss, damage, expense or liability which may be incurred by the Collateral Agent under this Security Agreement and the transactions contemplated hereby and any related agreement or other instrument or document, as the case may be, unless such liability shall be caused by the willful misconduct or gross negligence of the Collateral Agent.

(c)     Resignation; Successor.  The Collateral Agent may resign at any time by giving ten (10) business days' advance written notice of such resignation to each of the Investors and the Company.  Upon receipt of such notice of resignation, the Requisite Holders shall have the right to appoint a successor Collateral Agent either from among the Investors or, if no Investor agrees to act as Collateral Agent, a reputable commercial bank or trust company approved in writing by the Requisite Holders. The resigning Collateral Agent and the Company shall promptly execute all documents reasonably requested by the Investors or the successor Collateral Agent to convey all rights

25-02182-WLH11     Doc 16     Filed 12/15/25     Entered 12/15/25 15:40:58     Pg 237 of 286

and interests of the resigning Collateral Agent (in such capacity) under this Security Agreement to any successor Collateral Agent. If no successor Collateral Agent shall have been appointed by the Requisite Holders, and accepted such appointment, prior to the effective date of the resigning Collateral Agent's resignation, then the Investors shall continue to act in concert hereunder, pursuant to the agreement of the Requisite Holders, and to cause any function of the Collateral Agent to instead be performed hereunder by the Requisite Holders. Upon the acceptance by a successor Collateral Agent of its appointment as Collateral Agent hereunder, such successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges, duties and obligations of the resigning Collateral Agent, and the resigning Collateral Agent shall be discharged from its duties and obligations under this Security Agreement. Notwithstanding the resignation of a Collateral Agent hereunder, the provisions of Section 7(b)(ii) shall inure to its benefit with respect to any actions taken or omitted to be taken by it while it was Collateral Agent under this Security Agreement. At any time while any of the Notes are outstanding, the Collateral Agent shall resign if requested by the Requisite Holders, excluding the Collateral Agent. The resignation of the Collateral Agent shall not affect the Collateral Agent's right to indemnification under this Agreement.

        8.    <u>Miscellaneous</u>.

        (a)    <u>Notices</u>. Except as otherwise provided herein, all notices, requests, demands, consents, instructions or other communications to or upon Company or Collateral Agent under this Security Agreement shall be in writing and faxed or sent by electronic mail, mailed or delivered to each party to the facsimile number, electronic mail address, or address set forth below (or to such other facsimile number, electronic mail address or address as the recipient of any notice shall have notified the other in writing). All such notices and communications shall be effective upon the earlier of actual receipt, or (a) personal delivery to the party to be notified; (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day; (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; (d) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt; or (e) when faxed, upon confirmation of receipt.

        <u>Collateral Agent</u>:

                Cercano Management LLC
                Attn: General Counsel
                1110 112th Ave NE, Suite 202
                Belleveue, WA 98004
                Email: legalnotices@cercanoLP.com; stuartn@cercanoLP.com
                With a copy to:

        with a copy to:

                Fenwick & West LLP
                1191 Second Avenue, 10th Floor
                Seattle, WA 98101

<u>Company</u>:

1128 NW 52nd Street
Seattle, WA 98107
Attn: Batur Oktay
Telephone: (206) 457-3677

<u>with a copy to:</u>

Wilson Sonsini Goodrich & Rosati, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA 98108-7036
Attn: Craig Sherman and Jeana Kim
Telephone: 206-883-2575

(b) <u>Termination of Security Interest</u>. Upon the payment in full of all Obligations and the cancellation or termination of any commitment to extend credit or purchase Notes under the Purchase Agreement, the security interest granted herein shall terminate and all rights to the Collateral shall revert to Company. Upon such termination Collateral Agent hereby authorizes Company to file any UCC termination statements necessary to effect such termination and Collateral Agent will execute and deliver to Company any additional documents or instruments as Company shall reasonably request to evidence such termination.

(c) <u>Nonwaiver</u>. No failure or delay on Collateral Agent's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right.

(d) <u>Amendments and Waivers</u>. This Security Agreement may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Company, Collateral Agent and the Requisite Holders. Each waiver or consent under any provision hereof shall be effective only in the specific instances for the purpose for which given.

(e) <u>Assignments</u>. This Security Agreement shall be binding upon and inure to the benefit of Collateral Agent and Company and their respective successors and assigns; <u>provided</u>, <u>however</u>, that Company may not sell, assign or delegate rights and obligations hereunder without the prior written consent of Collateral Agent.

