Whitman L. Holt
Bankruptcy Judge

1   ARMAND J. KORNFELD (WSBA #121
    AIMEE S. WILLIG (WSBA #22859)
2   SHANE E. CREASON (WSBA #63865)
3   BUSH KORNFELD LLP
    601 UNION STREET, SUITE 5000
    SEATTLE, WA 98101
4   (206) 292-2110
5   jkornfeld@bskd.com
    awillig@bskd.com
6   screason@bskd.com

7                UNITED STATES BANKRUPTCY COURT
                 EASTERN DISTRICT OF WASHINGTON
8

9   In re                               Chapter 11

10  SUMMIT COLLECTIVE, INC. et al.,     Lead Case No. 25-02182-WLH11
                                        Jointly Administered
11                    Debtors.[1]
                                        ORDER APPROVING:
12                                      SALE OF ASSETS FREE AND
                                        CLEAR OF LIENS, CLAIMS,
13                                      ENCUMBRANCES AND
                                        ASSUMPTION AND
14                                      ASSIGNMENT OF EXECUTORY
                                        CONTRACTS UNEXPIRED
15                                      LEASES

16
17          Upon the motion (the "Motion") of the above-captioned debtors and debtors in

possession ("Debtors")  for entry of an order (this "Order") (i) approving the sale of
18
    Acquired Assets[2] free and clear of all liens, claims, interests, and encumbrances, and
19
    (ii) granting related relief; and the court having considered the Motion and the
20

21  ─────────────────────
    [1] The Debtors, along with their case numbers, are as follows: Summit Collective Incorporated (25-02182)
22  ("Summit") and Rad Power Bikes Inc. (25-02183) ("RAD").

23  [2] Capitalized terms not defined in this Order have their meaning as set forth in the APA or in the Bid
    Procedures Order, as applicable.

    ORDER APPROVING SALE AND ASSIGNMENT – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  arguments of counsel made at the hearing on the Motion (the "Sale Hearing"); and due

2  and sufficient notice of the Sale Hearing and the relief sought therein having been given

3  under the particular circumstances; and it appearing that no other or further notice need

4  be provided; and the court having reviewed the Motion, the Declarations of Teri

5  Stratton (ECF No. 15 and ECF No. 146) and of Angelina M. Smith (ECF No. 16 ECF

6  No. 151); and it appearing that the relief requested in the Motion is in the best interest

7  of the Debtors, their estates, their creditors and other parties in interest; and after due

8  deliberation thereon and good and sufficient cause appearing therefor, the court makes

9  the following findings of fact:

10  **Determination with Respect to the Findings of Fact and Conclusions of Law**

11        A.    The findings of fact and conclusions of law set forth in this Order

12  constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy

13  Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the

14  extent any of the following findings of fact constitute conclusions of law, they are

15  adopted as such. To the extent any of the following conclusions of law constitute

16  findings of fact, they are adopted as such. Any findings of fact or conclusions of law

17  stated by the court on the record at the Sale Hearing are incorporated into this Order, to

18  the extent they are not inconsistent with this Order.

19  **Jurisdiction, Final Order, and Statutory Predicates**

20        B.    This court has jurisdiction to hear and determine the Motion and over

21  the Debtors, their estates, and the Acquired Assets sold, as defined in the Asset

22  Purchase and Sale Agreement dated as of January 22, 2026, by and between debtor Rad

23  Power Bikes, Inc. ("RAD") and Life Electric Vehicles Holdings, Inc., as the Successful

ORDER APPROVING SALE AND ASSIGNMENT – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1 Bidder (the "APA"), a copy of which is attached hereto as Exhibit A, and the Asset

2 Purchase Agreement dated January 22, 2026, by and between RAD and Xander Bicycle

3 Corporation dba Retrospec, as the Back-Up Bidder (the "Back-Up APA"), a copy of

4 which is attached hereto as Exhibit B, pursuant to 28 U.S.C. §§ 157 and 1334. This is a

5 core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and this Motion in

6 the Eastern District of Washington is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7       C.     The statutory and legal predicates for the relief requested in the Motion are

8 sections 105(a) and 363(b), (f), and (m) of title 11 of the United States Code (the

9 "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

10 "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States

11 Bankruptcy Court for the Eastern District of Washington (the "Local Rules").

12       D.     This Order constitutes a final and appealable order within the meaning of

13 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), and to any extent

14 necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil

15 Procedure, as made applicable by Bankruptcy Rule 7054, the court expressly finds that

16 there is no just reason for delay in the implementation of this Order.

17       E.     On December 18, 2025, the court entered the *Order Approving Bid*

18 *Procedures* [ECF No. 50] (the "Bid Procedures Order").

19       F.     The Acquired Assets constitute property of the Debtors' estates, and title

20 to the Acquired Assets is vested in the Debtors' estates within the meaning of section

21 541(a) of the Bankruptcy Code.

22       G.     Based on the facts set forth in the Stratton and Smith Declarations, the

23 Successful Bidder, and the Back-Up Bidder if the Successful Bidder does not close its

ORDER APPROVING SALE AND ASSIGNMENT – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

purchase for any reason, is a good faith purchaser under section 363(m) of the Bankruptcy Code and as such, in the absence of a stay pending appeal, the Debtors and Successful Bidder may close the transaction contemplated by the APA at any time on or after entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rule 6004(h).

**Notice of the Sale and the Sale Hearing**

H.      In accordance with the provisions of the Bid Procedures Order, on December 31, 2025, the Debtors served the Notice of Sale Hearing and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases  [ECF No. 83] (the "Sale Notice") on all parties entitled to notice pursuant to the Limited Mailing List as defined in the Case Management Order entered by the court on December 18, 2025 [ECF No. 46] (collectively, the "Notice Parties").   The Sale Notice provided all interested parties with timely and proper notice of the Sale, the Auction, Sale Objection Deadline, and Sale Hearing.

I.      As evidenced by the affidavits of service previously filed with the court, proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, and the Sale has been provided in accordance with Bankruptcy Rules 2002, 6004, and 9014 and Local Rules 2002-1, 6004-1, and 9014-1. The Debtors also have complied with all obligations to provide notice of the Auction, the Sale Hearing, and the Sale as required by the Bid Procedures Order. Such notice was adequate, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Sale Hearing, or Sale is required.

ORDER APPROVING SALE AND ASSIGNMENT – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**Good Faith of the Successful Bidder**

J.      The Successful Bidder, and the Back-Up Bidder if the Successful Bidder does not close its purchase for any reason, is purchasing the Acquired Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is, therefore, entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, among other things: (a) the Successful Bidder and the Back-Up Bidder recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (b) the Successful Bidder and the Back-Up Bidder complied with the provisions in the Bid Procedures Order; (c) the Successful Bidder and the Back-Up Bidder agreed to subject their respective bids to the competitive bidding procedures set forth in the Bid Procedures Order; (d) all payments to be made by the Successful Bidder and the Back-Up Bidder and other agreements or arrangements entered into by the Successful Bidder and the Back-Up Bidder in connection with the Sale have been disclosed; (e) the negotiation and execution of the APA and the Back-Up APA, and any other agreements or instruments related thereto were at arms' length and in good faith. In the absence of a stay pending appeal, the Successful Bidder, and the Back-Up Bidder if the Successful Bidder does not close its purchase for any reason, is authorized to rely on this Order in closing the Sale on the terms and conditions set forth in the APA, the Back-Up APA, and this Order.

/ / /

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**Highest or Otherwise Best Offer**

K.     The Debtors solicited offers and noticed the Auction in accordance with the provisions of the Bid Procedures Order. The Auction and the sale process were conducted in a non-collusive manner, and the Debtors afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.

L.     Based upon the Bid Procedures approved pursuant to the Bid Procedures Order, the Debtors determined that the bid evidenced by the APA is the highest and best offer for the Acquired Assets and that the bid evidenced by the Back-Up APA is the next highest and best offer for the Acquired Assets.

M.     The APA constitutes the highest or otherwise best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Back-Up APA constitutes the next highest or otherwise best offer for the Acquired Assets, if the Successful Bidder does not close its purchase for any reason, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the APA constitutes the highest or best offer for the Acquired Assets, and that the Back-Up APA constitutes the next highest or best offer for the Acquired Assets, is a valid and sound exercise of the Debtors' business judgment.

N.     The APA, and the Back-Up Bid if the Successful Bidder does not close its purchase for any reason, represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these Chapter 11 cases. No other person or entity or

ORDER APPROVING SALE AND ASSIGNMENT – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Successful Bidder or the Back-Up Bidder.

O.    Approval of the Motion, the APA, the Back-Up APA, and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

**No Fraudulent Transfer**

P.    The consideration provided by the Successful Bidder pursuant to the APA, and the Back-up Bidder pursuant to the Backup APA, if the Successful Bidder does not close its purchase for any reason, is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the Eastern District of Washington. The APA, and Backup APA, was not entered into and will not be consummated for the purpose of hindering, delaying or defrauding creditors of the Debtors, and neither the Debtors nor the Successful Bidder and Backup Bidder have or has entered into the APA or Backup APA or is or are consummating the transactions contemplated thereby with any fraudulent or otherwise improper purpose.

**Validity of Transfer**

Q.    The Debtors have full corporate power and authority to execute and deliver the APA, the Back-Up APA, and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors to consummate the transactions contemplated by the APA or the Back-Up APA, except as otherwise set forth in the APA or the Back-Up APA.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

R.     The transfer of the Acquired Assets to the Successful Bidder, or the Back-Up Bidder, if the Successful Bidder does not close its purchase for any reason, will be, as of the Closing Date, a legal, valid and effective transfer of such assets and will vest the Successful Bidder or the Back-Up Bidder with all right, title, and interest of the Debtors to the Acquired Assets free and clear of any of the following related to or arising from the Acquired Assets: all liens of any kind, claims, interests, against or in the Acquired Assets; any Excluded Liabilities set forth in Section 2.2 of the APA or the Back-Up APA, as applicable; all successor or successor-in-interest liability claims or theories; any claims, actions, litigation, or administrative actions by any private or governmental entity related the Debtors' business including to products sold by the Debtors prior to the Closing Date accruing, arising, or relating to any time prior to the Closing Date ("Claims, Rights, and Encumbrances").

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

S.     The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Executory Contracts and Leases (subject to any agreement of the parties, any contract between RAD and Oracle Credit Corporation and Oracle America, Inc., successor in interest to NetSuite, Inc. is excepted from the definition of Assumed Executory Contracts and Leases) to Successful Bidder as part of the Sale, and the assumption and assignment of the Assumed Executory Contracts and Leases is in the best interests of the Debtors, their estates, and their creditors. The Assumed Executory Contracts and Leases being assigned to, and the Cure Costs being assumed by, Successful Bidder are an integral part of the Sale to Successful Bidder and, accordingly, such assumption and assignment

ORDER APPROVING SALE AND ASSIGNMENT – Page 8

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

of Assumed Executory Contracts and Leases enhance the value of the Debtors' estates. Except for Assumed Executory Contracts and Leases in which the non-debtor party waived any existing defaults in connection with the assumption and assignment to Successful Bidder thereof, Successful Bidder (i) has provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Executory Contracts and Leases, within the meaning of 11 U.S.C. § 365(b)(1)(A), and (ii) has provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Executory Contracts and Leases, with the meaning of 11 U.S.C. § 365(b)(1)(B), and Successful Bidder has provided adequate assurance of the future performance of and under the Assumed Executory Contracts and Leases, within the meaning of 11 U.S.C. § 365(b)(1)(C).

**Successful Bidder Designation of Lease For Assumption**

T.    RAD and PC Group Retail, LLC ("PC Group") as lessor, are parties to that certain Lease effective November 16, 2021, with respect to the space within building level 1, space A100a, in the Pacific City Shopping Center, located at First Street and Pacific Coast Highway in Huntington Beach, California (the "Huntington Lease").  As of the date of this Order, the PC Group and the Successful Bidder are in discussions with respect to the Huntington Lease.  Notwithstanding any provision of this Order, nothing in this Order will impact or affect the Huntington Lease and all of rights of the PC Group and the Debtors under the Lease and the Bankruptcy Code (including with respect to the assumption and assignment or rejection of the Huntington Lease) and the rights of the Successful Bidder under the APA with respect to the Debtor, are

ORDER APPROVING SALE AND ASSIGNMENT – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

completely reserved pending agreement of the parties or further Order of the court on motion and notice appropriate under the circumstances.

U.    The Successful Bidder APA provides for the Successful Bidder's ability to designate (the "Designation Process") executory contracts (each a "Contract") and unexpired non-residential real property leases (each a "Lease") for assumption and assignment on or before March 6, 2026 (the "Designation Period"). During the Designation Period, the Debtors will continue to operate on the premises subject to the Leases and pay related Lease obligations and other expenses. The Successful Bidder is obligated to reimburse the Debtors, in advance, for all such actual expenses from the date of Closing through the Successful Bidder's delivery of its Designation to Seller, including but not limited to employee expenses and amounts due and accrued under Leases during the Designation Period. If Successful Bidder fails to timely deliver the Designation to Seller, Successful Bidder will have no right to the Debtors' assumption and assignment to Successful Bidder of any Contract or Lease.

V.    All post-petition Lease obligations will be paid in full through the date of assumption of Leases pursuant to the Designation Process or through the date of rejection of Leases, as authorized by the court.

W.    The Back-Up Bidder does not seek the Debtors' assumption and assignment to it of any Leases.

X.    Pursuant to the Designation Process, upon the Successful Bidder's notification to the Debtors designating Contracts and Leases for assumption and assignment, the Debtors will file a Notice of Contract and Lease Designation with the

ORDER APPROVING SALE AND ASSIGNMENT – Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

court, with assumption and assignment of Contacts and Leases listed therein effective as of the date of the filing of the Notice of Contract and Lease Designation.

Y.      Contracts and Leases not identified in a Notice of Lease Designation will be subject to separate motion by the Debtors for rejection.

**Section 363(f) of the Bankruptcy Code Is Satisfied**

Z.      Neither the Successful Bidder nor the Back-Up Bidder would have entered into the APA or the Back-Up APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price) if the sale of the Acquired Assets to the Successful Bidder or Back-up Bidder were not free and clear of all Claims, Rights, and Encumbrances.