(f) <u>Cumulative Rights, etc</u>. The rights, powers and remedies of Collateral Agent under this Security Agreement shall be in addition to all rights, powers and remedies given to Collateral Agent by virtue of any applicable law, rule or regulation of any governmental authority, any Transaction Document or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Collateral Agent's rights hereunder. Company waives any right to require Collateral Agent to proceed against any person or entity or to exhaust any Collateral or to pursue any remedy in Collateral Agent's power.

(g) <u>Payments Free of Taxes, Etc</u>. All payments made by Company under the Transaction Documents shall be made by Company free and clear of and without deduction for any

-10-

and all present and future taxes, levies, charges, deductions and withholdings. In addition, Company shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Security Agreement. Upon request by Collateral Agent, Company shall furnish evidence satisfactory to Collateral Agent that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

(h)  _Partial Invalidity_.  If at any time any provision of this Security Agreement is or becomes illegal, invalid or unenforceable in any respect under the law or any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Security Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(i)  _Construction_.  Each of this Security Agreement and the other Transaction Documents is the result of negotiations among, and has been reviewed by, Company, Investors, Collateral Agent and their respective counsel. Accordingly, this Security Agreement and the other Transaction Documents shall be deemed to be the product of all parties hereto, and no ambiguity shall be construed in favor of or against Company, Investors or Collateral Agent.

(j)  _Entire Agreement_.  This Security Agreement taken together with the other Transaction Documents constitute and contain the entire agreement of Company, Investors and Collateral Agent and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(k)  _Other Interpretive Provisions_.  References in this Security Agreement and each of the other Transaction Documents to any document, instrument or agreement (a) includes all exhibits, schedules and other attachments thereto, (b) includes all documents, instruments or agreements issued or executed in replacement thereof, and (c) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Security Agreement or any other Transaction Document refer to this Security Agreement or such other Transaction Document, as the case may be, as a whole and not to any particular provision of this Security Agreement or such other Transaction Document, as the case may be. The words "include" and "including" and words of similar import when used in this Security Agreement or any other Transaction Document shall not be construed to be limiting or exclusive.

(l)  _Governing Law_.  This Security Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to conflicts of law rules.

(m)  _Dispute Resolution_.  The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Washington and to the jurisdiction of the United States District Court for the Western District of Washington for the purpose of any suit, action or other proceeding arising out of or based upon this Security Agreement, (b) agree not to commence any suit,

-11-

action or other proceeding arising out of or based upon this Security Agreement except in the state courts of Washington or the United States District Court for the Western District of Washington, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Security Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SECURITY AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(n)     Counterparts. This Security Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

[The remainder of this page is intentionally left blank]

-12-

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

RAD POWER BIKES INC.

By: _Phil Molyneux_____

Name: _Phil Molyneux_____

Title: _Chief Executive Officer_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, , the parties have caused this Security Agreement to be executed as of  the day and year first above written.

**INVESTOR**

**Counterpoint Ventures Investor Fund LP**

By:  MSCVF I GP LP, its general partner

By:  MSCVF I GP Inc., its general partner

By: _____

Name: _Mark Todtfeld_____

Title: _Managing Director_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, , the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Counterpoint Ventures Master Fund LP**

By: MSCVF I GP LP, its general partner

By: MSCVF I GP Inc., its general partner

By: _____

Name: _Mark Todtfeld_____

Title: _Managing Director_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, Company has caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Durable Capital Master Fund LP**

By:  Durable Capital Partners LP, its investment manager

By: _____

Name: _Julie Jack_____

Title: _Authorized Person_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**FIAM Target Date Blue Chip Growth Commingled Pool**

By:   Fidelity Institutional Asset Management Trust Company as Trustee

By: _____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**FIDELITY SPECIAL SITUATIONS FUND**

By its manager Fidelity Investments Canada ULC

By: _____

Name: Chris Maher _____

Title: Authorized Signatory _____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Advisor Series I:  Fidelity Advisor Growth Opportunities Fund**

By: _____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Advisor Series I:  Fidelity Advisor Series Growth Opportunities Fund**

By: _____

Name: Chris Maher _____

Title: Authorized Signatory _____

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Blue Chip Growth Commingled Pool**

By: Fidelity Management Trust Company, as Trustee

By: _Chris Maher_ _____

Name:_ Chris Maher_ _____

Title:_ Authorized Signatory_ _____

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Blue Chip Growth Institutional Trust**

By its manager Fidelity Investments Canada ULC

By: _Chris Maher_____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Canadian Growth Company Fund**

By its manager Fidelity Investments Canada ULC

By: _Chris Maher_ _____

Name: Chris Maher _____

Title: Authorized Signatory _____

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Contrafund Commingled Pool**

By:   Fidelity Management Trust Company, as Trustee

By: _____ *Chris Maher* _____
                E597109C8C7345D...