AA.    Neither the Successful Bidder nor the Back-Up Bidder (i) is or will be considered, a successor to the Debtors, (ii) has de facto or otherwise, merged with or into the Debtors, (iii) is a continuation or substantial continuation, or (iv) is holding itself out as a mere continuation, of the Debtors or their estates, business or operations, or any enterprise of the Debtors. Neither the Successful Bidder nor the Back-Up Bidder will have any obligation by operation of law or in equity for Claims, Rights, and Encumbrances except as expressly assumed under the APA or the Back-Up APA.

BB.    The Debtors may sell the Acquired Assets free and clear of all Claims, Rights, and Encumbrances because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Claims, Rights, and Encumbrances who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims, Rights, and Encumbrances  who did object

ORDER APPROVING SALE AND ASSIGNMENT – Page 11

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  fall within one or more of the other subsections of section 363(f) of the Bankruptcy

2  Code and are adequately protected by having their Claims, Rights, and Encumbrances,

3  if any, attach to the cash proceeds of the Sale attributable to the Acquired Assets in

4  which such holder alleges any Claims, Rights, and Encumbrances, in the same order of

5  priority, with the same validity, force and effect that such Claims, Rights, and

6  Encumbrances had prior to the Sale, subject to any claims and defenses the Debtors and

7  their estates may possess with respect thereto.

8  **Compelling Circumstances for an Immediate Sale**

9  CC.  To preserve the value of the Debtors' estates and to maximize the amount

10 of funding available to provide for a timely exit from these Chapter 11 cases, it is

11 essential that the Sale of the Acquired Assets occur within the time constraints set forth

12 in the APA or the Back-Up APA. Time is of the essence in consummating the Sale.

13 DD.  Given all of the circumstances of these Chapter 11 cases and the adequacy

14 and fair value of the Purchase Price under the APA and the Back-Up APA, the

15 proposed Sale of the Acquired Assets to the Successful Bidder, or the Back-up Bidder,

16 if the Successful Bidder does not close its purchase for any reason, constitutes a

17 reasonable and sound exercise of the Debtors' business judgment and should be

18 approved.

19 EE.  The Sale does not constitute a de facto or sub rosa plan of reorganization

20 or liquidation because it does not propose to (i) restructure existing debt of the Debtors,

21 (ii) impair or circumvent voting rights with respect to any plan proposed by the

22 Debtors, (iii) circumvent chapter 11 safeguards, including those set forth in sections

23 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

ORDER APPROVING SALE AND ASSIGNMENT – Page 12

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

FF. The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), and 363(m), and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**IT IS THEREFORE ORDERED THAT:**

1. The relief requested in the Motion [ECF No. 14] is granted and approved as set forth in this Order, and the Sale contemplated thereby is approved.

2. The APA and the Back-Up APA and the terms and conditions thereof are approved, and the Debtors are authorized to enter into all related agreements and such other ancillary documents consistent with the terms hereof and the APA and the Back-Up APA, and in furtherance thereof.

3. Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to take any and all actions necessary or appropriate to (i) consummate the Sale of the Acquired Assets to the Successful Bidder or the Back-Up Bidder, if the Successful Bidder does not close its purchase of the Acquired Assets, pursuant to and in accordance with the terms and conditions of the APA and the Back-Up APA, (ii) close the Sale as contemplated in the APA or the Back-Up APA and this Order, and (iii) execute and deliver, close, perform under, consummate, and implement the APA or the Back-Up APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and or the Back-Up APA and the Sale or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA or the Back-Up APA and such ancillary documents.

ORDER APPROVING SALE AND ASSIGNMENT – Page 13

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1    4.      This Order is binding in all respects upon the Debtors, their estates, all

2    holders of equity interests in the Debtors, all holders of any "claim(s)" (as defined in

3    the Bankruptcy Code) against the Debtors, whether known or unknown, any holders of

4    "liens" (as defined in the Bankruptcy Code) on all or any portion of the Acquired

5    Assets, the Successful Bidder, the Back-Up Bidder, all successors and assigns of the

6    Successful Bidder and the Back-Up Bidder, any other bidders for the Acquired Assets,

7    any trustees, if any, subsequently appointed in the Chapter 11 cases or upon a

8    conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases. This Order,

9    the APA and the Back-Up APA inure to the benefit of the Debtors, their estates, their

10   creditors, the Successful Bidder and the Back-Up Bidder, and their respective

11   successors and assigns. Nothing contained in any plan of reorganization or liquidation

12   or order of any type or kind entered in these Chapter 11 Cases or any subsequent

13   chapter 7 or chapter 11 case for the Debtors or any related proceedings subsequent to

14   the entry of this Order will directly conflict with or derogate from the provisions of the

15   APA and the Back-Up APA or the terms of this Order.

16   **Transfer of the Acquired Assets**

17   5.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code,

18   the Debtors are authorized and directed to transfer the Acquired Assets on the Closing

19   Date. The Acquired Assets will be transferred to the Successful Bidder, or the Back-Up

20   Bidder, if applicable, upon and as of  the Closing Date, and such transfer constitutes a

21   legal, valid, binding and effective transfer of such Acquired Assets and, upon the

22   Debtors' receipt of the Purchase Price, will be free and clear of all Claims, Rights, and

23   Encumbrances. The Acquired Assets will not be subject to any claims or interests

ORDER APPROVING SALE AND ASSIGNMENT – Page 14

BUSH KORNFELD LLP
LAW OFFICES
601 Union St, Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

allowed in the Chapter 11 cases, including, without, limitation, any claims allowed under sections 361, 362, 363, 364, 365, 502, 503, 506, or 507 of the Bankruptcy Code. Upon the Closing, the Successful Bidder or the Back-Up Bidder will take title to and possession of the Acquired Assets. All Claims, Rights, and Encumbrances will attach to the proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Acquired Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

6.      Except as expressly provided by the APA or the Back-Up APA, all persons and entities holding Claims, Rights, and Encumbrances on all or any portion of the Acquired Assets are forever barred, estopped and permanently enjoined from asserting against the Successful Bidder, the Back-Up Bidder, if applicable, or their successors or assigns, their property or the Acquired Assets, such Claims, Rights, and Encumbrances and all claims and rights relating thereto. All persons and entities are forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Successful Bidder or the Back-Up Bidder in accordance with the terms of the APA, or the Back-Up APA, if applicable, and this Order.

7.      All persons and entities that are in possession of the Acquired Assets on the Closing Date are directed to surrender possession of the Acquired Assets to the Successful Bidder or the Back-Up Bidder, if applicable, at the Closing.

8.      A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to cancel any Claims, Rights, and Encumbrances of record. On the Closing Date, each holder of a Claim, Right, and

ORDER APPROVING SALE AND ASSIGNMENT – Page 15

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Encumbrance is authorized and directed to execute such documents and take all other actions as may be deemed by the Successful Bidder or the Back-Up Bidder, if applicable, to be necessary or desirable to release its Claim, Right, and Encumbrance on the Acquired Assets, as provided for herein, as such Claim, Right, and Encumbrance may have been recorded or may otherwise exist.

9. The provisions of this Order authorizing the Sale of the Acquired Assets by the Debtors free and clear of Claims, Rights, and Encumbrances will be self-executing, and none of the Debtors, the Successful Bidder, or the Back-Up Bidder, if applicable, or any other party will be required to execute or file releases, termination statements, assignments, cancellations, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the Sale; provided, however, that this paragraph does not excuse such parties from performing any and all of their respective obligations under the APA or the Back-Up APA. A certified copy of this Order may be filed with the appropriate clerk or clerks and/or agencies or departments and/or recorded to act to cancel any of the Claims, Rights and Encumbrances on the Acquired Assets of record.

10. Notwithstanding Paragraph 11 herein, if any person or entity that has filed statements or other documents or agreements evidencing Claims, Rights, and Encumbrances on all or any portion of the Acquired Assets does not deliver, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and any other documents necessary or desirable to the Successful Bidder, or the Back-Up Bidder, if applicable, for the purpose of documenting the release of all Claims, Rights, and Encumbrances, which

ORDER APPROVING SALE AND ASSIGNMENT – Page 16

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtors and the Successful Bidder, or the Back-Up Bidder, if applicable, are each authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

11.     This Order governs the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title  or state of title in or to any property; and each of the foregoing persons and entities is authorized and directed to accept for filing any and all of the documents and instruments, including, without limitation, this Order, necessary and appropriate to consummate the transactions contemplated by the APA and the Back-up APA.

**Assumption and Assignment to Buyer of Assumed Executory Contracts and Leases.**

12.     Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to Successful Bidder of the Assumed Executory Contracts and Unexpired Leases by way of the Designation Process is hereby approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are hereby deemed satisfied.

ORDER APPROVING SALE AND ASSIGNMENT – Page 17

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  13. All post-petition Lease obligations will be paid in full through the date of

2  assumption of the Leases pursuant to the Designation Process or through the date of

3  rejection of the Leases, as authorized by the court.

4  14. Upon the filing with the court of a Notice of Contract and Lease

5  Designation, Contracts and Leases listed there shall be transferred to, and remain in full

6  force and effect for the benefit of, Successful Bidder in accordance with and subject to

7  the provisions of the APA, notwithstanding any provision in any such Contract or

8  Lease, including those of the type described in 11 U.S.C. § 365, that prohibit, restrict,

9  or condition such assignment or transfer.

10  15. All defaults or other obligations of the Debtors under Contracts and Leases

11  assumed and assigned pursuant to the Designation Process arising or accruing prior to

12  the Closing Date (without giving effect to any acceleration clauses or any default

13  provisions of the kind specified in 11 U.S.C. § 365(b)(2)) shall be cured, paid, satisfied

14  or otherwise discharged by Buyer in accordance with the terms of the APA or the

15  Back-up APA, and this Order.

16  16. The failure of the Debtors or Successful Bidder to enforce at any time one

17  or more terms or conditions of any Contracts and Leases assumed and assigned

18  pursuant to the Designation Process shall not be a waiver of such terms or conditions,

19  or of the Debtors' or Successful Bidder's rights to enforce every term and condition of

20  any Assumed Executory Contracts and Unexpired Leases.

21  17. At the time of any assignment pursuant to the Designation Process, the

22  Debtors shall be relieved from any liability for any breach of such Assumed Contracts

23  and Unexpired Leases occurring after such assignment pursuant to 11 U.S.C. § 365(k).

ORDER APPROVING SALE AND ASSIGNMENT – Page 18

BUSH KORNFELD LLP
LAW OFFICES
601 Union St, Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**Back-Up Bidder**

18.     In the event that the Successful Bidder fails to close the transaction contemplated by the APA, then RAD is authorized to execute and close under the terms of the Back-Up APA with the Back-Up Bidder, without notice to any other party or further court order. In the event that RAD closes the sale to the Back-Up Bidder pursuant to the Back-Up APA, the provisions of this Order will apply with equal force and effect to the Back-Up Bidder and the Back-Up APA.

**Huntington Lease**

19.     Notwithstanding any provision of this Order, nothing in this Order effects or will effect the assumption or assignment of the Huntington Lease.

**Miscellaneous**

20.     Effective upon the Closing Date, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Successful Bidder, its successors and assigns, the Back-Up Bidder, its successors and assigns, or the Acquired Assets, with respect to any Claim, Right, and Encumbrance.

21.     Except as otherwise provided in this Order and to the maximum extent available under applicable law and to the extent provided for under the APA, or the Back-Up APA, if applicable, the Successful Bidder or the Back-Up Bidder is

ORDER APPROVING SALE AND ASSIGNMENT – Page 19

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

authorized, as of the Closing Date, to operate under any license, permit, registration and

governmental authorization or approval of the Debtors with respect to the Acquired

Assets to the maximum extent available under applicable law and to the extent

provided for under the APA, or the Back-Up APA, if applicable, all such licenses,

permits, registrations and governmental authorizations and approvals are deemed to

have been transferred to the Successful Bidder, or the Back-Up Bidder, if applicable, as

of the Closing Date. All existing licenses, permits, registrations, and governmental

authorizations applicable to the Acquired Assets will remain in place for the Successful

Bidder's benefit, or the Back-Up Bidder's benefit, if applicable, until either new

licenses and permits are obtained or existing licenses, permits, registrations, and

governmental authorizations are transferred in accordance with applicable

administrative procedures. To the extent provided by section 525 of the Bankruptcy

Code, no governmental unit may revoke or suspend any grant, permit, or license

relating to the operation of the Acquired Assets sold, transferred or conveyed to the

Successful Bidder, or the Back-Up Bidder, if applicable, on account of the filing or

pendency of these Chapter 11 cases or the consummation of the Sale.

22.     Except as set forth in the APA or the Back-Up APA, the Successful

Bidder, or the Back-Up Bidder, if applicable, will not be liable for any claims against

the Debtors. By virtue of the Sale, the Successful Bidder, or the Back-Up Bidder, if

applicable, and either's affiliates, successors and assigns will not be deemed or

considered to (a) be a legal successor or otherwise be deemed a successor to any of the

Debtors, (b) have, de facto or otherwise, merged with or into the Debtors or (c) be a

continuation or substantial continuation, or be holding itself out as a mere continuation,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

of the Debtors or their estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Successful Bidder, or the Back-Up Bidder, if applicable, has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except as explicitly set forth in the APA or the Back-Up APA. Neither the Successful Bidder nor the Back-Up Bidder will have any successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.

23.     The transaction contemplated by and consummated under the APA, or the Back-Up APA, if applicable, is undertaken by the Successful Bidder, or the Back-Up Bidder, if applicable, without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the Sale will not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal. Both the Successful Bidder and the Back-Up Bidder are good faith buyers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to the full protection of section 363(m) of the Bankruptcy Code. The APA, or the Back-Up APA, if applicable, and the transactions contemplated in this

ORDER APPROVING SALE AND ASSIGNMENT – Page 21

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Order cannot be avoided under section 363(n) of the Bankruptcy Code. The Debtors and neither the Successful Bidder nor the Back-Up Bidder have engaged in any conduct that would cause or permit the APA, or the Back-Up APA, if applicable, or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

24.     Pursuant to Bankruptcy Rules 6004(h), 7062, and 9014, this Order is effective immediately upon its entry, and the Debtors and the Successful Bidder, or Back-Up Bidder in the event the Successful Bidder cannot close the Sale for any reason, are authorized to close the Sale immediately upon entry of this Order.

25.     The failure specifically to include any particular provision of the APA, or the Back-Up APA, if applicable, in this Order does not diminish or impair the effectiveness of such provision, it being the intent of the court that the APA, or the Back-Up APA, if applicable, be authorized and approved in its entirety.