Name: Chris Maher _____

Title: Authorized Signatory _____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Contrafund: Fidelity Advisor New Insights Fund – Sub B**

By: _Chris Maher_____
E597109C8C7345D...

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Contrafund: Fidelity Advisor New Insights Fund - Sub A**

By: _Chris Maher_____

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Contrafund: Fidelity Contrafund**

By: _Chris Maher_____

Name:_Chris Maher_____

Title:_Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of  the day and year first above written.

**INVESTOR**

**Fidelity Contrafund: Fidelity Contrafund K6**

By: _____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Contrafund: Fidelity Series Opportunistic Insights Fund**

By: _____ *Chris Maher* _____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Global Innovators Investment Trust**

By its manager Fidelity Investments Canada ULC

By: _Chris Maher_____
E597109C8C7345D...

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Growth Company Commingled Pool**

By: Fidelity Management Trust Company, as Trustee

By: *Chris Maher*
E597109C8C7345D...

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Insights Investment Trust**

By its manager Fidelity Investments Canada ULC

By: _Chris Maher_____

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Mt. Vernon Street Trust: Fidelity Growth Company K6 Fund**

By: _____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Mt. Vernon Street Trust: Fidelity Growth Company Fund**

By: _Chris Maher_____
E597109C8C7345D...

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Mt. Vernon Street Trust: Fidelity Series Growth Company Fund**

By: _Chris Maher_ _____
E597109C8C7345D...

Name: _Chris Maher_ _____

Title: _Authorized Signatory_ _____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity NorthStar Fund – Sub D**

By its manager Fidelity Investments Canada ULC

By: _Chris Maher_____
Name: Chris Maher_____
Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Securities Fund: Fidelity Blue Chip Growth Fund**

By: _Chris Maher_____
E597109C8C7345D...

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Securities Fund: Fidelity Blue Chip Growth K6 Fund**

By: _Chris Maher_____
E597109C8C7345D...

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity Securities Fund: Fidelity Series Blue Chip Growth Fund**

By: _Chris Maher_____
E597109C8C7345D...

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Fidelity U.S. Growth Opportunities Investment Trust**

By its manager Fidelity Investments Canada ULC

By: _____

Name: Chris Maher

Title: Authorized Signatory

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**The Rise Fund II Radcliffe, L.P.**


By: _____

Name: _Martin Davidson_____

Title: _Chief Accounting Officer_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**VCVC V LLC**

By: VCVC Management V LLC, its Manager

By: Cercano Legacy Manager LLC, its Manager

By: _____

Name: YB Choi _____

Title: Executive Vice President _____

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Variable Insurance Products Fund II: VIP Contrafund Portfolio – Subportfolio A**

By: _Chris Maher_____

Name: Chris Maher_____

Title: Authorized Signatory_____

*Signature page to Security Agreement*

DocuSign Envelope ID: 4A9A61E3-1E41-4A8C-B226-7EA4EE4FB915

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Variable Insurance Products Fund III: VIP Growth Opportunities Portfolio**

By: _Chris Maher_ _____

Name: Chris Maher _____

Title: Authorized Signatory _____

*Signature page to Security Agreement*

DocuSign Envelope ID: D5B5C7DF-EB18-458E-9725-76B69CCC0A6D

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**VC Direct No. 1, LLC**

By: _Mark Vadon_____

Name:_ Mark Vadon _____

Title:_ Manager _____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**MV Direct 3, LLC**

By: _Mark Vadon_____
DocuSigned by:
5794B7D7483F450...

Name: _Mark Vadon_____

Title: _Manager_____

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**MIKE AND HUGH'S BIKE COMPANY, LLC**

By: _____

Name: Hugh Holman

Title: Vice President

*Signature page to Security Agreement*

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

**Paul D. Hewson**

_____

DocuSign Envelope ID: 3AE11A33-0931-4CF7-BC27-AFF7F3F7500F

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**

By: _____

Name:    Mike Radenbaugh

[Signature page to Security Agreement]

IN WITNESS WHEREOF, the parties have caused this Security Agreement to be executed as of the day and year first above written.

**INVESTOR**
Serengeti Caracal Master Fund II LP

By: _____

Name: Albert J. Martinez

Title: Director

# ATTACHMENT 1

## TO SECURITY AGREEMENT

All right, title, interest, claims and demands of Company in all of its assets including but not limited to the following property:

(i)      All Accounts;

(ii)     All Chattel Paper;

(iii)    All Commercial Tort Claims listed on Exhibit A;

(iv)    All Deposit Accounts and cash;

(v)     All Documents;

(vi)    All Equipment;

(vii)   All General Intangibles;

(viii)  All Goods;

(ix)    All Instruments;

(x)     All Intellectual Property;

(xi)    All Inventory;

(xii)   All Investment Property;

(xiii)  All Letter-of-Credit Rights

(xiv)   To the extent not otherwise included, all proceeds and products of any and all of the foregoing, and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing.