26.     The APA, or the Back-Up APA, if applicable, and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or on the interests of the Successful Bidder, or the Back-Up Bidder, if applicable.

27.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion filed in these Chapter 11 cases, the terms of this Order will govern.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

28. The court retains jurisdiction and power to, among other things, interpret, implement and enforce the terms and provisions of this Order, the APA, and the Back-Up APA, if applicable, all amendments thereto and any releases, waivers and consents hereunder and thereunder, and each of the agreements executed in connection therewith to which the Debtors are party or which has been assigned by the Debtors to the Successful Bidder, or the Back-Up Bidder, if applicable, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to any of the foregoing. So long as the Debtors' Chapter 11 cases are not closed (or, if closed but then reopened), the court retains jurisdiction and power to enforce the injunctions and other rights of Successful Bidder, or the Back-Up Bidder, if applicable, described in this Order, in the event that after the Closing Date any third parties attempt to or actually interfere with such rights of Successful Bidder, or the Back-Up Bidder, if applicable, even if Debtors are not directly involved or named in any such actions or disputes between Successful Bidder, or the Back-Up Bidder, if applicable, and such third parties.

//End of Order//

Presented by:

BUSH KORNFELD LLP

By /s/ Armand J. Kornfeld
   Armand J. Kornfeld, WSBA #17214
Aimee S. Willig, WSBA #22859
Shane E. Creason, WSBA #63865
Attorneys for Debtors

ORDER APPROVING SALE AND ASSIGNMENT – Page 23

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1    Approved as to Form; Notice of
     Presentation Waived:
2
     BALLARD SPAHR LLP
3

4    By /s/ James B. Zack
        James B. Zack, WSBA #48122
5    Attorneys for Life Electric Vehicles Holdings, Inc.

6    CAIRNCROSS & HEMPELMANN, P.S.

7    By /s Jennifer K. Faubion
        Jennifer K. Faubion, WSBA #39880
8    Attorneys for Xander Bicycle Corporation dba Retrospec

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER APPROVING SALE AND ASSIGNMENT – Page 24

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2912 jz201360 1fg

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of this 22th day of January, 2026, by and between Life Electric Vehicles Holdings Inc., a Nevada corporation (the "Buyer"), on the one hand, and Rad Power Bikes Inc., a Delaware corporation ("Seller"), on the other hand. Each of Buyer and Seller is a "<u>Party</u>" and both are the "<u>Parties</u>."

## RECITALS:

A.    Seller and its affiliate Summit Collective, Inc. filed voluntary petitions (together the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Washington (the "Bankruptcy Court") entitled <u>In re Summit Collective, Inc. et al.,</u> Lead Case no. 25-02182-WLH11 (the jointly administered "Chapter 11 Case") on December 15, 2025 ("Petition Date") and continues to manage its property as debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

B.    Buyer desires to purchase certain assets from Seller and Seller desires to sell, convey, assign, and transfer to Buyer such assets pursuant to the terms and conditions of this Agreement; and

C.  The assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving such sale under Sections 105 and 363 of the Bankruptcy Code and the assumption and assignment of the Assumed Executory Contracts and Leases (as hereinafter defined) under Section 365 of the Bankruptcy Code.

## ARTICLE I.
## DEFINITIONS

**Section 1.1**    **Defined Terms.**  As used herein, the terms below will have the following meanings:

"<u>Acquired Location</u>" will mean the stores listed on Schedule 2.1(a)

"<u>Acquired Assets</u>" will have the meaning set forth in Section 2.1 herein.

"<u>Action</u>" means any legal action, suit, petition, plea, charge, claim, demand, arbitration, audit, complaint, grievance, summons, litigation, injunctions, corrective actions, mediation, suit, recalls, or other proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"<u>Administrative Books and Records</u>" means any Books and Records as necessary to allow Seller to complete administration of the Bankruptcy Case, including but not limited to completion of any required Tax returns, review and resolution of claims filed in the Bankruptcy Case, pursuit

of any claims against third parties, administering any rights under insurance policies, and other similar issues necessary to complete administration of the Bankruptcy Case.

"<u>Affiliate</u>" will have the same meaning as in the Bankruptcy Code.

"<u>Agreement</u>" will have the meaning as described in the Preamble herein.

"<u>Assignment and Assumption Agreement</u>" means the Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit A**, with any modifications thereto to be acceptable to each of Seller and Buyer.

"<u>Assumed Executory Contracts and Leases</u>" will mean the Existing Contracts designated for Assumption by Buyer pursuant to Section 2.2(a), and individually "Assumed Executory Contracts" and/or "Assumed Leases".

"<u>Assumed Liabilities</u>" will have the meaning set forth in Section 2.2(a) herein.

"<u>Bankruptcy Code</u>" will have the meaning as described in the Recitals herein.

"<u>Bankruptcy Court</u>" will have the meaning as described in the Recitals herein.

"<u>Bidding Procedures</u>" means the bidding procedures approved by the Bankruptcy Court in its Order Approving Bid Procedures on December 18, 2025.

"<u>Bill of Sale</u>" means the Bill of Sale substantially in the form attached hereto as **Exhibit B**, with any modifications thereto to be acceptable to each of Seller and Buyer.

"<u>Books and Records</u>" means all books and records pertaining to the Acquired Assets of any kind, wherever located.

"<u>Business Day</u>" will mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Washington or is a day on which banking institutions located in the state are authorized or required by law or other governmental action to close.

"<u>Buyer</u>" will have the meaning as described in the Preamble herein.

"<u>Cash</u>" means cash, cash equivalents, deposits, and customer payments made for Seller goods or merchandise but not yet available to Seller or otherwise distributed into a bank account of Seller and not included as an account receivable in Seller's accounting records, including, but not limited to the pending Shopify Payouts.

"<u>Claim</u>" will have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"<u>Closing Date</u>" will mean February 13, 2026 or as soon as possible thereafter but no later than February 27, 2026, or such later date mutually agreeable to the Parties .

"<u>Closing</u>" will have the meaning set forth in Section 3.1 herein.

"<u>Code</u>" will mean the Internal Revenue Code of 1986, as amended.

ja22k50160

"Cure Costs" means all monetary liabilities as of the effective date of Seller's assignment of a Contract to Buyer, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Executory Contracts and Leases pursuant to section 365 of the Bankruptcy Code at the time of the assumption thereof as such amounts are determined by the Bankruptcy Court.

"Designation Period" shall have the meaning set forth in Section 2.2(d).

"ERISA" will mean the Employee Retirement Income Security Act.

"ERISA Affiliate" will mean any entity required to be aggregated in a controlled group or affiliated service group with any Seller for purposes of ERISA or the Code (including under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA), at any relevant time.

"Excluded Assets" will have the meaning set forth in Section 2.3 herein.

"Existing Contracts" will mean all oral or written contracts, agreements, real or personal property leases, subleases, licenses, Permits, distribution arrangements, sales and purchase agreements, and purchase and sale orders to which Seller is a party.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b)) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Gift Cards" means exclusively the unused portions of Shopify gift cards, whether physical or digital, issued or sold by Seller prior to the Closing Date and redeemable for goods or services at any of the Seller's locations or through Seller's sales channels."Governmental Authority" means any United States federal, state, or local, or any foreign, government, governmental regulatory or administrative authority, agency or commission, or any court, tribunal or judicial or arbitral body.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event will include (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any indebtedness and (vii) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"Intellectual Property" means, interchangeably and collectively as the context requires: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) copyrights and copyrightable material; (iii) trade secrets and other confidential information, know-how, customer lists, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (iv) all rights with respect to hardware, software, computer programs, computer program code developed by Seller (including

25-02182-WLH11    Doc 180    Filed 01/30/26    Entered 01/30/26 16:14:06    Pg 28 of 74

source code and executable code), the algorithms underlying any computer program developed by Seller, documentation associated with any software, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(iii); (v) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (vi) registrations and applications for any of the foregoing; (vii) the right to sue for past infringement or unauthorized use of any of the foregoing; and (viii) all other intellectual property including the intellectual property included on <u>Schedule 2.1(b)</u> attached to this Agreement.

"<u>Inventory</u>" all inventory of any kind or nature, merchandise and goods related to the Business or Acquired Assets and maintained, held or stored by or for Seller on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including raw materials, components and other parts, work-in-process, finished goods or products, packaging materials and labels, and other stores and supplies used in or held for use in the operation of the Business as conducted by Seller, including any Inventory-In-Transit.

"<u>Inventory-In-Transit</u>" will mean Inventory ordered by but not received by Seller prior to Closing.

"<u>IRS</u>" will mean the Internal Revenue Service

"<u>Knowledge</u>" will mean the actual knowledge after reasonable inquiry of the current officers of Seller or that knowledge that would be obtained by a reasonably prudent businessperson after reasonable inquiry.

"<u>Liabilities or Liability</u>" will mean all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether incurred or not yet incurred, whether liquidated or unliquidated, and whether due or to become due), including all liabilities for Taxes with respect to periods prior to the Closing Date (including periods prior to the Petition Date).

"<u>Lien</u>" or "<u>Liens</u>" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee or continuation of Seller and (iv) any leasehold interest, license or other right, in favor of a Third Party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"<u>Non-Executory Contracts</u>" all of Seller's Existing Contracts which, on the date hereof, either Seller or non-Seller has fully performed all duties and obligations thereunder, while the duties and obligations of the other party(ies) to such contracts remain unperformed (the "<u>Non-Executory Contracts</u>").

25-02182-WLH11    Doc 180    Filed 01/30/26    Entered 01/30/26 16:14:06    Pg 29 of 74

"Order" means any decree, order, injunction, rule, judgment, or consent of or by any Governmental Authority.

"Ordinary Course of Business" will mean the ordinary course of business of Seller consistent with past custom and practice (including with respect to quantity and frequency), taking into account the effect of the filing of the Petition and consequent limitations on Seller's operations.

"Person" will mean any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind whatsoever.

"Petition Date" will mean December 15, 2025.

"Prepetition Obligations" means Seller's Liabilities occurring prior to the Petition Date.

"Purchase Price" will have the meaning as described in Section 2.6(a) herein.

"Representative" will mean any attorney, accountant, agent, independent contractor, or other representative.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein.

"Sale Order" means the order of the Bankruptcy Court obtained after proper notice to creditors and parties in interest consistent with the Bankruptcy Code, in form and substance satisfactory to Buyer, to be entered by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens and Claims pursuant to Sections 105 and 363(f) of the Bankruptcy Code; (iii) approving the assumption and assignment to Buyer of the Assumed Executory Contracts and Leases pursuant to Section 365(f)(2) of the Bankruptcy Code; (iv) transferring and assigning the Assumed Executory Contracts and Leases such that the Assumed Executory Contracts and Leases will be in full force and effect from and after the Closing; (v) finding that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; (vii) providing that the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (viii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (ix) authorizing the results of the Auction, if one occurs.

"Schedules" means the Schedules attached to this Agreement, if any.

"Seller's Business" will mean Seller's business as conducted by Seller prior to the Closing.

"Shopify Payouts" means customer payments made to Shopify for Seller goods or merchandise but not yet made available to Seller or otherwise distributed into a bank account of Seller.

"Store Employees" will mean all individuals employed by Seller at the Acquired Locations.

"Taxes" will mean all taxes, duties, charges, fees, registration fees, revenue permit fees, levies, penalties or other assessments imposed by any governmental entity or political subdivision thereof, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value added or gains taxes, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against the Seller.

"Third Party" means any Person other than Seller, Buyer, and any of their respective Affiliates.

"Warranty Claims" means claims by end-customers arising from written product warranties covering bikes and or parts sold by Seller prior to the Closing Date, solely to the extent such claim amount is equal to the value of a bike or part sold, or less, determined in accordance with Seller's warranty policies as in effect at the time of sale of the bike or part.


## ARTICLE II.
## PURCHASE AND SALE

**Section 2.1     Transfer of Assets/Acquired Assets.**  Upon the terms and subject to the conditions and provisions contained herein, at the Closing, Seller will sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Buyer, free and clear of all Liens and Claims, and Buyer will acquire and accept from Seller, all right, title and interest in and to all of the assets, properties, business and rights of any and every kind owned by Seller, whether tangible or intangible, real or personal, including, without limitation, the following assets (but exclusive, in all cases, of the Excluded Assets) (all of the assets to be sold, assigned, transferred and delivered to Buyer hereunder, the "Acquired Assets"):

(a)     all machinery, equipment, fixtures, furnishings, trade fixtures, storage racks, tools, dies and furniture and other similar items of personal property located at the Acquired Locations ("FF&E") as set forth on the attached Schedule 2.1(a);

(b)     all Inventory, including inventory located at the Acquired Locations, inventory purchased and held by vendors, Inventory-in-Transit, and including prepaid deposits and expenses;

(c)     all Intellectual Property;

(c)     all computers and software, and personal property related thereto located at the Acquired Locations;

ja22k50160

(d)     all rights existing under the Assumed Executory Contracts and Leases;

(f)     all accounts receivable;

(g)     all deposits or prepayments relating to the Assumed Executory Contracts and Leases;

(h)     any Non-Executory Contracts listed on Schedule 2.1(h) to the extent assignable and identified by Buyer to be assigned to it; and

(h)     all of Seller's Books and Records relating to any of the Acquired Assets but excluding the Administrative Books and Records.

### Section 2.2     Assignment and Assumption of Liabilities

(a)     Buyer will assume the following liabilities of Seller and will be responsible for the payment, performance, or discharge of all of the obligations under the Assumed Executory Contracts and Leases first arising after the Closing, or the Designation Period set forth in Section 2.2(d) with respect to Assumed Leases, and the following liabilities only (the "Assumed Liabilities"). Buyer agrees to provide reasonable access to Seller and other third parties to remove any Excluded Assets or other assets not an Acquired Asset that is subject to any Assumed Lease or Contract for a period of 30 days after Closing. Following are the Assumed Liabilities:

(1)     all obligations set forth in the Assumed Executory Contracts and Leases set forth on Schedule 2.2(a), including payment of the Cure Costs for each Assumed Executory Contract and Lease upon making a Designation to assume the subject Executory Contract or Lease;

(2)     all liabilities in connection with Inventory-In-Transit;

(3)     the Warranty Claims;

(4)     any excise, sales, or other transfer tax arising from or relating to the Seller's sale of the Acquired Assets to Buyer;

(5)     accrued vacation and/or paid-time-off, if any, owed to any of Seller's employees that Buyer hires/retains;

(6)     all liabilities, if any, set forth on Schedule 2.2(a)(6); and

(7)     Gift Cards issued by Seller.