The term "**Intellectual Property**" means all intellectual and similar property of every kind and nature now owned or hereafter acquired by Company, including inventions, designs, patents (whether registered or unregistered), copyrights (whether registered or unregistered), trademarks (whether registered or unregistered), trade secrets, domain names, confidential or proprietary technical and business information, know-how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, software and databases and all embodiments or fixations thereof whether in tangible or intangible form or contained on magnetic media readable by machine together with all such magnetic media and

related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

All capitalized terms used in this <u>Attachment 1</u> and not otherwise defined herein, shall have the respective meanings given to such terms in the Uniform Commercial Code of the State of Delaware as in effect from time to time.

Error! Unknown document property name.

**Exhibit A**

**to**

**Attachment 1 to Security Agreement**

**<u>Commercial Tort Claims</u>**

[None]

# EXHIBIT E

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional) | |
| B. E-MAIL CONTACT AT SUBMITTER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

**SEE BELOW FOR SECURED PARTY CONTACT INFORMATION**

Delaware Department of State
U.C.C. Filing Section
Filed: 03:11 PM 10/06/2023
U.C.C. Initial Filing No: 2023 6874332

Service Request No: 20233679603

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rad Power Bikes Inc. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1128 NW 52nd Street | Seattle | WA | 98107 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Cercano Management LLC, as Collateral Agent | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1110 112th Ave NE, Suite 202 | Bellevue | WA | 98004 | US |

4. This financing statement covers the following collateral:

All of Debtor's assets wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

# EXHIBIT F

**RAD POWER BIKES**
**CASH COLLATERAL BUDGET**
*$ Thousands*

| Wk #<br>Week Ending Wednesday | 1<br>12/24 | 2<br>12/31 | 3<br>1/7 | 4<br>1/14 | 5<br>1/21 | 6<br>1/28 | 7<br>2/4 |
|---|---|---|---|---|---|---|---|
| **CASH FLOW** | | | | | | | |
| **Operating Receipts** | | | | | | | |
| Revenue, Net of Sales Tax | 378 | 108 | 657 | 456 | 652 | 800 | 638 |
| Other | 227 | - | - | - | 165 | - | - |
| **Total Ops Rec** | **604** | **108** | **657** | **456** | **817** | **800** | **638** |
| **Operating Disbursements** | | | | | | | |
| Personnel | 426 | 136 | 132 | 378 | 104 | 403 | 204 |
| Warehousing, Logistics, Tariffs | 97 | - | 177 | 177 | 177 | 324 | 236 |
| Inventory | - | - | - | - | 8 | 50 | 116 |
| Marketing | - | - | 199 | - | 199 | - | 207 |
| Facilities | 132 | 3 | 303 | 7 | 7 | 7 | 303 |
| Insurance | 229 | 38 | 20 | - | - | 229 | 58 |
| IT | 46 | - | 47 | 47 | 47 | 47 | 45 |
| Other Opex | 10 | 20 | 26 | 4 | 26 | 10 | 36 |
| **Total Ops Disb** | **940** | **197** | **904** | **613** | **568** | **1,070** | **1,203** |
| **Ops CF** | **(336)** | **(89)** | **(247)** | **(157)** | **249** | **(270)** | **(565)** |
| **Non-Operating Disbursements** | | | | | | | |
| JPM Adequate Pro | - | - | 70 | - | - | - | 70 |
| 503(b)(9) Reserve - Inventory | - | - | - | 25 | - | - | - |
| KERP | - | - | - | - | 165 | - | - |
| Taxes | - | - | 50 | - | - | - | 50 |
| Estate Pro Fees Fund | - | - | 315 | - | - | - | 425 |
| Ordinary Course Professionals | - | - | - | 50 | - | 50 | - |
| JPM Pro Fees | - | - | 50 | - | - | - | 100 |
| UST Qtrly | - | - | - | - | - | 33 | - |
| Other | - | - | - | - | - | - | - |
| **Total Non-Ops Disb** | **-** | **-** | **485** | **75** | **165** | **83** | **645** |
| **Net CF** | **(336)** | **(89)** | **(732)** | **(232)** | **84** | **(353)** | **(1,210)** |
| **LIQUIDITY** | | | | | | | |
| Beginning Cash | 5,849 | 5,513 | 5,425 | 4,692 | 4,460 | 4,544 | 4,191 |
| Net CF | (336) | (89) | (732) | (232) | 84 | (353) | (1,210) |
| **Ending Cash** | **5,513** | **5,425** | **4,692** | **4,460** | **4,544** | **4,191** | **2,980** |