(b)     Section 2.2(a) above will not limit any claims or defenses Buyer may have against any party other than Seller. The transactions contemplated by this Agreement will in no way expand the rights or remedies of any Third Party against Buyer or Seller as compared to the rights and remedies which such Third Party would have had against Seller absent the Chapter 11 Case had Buyer not assumed such Assumed Liabilities.

ja22k50160

25-02182-WLH11     Doc 180     Filed 01/30/26     Entered 01/30/26 16:14:06     Pg 32 of 74

(c)     Buyer will indemnify Seller with respect to the Assumed Liabilities, including the obligation to defend, at its cost, any action by any third party to seek recovery from Seller of the Assumed Liabilities.

(d)     Buyer will have until March 6, 2026 (the "Designation Period") to designate which Executory Contracts and Leases it will assume (the "Assumed Leases") or not assume (the "Designation").  The Designation will be in writing and delivered to Seller no later than March 6, 2026, at 5pm, Pacific Time.  During the Designation Period, Seller will continue to operate the business on the premises subject to the Leases, and Buyer will reimburse Seller, in advance, for all actual expenses of doing so from the date of Closing through the Buyer's delivery of its Designation to Seller, including but not limited to employee expenses and amounts due under the Lease and  accrued during the Designation Period.  If Buyer fails to timely deliver the Designation to Seller, Seller will take immediate steps to have the Leases rejected, will cease all operations of the premises located at the Leased locations, and Buyer will have no right to assume the Leases.  If there are any disputes between the Parties regarding the operation of this Section 2.2(d), the Bankruptcy Court shall resolve such disputes on an emergency basis.  At their option, the Parties may enter into an agreement memorializing this Section 2.2(d), over which the Bankruptcy Court shall maintain jurisdiction, but such additional agreement is not necessary for the Parties to enforce the terms of this Section 2.2(d).

Section 2.3     Excluded Assets.     Notwithstanding anything to the contrary in this Agreement, the following assets of Seller will be retained by Seller and are not being sold or assigned to Buyer hereunder (all of the following are referred to herein collectively as the "Excluded Assets"):

(a)     any and all rights, claims, causes of action, including avoidance claims, arising under Chapter 5 of the Bankruptcy Code (a "Bankruptcy Action" and, collectively, the "Bankruptcy Actions"), and any actions and claims that may exist against any third party that arose prior to the Closing Date; provided, however, Seller agrees that it will not pursue any such Bankruptcy Actions against non-insiders of Seller without the prior written consent of Buyer;

(b)     Cash, cash equivalents, and deposits (except those provided by Seller with respect to any Assumed Contracts and Leases) of the Seller at the time of Closing;

(c)     corporate charter, seals, minute books, stock transfer books and other documents relating solely to the organization, maintenance, and existence of Seller;

(d)     all insurance policies and all of Seller's rights and claims pursuant to or arising under such policies;

(e)     all Existing Contracts which are not Assumed Executory Contracts and Leases (the "Excluded Contracts");

(f)     any rights of Seller under this Agreement;

(g)     any and all tax refunds that were accrued through operation of Seller's business prior to the Closing Date;

25-02182-WLH11     Doc 180     Filed 01/30/26     Entered 01/30/26 16:14:06     Pg 33 of 74

(h)     all documents and other books and records (financial, accounting and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, (A) that relate exclusively to the Excluded Assets or Unassumed Liabilities, (B) that if transferred as an Acquired Asset would violate any Person's privacy rights under applicable law, or (C) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Case or this Agreement and the transactions provided for herein;

(i)     computers and servers necessary to allow Seller to complete its required Tax returns and the administration of the Bankruptcy Case and more fully described on <u>Schedule 2.3(c)</u>;

(j)     Seller's ownership in any subsidiary;

(k)     all refunds, rebates, credits, and other amounts due to Seller related to any Taxes or that arise out of Seller's operation of its business prior to Closing; and

(l)     all proceeds and products of any and all of the Excluded Assets.

**Section 2.4     No Other Liabilities Assumed.**  Except as to Postpetition Obligations not paid by the Seller in full, Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Buyer will not assume any obligation of Seller, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, neither Buyer nor any of its Affiliates will assume, and will not be deemed to have assumed, any debt, Claim, obligation or other Liability of Seller whatsoever, including, but not limited to the following (collectively, the "<u>Unassumed Liabilities</u>"):

(a)     all Claims or Liabilities of Seller that relate to any of the Excluded Assets or Excluded Contracts;

(b)     any Cure Costs (pursuant to Section 365 of the Bankruptcy Code) with respect to any Assumed Executory Contracts and Leases;

(c)     other than liabilities assumed under Assumed Liabilities, all Indebtedness of Seller;

(d)     all Liabilities or obligations of Seller, including any pending or threatened investigation, recall, order or demand relating to any Governmental Authority, resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Seller anywhere or Seller's ownership or lease of any properties or assets or any properties or assets previously used by Seller at any time, or other actions, omissions or events occurring prior to the Closing including without limitation any such Liabilities which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, recall obligation or liability, treaty or other similar authority or (ii) relate to any and all Claims, disputes, demands,

actions, liabilities, damages, suits in equity or at law, administrative, regulatory or quasi-judicial proceedings, accounts, costs, expenses, setoffs, contributions, attorneys' fees and/or causes of action of whatever kind or character against Seller, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(e)     any Liability or obligation arising out of any action or proceeding commenced against Seller after the Closing and arising out of, or relating to, any occurrence or event happening prior to the Closing;

(f)     all Claims or Liabilities (whether known or unknown) with respect to the current or former employees of Seller (except as explicitly assumed in Section 2.2(a)), including, without limitation, payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including, without limitation, any Liability pursuant to the WARN Act for any action or inaction except to the extent action by Buyer is specifically required by the WARN Act;

(g)     any Liability arising under any employee benefit plan of Seller or any other employee benefit plan, program or arrangement at any time maintained, sponsored, or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any liability;

(h)     any Liability under any employment, collective bargaining, severance, retention or termination agreement with any employee, independent contractor, or contractor (or their representatives) of Seller, except to the extent such Liabilities arise after Closing and arise under an Assumed Executory Contract;

(i)     any Liability of Seller to any shareholder or Affiliate of Seller;

(j)     any Liability to indemnify, reimburse or advance amounts to any officer, director, employee, or agent of Seller;

(k)     any Liability to distribute to Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(l)     any Liability arising out of or resulting from non-compliance with any law, ordinance, regulation, or treaty by Seller;

(m)     any Liability of Seller under this Agreement or any other document executed in connection herewith;

(n)     any Liability of Seller based upon such person's acts or omissions occurring after the Closing;

(o)     any Liability of Seller for Taxes, including, without limitation, any Liability of Seller in respect of any amount of federal, state or other Taxes (including, without limitation, interest, penalties and additions to such Taxes and any liabilities relating to Taxes arising (i) as a

ja22k50160

result of Seller at any time being a member of an affiliated group (as defined in Section 1504(a) of the Code) and (ii) under any Tax allocation, sharing, indemnity, or similar agreement with any Person) which are imposed on or measured by the income of Seller for any period; and

(p)     any Liability arising out of or resulting from actions taken or not taken by Seller prior to Closing related to the shutdown of any of its operations or facilities or the termination of any of its employees or independent contractors including any severance obligations

The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement will not create an Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability in accordance with the provisions of Section 2.2 hereof.

**Section 2.6     Purchase Price and Allocation Schedule.**  The "Purchase Price" for the Acquired Assets is $13,276,102 USD  to be paid, in cash, at Closing.  The Parties agree that the Purchase Price will be allocated among the Acquired Assets as agreed by the Parties.

**Section 2.7     Deposit.** Buyer has previously paid to Seller an amount of $820,000.00 as an initial deposit, and will pay Seller an additional amount of $507,610.00 on or before close of business on Monday, January 26, 2026, to establish a deposit equal to **10% of Purchase Price** to be held and released in accordance with this Agreement (the "Deposit").

**Section 2.8     Bid Procedures and Stalking Horse Provisions.**  This Agreement is subject to the Bid Procedures.  Buyer acknowledges that it is bound by the Bid Procedures, and that the Seller, in furtherance of its duty to maximize the value of the assets in the Bankruptcy Case, will conduct a bidding process and, potentially, an auction of Seller's assets, pursuant to the terms of the Bid Procedures.  The Parties acknowledge that Buyer's agreement hereunder is subject to third parties submitting higher and better offers, as provided for in the Bid Procedures, and subject to a possible auction process thereunder.

**Section 2.9     Employee Matters.**

(a)     Except as necessary to comply with Section 2.2(d) and to complete administration of the Bankruptcy Case, in Seller's sole discretion, Seller will terminate the employment of all Employees as of the Closing.

(b)     Buyer will have the right, but not the obligation, to make offers of employment to such of the Employees and on terms as Buyer may elect prior to Closing.

(c)     Except as set forth in Section 2.2(a)(5), Seller will remain liable to the Employees for all payments of wages or other compensation (including vacation pay and bonuses) and other employee benefits and obligations arising at any time out of Seller's employment relationship with the Employees.

It is expressly agreed and understood that neither Buyer nor Seller have any right, power or authority to control, direct or regulate the labor relations and human resources policies and procedures of the other, that neither is deemed to constitute the agent or representative of the other and that neither is liable in any manner whatsoever for the acts or omissions of the other, its agents,

representatives or employees. All of Seller's present or former Employees which Buyer elects to hire, if any, will be "new hires" of Buyer for all purposes.

**Section 2.10   Inventory-In-Transit.**   Within three (3) business days following Closing, Seller will provide Buyer a schedule of Inventory-In-Transit, including identification of vendors and contact information including phone numbers. Buyer will have full responsibility for payment for Inventory-In-Transit received at Acquired Locations following Closing and/or for cancellation, if possible, of any pending orders for Inventory-In Transit. Beginning fourteen (14) days prior to Closing, Seller will not issue any new purchase orders that except as agreed to by Buyer.

# ARTICLE III.
# CLOSING

**Section 3.1   Closing.**   Upon the terms and conditions set forth herein and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed remotely or in such manner as is mutually agreeable to the parties. The date of Closing is sometimes referred to herein as the "Closing Date."

**Section 3.2   Actions at Closing**.   At the Closing, Seller and Buyer will deliver and do (or cause to be delivered and done) the following:

(a)   Instruments and Possession.   Seller will deliver to Buyer:

(i)   one or more Bills of Sale conveying in the aggregate all of the owned personal property of Seller included in the Acquired Assets, duly executed by Seller;

(ii)   possession of all tangible Acquired Assets owned by or in the possession of Seller (excluding any such items that are Excluded Assets);

(iii)   one or more Assignment and Assumption Agreements providing for the assignment and assumption of the Assumed Executory Contracts and Leases, duly executed by Seller;

(b)   Form of Instruments.   To the extent that the form of any document to be delivered hereunder is not attached as an exhibit hereto, such documents will be in form and substance, and will be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

**Section 3.3   Transaction Expenses.**   Each Party will bear its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

25-02182-WLH11     Doc 180     Filed 01/30/26     Entered 01/30/26 16:14:06     Pg 37 of 74

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1    Organization and Authorization.**    Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to the entry of the Sale Order, (i) this Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)), and (ii) each agreement or instrument which has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

**Section 4.2    No Violation.**    Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Seller do not and will not (i) conflict with or result in any breach of any of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in the creation of any Lien upon any of the Acquired Assets or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, under the provisions of the articles of incorporation, by-laws or other constitutive documents of Seller.

**Section 4.3    Governmental Consents and Approvals.**    Except for the Sale Order, there are no consents, waivers, agreements, approvals, permits or authorizations of, or declarations, filings, notices or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where the failure to so obtain would not be reasonably expected to have a Material Adverse Effect.  In addition, Seller represents that is has given all required notices under the WARN Act.

**Section 4.4    Title to Assets**

(a)    Seller has good and marketable title to, or a valid leasehold interest in, the Acquired Assets.

(b)    Subject to Bankruptcy Court approval, Seller has the power and the right to sell, assign and transfer the Acquired Assets, and Seller will sell and deliver to Buyer, and upon

ja22k50160

consummation of the transactions contemplated by this Agreement Buyer will acquire good and marketable title to the Acquired Assets free and clear of all Liens and Claims.

**Section 4.5    Legal Compliance.**  As to the Acquired Assets, to Seller's Knowledge, Seller has complied in all material respects, and is in material compliance, with all applicable laws, ordinances, rules, requirements and regulations of foreign, federal, state and local governments and agencies thereof relating to the ownership of the Acquired Assets.  Seller has complied with all laws, ordinances, rules, requirements and regulations relating to data protection and/or privacy, and no notices have been received by, and no claims have been filed against, Seller alleging a violation of any such laws, ordinances, rules, requirements or regulations.

**Section 4.6    As Is.**  Except as expressly set forth herein, the Acquired Assets are sold "As Is, Where Is", without warranty of any kind, and except for the representations and warranties set forth in this Article IV, no other representation or warranty is made or implied hereby, including a warranty of fitness for a particular purpose, a warranty of merchantability, or otherwise. EXCEPT AS EXPLICITLY SET FORTH HEREIN, SELLER MAKES NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

**Section 5.1    Organization.**  Buyer is a  corporation duly organized, validly existing and in good standing under the laws of the State of Nevada.

**Section 5.2    Authorization.**  Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other company proceedings on the part of Buyer are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).  Each agreement or instrument which has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and

25-02182-WLH11    Doc 180    Filed 01/30/26    Entered 01/30/26 16:14:06    Pg 39 of 74

similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

**Section 5.3    Governmental Consents and Approvals.**  To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or thereby.

**Section 5.4    No Violation.**  The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational documents of Buyer or (ii) conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

**Section 5.5    Cure Costs**.  Any Cure Costs due with respect to Assumed Executory Contracts and Leases will be paid by Buyer at Closing.

**Section 5.5    Available Funds to Close.**  Buyer has available funds to close the transactions contemplated by and as set forth in this Agreement, and the availability of these available funds is not contingent or subject to any condition other than the conditions explicitly set forth in this Agreement.

**ARTICLE VI.**
**ADDITIONAL COVENANTS**

**Section 6.1    Maintenance of Assets.**  Seller will, to the extent permitted by the Bankruptcy Court and consistent with reasonable commercial business practices, but without any obligation to pay or otherwise discharge Prepetition Obligations, (a) maintain the Acquired Assets and Acquired Locations in their current state of repair, excepting normal wear and tear, (b) operate the business at each Acquired Location in the Ordinary Course of Business based on its status as a debtor in a Chapter 11 bankruptcy, and (c) maintain the insurance covering the Acquired Assets in effect on the date hereof until Closing.

**Section 6.2    Best Efforts; Further Assurances**

(a)    Seller will use its reasonable best efforts to timely obtain any other consent required for the consummation of the transactions contemplated by this Agreement as soon as practicable.

(b)    Seller will execute such documents and use its reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, to put Buyer in actual possession and operating control of the Acquired Assets and Acquired Locations, to effectuate, record or perfect the transfer of the Acquired Assets to Buyer,

to confirm the title of the Acquired Assets in Buyer, to assist Buyer in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties, to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby); provided, however, that the foregoing will not require Seller to make any payments to any party unless necessary to accomplish the transfers contemplated by this paragraph 6.2(b). Seller will use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VII of this Agreement. The obligations of Seller set forth in the first sentence of this Section 6.2(b) will survive the Closing.

## ARTICLE VII.
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and assign the Acquired Locations and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Seller in accordance with Section 10. 4 herein.

**Section 7.1    Covenants and Representations.**  The representations and warranties of Buyer contained in Article V hereof which are not qualified as to materiality (or Material Adverse Effect) will be true and correct in all material respects and the representations and warranties of Buyer contained in Article V hereof which are qualified as to materiality (or Material Adverse Effect) will be true and correct in all respects, in each case as of the Closing Date, as though made on such date (except that representations and warranties that speak as of a specific date need be true and correct only as of such date), and the Buyer will have performed in all material respects all of the covenants, agreements and conditions required by this Agreement to be performed, satisfied and complied with by it hereunder on or prior to the Closing.

**Section 7.2    Bankruptcy Condition.**  The Sale Order will have been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and will not have been stayed or subject to any stay.

**Section 7.3    Deliveries.**  On or prior to the Closing Date, Buyer has delivered to Seller all of the following:

(a)    a certificate from Buyer in a form reasonably satisfactory to Seller, dated the Closing Date, stating that the conditions specified in this Section 7.1 have been satisfied; and

(b)    the Purchase Price in accordance with Section 2.6, above.

## ARTICLE VIII.
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets, assume the Acquired Locations, and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Buyer in accordance with Section 10.4 herein:

**Section 8.1      Representations and Warranties.**  The representations and warranties of Seller contained in Article IV hereof will be true and correct in all material respects as of the Closing Date as though made on such date (except that representations and warranties that speak as of a specific date need be true and correct only as of such date).

**Section 8.2      Covenants and Agreements.**  The Seller will have performed in all material respects all of the covenants, agreements and conditions required by this Agreement to be performed, satisfied, and complied with by it hereunder on or prior to the Closing.

**Section 8.3      Bankruptcy Condition.**  The Sale Order shall have been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and shall not have been stayed or subject to any stay.

**Section 8.4      Litigation.**  No action, suit or other legal proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages in respect thereof.

**Section 8.5      Deliveries.**  On or prior to the Closing Date, Seller shall have delivered to Buyer all of the following:

(a)      a certificate in a form reasonably satisfactory to Buyer, dated the Closing Date, stating that the conditions specified in Section 8.1 have been satisfied as of the Closing;

(b)      the documents and instruments called for in Section 3.2(a) hereof.

## ARTICLE IX

## POST-CLOSING COVENANTS

**Section 9.1.  Access to Books, Records, and Personnel.**  Inasmuch as some of Seller's books, records, and documents are to be included in the Acquired Assets and some are to be retained by Seller, i.e. Administrative Books and Records, and one Party may need access the books, records, and documents held by the other Party after the Closing, each Party must maintain (or provide for a designated representative to maintain) for at least one year after the Closing (or for any longer period applicable law requires) the respective books, records, and documents sold or retained under this Agreement relating to the Acquired Assets or the Assumed Leased Locations or the business operated at the Assumed Leased Locations and covering periods on or before the Closing.  During this one-year period, subject to the confidentiality rights of third parties, each Party's authorized representatives (to be identified on or before the Closing) may inspect and make copies of any books, records, and documents held by the other Party during normal business hours and on reasonable notice for any reasonable business purpose. If necessary, each Party must make its authorized representative(s) available to the other Party during normal business hours and on reasonable notice to facilitate such inspection and copying.

**Section 9.2.  Use of Name**.  Seller agrees that, after the Closing Date, it shall not use or employ in any manner, directly or indirectly, the name "Rad Power Bikes" as a trade name,

25-02182-WLH11      Doc 180      Filed 01/30/26      Entered 01/30/26 16:14:06      Pg 42 of 74

trademark, Internet domain name, or in any other manner whatsoever. As soon as practicable following the Closing Date, Seller will take all actions as are necessary and appropriate to change the name of Seller to remove any reference to the word "Rad" or "Rad Power" or any variation thereof, **provided, however,** that the filing of any required documents with the appropriate governmental agencies shall be completed within ten (10) Business Days after the Closing.

**Section 9.3. Privacy Policy.** Buyer agrees that it will adopt and comply with the Seller's privacy policy in place with respect to personally identifiable information, as defined in the Bankruptcy Code with regard to all existing such information available on the Closing Date.

**Section 9.4. Availability, Packaging, and Delivery of Inventory**. Within five (5) business days following the Closing Date (the "**Delivery Period**"), Seller shall, at Seller's sole cost and expense, arrange for the following for all Inventory included in the Acquired Assets:

(a) With respect to Inventory located within Seller Retail Locations, at Seller's sole cost and expense, prepare, package and provide Buyer with access to such locations and permit Buyer and its designated staff, employees, or other representatives to enter upon the premises and remove the packaged Inventory for Buyer's transportation to its separate locations; and

(b) With respect to Inventory in warehouses or otherwise under the control of third-party logistics companies, at Seller's sole cost and expense, package, prepare for shipment, and to the extent required, load Inventory into the Buyer delivery vehicles. Buyer shall bear any additional cost and expense after Seller has satisfied its obligations in this Section 2.11.

Title to and risk of loss for the Inventory shall remain with Seller until Inventory is loaded into the Buyer delivery vehicles after which risk of loss shall be with Buyer.

**ARTICLE X.**
**TERMINATION**

**Section 10.1 Termination.** This Agreement may be terminated prior to the Closing:

(a) At any time by mutual written consent executed by both Buyer and Seller;

(b) By Buyer if Seller is in breach of any material covenant, representation, undertaking or warranty that, if curable, is not cured within ten (10) calendar days after written notice from Buyer, or if a condition set forth in Article VIII is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c) By Seller if Buyer is in breach of any material covenant, representation or warranty that, if curable, is not cured within ten (10) calendar days after written notice from Seller, or if it appears that a condition set forth in Article VII is impossible (other than through the failure

of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date.

**Section 10.2   Obligations on Termination.**   In the event of termination of this Agreement pursuant to Section 10.1:

(a)   no Party hereto shall have any liability or obligation to the other Party hereto, any of its creditors and equity holders or any other Party except in accordance with Sections 10.2(b) and (c) below;

(b)   Buyer shall receive the Break-Up Fee, as provided for in the Bid Procedures, following the closing of the sale of the Acquired Assets with one or more Successful Bidder(s) (other than Buyer) following an Auction and related Sale Order approving the results of the Auction, as set forth in the Bid Procedures and

(c)   the Deposit shall, within three (3) business days of the termination of this Agreement, be released as follows:

(i)   If this Agreement is terminated pursuant to Section 10.1(a) or (b), the Deposit will be wire transferred to an account designated by Buyer.

(ii)   In the event this Agreement is terminated pursuant to Section 10.1(c), the Deposit will be retained by Seller.

If this Agreement terminates under Section 10.1 above, the Parties agree that the release of the Deposit Amount and the payment of the other amounts payable pursuant to Section 10.2 shall be in the nature of liquidated damages and shall be the sole and exclusive remedy of Buyer, Seller and/or Seller's receivership estate, whether at law or in equity, for any breach by Buyer or Seller, as the case may be, or any of their respective members, managers, affiliates and/or representatives, of the terms and conditions of this Agreement.

**Section 10.3   Effect of Termination or Breach.**  If the transactions contemplated hereby are not consummated, this Agreement will become null and void and of no further force and effect, except for the obligations of the Parties contained in this Section 10, and except that the termination of this Agreement for any cause will not relieve any Party hereto from any liability which at the time of termination had already accrued to any other Party hereto or which thereafter may accrue in respect of any act or omission of such Party prior to such termination.

## ARTICLE XI.
## MISCELLANEOUS

**Section 11.1   Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party without the prior written consent of the other; provided, however, (i) Buyer may assign some or all of its rights under this Agreement to any Affiliate of Buyer, so long as Buyer remains liable for its obligations and (ii) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit

of the parties hereto and their respective representatives, heirs, legatees, successors and permitted assigns, including without limitation any Chapter 11 trustee appointed in the Chapter 11 Case, and no other person will have any right, benefit or obligation hereunder.

**Section 11.2  Notices.**  Any notice, request, demand, waiver, consent, approval, or other communication (collectively, a "<u>Communication</u>") that is required or permitted to be given to any Party under this Agreement will be valid only if it is in writing (whether or not this Agreement expressly provides for it to be in writing) and given to that Party by electronic mail transmission, hand delivery, overnight mail with delivery confirmation, or certified mail with signature requirement at the mailing address or electronic mail address set forth below or to any other mailing address or electronic mail address as a Party designates by written notice given in the manner provided in this Section 11.2:

If to Buyer:

Robert Provost, CEO
Life Electric Vehicles Holdings, Inc.
601 Fairway Drive
Deerfield Beach, FL 33441
rob@life.bike

With a copy to:

James Zack
Ballard Spahr LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-2930
zackj@ballardspahr.com

If to Seller:

Rad Power Bikes Inc:

Angy Smith, CEO
<u>Angy.smith@radpowerbikes.com</u>

Helen Cho, General Counsel
Helen.cho@radpowerbikes.com

With a copy to:

Jay Kornfeld/Aimee Willig
Bush Kornfeld LLP
601 Union St.
Seattle, WA 98101

(206) 292-2110
jkornfeld@bskd.com
awillig@bskd.com

or to such other place and with such other copies as either Party may designate by written notice to the others. Notice shall be deemed complete as follows: if the Communication is by electronic mail transmission or overnight mail, the next business day; if the Communication is by certified mail, the next business day after confirmed receipt.

**Section 11.3  Choice of Law; Submission to Jurisdiction.**  This Agreement will be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Washington.  Each Party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in Section 11.2.  The parties hereto irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby and any such dispute will be deemed to have arisen in the State of Washington.  Each Party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

**Section 11.4  Entire Agreement; Amendments and Waivers.**  This Agreement, together with all Exhibits and Schedules attached or to be attached hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with regard to the subject matter hereof.  All amendments of this Agreement will only be effective if executed in writing by or on behalf of the Parties by authorized representative(s).  No waiver of any of the provisions of this Agreement will be effective unless made in a writing by the Party making the waiver or be deemed or constitute a waiver of any other provision hereof (whether or not similar), nor will such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 11.5  Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and will not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs, or clauses herein will be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules will be to the specified Exhibits and Schedules attached hereto.  All Exhibits and Schedules attached are made a part hereof.  All terms defined herein will have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to "this Agreement" will be deemed to include the Exhibits and Schedules attached hereto.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not

ja22k50160

only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision will be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "including" when used herein will mean "including, without limitation." Wherever in this Agreement the singular number is used, the same will include the plural, and the masculine gender will include the feminine and neuter genders, and vice versa, as the context requires.

Section 11.6 **Third Party Beneficiaries.** No Person other than the parties hereto, will have any rights or claims under this Agreement.

Section 11.7 **No Waiver.** The failure of either Party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of this Agreement by the other will not be a waiver of the breach or failure to perform, nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

Section 11.8 **Execution in Counterparts.** A Party may deliver executed signature pages to this Agreement by facsimile transmission or by electronic mail transmission to the other Party, and may bear signatures affixed electronically (i.e. DocuSign or any electronic signature platform with a signature certificate or equivalent complying with the U.S. federal SIGN Act of 2000), which facsimile copy or electronic copy will be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which counterparts together will constitute one agreement with the same effect as if the Parties had signed the same signature page.

Section 11.9 **Invalidity.** In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, will, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability will not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

Section 11.10 **Further Assurances.** Without limiting any other rights or obligations of the parties contained in this Agreement, following the Closing, each Party agrees to execute, or cause to be executed, such documents, instruments or conveyances and take such actions as may be reasonably requested by the other Party to effectuate the purposes of this Agreement, including, without limitation, such instruments as are reasonably requested by Buyer to vest in Buyer title in and to the Acquired Assets in accordance with the provisions of this Agreement.

Section 11.11 **Cumulative Remedies.** All rights and remedies of either Party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies will not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

Section 11.12 **Representation by Counsel; Mutual Negotiation.** Each Party has been represented by counsel of its choice in negotiating this Agreement. This Agreement will therefore be deemed to have been negotiated and prepared at the joint request, direction, and construction

of the Parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to either Party.

**Section 11.13 Post-Closing Dispute Resolution.** Either Party may submit to the Bankruptcy Court any controversy, claim or dispute of whatever nature between the parties arising out of or relating to this Agreement after the Closing that is not resolved within thirty (30) days after written notice by one Party to the other of such controversy, claim or dispute. The parties agree that the Bankruptcy Court will have exclusive jurisdiction to resolve such controversy, claim or dispute; provided, however, that upon the entry of a final decree in cases by the Bankruptcy Court, all disputes arising out of or relating to this Agreement (except as otherwise provided herein) will be brought in a state or federal court located in either King County for state court matters and the Eastern District of Washington for federal court matters. The Bankruptcy Court will award a Party that prevails in full its reasonable attorneys' fees and costs and will award a Party that prevails less than in full that portion of its reasonable attorneys' fees and costs as determined by the Bankruptcy Court.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

**SELLER:**

**RAD POWER BIKES INC.**

By: ___Angelina Smith (Jan 22, 2026 16:42:06 PST)_____
Its: __Chief Executive Officer_____

**BUYER:**

**LIFE ELECTRIC VEHICLES HOLDINGS INC.**

By: ___Robert Prevost (Jan 22, 2026 17:06:23 PST)_____
Its: __CEO_____

EXHIBIT A – Form of Assignment and Assumption Agreement

EXHIBIT B – Form of Bill of Sale

Schedule 2.1(b) – List of IP

<u>Schedule 2.3(c) – Computers/Servers nec for Seller to complete tax returns/administration of estate</u>

<u>Schedule 2.2(a)(6) – Specific Liabilities assumed by Buyer in addition to those specifically listed in APA</u>

<u>Schedule 2.2(a) -</u> Assumed Executory Contracts and Leases

<u>Schedule 2.1(a) – List of Acquired Locations</u>

ja22k50160

# EXHIBIT B

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of this 22nd day of January, 2026 (the "Effective Date"), by and between, Xander Bicycle Corporation, a Nevada Corporation d/b/a Retrospec ("Buyer") and Rad Power Bikes Inc., a Delaware corporation ("Seller"). Each of Buyer and Seller is a "Party" and collectively the "Parties" for the purposes of this Agreement.

## RECITALS:

A. Seller and its affiliate Summit Collective, Inc. filed voluntary petitions (together the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Washington (the "Bankruptcy Court") entitled *In re Summit Collective, Inc. et al.*, Lead Case no. 25-02182-WLH11 (the jointly administered "Chapter 11 Case") on December 15, 2025 ("Petition Date") and continues to manage its property as debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B. Buyer desires to purchase certain assets from Seller and Seller desires to sell, convey, assign, and transfer to Buyer such assets pursuant to the terms and conditions of this Agreement.

C. The assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving such sale under Sections 105 and 363 of the Bankruptcy Code and the assumption and assignment of the Assumed Executory Contracts (as hereinafter defined) under Section 365 of the Bankruptcy Code.

## ARTICLE I.
## DEFINITIONS

**Section 1.1    Defined Terms.** As used herein, the terms below will have the following meanings:

"Accounts Receivable" means all accounts, notes, and other rights to payment of Seller arising from the sale of goods or the performance of services in the ordinary course of business.

"Acquired Assets" will have the meaning set forth in Section 2.1.

"Action" means any legal action, suit, petition, plea, charge, claim, demand, arbitration, audit, complaint, grievance, summons, litigation, injunctions, corrective actions, mediation, suit, recalls, or other proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Administrative Books and Records" means any Books and Records as necessary to allow Seller to complete administration of the Chapter 11 Case, including but not limited to completion

of any required Tax returns, review and resolution of claims filed in the Chapter 11 Case, pursuit of any claims against third parties, administering any rights under insurance policies, and other similar issues necessary to complete administration of the Chapter 11 Case.

"Affiliate" will have the same meaning as in the Bankruptcy Code.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form attached hereto as **Exhibit A**, with any modifications thereto to be acceptable to each of Seller and Buyer.

"Assumed Executory Contracts" will mean the Existing Contracts designated for Assumption by Buyer pursuant to Section 2.2(a).

"Assumed Liabilities" will have the meaning set forth in Section 2.2(a) herein.

"Avoidance Action" means any claim or cause of action of the Debtor or the Bankruptcy Estate to avoid or recover a transfer or obligation pursuant to sections 547, 548, 549, or 550 of the Bankruptcy Code and any analogous state law fraudulent transfer or preference claim.

"Bankruptcy Code" will have the meaning as described in the Recitals herein.

"Bankruptcy Court" will have the meaning as described in the Recitals herein.

"Bankruptcy Estate" means the estate of the Debtor created pursuant to section 541(a) of the Bankruptcy Code.

"Bid Procedures" means the bidding procedures approved by the Bankruptcy Court in its Order Approving Bid Procedures on December 18, 2025.

"Bike Inventory" means exclusively Seller's electric bicycle and tricycle Inventory, whether currently in possession of Seller or included as any Inventory-in-Transit.

"Bill of Sale" means the Bill of Sale substantially in the form attached hereto as **Exhibit B**, with any modifications thereto to be acceptable to each of Seller and Buyer.

"Books and Records" means all books and records pertaining to the Acquired Assets of any kind, wherever located, including but not limited to, wholesale inventory lists and customer lists.

"Business" means the Seller's electric bicycle ("e-bike") company that designs, manufactures, and sells e-bikes and related accessories through wholesale, online company-owned retail channels, and other channels as operated by Seller prior to the Closing.

"Business Day" will mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Washington or is a day on which banking institutions located in the state are authorized or required by law or other governmental action to close.

"Cash" means cash, cash equivalents, deposits, and customer payments made for Seller goods or merchandise but not yet available to Seller or otherwise distributed into a bank account of Seller and not included as an account receivable in Seller's accounting records, including, but not limited to the pending Shopify Payouts.

"Claim" will have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing Date" will mean February 13, 2026 or as soon as possible thereafter but no later than February 27, 2026, or such later date mutually agreeable to the Parties.

"Closing" will have the meaning set forth in Section 3.1.

"Code" will mean the Internal Revenue Code of 1986, as amended.

"Compliance Documentation" means all certifications, reports, test results, approvals, and other documentation evidencing compliance of the Products and Inventory with applicable laws, regulations, and industry standards, including without limitation documentation issued by CPSC, or by or related to UL, ACT, SGS, ISO, and any other recognized testing laboratories or accreditation bodies.

"Cure Costs" means all monetary liabilities as of the effective date of Seller's assignment of a Contract to Buyer, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code at the time of the assumption thereof as such amounts are determined by the Bankruptcy Court.

"Employees" means all individuals employed by the Debtor as of the Closing Date, whether on a full-time, part-time, temporary, or seasonal basis.

"ERISA" will mean the Employee Retirement Income Security Act.

"ERISA Affiliate" will mean any entity required to be aggregated in a controlled group or affiliated service group with any Seller for purposes of ERISA or the Code (including under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA), at any relevant time.

"Excluded Assets" will have the meaning set forth in Section 2.3 herein.

"Existing Contracts" will mean all oral or written contracts, agreements, real or personal property leases, non-competition agreements, non-disclosure agreement, subleases, licenses, Permits, distribution arrangements, sales and purchase agreements, and purchase and sale orders to which Seller is a party.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Gift Cards" means exclusively the unused portions of Shopify gift cards, whether physical or digital, issued or sold by Seller prior to the Closing Date and redeemable for goods or services at any of the Seller's locations or through Seller's sales channels.

"Governmental Authority" means any United States federal, state, or local, or any foreign, government, governmental regulatory or administrative authority, agency or commission, or any court, tribunal or judicial or arbitral body.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event will include (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any indebtedness and (vii) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"Intellectual Property" means, interchangeably and collectively as the context requires: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) copyrights and copyrightable material; (iii) trademarks, both registered and unregistered; (iv) trade secrets and other confidential information, know-how, customer lists, customer information (excluding EU/UK customer information).

, domains, telephone numbers, email addresses, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (v) all rights with respect to hardware, software, computer programs, computer program code developed by Seller (including source code and executable code), the algorithms underlying any computer program developed by Seller, documentation associated with any software, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(iv); (vi) all social media accounts and related content included on the social media accounts; (vii) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (ix) registrations and applications for any of the foregoing; (viii) the right to sue for past infringement or unauthorized use of any of the foregoing; and (x) all other intellectual property including, but not limited to, the intellectual property included on **Schedule 2.1(c)** attached to this Agreement.

"Inventory" means all inventory of any kind or nature, merchandise and goods related to the Business or Acquired Assets and maintained, held or stored by or for Seller on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including raw materials, components and other parts, work-in-process, finished goods or products, packaging materials and labels, and other stores and supplies used in or held for use in the operation of the Business as conducted by Seller, including any Inventory-In-Transit.

"Inventory-In-Transit" will mean Inventory ordered by and in transit to Seller, but not received by Seller prior to Closing.

Docusign Envelope ID: 1786FD02-7202-4140-B808-29BC41112424

"IRS" will mean the Internal Revenue Service.

"Knowledge" will mean the actual knowledge after reasonable inquiry of the current officers of Seller or that knowledge that would be obtained by a reasonably prudent businessperson after reasonable inquiry.

"Liabilities or Liability" will mean all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether incurred or not yet incurred, whether liquidated or unliquidated, and whether due or to become due), including all liabilities for Taxes with respect to periods prior to the Closing Date (including periods prior to the Petition Date).

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee or continuation of Seller and (iv) any leasehold interest, license or other right, in favor of a Third Party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Effect" means a material adverse effect on the Acquired Assets.

"Non-Executory Contracts" means all of Seller's Existing Contracts which, on the date hereof, Seller has fully performed all duties and obligations thereunder, while the duties and obligations of the other party(ies) to such contracts remain unperformed.

"Order" means any decree, order, injunction, rule, judgment, or consent of or by any Governmental Authority.

"Ordinary Course of Business" will mean the ordinary course of business of Seller consistent with past custom and practice (including with respect to quantity and frequency), taking into account the effect of the filing of the Petition and consequent limitations on Seller's operations.

"Person" will mean any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind whatsoever.

"Petition Date" will mean December 15, 2025.

"Prepetition Obligations" means Seller's Liabilities occurring prior to the Petition Date.

"Purchase Price" will have the meaning as described in Section 2.6 herein.

Docusign Envelope ID: 1786FD02-7202-4140-B808-29BC41112424

"Representative" will mean any attorney, accountant, agent, independent contractor, or other representative.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein.

"Sale Order" means the order of the Bankruptcy Court obtained after proper notice to creditors and parties in interest consistent with the Bankruptcy Code, in form and substance satisfactory to Buyer, to be entered by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens and Claims pursuant to Sections 105 and 363(f) of the Bankruptcy Code; (iii) approving the assumption and assignment to Buyer of the Assumed Executory Contracts pursuant to Section 365(f)(2) of the Bankruptcy Code; (iv) transferring and assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; (vii) providing that the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (viii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (ix) authorizing the results of the Auction, if one occurs.

"Schedules" means the Schedules attached to this Agreement, if any.

"Seller Retail Locations" means all retail store front locations for which Seller independently sells and services Inventory.

"Shopify Payouts" means customer payments made to Shopify for Seller goods or merchandise but not yet made available to Seller or otherwise distributed into a bank account of Seller.

"Software" will mean (i) the Shopify store(s) used in connection with Seller's direct-to-consumer (DTC), wholesale/B2B, and point-of-sale (POS) operations, and (ii) the remaining term and benefit of any other software platforms, applications, or systems used in the Business solely for purposes of data access and migration, provided that no contracts are assigned to Buyer pursuant to this Agreement.

"Taxes" will mean all taxes, duties, charges, fees, registration fees, revenue permit fees, levies, penalties or other assessments imposed by any governmental entity or political subdivision thereof, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value added or gains taxes, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties or additions attributable

thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against the Seller.

"Third Party" means any Person other than Seller, Buyer, and any of their respective Affiliates.

"Warranty Claims" means claims by end-customers residing in the United States arising from written product warranties covering bikes and or parts sold by Seller prior to the Closing Date, solely to the extent (i) such claim amount is equal to the value of a bike or part sold, or less, determined in accordance with Seller's warranty policies as in effect at the time of sale of the bike or part; and (ii) such claim is related to bikes with Safe Shield batteries and those bikes without quick release forks.

**ARTICLE II.**
**PURCHASE AND SALE**

**Section 2.1     Transfer of Assets/Acquired Assets.** Upon the terms and subject to the conditions and provisions contained herein, at the Closing, Seller will sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Buyer, free and clear of all Liens and Claims, and Buyer will acquire and accept from Seller, all right, title and interest in and to all of the assets, properties, business and rights of any and every kind owned by Seller, whether tangible or intangible, real or personal, including, without limitation, the following assets (but exclusive, in all cases, of the Excluded Assets) (all of the assets to be sold, assigned, transferred and delivered to Buyer hereunder, the "Acquired Assets"):

(a)     all machinery, vehicles, equipment, including all electronic bicycle lifts, fixtures, furnishings, trade fixtures, storage and display racks, tools, dies and furniture and other similar items of personal property of Seller ("FF&E") as set forth on the attached **Schedule 2.1(a)**;

(b)     all Inventory, regardless of its location, inventory purchased and held by vendors, Inventory-in-Transit, and including prepaid deposits and expenses;

(c)     all Intellectual Property, including the logos, domains, patents, and trademarks identified in **Schedule 2.1(c)**;

(d)     all rights existing under the Assumed Executory Contracts;

(e)     all Accounts Receivable;

(f)     all deposits or prepayments relating to the Assumed Executory Contracts ;

(h)     any Non-Executory Contracts listed on **Schedule 2.1(h)** to the extent assignable and identified by Buyer to be assigned to it;

(i)     all of Seller's Books and Records relating to any of the Acquired Assets but excluding the Administrative Books and Records;

(j)     all non-disclosure, non-compete, and non-solicitation agreements to which Seller is a party or by which Seller is bound, including as set forth on **Schedule 2.1(j)**; and

(k)     all Compliance Documentation.

**Section 2.2     Assignment and Assumption of Liabilities**

(a)     Buyer will assume the following liabilities of Seller and will be responsible for the payment, performance, or discharge of all of the obligations under the Assumed Executory Contracts first arising after the Closing, the following liabilities only (the "Assumed Liabilities"). Buyer agrees to provide reasonable access to Seller and other third parties to remove any Excluded Assets or other assets not an Acquired Asset that is subject to any Assumed Contract for a period of 30 days after Closing. Following are the Assumed Liabilities:

(1)     any Warranty Claims related to: (a) bike frames for a period of one (1) year following the original customer purchase date, or (b) bike parts for a period of six (6) months following the original customer purchase date, in an aggregate amount not to exceed $1,178,030.89;

(2)     any excise, sales, or other transfer tax arising from or relating to the Seller's sale of the Acquired Assets to Buyer;

(3)     accrued vacation and/or paid-time-off, if any, owed to any of the Employees that Buyer hires/retains;

(4)     Gift Cards issued by Seller prior to the Closing Date, in an aggregate amount not to exceed $1,296,979.00; and

(5)     all liabilities, if any, set forth on **Schedule 2.2(a)(7)**.

(b)     This Section will not limit any claims or defenses Buyer may have against any party other than Seller. The transactions contemplated by this Agreement will in no way expand the rights or remedies of any Third Party against Buyer or Seller as compared to the rights and remedies which such Third Party would have had against Seller absent the Chapter 11 Case had Buyer not assumed such Assumed Liabilities.

(c)     Buyer will indemnify Seller with respect to the Assumed Liabilities, including the obligation to defend, at its cost, any action by any third party to seek recovery from Seller of the Assumed Liabilities.

**Section 2.3     Excluded Assets.** Notwithstanding anything to the contrary in this Agreement, the following assets of Seller will be retained by Seller and are not being sold or assigned to Buyer hereunder (all of the following are referred to herein collectively as the "Excluded Assets"):

(a)     any and all rights, claims, causes of action, including avoidance claims, arising under Chapter 5 of the Bankruptcy Code (a "Bankruptcy Action" and, collectively, the

"Bankruptcy Actions"), and any actions and claims that may exist against any third party that arose prior to the Closing Date;

(b)    Cash (except those provided by Seller with respect to any Assumed Contracts) of the Seller at the time of Closing;

(c)    corporate charter, seals, minute books, stock transfer books and other documents relating solely to the organization, maintenance, and existence of Seller;

(d)    all insurance policies and all of Seller's rights and claims pursuant to or arising under such policies;

(e)    all Existing Contracts which are not Assumed Executory Contracts, including all leases governing the Seller's use and occupancy of its premises (collectively, the "Excluded Contracts");

(f)    any rights of Seller under this Agreement;

(g)    any and all tax refunds that were accrued through operation of the Business prior to the Closing Date;

(h)    all documents and other books and records (financial, accounting and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, (A) that relate exclusively to the Excluded Assets or Unassumed Liabilities, (B) that if transferred as an Acquired Asset would violate any Person's privacy rights under applicable law, or (C) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Chapter 11 Case or this Agreement and the transactions provided for herein;

(i)    computers and servers necessary to allow Seller to complete its required tax returns and the administration of the Chapter 11 Case and more fully described on **Schedule 2.3(i)**;

(j)    Seller's ownership in any subsidiary;

(k)    all refunds, rebates, credits, and other amounts due to Seller related to any Taxes or that arise out of Seller's operation of the Business prior to Closing;

(l)    all EU/UK customer information and data; and

(l)    all proceeds and products of any and all of the Excluded Assets.

**Section 2.4    No Other Liabilities Assumed.** Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Buyer will not assume any obligation of Seller, other than the Assumed Liabilities. In furtherance and not in limitation of the foregoing, neither Buyer nor any of its Affiliates will assume, and will not be deemed to have assumed, any

debt, Claim, obligation or other Liability of Seller whatsoever, including, but not limited to the following (collectively, the "Unassumed Liabilities"):

(a)     all Claims or Liabilities of Seller that relate to the Business, including any arising out of or relating to (i) any non-Safe Shield batteries manufactured, sold, distributed, or placed into commerce prior to obtaining UL certification, and (ii) bikes with quick-release skewer;

(b)     other than liabilities assumed under Assumed Liabilities, all Indebtedness of Seller;

(c)     all Liabilities or obligations of Seller, including any pending or threatened investigation, recall, order or demand relating to any Governmental Authority, resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Seller anywhere or Seller's ownership or lease of any properties or assets or any properties or assets previously used by Seller at any time, or other actions, omissions or events occurring prior to the Closing including without limitation any such Liabilities which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, recall obligation or liability, treaty or other similar authority or (ii) relate to any and all Claims, disputes, demands, actions, liabilities, damages, suits in equity or at law, administrative, regulatory or quasi-judicial proceedings, accounts, costs, expenses, setoffs, contributions, attorneys' fees and/or causes of action of whatever kind or character against Seller, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(d)     any Liability or obligation arising out of any action or proceeding commenced against Seller after the Closing and arising out of, or relating to, any occurrence or event happening prior to the Closing;

(e)     all Claims or Liabilities (whether known or unknown) with respect to the current or former Employees of Seller (except as explicitly assumed in Section 2.2(a)), including, without limitation, payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including, without limitation, any Liability pursuant to the WARN Act for any action or inaction except to the extent action by Buyer is specifically required by the WARN Act;

(f)     any Liability arising under any employee benefit plan of Seller or any other employee benefit plan, program or arrangement at any time maintained, sponsored, or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any liability;

(g)     any Liability under any employment, collective bargaining, severance, retention or termination agreement with any Employee, independent contractor, or contractor (or their representatives) of Seller, except to the extent such Liabilities arise after Closing and arise under an Assumed Executory Contract;

(h)     any Liability of Seller to any shareholder or Affiliate of Seller;

(i) any Liability to indemnify, reimburse or advance amounts to any officer, director, Employee, or agent of Seller;

(j) any Liability to distribute to Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(k) any Liability arising out of or resulting from non-compliance with any law, ordinance, regulation, or treaty by Seller;

(l) any Liability of Seller under this Agreement or any other document executed in connection herewith;

(m) any Liability of Seller based upon such person's acts or omissions occurring after the Closing;

(n) any Liability of Seller for Taxes, including, without limitation, any Liability of Seller in respect of any amount of federal, state or other Taxes (including, without limitation, interest, penalties and additions to such Taxes and any liabilities relating to Taxes arising (i) as a result of Seller at any time being a member of an affiliated group (as defined in Section 1504(a) of the Code) and (ii) under any Tax allocation, sharing, indemnity, or similar agreement with any Person) which are imposed on or measured by the income of Seller for any period; and

(o) any Liability arising out of or resulting from actions taken or not taken by Seller prior to Closing related to the shutdown of any of its operations or facilities or the termination of any of its Employees or independent contractors including any severance obligations.

The Parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement will not create an Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability in accordance with the provisions of Section 2.2 hereof.

**Section 2.6 Purchase Price and Allocation Schedule.** The "**Purchase Price**" for the Acquired Assets is $13,000,000.00 to be paid, in cash, at Closing. The Parties agree that the Purchase Price will be allocated among the Acquired Assets as agreed by the Parties, pursuant to **Schedule 2.6**.

**Section 2.7 Deposit.** Within two (2) Business days of Execution, Buyer will pay to Seller 10% of the Purchase Price to be held and released in accordance with this Agreement (the "**Deposit**").

**Section 2.8 Bid Procedures.** This Agreement is subject to the Bid Procedures and Buyer agrees that it is bound by and will comply fully with the Bid Procedures, including its obligations to serve as a Backup Bidder, and that the Seller, in furtherance of its duty to maximize the value of the assets in the Bankruptcy Case, will conduct a bidding process and, potentially, an auction of Seller's assets, pursuant to the terms of the Bid Procedures. The Parties acknowledge that Buyer's agreement hereunder is subject to third parties submitting higher and better offers, as provided for in the Bid Procedures, and subject to a possible auction process thereunder.

Docusign Envelope ID: 1786FD02-7202-4140-B808-29BC41112424

**Section 2.9    Employee Matters.**

(a)    Except as necessary to comply with Section 2.2(c) and to complete administration of the Chapter 11 Case, in Seller's sole discretion, Seller will terminate the employment of all Employees as of the Closing.

(b)    Buyer will have the right, but not the obligation, to make offers of employment to such of the Employees and on terms as Buyer may elect prior to Closing.

(c)    Except as set forth in Section 2.2(a)(6), Seller will remain liable to the Employees for all payments of wages or other compensation (including vacation pay and bonuses) and other employee benefits and obligations arising at any time out of Seller's employment relationship with the Employees.

It is expressly agreed and understood that neither Buyer nor Seller have any right, power or authority to control, direct or regulate the labor relations and human resources policies and procedures of the other, that neither is deemed to constitute the agent or representative of the other and that neither is liable in any manner whatsoever for the acts or omissions of the other, its agents, representatives or Employees. All of Seller's present or former Employees which Buyer elects to hire, if any, will be "new hires" of Buyer for all purposes.

**Section 2.10   Inventory-In-Transit.** Within three (3) Business Days following Closing, Seller will provide Buyer a schedule of Inventory-In-Transit, including identification of vendors and contact information including phone numbers. Buyer will have full responsibility for payment for Inventory-In-Transit received following Closing and/or for cancellation, if possible, of any pending orders for Inventory-In Transit. Beginning fourteen (14) days prior to Closing, Seller will not issue any new purchase orders except as agreed to by Buyer.

**Section 2.11   Availability, Packaging, and Delivery of Inventory**. Within five (5) business days following the Closing Date (the "**Delivery Period**"), Seller shall, at Seller's sole cost and expense, arrange for the following for all Inventory included in the Acquired Assets:

(a) With respect to Inventory located within Seller Retail Locations, at Seller's sole cost and expense, prepare, package and provide Buyer with access to such locations and permit Buyer and its designated staff, employees, or other representatives to enter upon the premises and remove the packaged Inventory for Buyer's transportation to its separate locations; and

(b) With respect to Inventory in warehouses or otherwise under the control of third-party logistics companies, at Seller's sole cost and expense, package, prepare for shipment, and to the extent required, load Inventory into the Buyer delivery vehicles. Buyer shall be responsible for transportation of Inventory from the warehouses or third-party logistics companies to a place of Buyer's choosing at Buyer's sole cost and expense.

Title to and risk of loss for the Inventory shall remain with Seller until Inventory is loaded into the Buyer delivery vehicles after which risk of loss shall be with Buyer.

## ARTICLE III.
## CLOSING

**Section 3.1    Closing.** Upon the terms and conditions set forth herein and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") will be completed remotely or in such manner as is mutually agreeable to the Parties. The date of Closing is sometimes referred to herein as the "Closing Date."

**Section 3.2    Actions at Closing**. At the Closing, Seller and Buyer will deliver and do (or cause to be delivered and done) the following:

(a)    Instruments and Possession. Seller will deliver to Buyer:

(i)    one or more Bills of Sale conveying in the aggregate all of the owned personal property of Seller included in the Acquired Assets, duly executed by Seller;

(ii)    possession of all tangible Acquired Assets owned by or in the possession of Seller (excluding any such items that are Excluded Assets); and

(iii)    one or more Assignment and Assumption Agreements providing for the assignment and assumption of the Assumed Executory Contracts, duly executed by Seller.

(b)    Form of Instruments. To the extent that the form of any document to be delivered hereunder is not attached as an exhibit hereto, such documents will be in form and substance, and will be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

**Section 3.3    Transaction Expenses.** Each Party will bear its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1    Organization and Authorization.** Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware. Subject to the entry of the Sale Order, (i) this Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)), and (ii) each agreement or instrument which has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation

Docusign Envelope ID: 1786FD02-7202-4140-B808-29BC41112424

of Seller, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

**Section 4.2    No Violation.** Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Seller do not and will not (i) conflict with or result in any breach of any of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in the creation of any Lien upon any of the Acquired Assets or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, under the provisions of the articles of incorporation, by-laws or other constitutive documents of Seller.

**Section 4.3    Governmental Consents and Approvals.** Except for the Sale Order, there are no consents, waivers, agreements, approvals, permits or authorizations of, or declarations, filings, notices or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where the failure to so obtain would not be reasonably expected to have a Material Adverse Effect. In addition, Seller represents that is has given all required notices under the WARN Act.

**Section 4.4    Title to Assets**

(a)    Seller has good and marketable title to, or a valid leasehold interest in, the Acquired Assets.

(b)    Subject to Bankruptcy Court approval, Seller has the power and the right to sell, assign and transfer the Acquired Assets, and Seller will sell and deliver to Buyer, and upon consummation of the transactions contemplated by this Agreement Buyer will acquire good and marketable title to the Acquired Assets free and clear of all Liens and Claims.

**Section 4.5    Legal Compliance.** As to the Acquired Assets, Seller has complied in all material respects, and is in material compliance, with all applicable laws, ordinances, rules, requirements and regulations of foreign, federal, state and local governments and agencies thereof relating to the ownership of the Acquired Assets. Seller has complied in all material respects with all applicable laws, ordinances, rules, requirements and regulations relating to data protection and/or privacy, and no notices have been received by, and no claims have been filed against, Seller alleging a violation of any such laws, ordinances, rules, requirements or regulations.

**Section 4.6    As Is, Where Is.** Except as expressly set forth herein, the Acquired Assets are sold "As Is, Where Is", without warranty of any kind, and except for the representations and warranties set forth in this Article IV, no other representation or warranty is made or implied hereby, including a warranty of fitness for a particular purpose, a warranty of merchantability, or otherwise. EXCEPT AS EXPLICITLY SET FORTH HEREIN, SELLER MAKES NO EXPRESS

WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES, OR THE BUSINESS.

## ARTICLE V.
### REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

**Section 5.1    Organization.** Buyer is a Nevada corporation, duly organized, validly existing and in good standing under the laws of the State of Nevada.

**Section 5.2    Authorization.** Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other company proceedings on the part of Buyer are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)). Each agreement or instrument which has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

**Section 5.3    Governmental Consents and Approvals.** To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or thereby.

**Section 5.4    No Violation.** The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational documents of Buyer or (ii) conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

**Section 5.5     Cure Costs**. Any Cure Costs due with respect to Assumed Executory Contracts will be paid by Buyer at Closing.

**Section 5.5     Available Funds to Close.** Buyer has available funds to close the transactions contemplated by and as set forth in this Agreement, and the availability of these available funds is not contingent or subject to any condition other than the conditions explicitly set forth in this Agreement.

## ARTICLE VI.
## ADDITIONAL COVENANTS

**Section 6.1     Maintenance of Assets.** Seller will, to the extent permitted by the Bankruptcy Court and consistent with reasonable commercial business practices, but without any obligation to pay or otherwise discharge Prepetition Obligations, (a) maintain the Acquired Assets in their current state of repair, excepting normal wear and tear, (b) operate the Business at each Acquired Location in the Ordinary Course of Business based on its status as a debtor in a Chapter 11 bankruptcy, and (c) maintain the insurance covering the Acquired Assets in effect on the date hereof until Closing.

**Section 6.2     Best Efforts; Further Assurances**

(a)     Seller will use its reasonable best efforts to timely obtain any other consent required for the consummation of the transactions contemplated by this Agreement as soon as practicable.

(b)     Seller will execute such documents and use its reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, to put Buyer in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Buyer, to confirm the title of the Acquired Assets in Buyer, to assist Buyer in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties, to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby); provided, however, that the foregoing will not require Seller to make any payments to any party unless necessary to accomplish the transfers contemplated by this Section. Seller will use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VII of this Agreement. The obligations of Seller set forth in the first sentence of this Section will survive the Closing.

**Section 6.3     Avoidance Action Covenant of Seller**. Effective as of the Closing Date and subject to entry of the Sale Order, the Seller, on behalf of itself and the Bankruptcy Estate, **IRREVOCABLY WAIVES, RELEASES, AND COVENANTS NOT TO ASSERT, COMMENCE, OR PROSECUTE ANY AVOIDANCE ACTION AGAINST ANY PERSON THAT IS NOT AN INSIDER (AS DEFINED IN SECTION 101(31) OF THE BANKRUPTCY CODE) OF THE DEBTOR WITH RESPECT TO ANY TRANSFER, PAYMENT, OR OBLIGATION OCCURRING PRIOR TO THE CLOSING.**

## ARTICLE VII.
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Seller in accordance with Section 11.4.

**Section 7.1     Covenants and Representations.** The representations and warranties of Buyer contained in Article V hereof which are not qualified as to materiality (or Material Adverse Effect) will be true and correct in all material respects and the representations and warranties of Buyer contained in Article V hereof which are qualified as to materiality (or Material Adverse Effect) will be true and correct in all respects, in each case as of the Closing Date, as though made on such date (except that representations and warranties that speak as of a specific date need be true and correct only as of such date), and the Buyer will have performed in all material respects all of the covenants, agreements and conditions required by this Agreement to be performed, satisfied and complied with by it hereunder on or prior to the Closing.

**Section 7.2     Bankruptcy Condition.** The Sale Order will have been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and will not have been stayed or subject to any stay.

**Section 7.3     Deliveries.** On or prior to the Closing Date, Buyer has delivered to Seller all of the following:

(a)     a duly-executed copy of the Assumption and Assignment Agreement;

(b)     a duly-executed copy of the Bill of Sale;

(c)     a certificate from Buyer in a form reasonably satisfactory to Seller, dated the Closing Date, stating that the conditions specified in Section 7.1 have been satisfied;

(d)     the Deposit; and

(e)     the Purchase Price in accordance with Section 2.6.

## ARTICLE VIII.
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Buyer in accordance with Section 11.4:

**Section 8.1     Representations and Warranties.** The representations and warranties of Seller contained in Article IV hereof will be true and correct in all material respects as of the

Closing Date as though made on such date (except that representations and warranties that speak as of a specific date need be true and correct only as of such date).

**Section 8.2    Covenants and Agreements.** The Seller will have performed in all material respects all of the covenants, agreements and conditions required by this Agreement to be performed, satisfied, and complied with by it hereunder on or prior to the Closing.

**Section 8.3    Bankruptcy Condition.** The Sale Order shall have been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and shall not have been stayed or subject to any stay.

**Section 8.4    Litigation.** No action, suit or other legal proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages in respect thereof.

**Section 8.5    Deliveries.** On or prior to the Closing Date, Seller shall have delivered to Buyer all of the following:

(a)    a duly-executed copy of the Assumption and Assignment Agreement;

(b)    a duly-executed copy of the Bill of Sale; and

(c)    a certificate in a form reasonably satisfactory to Buyer, dated the Closing Date, stating that the conditions specified in Section 8.1 have been satisfied as of the Closing.

## ARTICLE IX
## POST-CLOSING COVENANTS

**Section 9.1. Access to Books, Records, and Personnel.** Inasmuch as some of Seller's books, records, and documents are to be included in the Acquired Assets and some are to be retained by Seller, i.e. Administrative Books and Records, and one Party may need access the books, records, and documents held by the other Party after the Closing, each Party must maintain (or provide for a designated representative to maintain) for at least one year after the Closing (or for any longer period applicable law requires) the respective books, records, and documents sold or retained under this Agreement relating to the Acquired Assets and covering periods on or before the Closing. During this one-year period, subject to the confidentiality rights of third parties, each Party's authorized representatives (to be identified on or before the Closing) may inspect and make copies of any books, records, and documents held by the other Party during normal business hours and on reasonable notice for any reasonable business purpose. If necessary, each Party must make its authorized representative(s) available to the other Party during normal business hours and on reasonable notice to facilitate such inspection and copying.

**Section 9.2. Use of Intellectual Property and Name.** Seller agrees that, after the Closing Date, it shall not use or employ in any manner, directly or indirectly, any of the Intellectual Property, including but not limited to, the name "Rad Power Bikes" as a trade name, trademark, Internet domain name, or in any other manner whatsoever. As soon as practicable following the Closing Date, Seller will take all actions as are necessary and appropriate to change the name of

Seller to remove any reference to the word "Rad" or "Rad Power" or any variation thereof, provided, however, that the filing of any required documents with the appropriate governmental agencies shall be completed within ten (10) Business Days after the Closing.

**Section 9.3. Privacy Policy.**  Buyer agrees to comply in all material respects with Seller's privacy policy (except with regards to all EU/UK customers information and data which it is not purchasing and will not take possession of) in place on the Closing Date with respect to personally identifiable information, as defined in the Bankruptcy Code with regard to all existing such information available on the Closing Date.

# ARTICLE X.
# TERMINATION

**Section 10.1   Termination.** This Agreement may be terminated prior to the Closing:

(a)      At any time by mutual written consent executed by both Buyer and Seller;

(b)      By Buyer if Seller is in breach of any material covenant, representation, undertaking or warranty that, if curable, is not cured within ten (10) calendar days after written notice from Buyer, or if a condition set forth in Article VIII is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)      By Seller if Buyer is in breach of any material covenant, representation or warranty that, if curable, is not cured within ten (10) calendar days after written notice from Seller, or if it appears that a condition set forth in Article VII is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date.

**Section 10.2   Obligations on Termination.** In the event of termination of this Agreement pursuant to Section 10.1:

(a)      no Party hereto shall have any liability or obligation to the other Party hereto, any of its creditors and equity holders or any other Party except in accordance with Section 10.2(b);

(b)      the Deposit shall, within three (3) Business Days of the termination of this Agreement, be released as follows:

(i)      If this Agreement is terminated pursuant to Section 10.1(a) or (b), the Deposit will be wire transferred to an account designated by Buyer.

(ii)     In the event this Agreement is terminated pursuant to Section 10.1(c), the Deposit will be retained by Seller.

If this Agreement terminates under Section 10.1 above, the Parties agree that the release of the Deposit and the payment of the other amounts payable pursuant to Section 10.2 shall be in the

nature of liquidated damages and shall be the sole and exclusive remedy of Buyer, Seller and/or Seller's Bankruptcy Estate, whether at law or in equity, for any breach by Buyer or Seller, as the case may be, or any of their respective members, managers, affiliates and/or representatives, of the terms and conditions of this Agreement.

Section 10.3   **Effect of Termination or Breach.** If the transactions contemplated hereby are not consummated, this Agreement will become null and void and of no further force and effect, except for the obligations of the Parties contained in this Article X, and except that the termination of this Agreement for any cause will not relieve any Party hereto from any liability which at the time of termination had already accrued to any other Party hereto or which thereafter may accrue in respect of any act or omission of such Party prior to such termination.

# ARTICLE XI.
## MISCELLANEOUS

Section 11.1   **Assignment; Successors.** Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either Party without the prior written consent of the other; provided, however, (i) Buyer may assign some or all of its rights under this Agreement to any Affiliate of Buyer, so long as Buyer remains liable for its obligations and (ii) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective representatives, heirs, legatees, successors and permitted assigns, including without limitation any Chapter 11 trustee appointed in the Chapter 11 Case, and no other person will have any right, benefit or obligation hereunder.

Section 11.2   **Notices.** Any notice, request, demand, waiver, consent, approval, or other communication (collectively, a "Communication") that is required or permitted to be given to any Party under this Agreement will be valid only if it is in writing (whether or not this Agreement expressly provides for it to be in writing) and given to that Party by electronic mail transmission, hand delivery, overnight mail with delivery confirmation, or certified mail with signature requirement at the mailing address or electronic mail address set forth below or to any other mailing address or electronic mail address as a Party designates by written notice given in the manner provided in this Section:

|  |  |
|---|---|
| If to Buyer: | Retrospec |
|  | Attn: Ely Khakshouri, Chief Executive Officer |
|  | 3827 S. Carson St., PMB #2014 |
|  | Carson City, NV 89701 |
|  | Email: ely@retrospec.com |
|  |  |
| With a copy to: | Cairncross & Hempelmann, P.S. |
|  | Attn: Jennifer Faubion |
|  | 24 2nd Avenue, Suite #500 |
|  | Seattle, WA 98104 |

|              |                                                        |
|--------------|--------------------------------------------------------|
| If to Seller: | Rad Power Bikes Inc                                   |
|              | Attn: Angy Smith, Chief Executive Officer and Helen Cho, |
|              | General Counsel                                        |
|              | Email: Angy.smith@radpowerbikes.com and               |
|              | helen.cho@radpowerbikes.com                           |
|              |                                                        |
| With a copy to: | Jay Kornfeld/Aimee Willig                          |
|              | Bush Kornfeld LLP                                      |
|              | 601 Union St.                                         |
|              | Seattle, WA 98101                                     |
|              | (206) 292-2110                                        |
|              | jkornfeld@bskd.com                                    |
|              | awillig@bskd.com                                      |

or to such other place and with such other copies as either Party may designate by written notice to the others. Notice shall be deemed complete as follows: if the Communication is by electronic mail transmission or overnight mail, the next Business Day; if the Communication is by certified mail, the next Business Day after confirmed receipt.

**Section 11.3   Choice of Law; Submission to Jurisdiction.** This Agreement will be construed and interpreted, and the rights of the Parties determined in accordance with, the laws of the State of Washington. Each Party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in Section 11.2. The Parties irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby and any such dispute will be deemed to have arisen in the State of Washington. Each Party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

**Section 11.4   Entire Agreement; Amendments and Waivers.** This Agreement, together with all exhibits and schedules attached or to be attached hereto, constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties with regard to the subject matter hereof. All amendments of this Agreement will only be effective if executed in writing by or on behalf of the Parties by authorized representative(s). No waiver of any of the provisions of this Agreement will be effective unless made in a writing by the Party making the waiver or be deemed or constitute a waiver of any other provision hereof (whether or not similar), nor will such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 11.5   Construction.** The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of

Docusign Envelope ID: 1786FD02-7202-4140-B808-29BC41112424

this Agreement, and will not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections, paragraphs, or clauses herein will be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules will be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached are made a part hereof. All terms defined herein will have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to "this Agreement" will be deemed to include the Exhibits and Schedules attached hereto. The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision will be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "including" when used herein will mean "including, without limitation." Wherever in this Agreement the singular number is used, the same will include the plural, and the masculine gender will include the feminine and neuter genders, and vice versa, as the context requires.

Section 11.6  **Third Party Beneficiaries.** No Person other than the Parties, will have any rights or claims under this Agreement.

Section 11.7  **No Waiver.** The failure of either Party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of this Agreement by the other will not be a waiver of the breach or failure to perform, nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

Section 11.8  **Execution in Counterparts.** A Party may deliver executed signature pages to this Agreement by facsimile transmission or by electronic mail transmission to the other Party, and may bear signatures affixed electronically (i.e. DocuSign or any electronic signature platform with a signature certificate or equivalent complying with the U.S. federal SIGN Act of 2000), which facsimile copy or electronic copy will be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which counterparts together will constitute one agreement with the same effect as if the Parties had signed the same signature page.

Section 11.9  **Invalidity.** In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, will, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability will not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

Section 11.10  **Further Assurances.** Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute, or cause to be executed, such documents, instruments or conveyances and take such actions as may be reasonably requested by the other Party to effectuate the purposes of this Agreement, including, without limitation, such instruments as are reasonably requested by Buyer to vest in Buyer title in and to the Acquired Assets in accordance with the provisions of this Agreement.

**Section 11.11 Cumulative Remedies.** All rights and remedies of either Party hereto are cumulative of each other and of every other right or remedy such Party may otherwise have at law or in equity, and the exercise of one or more rights or remedies will not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

**Section 11.12 Representation by Counsel; Mutual Negotiation.** Each Party has been represented by counsel of its choice in negotiating this Agreement. This Agreement will therefore be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to either Party.

**Section 11.13 Post-Closing Dispute Resolution.** Either Party may submit to the Bankruptcy Court any controversy, claim or dispute of whatever nature between the Parties arising out of or relating to this Agreement after the Closing that is not resolved within thirty (30) days after written notice by one Party to the other of such controversy, claim or dispute. The Parties agree that the Bankruptcy Court will have exclusive jurisdiction to resolve such controversy, claim or dispute; provided, however, that upon the entry of a final decree in cases by the Bankruptcy Court, all disputes arising out of or relating to this Agreement (except as otherwise provided herein) will be brought in a state or federal court located in either King County for state court matters and the Eastern District of Washington for federal court matters. The Bankruptcy Court will award a Party that prevails in full its reasonable attorneys' fees and costs and will award a Party that prevails less than in full that portion of its reasonable attorneys' fees and costs as determined by the Bankruptcy Court.

**Section 11.14 Exhibits and Schedules**. The following are the exhibits and schedules for this Agreement:

Exhibit A – Form of Assignment and Assumption Agreement

Exhibit B – Form of Bill of Sale

Schedule 2.1(a) – FF&E

Schedule 2.1(c) – Intellectual Property

Schedule 2.1(h) – Non-Executory Contracts

Schedule 2.2(a)(5) - Non-Disclosure, Non-Compete, and Non-Solicitation Agreements.

Schedule 2.2(a)(7) – Assumed Liabilities

Schedule 2.3(i) – Computers and Servers with Tax Documentation

Schedule 2.6 – Allocation of Purchase Price

Schedule 2.7(a) – Estimated Inventory at Closing

*[**Signature page follows**]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the Effective Date.

**SELLER:**

**RAD POWER BIKES INC.**

By: _Angelina Smith (signature)_

Name: Angelina Smith

Its: Chief Executive Officer

**BUYER:**

**XANDER BICYCLE CORPORATION, A NEVADA CORPORATION D/B/A RETROSPEC**

By: _Ely Khakshouri (signature)_

Name: Ely Khakshouri

Its: Chief Executive Officer